# Exhibit E:

# Police Accountability Task Force Report



# POLICE ACCOUNTABILITY TASK FORCE

## Recommendations for Reform:

Restoring Trust between the Chicago Police
and the Communities they Serve

REPORT

April 2016



# Table of Contents

Acknowledgements .................................................................................................................................... iv

Glossary of Terms ...................................................................................................................................... v

Executive Summary ................................................................................................................................... 1

    The Tipping Point ................................................................................................................................. 2

    The Work of the Police Accountability Task Force ............................................................................... 4

    Community Engagement ...................................................................................................................... 5

    How did we get to this point? Some Overarching Findings ................................................................ 6

    Other Key Findings By Working Group .............................................................................................. 13

    Recommendations ............................................................................................................................. 17

    How We Propose to Empower People ............................................................................................... 17

    How We Propose to Address the Inadequate Emphasis on Accountability ....................................... 18

    How We Propose to Address Other Systemic and Longstanding Problems ....................................... 19

    Next Steps ......................................................................................................................................... 19

    Is Real Reform Possible? ................................................................................................................... 20

Context ..................................................................................................................................................... 22

    U.S. Department of Justice Investigation .......................................................................................... 22

    Prior Task Forces ............................................................................................................................... 23

    National & Local Conversation on Policing ....................................................................................... 25

    Broader Challenges Facing Chicago .................................................................................................. 26

    Basic Facts About CPD's Structure .................................................................................................... 27

Community-Police Relations ................................................................................................................... 32

    How have CPD's actions created mistrust in communities of color? ................................................. 32

    Is CPD doing enough to combat racial bias? .................................................................................... 43

    How should CPD involve the community in its policing efforts? ........................................................ 51

    Are CPD officers adequately equipped to interact with youth? ........................................................ 54

    Is CPD doing enough to protect human and civil rights? ................................................................. 56

Legal Oversight & Accountability ........................................................................................................... 63

    How does the existing police oversight system work? ...................................................................... 64

    Why does the community not have a role in the police oversight system? ........................................ 68

What are the barriers to identifying police misconduct? The Code of Silence and beyond. ..................... 69

Why are investigations ineffective and biased? ............................................................................................. 77

Why is it so hard to impose discipline on an officer? .................................................................................... 84

Why aren't the police held accountable through the courts and other systems? ...................................... 89

**Early Intervention & Personnel Concerns** .................................................................................................. **96**

Why does CPD lack a culture of accountability when it comes to the internal management of its police officers? .................................................................................................................................................................. 96

What are the current internal mechanisms for holding CPD's officers accountable for their conduct? .. 99

Why are these current CPD accountability systems ineffective? ................................................................ 101

What is the right tool for CPD to use to hold police officers and their supervisors accountable on a range of issues, including use of force and respectful interactions with citizens? ................................... 105

**De-Escalation** ...................................................................................................................................................... **115**

Why are so few 911 calls to OEMC identified as mental health-related? ................................................... 117

What is CPD's current approach to mental health crisis response? Don't they have a Crisis Intervention Team Program? Why isn't it working? ............................................................................................................. 120

Why aren't all identified mental health crisis calls getting a CIT response? ............................................... 121

Why are so many people with mental illnesses having repeat contacts with CPD and ending up in the criminal justice system? ...................................................................................................................................... 123

Why are we only treating people after they are in crisis? ............................................................................. 126

How are police escalating trauma, including at crime scenes? .................................................................... 127

**Video Release Policy** ......................................................................................................................................... **131**

Why does the City not immediately release all video, audio and police reports on every police shooting or death in custody? ........................................................................................................................................... 131

**Overarching Issues** ............................................................................................................................................ **137**

Does CPD's training need significant overhaul? ........................................................................................... 137

Are there enough Sergeants to effectively supervise the large number of patrol officers? ................... 140

Why aren't all CPD officers already wearing body cameras? ...................................................................... 141

**Disclaimer** ........................................................................................................................................................... **143**

**Appendix 1** ................................................................................................................**144**

    Police Accountability Task Force Members ........................................................................ 144

**Appendix 2** ................................................................................................................**145**

    Police Accountability Task Force Working Group Members ....................................................... 145

**Appendix 3** ................................................................................................................**148**

    Police Accountability Task Force Interviews ..................................................................... 148

**Appendix 4** ................................................................................................................**153**

    Community Relations Working Group Checklist ................................................................. 153

**Appendix 5** ................................................................................................................**155**

    Oversight Working Group Flowchart ............................................................................. 155

**Appendix 6** ................................................................................................................**158**

    Oversight Working Group Checklists .............................................................................. 158

    Collective Bargaining Agreement Checklist ...................................................................... 159

    Civilian Police Investigative Agency Checklist ................................................................... 161

    IRPA Recommendation Checklist ................................................................................. 164

    Independent Inspector General for Public Safety Checklist ..................................................... 165

    Community Safety Oversight Board Checklist .................................................................... 169

    Selection Methodology for Community Safety Oversight Board ................................................. 170

    Selection for Community Safety Oversight Board Checklist ..................................................... 171

**Appendix 7** ................................................................................................................**173**

    Early Intervention & Personnel Concerns Working Group Checklist ............................................ 173

**Appendix 8** ................................................................................................................**175**

    Early Intervention System – Identifying Triggers ................................................................ 175

**Appendix 9** ................................................................................................................**179**

    De-Escalation Working Group Checklist .......................................................................... 179

**Appendix 10** ..............................................................................................................**180**

    Proposed Video Release Policy ................................................................................... 180

**Appendix 11** ..............................................................................................................**183**

    Overarching Recommendations Checklist ........................................................................ 183

# Acknowledgements

**This report reflects the contributions of hundreds of people. The Task Force is grateful for everyone's support in this collaborative effort. While we have tried to capture everyone here and in the appendices to this report, we have inevitably missed some, and apologize for any omissions.**

## WORKING GROUPS

Forty-six men and women from diverse backgrounds volunteered their time and expertise to serve on our Working Groups. They conducted research, interviewed experts and developed and drafted recommendations. Working Group members are listed in Appendix 2.

## INTERVIEWS

The Task Force and Working Groups interviewed more than 100 national and local experts, as well as citizens of Chicago young and old. The interviewees provided invaluable insight to the Task Force's work. Their names and affiliations are found in Appendix 3.

## EMPLOYERS

The Task Force members would like to thank their employers and staff who gave them the time and support necessary to do this work. At Mayer Brown LLP, Paul Theiss, Chairman, and Rebecca Eisner, Partner in Charge of Mayer Brown's Chicago office, allocated a significant amount of staffing resources and in-kind contributions; Abigail M. Bartine, Matthew Sostrin and Gail Tang spent countless hours researching, drafting and formatting the report. At Hinshaw & Culbertson LLP, Kevin Burke, Chairman, and Robert Shannon, Managing Partner, assigned three attorneys and a paralegal to participate in working groups. At DePaul University, Nichole Pinkard, Associate Professor in the College of Computing and Digital Media, supported Sybil Madison-Boyd's participation as a Task Force member. The leadership of NAMI Chicago, John F. Kennedy, NAMI Chicago Outside General Counsel and Vice President Board of Directors, Eddy Eisenberg, Board President, and Jennifer Koehler, Board of Directors, supported Alexa James in her role as Task Force member and provided in-kind contributions.

## STAFFING SUPPORT

The Task Force's work was also made possible by the generosity and contributions of time and talent of individuals as well as non-profit organizations and private funders. The Civic Consulting Alliance, led by Brian Fabes, CEO, provided the following team to assist the working groups: Antonio Benecchi, David Byrd, Danielle Harbison, Lisa Reijula, Yen-Li Thompson and Asheley Van Ness. Communications and public engagement support was provided by Grisko LLC, Adorn Mitchell, Wynona Redmond, Jeff Riley, Delores Robinson and Jennifer Solomon. The University of Chicago Crime Lab provided interns who conducted countless hours of research. Lisa Schneider Fabes served as the project manager.

## FORUM HOSTS

More than 750 people attended one of the Task Force's four community forums, sharing their experiences and ideas. The forums were hosted by Reverend Jonny L. Miller with Mt. Vernon Baptist Church, Rose Joshua with the South Side NAACP, Maria Socorro Pesqueira with Mujeres Latinas en Acción and Principal Juan Carlos Ocón of Benito Juarez Community Academy, and Charles Hardwick with the Howard Area Community Center and Principal Chad Adams of Sullivan High School. The forums were moderated by Darryl Denard and Matt McGill with iHeart media and Sol Flores, Executive Director of La Case Norte.

# Glossary of Terms

| | |
|---|---|
| **ACT** | Assertive Community Treatment |
| **BIA** | Bureau of Internal Affairs |
| **BIS** | Behavioral Intervention System |
| **CAPS** | Chicago's Alternative Police Strategy |
| **CBA** | Collective Bargaining Agreement |
| **CDPH** | Chicago Department of Public Health |
| **CEED** | Community Empowerment and Engagement Districts |
| **CIT** | Crisis Intervention Team |
| **CLEAR** | Citizen and Law Enforcement Analysis and Reporting |
| **CPD** | Chicago Police Department |
| **CPIA** | Civilian Police Investigative Agency |
| **CPS** | Chicago Public Schools |
| **CR** | Complaint Register |
| **CRU** | Crisis Response Unit |
| **CSMP** | Comprehensive Stress Management Program |
| **CSU** | Crisis Stabilization Unit |
| **EIS** | Early Intervention System |
| **FOP** | Fraternal Order of Police |
| **FTO** | Field Training Officer |
| **IAD** | Internal Affairs Division |
| **IPP** | Individualized Performance Plan |
| **IPRA** | Independent Police Review Authority |
| **MEU** | Mental Evaluation Unit |
| **MHCRU** | Mental Health Critical Response Unit |
| **OEMC** | Office of Emergency Management Communications |
| **PC** | Personnel Concerns |
| **PPO** | Probationary Police Officer |
| **SPAR** | Summary Punishment Action Request |
| **TRR** | Tactical Response Report |

# Executive Summary

*"The police need to know who they work for – the community. The authority that they have belongs to the people."[1]*

**A painful but necessary reckoning is upon us. That is what these times demand.**

The Police Accountability Task Force arose amidst a significant and historic public outcry. The outcry brought people into the streets, on social media and on other venues to say in a very clear voice that they had reached a breaking point with the entire local law enforcement infrastructure. People were and are demanding accountability and real and lasting change. The outcry was not localized in any particular neighborhood or demographic, although communities of color and those ravaged by crime added some of the most poignant commentary.

The Task Force immediately understood that one of our most important responsibilities was to actively seek out, listen and respond to voices from all over Chicago who had much to say about their personal and often painful experiences with the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA") and other parts of the local policing infrastructure, as well as their frustrations and lack of confidence in political actors. What we have heard has been humbling. As we dug deeper into the complaints of so many about the callous and disrespectful way in which they had been treated by some officers, we also understood that we had an important duty to lay bare the systemic and sanctioned practices that led to the deaths of fellow citizens and the deprivation of the rights of so many others. We have borne witness to many hard truths which have profound and lasting impacts on the lives and hopes of individuals and communities. Our recommendations are intended to be responsive to the people, empower the people and to specifically identify a range of changes that are essential to building trust, accountability and lasting change.

As part of our work, the Task Force heard from many current and former CPD officers who are dedicated public servants, committed to performing their duties lawfully and making Chicago a safer place for all of its residents. Serving as a police officer is a challenging and often dangerous job. The police face an increasingly daunting challenge in crime fighting. Illegal guns flood the streets of the same neighborhoods that are devastated by crime, poverty and unemployment. We as a society cannot expect the police to cure every ill in Chicago's neighborhoods. Yet we put significant pressure on them to solve and prevent crime, as well as to address the manifestations of a number of other daunting social and economic challenges beyond their charge and capacity to manage, let alone solve. Still, a keen appreciation of and sensitivity to these broader issues is critical to effective law enforcement and positive community-police relations.

The findings and recommendations in this report are not meant to disregard or undervalue the efforts of the many dedicated CPD officers who show up to work every day to serve and protect the community. The challenge is creating a partnership between the police and the community that is premised upon respect and recognizes that our collective fates are very much intertwined. Simply put, a more professional, engaged and respectful police force benefits us all. We cannot and have not shied away

from identifying systemic problems or challenges that undermine the efforts of those officers who are sincerely committed to doing their jobs the right way. To be sure, individual officers must own responsibility for not merely their actions each day, but also the reverberating and sometimes corrosive and lingering effect of those actions on citizens. And ultimately, the responsibility for setting the correct course lies with CPD leadership itself.

The City and in particular CPD would do well to embrace the necessary changes to address the systemic problems in CPD and not simply hope that this storm will pass. It will not and ignoring this opportunity will exacerbate an already volatile set of circumstances. CPD in particular must face the problems in order to fix them.

## The Tipping Point

On the night of October 20, 2014, the too short and very tragic life of Laquan McDonald ended when Chicago Police Officer Jason Van Dyke shot him. One of the last officers to arrive at the scene of a call about someone damaging cars, Van Dyke came out of his vehicle, gun raised and immediately fired off 16 shots. The first shot hit McDonald and he immediately fell to the ground. While he lay motionless, Van Dyke continued to unload his clip, firing 16 shots in all into McDonald's body. All of this was captured on police videotape.

Initial reports of the shooting were superficial and false. The false narrative about the shooting originated with comments from the scene by former Fraternal Order of Police spokesperson, Pat Camden. Camden claimed to reporters that:

> *"Officers got out of their car and began approaching McDonald, again telling him to drop the knife." "The boy lunged at police, and one of the officers opened fire."*[2]

> *"[O]fficers were forced to defend themselves."*[3]

> *"[McDonald] is a very serious threat to the officers, and he leaves them no choice at that point but to defend themselves."*[4]

The next day CPD put out a statement that said McDonald "refused to comply with orders to drop the knife and continued to approach the officers." Camden later acknowledged to the Washington Post that his information was *"hearsay, . . . basically." "I have no idea where it came from. It was being told to me after it was told to somebody else who was told by another person, and this was two hours after the incident."*[5]

Also, other on-scene officers repeated the same false narrative. These officers uniformly said that McDonald posed an imminent threat immediately before Van Dyke shot him:[6]

### *From P.O. Jason Van Dyke:*

> *"McDonald was holding the knife in his right hand, in an underhand grip, with the blade pointed forward. He was swinging the knife in an aggressive, exaggerated manner. Van Dyke ordered McDonald to 'Drop the knife!' multiple times. McDonald ignored Van Dyke's verbal direction to drop the knife and continued to advance toward Van Dyke. When McDonald got to within 10 to 15 feet of Officer Van Dyke, McDonald looked toward Van Dyke. McDonald raised the knife across his chest and over his shoulder, pointing the knife at Van Dyke. Van Dyke*

*believed McDonald was attacking Van Dyke with the knife, and attempting to kill Van Dyke. In defense of his life, Van Dyke backpedaled and fired his handgun at McDonald, to stop the attack. McDonald fell to the ground but continued to move and continued to grasp the knife, refusing to let go of it. Van Dyke continued to fire his weapon at McDonald as McDonald was on the ground, as McDonald appeared to be attempting to get up, all the while continuing to point the knife at Van Dyke."*

### *From P.O. Joseph Walsh, Van Dyke's partner:*

*"Walsh ordered McDonald to 'Drop the knife!' multiple times as McDonald approached the officers.... McDonald ignored the verbal direction given by both Walsh and Officer Van Dyke, and continued to advance toward the officers. When McDonald got to within 12 to 15 feet of the officers he swung the knife toward the officers in an aggressive manner. Van Dyke opened fire with his handgun and McDonald fell to the ground. Van Dyke continued firing his weapon at McDonald as McDonald continued moving on the ground, attempting to get up, while still armed with the knife.... Officer Walsh said he believed McDonald was attacking Walsh and Officer Van Dyke with the knife and attempting to kill them when the shots were fired."*

### *From P.O. Dora Fontaine:*

*"Fontaine heard the officers repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal direction and instead, raised his right arm toward Officer Van Dyke, as if attacking Van Dyke. At this time Van Dyke fired multiple shots from his handgun, until McDonald fell to the ground and stopped moving his right arm and hand, which still grasped the knife."*

### *From P.O. Ricardo Viramontes:*

*"Viramontes heard Officer Jason Van Dyke repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal direction and turned toward Van Dyke and his partner, Officer Joseph Walsh. At this time Van Dyke fired multiple shots from his handgun. McDonald fell to the ground but continued to move, attempting to get back up, with the knife still in his hand."*

### *From P.O. Daphne Sebastian:*

*"Officers Joseph Walsh and Jason Van Dyke exited their vehicle and drew their handguns. McDonald turned toward the two officers and continued to wave the knife. Sebastian heard the officers repeatedly order McDonald to 'Drop the knife!' McDonald ignored the verbal directions and continued to advance on the officers, waving the knife. Officer Sebastian heard multiple gunshots and McDonald fell to the ground, where he continued to move. Sebastian did not know who fired the shots...."[7]*

IPRA referred the investigation of the shooting to the Cook County State's Attorney in November 2014. Thereafter, by early December 2014, the case had been referred to the U.S. Attorney's Office and the Federal Bureau of Investigation. The federal grand jury investigation remains pending.

Not until thirteen months later—after a pitched legal battle doggedly pursued by local investigative journalists resulted in the court-ordered release of the dash-cam video of the shooting—did the public learn the truth: McDonald made no movements toward any officers at the time Van Dyke fired the first shot, and

McDonald certainly did not lunge or otherwise make any threatening movements. The truth is that at the time Van Dyke fired the first of 16 shots, Laquan McDonald posed no immediate threat to anyone.

The civic outrage that followed gave voice to long-simmering anger not just about McDonald, but the deaths of others at the hands of the police, including Rekia Boyd, Ronald Johnson and, more recently, Quintonio LeGrier, Betty Jones and Philip Coleman. The deaths of numerous men and women of color whose lives came to an end solely because of an encounter with CPD became an important rallying cry. That outrage exposed deep and longstanding fault lines between black and Latino communities on the one hand and the police on the other arising from police shootings to be sure, but also about daily, pervasive transgressions that prevent people of all ages, races, ethnicities and gender across Chicago from having basic freedom of movement in their own neighborhoods. Stopped without justification, verbally and physically abused, and in some instances arrested, and then detained without counsel—that is what we heard about over and over again. Many of those voices came from young people who are on the frontlines of daily encounters with the police whether on the streets or in schools. Far too many of our residents are at daily risk of being caught up in a cycle of policing that deprives them of their basic human rights.

McDonald's shooting became the tipping point for long-simmering community anger. The videotape was painful, horrific and illuminating in ways that irrefutably exemplified what those in communities of color have long said, and shocked and stirred the conscience of those in other neighborhoods. The videotape itself, the initial official reaction, which but for the efforts of the journalist community likely would have relegated McDonald's death to less than a footnote in the over 400 police-involved shootings of citizens since 2008, coupled with the 13-month delay in the release of the videotape—all underscored and exposed systemic institutional failures going back decades that can no longer be ignored. These failures manifest themselves in various ways:

- Death and Injury at the Hands of the Police
- Random But Pervasive Physical and Verbal Abuse By the Police
- Deprivation of Basic Human and Constitutional Rights
- Lack of Individual and Systemic Accountability

## The Work of the Police Accountability Task Force

This moment that we are in requires each of us to ask difficult but necessary questions. Questions that reject the status quo, the accepted way of doing business, and which look beyond an individual incident to the larger systemic policies, practices and procedures that spawn, support and protect the kind of corrosive behavior played out every day by the police on the streets.

The Task Force took on this challenge. We heard the chorus of voices from all over Chicago who demanded answers, accountability and change. In conducting our work, the Task Force has been guided by a mission adopted early on:

> **To lay the foundation for the rejuvenation of trust between the police and the communities they serve by facing hard truths and creating a roadmap for real and lasting transparency, respectful engagement, accountability and change.**

The Task Force formed five Working Groups consisting of people from all over Chicago to address the following topics:

**Community Relations**, focusing on the need to bridge the gulf in relations between the police and the communities they serve, beginning with a review of the CPD's policies, procedures and practices with respect to addressing racism and racial bias, training, community policing, protecting human and civil rights and accountability and transparency.

**Legal Oversight & Accountability**, examining impediments to true accountability in the legal infrastructure, such as state statutes, collective bargaining agreements, general orders and other policies and procedures, and comparing Chicago's police oversight system with national best practices and models in other cities.

**Early Intervention & Personnel Concerns**, designing a personnel management system that identifies, rewards and models exemplary conduct while flagging problem behaviors and intervening at the earliest possible stage.

**De-Escalation**, addressing how police officers should de-escalate situations to minimize the use of force, including de-escalation and related issues where officers encounter citizens experiencing mental health crises.

**Video Release Policies**, developing a commonsense policy for the release of video, audio and other evidence related to serious police actions that balances the public's right to know with law enforcement's need to investigate these incidents without compromising critical evidence.

The Working Groups were made up of a broad and diverse range of 46 Chicagoans that included professionals and subject matter experts, such as those in police training, civil rights and mental health, as well as elected officials, faith leaders and community activists.[8] The collective and individual contributions have been significant and have enriched the work in innumerable ways. Through its Working Groups, the Task Force conducted more than 100 discussions with organizations and individuals with subject matter expertise, experience and relevant information and perspectives to share.[9] These conversations included current and former CPD officers and supervisors, police and other government officials in other cities, judges and civil rights lawyers, professors, researchers and community activists.[10]

The Task Force is deeply grateful to all those who participated in this process. The voices of those who joined us in interviews and discussions, sent comments, letters and position papers, and turned out at community forums provided the foundation for this work.

## Community Engagement

Based on the belief that real and lasting change is possible only when the people most affected by policing have a voice, community engagement was central to our work. In order to lay the foundation for building trust between the police and the communities they serve, the Task Force engaged in a robust community engagement process. That process included:

- Community members as active participants in our Working Groups.
- Individual and small group discussions with subject matter experts.

- Four community forums for residents to speak directly with the Task Force.
- Reading comments submitted by mail, through the website, by social media and at the forums.

The forums took place on the West, South, and North Sides and in Pilsen and were attended by over 750 residents. In planning the forums, the Task Force reached out to 95 community groups, 63 elected officials and 83 religious institutions. We also hosted three youth forums with high school students from throughout the City and discussed their perspectives on interactions with the police, both in their schools and in their neighborhoods.

## How did we get to this point? Some Overarching Findings.

*"If you are not severely and wholeheartedly dealing with racism, you are not going to get to the bottom of this issue."[11]*

We arrived at this point in part because of racism.

We arrived at this point because of a mentality in CPD that the ends justify the means.

We arrived at this point because of a failure to make accountability a core value and imperative within CPD.

We arrived at this point because of a significant underinvestment in human capital.

### RACISM

The Task Force heard over and over again from a range of voices, particularly from African-Americans, that some CPD officers are racist, have no respect for the lives and experiences of people of color and approach every encounter with people of color as if the person, regardless of age, gender or circumstance, is a criminal. Some people do not feel safe in any encounter with the police. Some do not feel like they have the ability to walk in their neighborhoods or drive in their cars without being aggressively confronted by the police. The consistent theme of these deeply-held beliefs came from a significant cross-section of people: men and women, young, middle-aged and older, doctors, lawyers, teachers and other professionals, students, and everyday workers. Regardless of the demographic, people of color loudly expressed their outrage about how they are treated by the police.

These encounters leave an indelible mark. Long after the officer moves on to chase the next call or make the next stop, the citizen involved remains affected and if the encounter involved physical or verbal aggression, even if there was no arrest, there is a lasting, negative effect.

The linkage between racism and CPD did not just bubble up in the aftermath of the release of the McDonald video. Racism and maltreatment at the hands of the police have been consistent complaints from communities of color for decades. And there have been many significant flashpoints over the years—the killing of Fred Hampton (1960s), the Metcalfe hearings (1970s), federal court findings of a pattern and practice of discriminatory hiring (1970s), Jon Burge and his midnight crew (1970s to 1990s), widespread disorderly conduct arrests (1980s), the unconstitutional gang loitering ordinance (1990s), widespread use of investigatory stops and frisks (2000s) and other points. False arrests, coerced confessions and wrongful convictions are also a part of this history. Lives lost and countless more

damaged. These events and others mark a long, sad history of death, false imprisonment, physical and verbal abuse and general discontent about police actions in neighborhoods of color.

## THE ENDS JUSTIFYING THE MEANS

There are too many neighborhoods in Chicago that are devastated by crime and abject poverty. In those areas, aside from a recommitment to investments in jobs, education and many other important community anchors, those residents need the protection of the police. However, CPD's own data and other information strongly suggests that CDP's response to the violence is not sufficiently imbued with Constitutional policing tactics and is also comparatively void of actual procedural and restorative justice in the day-to-day encounters between the police and citizens.

CPD's own data gives validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color.

**Police Officers Shoot African-Americans At Alarming Rates:** Of the 404 shootings between 2008-2015:[12]

- 74% or 299 African Americans were hit or killed by police officers, as compared with
- 14% or 55 Hispanics;
- 8% or 33 Whites; and
- 0.25% Asians.

For perspective, citywide, Chicago is almost evenly split by race among whites (31.7%), blacks (32.9%) and Hispanics (28.9%).[13]



**Police Officers Disproportionately Use Tasers Against African-Americans:** Of the 1,886 taser discharges by CPD between 2012 and 2015, African-Americans were the target of those discharges at a very high rate[14]:

- 76% or 1,435 African-Americans were shot with tasers;
- 13% or 254 Hispanics;
- 8% or 144 Whites; and
- 0.21% or 4 Asians.



Beyond the use of force with guns and tasers, CPD's dependence on investigatory stops as an essential part of its policing strategy has only served to worsen already fractured community relations.

**Traffic Stops:** In 2013,

- 46% of 100,676 traffic stops involved African-Americans;
- 22% involved Hispanics;
- 27% involved Whites.[15]



Moreover, black and Hispanic drivers were searched approximately four times as often as white drivers, yet CPD's own data show that contraband was found on white drivers twice as often as black and Hispanic drivers.



**Other Street Stops:** In the summer of 2014, CPD stopped more than 250,000 people—93.6 for every 10,000 City residents—in encounters not leading to arrests.[16] (This figure dwarfs the number of stops by New York City police, which from 2011-2014, stopped anywhere between 1.6 and 22.9 people per 10,000.)

Of those 250,000 people stopped by CPD in the summer of 2014,

- 72% were African American;
- 17% were Hispanic;
- 9% were White; and
- 1% were Asian.



A 2015 survey of 1,200 Chicago residents, ages 16 and older, also found significant racial disparities in the number of police-initiated stops and the perception of abusive police behavior.[17] The survey found that **almost 70%** of young African-American males reported being stopped by police in the past 12 months, and 56% reported being stopped on foot.[18]



The survey found that "[m]ost people stopped by Chicago police are not ticketed, arrested or taken to a police station." [19] In addition, the survey established "large racial disparities in the use of force reported by respondents."[20] The survey revealed that "15% of Blacks and 17% of Hispanics reported being shoved or pushed around, in contrast to 6% of Whites. [Blacks] were twice as likely as whites to be threatened by a weapon. Compared to whites, all other groups were at least twice as likely to have been subjected to some form of force before being released."[21]

The overuse of investigatory stops has left a lingering, negative perception of the police in communities of color, in part because for people of color, a significant number of those stops also involved actual or threatened physical abuse.[22]

## FAILURE TO MAKE ACCOUNTABILITY A CORE VALUE AND IMPERATIVE

Going back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority. Currently, neither the non-disciplinary interventions available nor the disciplinary system are functioning.

The public has lost faith in the oversight system. Every stage of investigations and discipline is plagued by serious structural and procedural flaws that make real accountability nearly impossible. The collective bargaining agreements provide an unfair advantage to officers, and the investigating agencies—IPRA and CPD's Bureau of Internal Affairs—are under-resourced, lack true independence and are not held accountable for their work. Even where misconduct is found to have occurred, officers are frequently able to avoid meaningful consequences due to an opaque, drawn out and unscrutinized disciplinary process.

**Complaints go uninvestigated.** From 2011-2015, 40% of complaints filed were not investigated by IPRA or BIA.



**INDEPENDENT POLICE REVIEW AUTHORITY**
COMPLAINTS                                    2011–2015

SUSTAINED 7%
NO AFFIDAVIT 40%
NOT SUSTAINED 37%
UNFOUNDED 15%
EXONERATED 1%

IN THE LAST 5 YEARS **40%** OF COMPLAINTS WERE NEVER FULLY INVESTIGATED

**DEFINITIONS KEY**

**NO AFFIDAVIT**
Allegation was never fully investigated.
**SUSTAINED**
Allegation was supported by sufficient evidence to justify disciplinary action.
**NOT SUSTAINED**
Allegation lacked sufficient evidence needed to prove or disprove.
**UNFOUNDED**
Allegation was not based on the facts revealed through investigation, or the reported incident did not occur.
**EXONERATED**
Incident occurred, but the action taken by the officer(s) was deemed lawful and proper.

**Arbitrators reduce or void disciplinary recommendations.** In 2015, arbitrators reduced disciplinary recommendations in 56.4% of cases and eliminated any discipline in 16.1% of cases. In total, arbitrators reduced or eliminated discipline in 73% of cases.



**No risk management regarding lawsuits.** There continues to be an unacceptably high number of lawsuits filed against the City and individual police officers every year. Despite this persistent problem, which results in the outlay of tens of millions of dollars every year, CPD does not employ a systematic tool for evaluating risk issues identified in lawsuits.





**High number of CPD officers with significant CRs.**
The enduring issue of CPD officers acquiring a large number of Complaint Registers ("CRs") remains a problem that must be addressed immediately. From 2007-2015, over 1,500 CPD officers acquired 10 or more CRs, 65 of whom accumulated 30 or more CRs. It is important to note that these numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.



Any one of these metrics in isolation is troubling, but taken together, the only conclusion that can be reached is that there is no serious embrace by CPD leadership of the need to make accountability a core value. These statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself. The absence of accountability benefits only the problem officer and undermines officers who came into the job for the right reasons and remain dedicated to serving and protecting. Sadly, CPD collects a significant amount of data that it could readily use to address these very troubling trends. Unfortunately, there is no systemic approach to addressing these issues, data collection is siloed and individual stakeholders do virtually nothing with the data they possess. Simply put, there is no ownership of the issue within CPD leadership or elsewhere, and thus there have been no substantive efforts to address these problems which continue to cost taxpayers tens of millions of dollars each year. These figures demand immediate change.

## SIGNIFICANT UNDERINVESTMENT IN HUMAN CAPITAL

The problems that the Task Force has identified have their origins in systemic failings going back many years. These failings touch:

- **Recruitment of Young Officers.** Chicago remains one of the most segregated cities in the country. CPD recruits from those segregated neighborhoods, but has fallen woefully short in acknowledging and addressing the fact that for many young recruits, the Training Academy may be their first substantive experience with someone who is of a different race or ethnicity.

- **Training Officers To Address Conscious and Unconscious Bias in the Daily Discharge of Their Responsibilities.** While CPD has made significant strides in addressing cultural literacy in the Academy's Procedural Justice training and Crisis Intervention Team ("CIT") training, much more needs to be done. Fundamentally, there needs to be a real commitment to Constitutional policing strategies and tactics that strike the appropriate balance between keeping our communities safe without trampling on basic Constitutional and human rights. This important value must be embedded into all training, on an annual basis. Serving and protecting cannot mean that the rights of certain communities or individuals must be sacrificed.

- **Absence of Other Investments.** If there is a real commitment to cultural change within CPD, the balance will shift when there are adequate resources devoted to training. Currently, aside from annual firearms certification and sporadic training sessions, there is no mandatory training on any other topic.

This means that after an officer leaves the Academy, he can serve his entire career without ever receiving any annual, mandatory training of any kind. An astounding fact, particularly in light of recent sea changes in policing strategies and technology.

What limited post-Academy training happens is primarily delivered through roll-call videos. Roll call was derisively described by one officer as "day care," meaning that officers slept, checked their smartphones or otherwise paid little attention to what was happening. Compounding this problem is that there are no metrics used to determine the level of comprehension or retention of the topic reflected in the video training. What also seems certain is that the level of attention given to the videos is not required to be reinforced with any training materials for the roll-call commander and rarely are officers afforded an opportunity to ask follow-up questions or otherwise access FAQs or other materials to reinforce the training. Also, CPD has a large portfolio of training videos that officers can access through a web-based portal, but no effort is made to even track the number of times officers access those training videos. And in recent memory, there has been no effort to survey officers to assess the areas in which they need training.

Right now, the community has no role in any of the training done either in the Academy or thereafter. Cities across the country recognize that community involvement in training is an important element and yet another way to bridge the gap between the police and the communities they serve.

Also, service as an Academy instructor is not sufficiently valued within CPD and some instructors are teaching while under investigation for a range of alleged offenses. The Academy's physical space is also woefully inadequate to meet current and future needs. For example, the recent mandatory Taser training is being conducted in the hallways of the Academy because there is simply no other space available.  The physical structure that houses the Academy is antiquated, cramped and cannot accommodate even current needs, let alone the increased training that will be necessary to make real cultural change. The constraints of the physical space negatively impact the effectiveness of training.

## Other Key Findings By Working Group

### COMMUNITY-POLICE RELATIONS

The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particuarly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself.

CPD is not doing enough to combat racial bias. Policies need further clarification, as it is not clear whether and when officers may use race as a factor when initiating stops. While CPD collects a fair amount of data, little is reported to the public. CPD still has significant work to do to diversify its ranks, especially at supervisory levels. And more needs to be done to train officers to acknowledge and address their biases and deploy officers who are culturally competent and have a proper understanding of the communities they are assigned to serve.

Historically, CPD has relied on the Community Alternative Policing Strategy ("CAPS") to fulfill its community-policing function. The CAPS brand is significantly damaged after years of neglect. Ultimately,

community policing cannot be relegated to a small, underfunded program; it must be treated as a core philosophy infused throughout CPD.

CPD officers are not adequately equipped to engage with youth. The existing relationship between CPD and youth—particularly youth of color—is antagonistic, to say the least. Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by those who have sworn to protect and serve them.

Finally, CPD is not doing enough to protect human and civil rights. Providing arrestees access to counsel is a particular problem. In 2014, only 3 out of every 1,000 arrestees had an attorney at any point while in police custody. In 2015, that number "doubled" to 6. The City's youth are particularly vulnerable and often lack awareness of their rights.

## LEGAL OVERSIGHT & ACCOUNTABILITY

Chicago's police accountability system is broken. The system is supposed to hold police officers accountable to the people they serve and protect by identifying potential misconduct, investigating it and, when appropriate, imposing discipline. But at every step of the way, the police oversight system is riddled with legal and practical barriers to accountability.

IPRA is badly broken. Almost since its inception, there have been questions about whether the agency performed its work fairly, competently, with rigor and independence. The answer is no. Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers. Up until recently, the agency has been run by former law enforcement, who allowed leadership to reverse findings without creating any record of the changes. IPRA has lost the trust of the community, which it cannot function without.

Imposing discipline on officers guilty of misconduct has also been a challenge. Existing policies and the woefully inadequate oversight regarding how discipline is imposed have allowed far too many officers to receive little or no discipline even after a complaint is sustained. Discipline is not handed down evenly, and there are several layers in the process where discipline is often reduced.

The collective bargaining agreements between the police unions and the City have essentially turned the code of silence into official policy. The CBAs discourage reporting misconduct by requiring affidavits, prohibiting anonymous complaints and requiring that accused officers be given the complainant's name early in the process. Once a complaint is in the system, the CBAs make it easy for officers to lie if they are so inclined —they can wait 24 hours before providing a statement after a shooting, allowing them to confer with other officers, and they can amend statements after viewing video or audio evidence. In many cases, the CBAs also require the City to ignore or even destroy evidence of misconduct after a certain number of years.

The community has long been shut out of Chicago's police oversight system. Meaningful engagement with the community—and giving the community power in the oversight system—is critical to ensuring that officers are held accountable for misconduct.

Finally, in the current system, there is no entity to police the police oversight system itself. There is no way to know if existing entities are performing their jobs with rigor and integrity, and no entity is equipped to identify and address systemic changes regarding patterns and practices of misconduct or bias, or to

analyze policies and procedures to prevent future problems. Police inspectors general—often called auditors—have emerged nationally in response to a growing belief that traditional oversight agencies would benefit from having a second set of eyes to ensure that they perform as they should.

## EARLY INTERVENTION AND PERSONNEL CONCERNS

The community is rightfully skeptical that enough is being done within CPD to adequately supervise and identify officers whose actions are falling short of expectations. There is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of how to identify and handle problem officers.

CPD currently collects a variety of data on issues related to officer performance—including complaints and lawsuits—but does little to holistically analyze officer performance and intervene when troubling patterns emerge. Data collection is incomplete. Distribution, analysis and follow-up is limited.

Although supervisors have potentially-invaluable tools for managing each of the officers under their charge through a Performance Recognition System and a dashboard program, this monitoring and intervention system is not working. There are no mandatory requirements that supervisors use the system to analyze data or intervene in officer misconduct. Review of the data is entirely discretionary—or it is at least treated that way. Supervisors are not required to input information to explain the data or take any action in response to the data they receive. As a result, there is no way to know if supervisors are even using the dashboard, much less how they are using it. There do not appear to be any enforcement mechanisms to ensure supervisors use the program and, according to our interviews, the system is considered far from mandatory. In fact, our interviews with officers and supervisory personnel indicate that the dashboard has not been functional so far in 2016.

In recent years, CPD's two formal early intervention programs—the Behavioral Intervention System ("BIS") and Personnel Concerns ("PC")—have rarely been used. In 2007, 276 officers were included in either BIS or PC. Participation quickly dropped off after FOP filed a grievance against CPD for certain officers' inclusion. CPD and FOP settled the grievance by agreeing to remove officers from the programs. By 2013, *zero* officers were being actively managed through either of those programs. In 2014, only 7 officers were enrolled in the program. In 2015, 13 officers were enrolled.



**NUMBER OF OFFICERS** IN BEHAVIORAL INTERVENTION AND PERSONNEL CONCERNS PROGRAMS *COMBINED*

276  219  134  82  22  13  0  7  13

2007 ⟶ 2015

There are many national models to design a more effective early intervention system, including systems mandated by Department of Justice consent decrees. Chicago has a lot of catching up to do. Advances in technology and data analysis allow police departments to identify officers who may be in need of interventions and to respond appropriately. It is imperative that CPD have a system in place that allows for a 360-degree view of the activity and conduct of its officers. The system should allow CPD to identify problematic behaviors at the earliest possible instance so that it can get officers back on track or, if necessary, manage them out of the department before it is too late. This is an essential component in re-establishing legitimacy with the community.

## DE-ESCALATION

Unfortunately, there have been many examples of CPD encounters with citizens in rountine situations that have gone tragically wrong. There are also widespread reports from people all over Chicago that some officers approach these same routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language. It is critically important that each officer approach every encounter with a citizen with respect and a commitment to the sanctity of life.

In addition, there have increasingly been situations in which police response to calls involving persons experiencing mental health crises ended with devastating results. OEMC must be able to identify calls and encounters that are mental-health related and respond with appropriate resources.

Emergency calltakers and dispatchers are a critical component of mental health crisis response, but they are ill-equipped to identify mental health calls and dispatch appropriate resources. OEMC personnel receive only one hour of annual training about crisis intervention and mental health, and their (understandable) focus on speedy dispatches often hinders accurate identification of mental health calls and the quality of response.

In 2005, following a series of highly publicized shootings of persons with mental illnesses, CPD established a CIT program to train officers on addressing individuals in mental health crises. Officers can take a 40-hour course to become CIT-certified. The CIT program has had a number of positive outcomes, but only 15% of CPD officers are CIT-certified. This is not enough to ensure that there are enough CIT-certified officers to respond to mental health calls.

Even when officers have CIT training, they have limited options to divert those living with mental illness to healthcare providers instead of jail. Currently, the only diversion option is the emergency room at various hospitals. More often, officers take individuals to Cook County Jail, which has become one of the largest mental health treatment providers in the nation. When officers do transport individuals to designated emergency room drop-offs, they often see the same person back in their beat hours or days later, with no change in their behavior. This is a poor use of manpower and resources.

Police officers are too often the first responders to those living with mental illness and experiencing a crisis. Most people living with mental illness do not receive treatment, in large part due to the shrinking mental healthcare safety net. The mental health system focuses on chronic care management for people who are living with severe, disabling mental illnesses. It does not address early intervention that might encourage recovery and avoid long-term disability. Without these less intensive, recovery-promoting services, persons living with mental illness fail to get timely treatment until their symptoms are so severe as to require costly crisis management.

**VIDEO RELEASE**

On February 16, 2016, the Task Force released on an expedited basis a policy for the public release of video and audio recordings of certain critical incidents involving police officers. The Mayor immediately adopted the policy. Before the adoption of the policy, the practice in Chicago was generally to withhold from public release any video recording of a police incident until investigations, whether criminal or merely disciplinary, were concluded. The absence of a clear, written policy led to inconsistencies, confusion and mistrust on the part of the public, as well as a proliferation of expensive and time-consuming litigation conducted under the Freedom of Information Act. In many cases, it also left the public in the dark about matters of serious public interest.

## Where do we go from here?

**Task Force Recommendations.** The Task Force's Report contains observations and findings about a range of issues that likely have never been seen before by the public, or at least never been addressed so openly. The recommendations, if adopted, will fundamentally change the way in which the public engages with the police, create more effective oversight and auditing, and create a transparent system of accountability and responsibility for all stakeholders. We have not solved all problems, but we have created a blueprint for lasting change.

Our recommendations are designed to address the root causes of the issues facing CPD, IPRA and other stake holders.

## How We Propose to Empower People.

- Create a **Community Safety Oversight Board**, allowing the community to have a powerful platform and role in the police oversight system.
- Implement a citywide **Reconciliation Process** beginning with the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination, and making a public commitment to cultural change.
- **Replace CAPS with localized Community Empowerment and Engagement Districts (CEED) for each of the city's 22 police districts**, and support them accordingly. Under CEED, district Commanders and other leadership would work with local stakeholders to develop tailored community policing strategies and partnerships.
- **Renew commitment to beat-based policing and expand community patrols** so that officers learn about and get to know the communities they serve, and community members take an active role in partnering with the police.
- **Reinvigorate community policing as a core philosophy and approach** that informs actions throughout the department.
- **Evaluate and improve the training officers receive with respect to youth** so that they are prepared to engage in ways that are age-appropriate, trauma-informed and based in a restorative justice model.

- Require CPD and the police oversight system to be more **transparent** and release to the public incident-level information on arrests, traffic and investigatory stops, officer weapon use and disciplinary cases.
- **Host citywide summits** jointly sponsored by the Mayor and the President of the Cook County Board to develop and implement comprehensive criminal justice reform.
- Encourage the Mayor and President of the Cook County Board to work together to develop and implement programs that address **socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.**
- Adoption of a citywide protocol allowing arrestees to make **phone calls to an attorney and/or family member(s) within one hour of arrest**.
- Implementation of citywide **"Know Your Rights" training** for youth.

## How We Propose to Address the Inadequate Emphasis on Accountability.

- Create a dedicated **Inspector General for Public Safety**, which would independently audit and monitor CPD and the police oversight system, including for patterns of racial bias.
- **Replace the Independent Police Review Authority with a new and fully transparent and accountable Civilian Police Investigative Agency**, which will enhance structural protections, powers and resources for investigating serious cases of police misconduct, even in the absence of sworn complaints. The new CPIA should ensure an accessible, professional and supportive complaint process.
- Implement a data-driven, best-in-class **Early Intervention System for CPD to identify officers with problems** before they become problems for the community.
- Fundamentally **change provisions in the collective bargaining agreements** that are impediments to accountability, such as allowing for anonymous complaints, eliminating the ability to change statements after reviewing video and removing the requirement to destroy complaint records.
- Fully **implement the first-in-the-nation written video release policy** for officer-involved shootings.
- **Expand CPD's body cam** pilot program.
- Require that **all disciplinary information be provided online** so that citizens can track complaints and discipline histories.

## How We Propose to Address Other Systemic and Longstanding Problems.

- Establish for the first time in Chicago a **Deputy Chief of Diversity and Inclusion in CPD**.

- Implement policies to **dismantle the institutionalization of the police "code of silence,"** including substantial changes to the collective bargaining agreements between the police and the City, ending command channel review, reforming the role of CPD supervisors and pattern and practice analysis.

- **Establish a smart 911 system** for OEMC, allowing residents to pre-enter information on mental health or other issues that would be instantly available to OEMC operators.

- **Create a multi-layer co-responder system** where mental health providers work with OEMC and CPD to link individuals to treatment.

- **Expand significantly the Crisis Intervention System** for CPD and other first responders.

- **Create a "Mental Health Critical Response Unit"** within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency co-ordination and data collection.

- **Create a hotline for CPD members**, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.

While we address some statistics regarding the use of force by CPD officers, in deference to the U.S. Department of Justice's ongoing pattern and practice investigation, we did not conduct a detailed analysis of CDP's use of force practices. But as statistics on police shooting of civilians, taser discharges and other troubling practices like shooting at cars, at the backs of fleeing suspects and the range of off-duty incidents involving weapons discharges all make plain, there must be a fundamental re-thinking of the current use-of-force policies. The Task Force heard over and over: just because you *can* use force, does not mean you *should* use force. The community must also be at the table for this conversation. The primary guiding principle of CPD's use of force policies and practices must be sanctity of all lives.

The full list of recommendations can be found throughout the Task Force Report as well as in stand alone recommendation checklists in the appendices.

## Next Steps

The publishing of this Report is a point of departure for the next phase of work in fixing the system of policing in Chicago. This report is just a blueprint of the work necessary to reform structures that have for too long gone on unchecked and fundamentally unchanged. The citizens, elected officials and others in public life in Chicago now must take this report and act on it. We have outlined many steps that will require decisions, planning and action from many different actors, including the Mayor, City Council and CPD. Moreover, to make fundamental change, a broad range of stakeholders—including Cook County bodies, State legislators, community and faith organizations, advocates, philanthropic organizations and the community—all need to embrace the need for change and do their part.

For the Mayor and City Council, we expect that policies, ordinances and procedures will be adopted in the next 90 to 180 days to take aggressive steps to implement the recommendations within this Report. We hope that someone within each branch of government will lay out a timeline for delivering what we have outlined as necessary, and set up an accountability structure for ensuring that action is taken and changes are implemented. For CPD, there is much that can be done immediately and it will only inure to the benefit of the new leadership to adopt as many changes—including both policies and practices—described here, as quickly as is practicable. We encourage Cook County and State legislators to join the effort, as policing reform in Chicago impacts both the region and state, and many of our recommendations affect other areas of Illinois.

The challenge is broader but no less important for advocates, community and faith organizations, philanthropy and the broader community. From this moment we hope that these individuals and groups will push for and demand that the police accountability system in Chicago change, whether they agree with our recommendations or not. We further hope that all who have labored over or otherwise been affected by these issues will continue to ensure that their voices are heard in this debate and that this moment for change does not pass. Finally, we hope that these bodies will think about and consider a design for the path ahead. The Task Force cannot say exactly what should happen next in this debate. It is to the government and the people of Chicago—through the bodies outlined above and others—to determine where we go from here.

## Is Real Reform Possible?

Reform is possible if there is a will and a commitment. But where reform must begin is with an acknowledgement of the sad history and present conditions that have left the people totally alienated from the police, and afraid for their physical and emotional safety. And while many individuals and entities have a role to play, the change must start with CPD. CPD cannot begin to build trust, repair what is broken and tattered unless—from the top leadership on down—it faces these hard truths, acknowledges what it has done at the individual and institutional levels and earnestly reaches out with respect. Only then can it expect to engage the community in a true partnership.

## Endnotes

[1] Comment from Sullivan High School Community Forum (Feb. 25, 2016).

[2] Quinn Ford, Cops: Boy, 17, Fatally Shot by Officer After Refusing to Drop Knife, Chicago Tribune (Oct. 21, 2014), *available at* http://www.chicagotribune.com/news/local/breaking/chi-chicago-shootings-violence-20141021-story.html.

[3] *Id*.

[4] CBS2 Chicago, Marissa Bailey reporting (Oct. 21, 2014); ABC7 Chicago, Tanja Babich reporting (Oct. 21, 2014).

[5] Mark Berman, Why Did Authorities Say Laquan McDonald Lunged at Chicago Police Officers? Washington Post (Nov. 25, 2015), *available at* https://www.washingtonpost.com/news/post-nation/wp/2015/11/25/why-did-authorities-say-laquan-mcdonald-lunged-at-chicago-police-officers/.

[6] As reported by Detective David Marsh who interviewed the various responding officers, including Van Dyke. *See* Case Supplementary Reports, *available at* http://www.nbcchicago.com/investigations/Laquan-McDonald-Police-Report-Dashcam-360644211.html.

[7] All of these officers and others are the subject of an investigation being conducted by the City's Office of Inspector General.

[8] The Working Group members are identified in Appendix 2.

[9] The Civic Consulting Alliance provided invaluable staffing to support the Task Force. The research team disseminated hundreds of law enforcement policies from across the nation, consent decrees involving other cities and research reports from a variety of leading experts and organizations. As part of its work, the Task Force also made over 100 data and document requests to the City of Chicago. Many are available on the Task Force website at https://chicagopatf.org/resources/research-documents/

[10] The individuals interviewed by the Working Groups are identified in Appendix 3.

[11] Comment from Pamela Hunt, Mt. Vernon Baptist Church Community Forum (Feb. 2, 2016).

[12] Data provided by IPRA.

[13] United States Census Bureau, QuickFacts, Chicago, Illinois, *available at* http://www.census.gov/quickfacts/table/PST045215/1714000.

[14] *Id.*

[15] CPD Traffic Stops and Resulting Searches in 2013, ACLU of Illinois (Dec. 2014), *available at* http://www.aclu-il.org/wp-content/uploads/2014/12/Report-re-CPD-traffic-stops-in-2013.pdf.

[16] Stop and Frisk Practices in Chicago, ACLU of Illinois (Mar. 2015), *available at* http://www.aclu-il.org/wp-content/uploads/2015/03/ACLU_StopandFrisk_6.pdf.

[17] Wesley G. Skogan, Chicago Community Survey, Preliminary Survey of Findings (Dec. 29, 2015). The survey respondents were "selected from randomly chosen residential addresses throughout the city. They were questioned in their homes by professional interviewers from the Survey Research Laboratory of the University of Illinois-Chicago.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

# Context

Before addressing the Task Force's findings and recommendations, it is important to set the context for our work. While we were doing our work, the U.S. Department of Justice was investigating CPD as well. We are also not the first "task force" to evaluate CPD, which has a history of great accomplishment as well as scandal resulting in reform efforts. Moreover, many of the issues discussed in this report are not unique to Chicago, as issues of race and policing have received significant national attention in recent years. At the same time, policing in Chicago involves several overarching challenges that must be taken into account. Finally, a basic understanding of CPD's current structure, training and promotion system is important to contextualize the issues addressed in this report.

## U.S. Department of Justice Investigation

On December 7, 2015, six days after Mayor Emanuel appointed the Task Force, the U.S. Department of Justice announced that it had opened a civil pattern or practice investigation into CPD. By statute, it is unlawful for police "to engage in a pattern or practice of conduct … that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[23] The Department of Justice can bring civil suits for relief "to eliminate the pattern or practice."[24] The Department of Justice notified CPD that its investigation "will focus on CPD's use of force, including racial, ethnic and other disparities in use of force, and its systems of accountability."[25] Given the Department of Justice's focus, the Task Force has not conducted a detailed analysis of CPD's use-of-force practices.

A pattern or practice proceeding is a powerful tool, but the process "typically takes years" from start to finish.[26] From 2009-2015, the Department of Justice opened 23 pattern or practice investigations. Of the larger police departments investigated, the first stage of the process alone—investigating and issuing findings—took anywhere from eight months to three plus years: Cleveland Division of Police (19 months); Las Vegas Metropolitan Police Department (8 months); Miami Police Department (20 months); New Orleans Police Department (10 months); Newark Police Department (38 months); Seattle Police Department (9 months); and Baltimore Police Department (11 months and counting). The implementation of remedies takes more time. And CPD is far larger than any of these departments.

The Task Force views its findings and recommendations as complementary to the Department of Justice's ongoing investigation. Given the likely length of the federal process, the Task Force's report presents an opportunity to begin immediately the process of improving transparency, respectful engagement and accountability. Since early December, the Department of Justice has been well aware of the scope of the Task Force's work. With the issuance of this report, the Department of Justice can decide whether and how to take the Task Force's findings and recommendations—and the City's and CPD's efforts to implement them—into account when it releases its own findings.

## Prior Task Forces

CPD dates back to 1835, when the Town of Chicago was first authorized to establish its own police force. The City of Chicago was incorporated two years later. Since then, CPD has not been immune to the corruption that has often plagued City government.

We are at least the sixth "task force" to recommend reforms to CPD. These reform efforts typically occurred in response to corruption-related scandals. Though some of these reforms led to the police oversight system that is in place today, few if any prior task forces have been charged with broadly reviewing community-police relations and the patchwork oversight system that has developed over time. Nonetheless, there are a number of issues and themes associated with these prior reform efforts that resonate today. This Task Force has a unique opportunity to ensure that CPD and its oversight system are structured to ensure that the core values of respectful engagement and accountability are given the priority they deserve.

The first body commissioned to review CPD that we identified dates back to 1898. At that time, Governor Tanner appointed the "Berry Committee" to examine the City's compliance with a civil service law that was supposed to ensure that positions in CPD were filled based on merit.[27] The Berry Committee concluded that "the administration now in force in Chicago is unalterably opposed to the merit system and has done everything in its power to destroy the law and nullify its provisions and has made it a mockery, a byword and a sham."[28] The administration "remove[d] from office competent and capable men without any cause, in order to appoint their own friends to office," leading to the appointment of "many men of unsavory reputation and mental and physical unfitness."[29] The Berry Committee found that CPD "should be removed … as far as possible[] from politics" and that police officers should "be retained alone upon their merits and discharged only for cause."[30]

In 1911, Mayor Harrison directed the Chicago Civil Service Commission to investigate connections between CPD and "various criminal classes," including gamblers.[31] The Commission found that "there is, and for years has been, a connection between [CPD] and the various criminal classes in the city of Chicago."[32] Because gambling was so widespread, CPD's "Gambling Squad itself was not above suspicion, either on account of palpable stupidity or deliberate collusion with the gambling fraternity."[33] The Commission also noted lax discipline throughout CPD, finding that "[i]f there is one great fault in [CPD], it is the fact that to a large extent the sergeants do not exercise that degree of authority and responsibility which their title and increased pay demands."[34] The Commission recommended a number of actions to address its findings. Among them, it recommended that "the Police Pension Law be revised so as to prevent payment of pensions to persons discharged from the force."[35]

In 1960, Mayor Richard J. Daley appointed a committee to recommend ways to modernize and professionalize CPD in response to what was then described as "the mother of all scandals."[36] A group of eight CPD officers from the Summerdale District on Chicago's North Side had been caught operating a large-scale burglary ring.[37] (Unfortunately, calling Summerdale the "mother" of all scandals proved prophetic as other officers have been caught engaging in criminal conduct over the years.) The head of the committee was Orlando Wilson, the Dean of the School of Criminology at the University of California.

The Summerdale scandal brought about a significant reorganization and transformation of CPD into a "professional" police force.[38] The committee nominated Wilson to serve as Superintendent of Police, a position he held for seven years. Wilson promptly turned over the top command and made CPD more independent of partisan political influences. The committee also recommended the establishment of a five-member Police Board to nominate candidates for superintendent vacancies, adopt rules and regulations for CPD, prepare budgets and address recommendations for officer discipline in serious cases. This body would ultimately become today's Chicago Police Board.

In the early 1970s, CPD faced increasing allegations of police brutality, particularly in African-American communities. In response, Congressman Ralph Metcalfe convened a "Blue Ribbon Panel" to report on "The Misuse of Police Authority in Chicago."[39] The panel heard testimony concerning "many instances of grossly abusive conduct on the part of Chicago policemen," which "poison[] police-community relations."[40] The panel found that CPD used fatal force more frequently than in other big cities, and that 75% of those killed were black.[41] It also noted "the false arrests, the illegal searches or the more common kind of psychological violence that occurs daily, especially in exchanges between police and minorities and young people. Very few young Blacks and Browns have been spared the experience of having to swallow their pride and take a bullying insult from a police officer."[42]

And yet, the Metcalfe panel found, "complaints from citizens of abusive conduct by police are almost universally rejected by [CPD's] self-investigation system."[43] Excessive force complaints were sustained in only 1.4% of cases.[44] This led the panel to recommend that "an entirely new independent investigating agency, reporting its factual findings to the Police Board for imposition of discipline … should be created."[45] The panel's recommendation led to the establishment of the Office of Professional Standards ("OPS") in 1974. (In 2007, OPS was replaced by the Independent Police Review Authority.) The panel also recommended increasing the size of the Police Board from five to fifteen to promote "genuine, representative public participation."[46] The board was ultimately enlarged to nine members.

In 1997, Mayor Richard M. Daley appointed the Commission on Police Integrity to examine the root causes of police corruption, review how other urban police departments approach the issue and propose changes to CPD policies and procedures. Prominent attorney Dan Webb headed the commission, and served along with then-Assistant State's Attorney Anita Alvarez, Sharon Gist Gilliam, former CPD Superintendent Fred Rice and Brian L. Crowe. The mayor appointed the commission after a group of seven CPD officers from the Austin District (15th) on Chicago's West Side were indicted for robbing and extorting money and narcotics from drug dealers. Another three officers from the Gresham District (6th) were indicted for conspiracy to commit robbery and sales of illegally confiscated narcotics.

The 1997 Commission on Police Integrity made a number of recommendations. The recommendations included: (1) increasing the minimum requirements for new recruits to a bachelor's degree and one year of work history; (2) overhauling the field training officer program and extending the probationary period for new officers from 12 to 18 months; (3) establishing an "early warning" system to alert command personnel when an officer may be involved in a pattern of misconduct; (4) implementing a range of management improvements, including emphasizing supervisor accountability and expanding training for new Sergeants; and (5) implementing continuing education or in-service training for officers.[47] Some of these recommendations were implemented. Unfortunately, other recommendations were not addressed and still need attention, as we discuss in more detail below.

## National & Local Conversation on Policing

In a large urban environment like Chicago, race matters in policing. In recent years in particular, race and policing have received significant public attention, often in response to officer-involved shootings and other tragic incidents affecting people of color. Information about these incidents can spread quickly over social media, especially if part of the incident is captured on video, an increasingly frequent occurrence. These incidents have sparked national attention and discussion, sometimes leading to violent protests.

In Ferguson, Missouri, Officer Darren Wilson shot and killed Michael Brown, 18.

In Cleveland, Ohio, Officer Timothy Loehmann shot and killed Tamir Rice, 12.

In Baltimore, Maryland, Freddie Gray died after sustaining spinal cord injuries while he was transported in a police van after his arrest for possessing an allegedly illegal switchblade.

In New York City, Eric Garner died after Officer Daniel Pantaleo put him in a chokehold while arresting him on suspicion of selling loose cigarettes.

In the wake of Ferguson and other events, President Obama appointed a Task Force on 21st Century Policing. The 21st Century Policing Task Force was charged with identifying best practices and offering recommendations on how policing practices can promote effective crime reduction while building public trust. The 21st Century Policing Task Force made a variety of recommendations organized around six "pillars": building trust and legitimacy, policy and oversight, technology and social media, community policing and crime reduction, officer training and education and officer safety and wellness.[48] These recommendations address many of the same topics at issue in this report, and will be discussed in more detail later.

Chicago has had its own share of officer-involved shootings. While these shootings have declined over the past five years, of the 404 shootings by police officers between 2008 and 2015,[49] 299 or 74% of the victims shot or killed were black. Thus, little has changed since the early 1970s when the Metcalfe panel found that 75% of those killed by CPD were black.

IPRA investigated all of these shootings and deemed nearly all of them justified. The justifications for these historic shootings have been repeatedly called into question. IPRA recently announced the hiring of outside experts to "audit … closed officer-involved shooting investigations . . . to assess the quality of the investigative process and the accuracy of the findings and outcomes."[50]

Some of these shootings—in addition to Laquan McDonald—have raised significant public concern. On March 21, 2012, Rekia Boyd, 22, was shot and killed by off-duty CPD detective Dante Servin. After warning a group of people about talking too loudly, Servin fired at them from his car as they turned to walk away. Boyd was struck in the head and killed. Servin claimed that he thought he saw a gun, but it turned out to be a cell phone. Servin was charged with involuntary manslaughter, which applies in cases of recklessness. In an odd twist, the court dismissed the involuntary manslaughter charge because it deemed Servin's alleged conduct *intentional* (not reckless) and suggested that Servin could have been charged with first-degree murder. Proceedings are underway to terminate Servin's employment with CPD, and the City paid $4.5 million to settle a lawsuit by Boyd's family.[51]

On December 26, 2015, Quintonio LeGrier, 19, made three 911 calls seeking help concerning a fight with his father. Officers were dispatched only after LeGrier's father made his own 911 call reporting that LeGrier was threatening him with a baseball bat. LeGrier had a history of mental illness that went undetected by 911 operators. What happened next when police arrived on the scene is not clear. But Officer Robert Rialmo shot and killed LeGrier. A neighbor, Betty Jones, 55, was also struck and killed. In one final twist, Rialmo has responded to a civil suit filed against him by counterclaiming against LeGrier's estate for assault and infliction of emotion distress. Rialmo asserts that "forc[ing] Rialmo to end LeGrier's life" and Jones's as well caused "Rialmo to suffer extreme emotional trauma."[52]

## Broader Challenges Facing Chicago

**Diversity and Segregation.** Chicago is one of the most diverse cities in the nation. Citywide, Chicago is almost evenly split by race among whites (31.7%), blacks (32.9%) and Hispanics (28.9%). Chicago has a significant Asian population (5.5%) as well.[53] Chicago is also home to a wide variety of ethnic groups from across the globe. Chicago's great cultural diversity is often considered one of its greatest strengths.

At the same time, many of Chicago's neighborhoods are heavily segregated. This segregation dates back a century or more, as segregation enforced by law gave way to de facto segregation.[54] While at least certain neighborhoods are gradually integrating, Chicago still consistently rates as one of the most segregated big cities in the United States.[55] For example, 19 of Chicago's 77 "community areas" are at least two-thirds white, 26 are at least two-thirds black and 10 are at least two-thirds Hispanic. Many of Chicago's black citizens remain particularly isolated. Twenty community areas are at least 90% black, and 12 are at least 95% black (led by Burnside at 99.4%, Auburn Gresham at 98.5% and Washington Park at 98.1%).[56]

Because many neighborhoods are predominantly white, black or Hispanic, residents are often largely isolated from other races and ethnic groups. This segregation poses particular challenges for younger police officers, whose early assignments to certain neighborhoods may be their first significant experience interacting with different racial and ethnic groups and understanding the culture of communities different from their own.

**Poverty and Unemployment.** Citywide, 22.1% of Chicagoans live in poverty, 10.1% live in extreme poverty and 12.9% are unemployed. These figures are roughly in line with other big cites. Not surprisingly, however, Chicago's highest-crime neighborhoods have even higher rates of poverty and unemployment. In Austin, which is 86.4% black, 30.6% live in poverty, 13.0% live in extreme poverty and 22.6% are unemployed. In North Lawndale, which is 92.5% black, 45.3% live in poverty, 25.4% live in extreme poverty and 21.2% are unemployed. In Roseland, which is 96.6% black, 23.3% live in poverty, 12.7% live in extreme poverty and 20.3% are unemployed. And in West Englewood, which is 95.1% black, 39.8% live in poverty, 19.1% live in extreme poverty and 35.9% are unemployed.[57]

These same neighborhoods are ravaged by violent crime. In Austin (population 98,162), in 2013 and 2014, there were 3,341 violent crimes, including 67 homicides, 219 non fatal shootings and 725 armed robberies with guns. In North Lawndale (population 36,074), there were 1,859 violent crimes, including 27 homicides, 110 non fatal shootings and 315 armed robberies with guns. In Roseland (population 45,285), there were 1,586 violent crimes, including 27 homicides, 119 non fatal shootings and 376 armed

robberies with guns. And in West Englewood (population 35,294), there were 1,831 violent crimes, including 48 homicides, 175 non fatal shootings and 316 armed robberies with guns.[58]

Chicago has many neighborhoods where there is an alarming lack of jobs as well as a dearth of basic community services and anchors like decent schools, day care, churches, community centers, parks or grocery stores. As a result, many of these communities lack hope or the tools to break the vicious cycle of poverty and crime. Given the myriad social problems plaguing these neighborhoods, police officers are often ill-equipped to address many of these communities' needs. Yet they are frequently expected to do so.

**Illegal Guns.** Chicago also has a significant gun violence problem. In recent years, CPD has recovered significantly more guns used in crimes *per capita* than New York City and Los Angeles combined. In 2012, Chicago recovered 27.7 crime guns per 10,000 residents, compared to 12.2 by Los Angeles and 3.9 by New York City.[59] The number of gun recoveries is even more striking in Chicago's highest-crime neighborhoods. In 2013 and 2014, CPD recovered 58.9 crime guns per 10,000 residents in Austin, 115.2 in West Englewood, 111.4 in Roseland and 120.6 in North Lawndale.[60]

These differences in gun recoveries cannot be explained by superior policing strategies or the devotion of more resources in Chicago compared to Los Angeles and New York City. Chicago simply has more guns used in crimes. In 2011, while Chicago, Los Angeles and New York City had similar non-gun homicide rates (between 1.90 and 2.67 per 100,000 residents), Chicago significantly outpaced Los Angeles and New York City for gun-related homicides: 13.39 per 100,000 residents compared to 5.93 and 3.84, respectively.[61] And while Chicago has strict gun laws, certain areas of the City are literally ringed by suburban gun shops, and guns can easily be procured in neighboring states like Indiana and Wisconsin, as well as through an entrenched pipeline of illegal guns coming from southern states.

The proliferation of guns inevitably raises the stakes for police-citizen encounters and fundamentally changes the dynamic of policing.

## Basic Facts About CPD's Structure

A Chicago police officer's job is also affected by the internal structure and operations of CPD itself. A police officer must interact not only with members of the community, but also with his or her supervisors, subordinates and colleagues. Below, we provide a brief overview of CPD's structure and its hiring, training and promotion processes. This overview provides further context to the findings and recommendations later in this report.

CPD is the second-largest police department in the United States, with 12,500 budgeted sworn officers. It trails only New York City's (34,454 sworn officers). After Chicago, the next largest police departments are in Los Angeles (9,920), Philadelphia (6,515), Houston (5,295), Washington DC (3,865), Dallas (3,478), Phoenix (2,952), Baltimore (2,949) and Miami-Dade (2,745).[62]

The Superintendent of Police, along with his First Deputy Superintendent, are in charge of administering and directing CPD's operations. The Superintendent and First Deputy manage four Bureaus—Patrol, Detectives, Organized Crime and Support Services—each of which is commanded by a Chief and between one to six Deputy Chiefs.[63]

Patrol is by far the largest Bureau in CPD. It is responsible for general field operations, including the protection of life and property, apprehension of criminals and enforcement of traffic laws and ordinances. Within Patrol, Chicago is divided into 22 districts, organized into three Areas (North, South, and Central). Each Area is commanded by a Deputy Chief, and each district is run by a Commander.[64] Within each district, under the Commander, there are Captains, Lieutenants, Sergeants and Police Officers.

Every few years, CPD accepts applications for entry-level officers. The process begins with a written exam. Applicants who pass the test are then placed in a lottery for further consideration, with preferences for certain groups (e.g., military veterans, Chicago Public School graduates). If selected, applicants are subjected to a physical fitness test, drug screening, medical exam, background investigation and psychological evaluation. If an applicant makes it through the screening process, he or she then enters the Police Academy. A year or more can pass between the time an applicant takes the written exam and the start of the Academy, depending on the availability of Academy slots. This lengthy lag time can defeat recruitment efforts to diversify Academy classes.

Overall, about 15% of applicants who start the hiring process make it to the Academy, at which point they become Probationary Police Officers ("PPOs"). In the Academy, PPOs receive six months of formal training (between 900 and 1,000 hours). The Academy graduates 70-75 person classes every few months. At the time of hire, new officers must be 21 years old and have at least 60 semester hours from an accredited college or university (with exceptions for military service). Thus, the typical Academy graduate is in his or her early-to-mid 20s and has at least some college education, if not a degree.

After graduating from the Academy, CPD recruits remain PPOs for another 12 months (18 months total). During that time, PPOs remain "assigned" to the Academy. The PPOs are assigned to work with field training officers ("FTOs") for training in three cycles (often 28 days per cycle) in varying districts. The PPOs are then detailed to particular districts to complete their probationary periods. The starting annual salary when a PPO begins the Academy is $46,668. After 12 months, PPOs are paid $66,606. After 18 months, when the probationary period ends, newly-minted officers receive an annual salary of $70,380.[65]

After the probationary period, a new officer is assigned to a particular district for permanent assignment. A small number of officers who achieved academic and other distinctions in the Academy get to choose their initial district assignment. Upon assignment to a district, the Commander assigns officers to particular watches and beats. After the initial assignment, an officer may transfer to another district pursuant to a bidding process.

Non-supervisory officers and detectives are represented by the Fraternal Order of Police ("FOP") and are covered by FOP's collective bargaining agreement with the City. The agreement governs watch and beat assignments, as well as the bidding process for transfers. Under the agreement, these processes are generally based on seniority, which means that new officers often end up in high-crime beats and the most difficult watches.

Officers are supervised by Sergeants. According to their job description, Sergeants are expected to prepare officers for duty and roll call, monitor officer activity, provide guidance on how to handle incidents, monitor adherence to procedures and ensure that officers are carrying out assigned responsibilities. Sergeants are also responsible for reviewing and evaluating officers' performance and administering counseling, development and corrective action. Sergeants must report significant incidents

up the chain of command and conduct activities related to internal and complaint investigations and employee grievances.[66]

As of January 1, 2016, CPD had 1,094 Sergeants. Sporadically, CPD takes applications for Sergeants. Officers are eligible for promotion based on the results of a written exam and assessment exercise. Up to 30% of Sergeant promotions can be made through a merit selection process as well. At the time of promotion, Sergeants must have served at least five years as officers. Notably, an officer's disciplinary record is not considered in the Sergeant promotion process.[67] In addition, the promotion criteria does not include an assessment of an individual's ability to mentor or otherwise manage the health and well-being of officers or other accountability measures like citizen or administrative complaints or interventions. Sergeants are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Sergeants, and have their own collective bargaining agreement with the City.

Sergeants are supervised by Lieutenants. According to their job description, the Lieutenant serves as the officer in charge of a unit or section during an assigned tour of duty. Among other things, Lieutenants are expected to (i) ensure that Sergeants evaluate, guide and instruct officers as needed, (ii) coach and mentor subordinates, (iii) maintain an environment in which clear standards exist for acceptable behavior and performance and (iv) monitor and ensure compliance with investigative guidelines regarding complaint, disciplinary and summary punishment procedures.[68]

As of January 1, 2016, CPD had 187 Lieutenants. Sporadically, CPD takes applications for Lieutenants. Sergeants are eligible for promotion to Lieutenant based on the results of a written exam and assessment exercise. Again, up to 30% of Lieutenant promotions can be made through a merit selection process as well. At the time of promotion, Lieutenants must have served at least three years as a Sergeant. They also must have a bachelor's degree. Notably, a Sergeant's disciplinary record (and the disciplinary record of the officers he or she supervises) is not considered in the Lieutenant promotion process.[69] Lieutenants are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Lieutenants, and have their own collective bargaining agreement with the City.

CPD also has 31 Captains, who supervise the Lieutenants.[70] A Captain is the second in command of a district (beneath the Commander), or may serve as an executive officer of another unit. Among other things, Captains assist the District Commander in operations, administration, planning, identification of emerging crime trends and preparing strategic plans to address crime and disorder issues impacting the community.

The Superintendent is responsible for selecting Captains. To be eligible, a candidate must have at least two years' experience as Lieutenant at the time of promotion. A candidate also must have "an acceptable disciplinary record" at the time of application, meaning that the record "cannot include any sustained Complaint Register ("CR") investigations for misconduct resulting in suspensions of more than 7 days during the prior 12 months, or 3 or more sustained CR investigations resulting in suspensions of any length during the past 5 years.[71] This is the only instance in which disciplinary records are considered during the promotion process. Captains are represented by the Policemen's Benevolent & Protective Association of Illinois, Unit 156-Captains, and have their own collective bargaining agreement with the City.

After an officer leaves the Academy, aside from annual firearms certifications, there are no mandatory annual training requirements for the rest of that officer's career. To be sure, occasional trainings are sometimes put in place, such as the recent Taser training, but those kinds of trainings appear to be reactive and not part of a regular regime of in-service mandatory training. In addition, years ago CPD started a series of streaming video training to be used during roll calls. Some of these videos are well produced and provide excellent content. However, there is no program in place to ensure that they are consistently used.

## Endnotes

[23] 42 U.S.C. § 14141(a).

[24] *Id.* § 14141(b).

[25] U.S. Department of Justice Press Release, Justice Department Opens Pattern or Practice Investigation into the Chicago Police Department (Dec. 7, 2015), *available at* https://www.justice.gov/opa/pr/justice-department-opens-pattern-or-practice-investigation-chicago-police-department.

[26] U.S. Department of Justice, How Department of Justice Civil Rights Division Conducts Pattern-or-Practice Investigations (May 8, 2015), *available at* https://www.justice.gov/file/how-pp-investigations-work/download.

[27] Journal of the Senate, Special Session of the Fortieth General Assembly of the State of Illinois, 136-52 (1898).

[28] *Id.* at 140.

[29] *Id.*

[30] *Id.* at 152.

[31] H.M. Campbell, Flynn, Lower, Chicago Police Report of the Chicago Civil Service Commission, 3 J. Am. Inst. Crim. L. & Criminology 62 (May 1912 to Mar. 1913), *available at* http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1153&context=jclc.

[32] *Id.* at 81.

[33] *Id.* at 64.

[34] *Id.* at 77.

[35] *Id.* at 83.

[36] Police Forum, Academy of Criminal Justice Sciences Police Section, Vol. 4, No. 4 (Oct. 1994) ("Police Forum").

[37] *See* Richard C. Lindberg, The Babbling Burglar and the Summerdale Scandal: The Lessons of Police Malfeasance (2002).

[38] *See generally* Police Forum, *supra* note 36; *see also* Municipal Reference Collection, Chicago Public Library, A Chronological History of Chicago: 1673- (last updated Aug. 1997); Wesley G. Skogan, Police and Community in Chicago, Ch. 9 (Oxford Univ. Press 2006).

[39] The Misuse of Police Authority in Chicago, A Report and Recommendations based on hearings before the Blue Ribbon Panel convened by the Honorable Ralph H. Metcalfe, Representative, First Congressional District of Illinois, on June 26, July 17, July 24, and July 31, 1972.

[40] *Id.* at 29.

[41] *Id.* at 30.

[42] *Id.* at 31.

[43] *Id.* at 32.

[44] *Id.* at 33.

[45] *Id.* at 42.

[46] *Id.* at 58.

[47] Report of the Commission on Police Integrity (Nov. 1997).

[48] Final Report, President's Task Force on 21st Century Policing (May 2015) ("21st Century Policing Task Force Report"), *available at* http://www.cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[49] Jeremy Gorner, Chicago Police Shot Fewer People in 2015, Chicago Tribune (Jan. 2, 2016), *available at* http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-shootings-2015-met-20160101-story.html.

[50] IPRA Press Release, The Independent Police Review Authority to Conduct Historical Review of Officer-Involved Shooting Investigations (Mar. 23, 2016), *available at*

http://www.iprachicago.org/content/dam/ipra/Documents/Press_Releases_and_Statements/March_23_2016_IPRA_Historical_Review
.pdf.

[51] *See, e.g.,* Jeremy Gorner, McCarthy Moves to Fire Detective Dante Servin in Fatal Off-Duty Shooting of Rekia Boyd, Chicago Tribune (Nov. 24, 2015), *available at* http://www.chicagotribune.com/news/ct-mccarthy-moves-to-fire-detective-dante-servin-after-fatal-off-duty-shooting-20151123-story.html.

[52] *See, e.g.,* David A. Graham, Why the Officer Who Killed Quintonio LeGrier Is Suing Him, *The Atlantic* (Feb. 8, 2016), *available at* http://www.theatlantic.com/national/archive/2016/02/why-the-officer-who-killed-quintonio-legrier-is-suing-him/460443/; Jeremy Gorner & Annie Sweeney, Quintonio LeGrier Called 911 Three Times Before a Chicago Cop Shot Him, Chicago Tribune (Jan. 26, 2016), *available at* http://www.chicagotribune.com/news/local/breaking/ct-quintonio-legrier-bettie-jones-911-calls-met-20160125-story.html.

[53] United States Census Bureau, QuickFacts, Chicago, Illinois, *available at* http://www.census.gov/quickfacts/table/PST045215/1714000.

[54] *See, e.g.,* Ta-Nehisi Coates, The Case For Reparations, The Atlantic (June 2014), *available at* http://www.theatlantic.com/magazine/archive/2014/06/the-case-for-reparations/361631/.

[55] Edward Glaeser & Jacob Vigdor, The End of The Segregated Century: Racial Segregation in America's Neighborhoods, 1890-2010, Manhattan Institute, (Jan. 22, 2012), *available at* https://www.manhattan-institute.org/html/end-segregated-century-racial-separation-americas-neighborhoods-1890-2010-5848.html; John R. Logan & Brian J. Stults, US2010 Project, The Persistence of Segregation in the Metropolis: New Findings from the 2010 Census (Mar. 24, 2011), *available at* http://www.s4.brown.edu/us2010/Data/Report/report2.pdf; William H. Frey, Brookings Institution, Census Shows Modest Declines in Black-White Segregation (Dec. 8, 2015), *available at* http://www.brookings.edu/blogs/the-avenue/posts/2015/12/08-census-black-white-segregation-frey; Nate Silver, The Most Diverse Cities Are Often the Most Segregated, FiveThirtyEight (May 1, 2015), *available at* http://fivethirtyeight.com/features/the-most-diverse-cities-are-often-the-most-segregated/.

[56] Jennifer Clary, Social Impact Research Center, A Heartland Alliance Program, Chicago Community Indicators (2012) (analyzing data from the U.S. Census Bureau's 2000 Dicennial Census and 2008-12 American Community Survey 5-year estimates program) ("Chicago Community Indicators"), *available at* http://www.ilpovertyreport.org/sites/default/files/uploads/Chicago%20Community%20Area%20Indicators,%202000-2012_140321.pdf.

[57] *Id.*

[58] Data provided by the University of Chicago Crime Lab.

[59] City of Chicago – Office of the Mayor, Chicago Police Department, Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, Figure A (May 27, 2014) ("Tracing The Guns"), *available at* http://www.chicagobusiness.com/Assets/downloads/20151102-Tracing-Guns.pdf.

[60] Data provided by the University of Chicago Crime Lab.

[61] Tracing The Guns, *supra* note 59, Figure B.

[62] U.S. Department of Justice, Local Police Departments, 2013: Personnel, Policies, and Practices, Appendix Table 2 (May 2015), *available at* http://www.bjs.gov/content/pub/pdf/lpd13ppp.pdf.

[63] CPD, General Order G01-02, Department Organization for Command, Attachments 1-6 (Jan. 21, 2015).

[64] CPD, General Order G01-02-03, Organization and Functions of the Bureau of Patrol (Jan. 21, 2015).

[65] CPD, 2016 Position & Salary Schedule, *available at* http://directives.chicagopolice.org/forms/CPD-61.400.pdf.

[66] *See generally* CPD, Police Sergeant Job Announcement (2013).

[67] *Id.*

[68] CPD, Lieutenant Job Announcement (2014).

[69] *Id.*

[70] CPD, Captain – Senior Executive Service (SES), Employee Resource E05-05 (Apr. 3, 2013).

[71] *Id.* at 2.

# Community-Police Relations

*"The ability of the police to perform their duties is dependent upon public approval of police existence, actions, behavior and the ability of the police to secure and maintain public respect."*

Sir Robert Peel, Principles of Law Enforcement, 1829

*"Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly, affects all indirectly."*

Martin Luther King, Jr., 1963

*"When you have police officers who abuse citizens, you erode public confidence in law enforcement. That makes the job of good police officers unsafe."*

Mary Frances Berry, 1999

## How have CPD's actions created mistrust in communities of color?

The lack of trust between the police and the communities they serve—especially communities of color—is one of the most significant issues facing CPD today. At each of its community forums, the Task Force heard a large and diverse group of Chicago residents express their deeply held view that racism, or at least racial bias, is the root cause of the lack of trust between CPD and minority communities. People of color articulated instance after instance in which police officers interacted with them in disrespectful and sometimes outright racist ways. The forums provided a window into the intense sadness, pain and frustration the community feels as a result of their first-hand experiences with CPD. Indeed, recent polling suggests that only 20% of Chicagoans—including just 6% of African-Americans—believe CPD treats all citizens fairly.[72]

The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through enforcement and other practices that disproportionately affect and often show little respect for people of color. CPD's long history and current practices are at the root of the deep distrust of the police and remain a significant impediment to improved community-police relations.

## RACISM & RACIAL BIAS IN POLICING – HISTORY

In recounting the history of race and policing, it is difficult to pick a starting point. We could go back a century or more. Between 1910 and 1940, Chicago's black population increased from 40,000 to 278,000 as many black families moved to Chicago as part of the Great Migration.[73] Many families moved to Chicago to escape increasing racism and violence in the South, undoubtedly taking scars and distrust with them.

Chicago had its own race issues. In 1919, race riots broke out after white men threw rocks at black swimmers at a South Side beach for violating the unofficial segregation of Chicago's beaches, causing the death of Eugene Williams, 17. The police's refusal to arrest a white offender sparked weeks of violence, leaving 38 dead, over 500 injured, and 1,000 black families homeless.[74] By the 1930s, 90% of Chicago's black residents were confined to a narrow four-block strip on the South Side known as the "Black Belt."[75] Blacks who tried to move elsewhere were often met with vandalism, arson and other acts of violence.[76] This violence would not have been possible without at least tacit support of the police.

While acknowledging this older history, we focus below on some salient events and trends in Chicago policing over the past 50 years. This review captures some of the key incidents and practices which many of today's residents experienced or witnessed first hand, directly shaping their views of CPD. Some are examples of intentional mistreatment of people of color. Others are examples of well-intentioned practices that nonetheless had a significantly disparate impact in Chicago's minority neighborhoods.

**Fred Hampton.** One of the most notorious flash points in the racial dynamics between the police and communities of color was the shooting of Fred Hampton. At 4:45 a.m. on December 4, 1969, 14 CPD officers attached to the Cook County State's Attorney's Office executed a search warrant at an apartment where nine members of the Illinois Black Panther Party were staying. After seven minutes of gunfire, Hampton, 21, and another Panther, Mark Clark, 22, were dead. Hampton was the charismatic and controversial Chairman of the Illinois Black Panthers. To many in the black community, the raid was little more than a pretext to kill Hampton.

The events of that morning were hotly disputed. A federal grand jury ultimately found that the raid was "not professionally planned or properly executed."[77] The grand jury was also troubled by an "irreconcilable disparity" between officers' accounts of the raid and the physical evidence.[78] While officers claimed that the Panthers fired at them at least 10-15 times, ballistics showed that all but one of the 80-100 shots fired that morning came from the police.[79] The grand jury did not indict the officers (largely because the surviving Panthers had not cooperated in its investigation), though it concluded that the officers' performance "gives some reasonable basis for public doubt of their efficiency or even of their credibility."[80]

A state grand jury later indicted State's Attorney Edward Hanrahan and the raiding officers for obstruction of justice based on their actions and statements after the raid. They were ultimately acquitted in a bench trial, but Hanrahan lost re-election in 1972 and would not hold public office again. Hampton's and Clark's families and several Panthers who survived the raid filed a federal civil rights suit. After many years of litigation, including an 18-month trial,[81] the City agreed in 1982 to settle the plaintiffs' claims for $1.85 million (the equivalent of roughly $4.5 million in today's dollars, a not-insubstantial sum).

**Disorderly Conduct Arrests.** In the early 1980s, a *Chicago Reporter* investigation found that CPD was making approximately 150,000 "disorderly conduct" arrests each year, predominantly in minority communities. What constituted disorderly conduct was often vague, and few cases were prosecuted because officers routinely failed to appear in court. In 1980, 89,382 blacks were arrested for disorderly conduct, compared to 33,270 whites and 17,931 Latinos. The arrests constituted almost half of all arrests by CPD and therefore became one of the primary ways police interacted with minority communities.[82]

The ACLU filed suit to stop CPD's practice of making disorderly conduct arrests with no intention of prosecuting. A reportedly "outraged" and "irate" federal judge declared the practice unconstitutional after the City repeatedly failed to participate in the case (a sadly ironic failure, given the underlying problem of officers failing to appear in court).[83] As part of its order, the court directed the City to expunge more than 800,000 disorderly conduct arrests over the prior five years where the arresting officer failed to appear for court hearings.[84] The ACLU and the City ultimately entered into a consent decree requiring officers who make disorderly conduct arrests to appear at all court hearings until a case is resolved.[85]

By the early 1990s, disorderly conduct arrests dropped to approximately 60,000 per year, but racial disparities remained. In 1993, CPD arrested approximately 40,000 blacks for disorderly conduct, compared to approximately 10,000 Hispanics and 8,000 whites. By the 2000s, disorderly conduct arrests dropped significantly, to approximately 10,000 per year. Even then, the black/white ratio for disorderly conduct arrests was 10:1.[86]

**Jon Burge.** From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions. Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns and burning them on radiators. For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police "code of silence." Burge was eventually suspended in 1991, and the Chicago Police Board fired him in 1993. After Burge's firing, the FOP attempted (unsuccessfully) to enter a float in the South Side Irish Parade honoring him.[87]

In 2006, after a four-year investigation, special prosecutors concluded that there was enough evidence to bring criminal charges against police officers in three cases of torture (Andrew Wilson, Phillip Adkins and Alfonzo Pinex), but the statute of limitations had already run out.[88] While it was too late to bring criminal charges for the torture itself, federal prosecutors later charged and convicted Burge for obstruction of justice and perjury after he lied about the torture in a civil case. Burge served 54 months in federal prison, far less time than that served by the innocent men he helped convict through coerced and false confessions.[89] As discussed later in this report, Burge was allowed to keep his pension.[90]

The fallout from Burge's actions was substantial. Many convictions where Burge had played a role were reversed, remanded or overturned.[91] In 2003, Governor Ryan pardoned four African-American inmates on death row who had long maintained that Burge tortured them to confess to murders they did not commit.[92] Numerous civil suits were filed. To date, the City has spent upwards of $100 million on Burge-related settlements, judgments and legal fees.[93]

In 2013, Mayor Emanuel apologized for this "dark chapter" in the city's history.[94] Two years later, the Mayor and City Council "acknowledge[d] and condemn[ed], as evil and reprehensible, any and all acts of

torture and abuse inflicted upon the Burge victims" and "apologize[d] to the Burge victims for these horrific and inexcusable acts." Along with the apology, the City agreed to pay $5.5 million in reparations and provide other city services to Burge victims and to educate future CPS students about the Burge case and its legacy.[95]

**Gang Loitering Ordinance.** In 1992, Chicago enacted a "gang loitering ordinance" in response to complaints that gang members were intimidating law-abiding citizens. The ordinance prohibited individuals believed to be "criminal street gang members" from "loitering" in a public place after they had been ordered to disperse. From 1992 to 1995, CPD issued over 89,000 dispersal orders and arrested over 42,000 individuals. While precise statistics are not available, the ordinance was predominantly enforced against people of color.[96]

In 1999, the U.S. Supreme Court held that the ordinance violated due process rights because it was unconstitutionally vague.[97] The Court held that the ordinance "lef[t] the public uncertain as to the conduct it prohibits" because it "fail[ed] to distinguish between innocent conduct and conduct threatening harm."[98] The Court further held that the ordinance created a "potential for arbitrary enforcement" because it "afford[ed] too much discretion to the police" and "reach[ed] a substantial amount of innocent conduct."[99]

After the U.S. Supreme Court's ruling, the City amended its gang loitering ordinance to make it more specific. However, the ordinance is still predominantly enforced against people of color. In the summer of 2014, CPD officers issued 4,842 dispersal orders—4,100 against blacks (84.7%), 673 against Hispanics (13.9%) and 66 against whites (1.4%).[100]

## RACIAL BIAS IN POLICING – CPD'S CURRENT PRACTICES

Racial bias is not a thing of the past. Rather, data establishes that CPD's use of force disproportionately affects people of color. The same is true for foot and traffic stops. These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself.

**Use of Force.** For both officer-involved shootings and Taser discharges, citizens on the other end of use of force by CPD are predominantly African-American.

From 2008 through 2015, there were 404 officer-involved shootings resulting in injury or death. Of those 404 shootings, 299 (74%) of the persons killed or injured were black, 55 (14%) were Hispanic, 33 (8%) were white and 1 (0.25%) was Asian.[101]



OFFICER INVOLVED SHOOTINGS
2008 - 2015

300

NUMBER OF SHOOTINGS

74% of the persons killed or injured were black

0

BLACK    HISPANIC    WHITE    ASIAN

From 2012 through 2015, there were a total of 1,886 officer-involved Taser discharges. Of those 1,886 discharges, 1,435 (76%) of the persons subjected to Taser discharges were black, 254 (13%) were Hispanic, 144 (8%) were white and 4 (0.21%) were Asian.[102]



**OFFICER INVOLVED**
TASER DISCHARGES
2012 - 2015

**Investigatory Stops.** Under the U.S. Supreme Court's 1968 decision in *Terry v. Ohio*,[103] an officer may conduct a brief investigatory stop upon "reasonable suspicion"—based on "specific and articulable facts"—that a person has committed or is about to commit a crime. An officer also may conduct a limited search or pat down for weapons upon reasonable suspicion that a person is armed and dangerous. While the Court granted police officers these powers in appropriate cases, it also acknowledged that investigatory stops and frisks "must surely be an annoying, frightening, and perhaps humiliating experience."[104]

CPD's data raises serious questions about whether it abides by *Terry* and its progeny. In the summer of 2014, CPD stopped more than 250,000 people in



**STOPS**
BY RACE IN 2014

According to the American Civil Liberties Union of Illinois (ACLU)

* ASIAN-PACIFIC ISLANDER

encounters not leading to arrests. These investigatory stops amounted to 93.6 per 10,000 people. (In contrast, New York City, from 2011-2014, stopped between 1.6 and 22.9 per 10,000 people.)[105]

Notably, out of the 250,000 investigatory stops in the summer of 2014, 72% of those stopped were black, compared to 17% Hispanic and 9% white.[106]

African Americans have been particularly targeted in predominantly white neighborhoods. In District 18, which covers the Near North Side and part of Lincoln Park, only 9.1% of the population is black, yet blacks accounted for 57.7% of all stops. Meanwhile, 75.5% of the district's population is white, yet whites accounted for only 28.6% of all stops. Similarly, in District 19, which covers parts of Lincoln Park, Lakeview, Uptown and Lincoln Square, only 6.6% of the population is black, yet blacks accounted for 51.1% of all stops. 75% of the district's population is white, yet whites accounted for only 29.2% of all stops.[107]



Investigatory stops have accumulated in striking numbers among young black males. A survey of Chicago residents in 2015 found that 56% of young black males reported being stopped on foot by CPD one or more times during the prior 12 months. When traffic stops were included, almost 70% of young black males reported being stopped by the police in the past year, a number far exceeding any other demographic.[108] In addition, the survey established "large racial disparities in the use of force reported by respondents."[109] The survey revealed that "15% of Blacks and 17% of Hispanics reported being shoved or pushed around, in contrast to 6% of Whites. [Blacks] were twice as likely as whites to be threatened by a weapon. Compared to whites, all other groups were at least twice as likely to have been subjected to some form of force before being released."[110]



We heard many personal accounts corroborating this data. For example, in a youth forum at the Mikva Challenge, we spoke with a high school student who reported being stopped by CPD and placed in squad cars six or seven times. Each time, he reported, officers tersely kicked him out of the car when they were finished without explanation or apology. Similarly, in a youth forum at Precious Blood Ministries, a young Latino man reported being stopped by the police on his way home from work. He had just cashed his paycheck, and an officer suggested that he "had a lot of money for a Mexican."

These stops—and how they were conducted—had clearly left a deep mark on how youths and young adults view the police. The stops were also traumatizing, and rendered the youths involved powerless and voiceless. Multiply these experiences by the hundreds of thousands if not millions of investigatory stops in recent years, particularly in the black community, and the indelible mark left on the City is deep and will continue to reverberate for years.

**Traffic Stops.** CPD's traffic stop data also raise significant concerns regarding racial bias. In 2013, 46% of CPD's 100,676 traffic stops involved black drivers, even though only 32% of the City's population is black. White and Hispanic drivers were stopped at rates lower than their representation in the City's population.[111]

For both blacks and Hispanics, the disparity widens significantly when it comes to vehicle searches. In 2013, CPD was over four times more likely to search *with* consent vehicles of black and Hispanic motorists, compared to white motorists (4.74 and 4.09 times, respectively). CPD was also more likely to search *without* consent vehicles of black and Hispanic motorists, compared to white motorists (3.42 and 4.82 times).[112]



Given these numbers, one might expect that CPD finds contraband in vehicles of black and Hispanic motorists at higher rates. That is not the case. In fact, the opposite is true. In consent searches, CPD found contraband when officers searched white motorists **twice as often** compared to black and Hispanic motorists. The "hit rates" were 12% for black motorists, 13% for Hispanic motorists and 24% for white motorists. The same pattern held for searches without consent. The hit rates were 17% for black motorists, 20% for Hispanic motorists and 30% for white motorists.[113] These numbers appear to suggest that black and Hispanic motorists are subject to a high number of vehicle searches even though CPD's own data suggest that, relative to whites, they are less likely to have contraband.

The disparate impact on minority motorists is not limited to routine traffic stops. From 2008 through 2013, CPD set up 84% of DUI checkpoints in predominantly black or Hispanic police districts.[114] Moreover, between March and August 2015, CPD set up 14 DUI checkpoints: nine in majority-black police districts, four in majority-Hispanic districts, and only one in a majority-white district. Some majority-white police districts have more alcohol-related car crashes than many of these minority districts, raising significant questions about how CPD selects the locations for these DUI checkpoints.[115]

**Police Oversight System.** The police oversight system itself is not immune to racial bias. From March 2011 through September 2015, CPD's Bureau of Internal Affairs and IPRA examined about 17,500 complaints of police misconduct with named complainants. Of those 17,500 complaints, 61% were filed by African-Americans, 21% were filed by whites and 12% were filed by Hispanics. And yet, the rates of sustained cases looked very different. Of the misconduct complaints sustained, 25% were filed by African-Americans, compared to 58% by whites and 15% by Hispanics.[116] In short, allegations of police misconduct by whites "are nine times more likely to be upheld than those by blacks and almost three times more likely than those by Hispanics."[117]



Racial bias may also come into play on the officer side. Some reports suggest that black officers are disproportionately found guilty of offenses, and black officers with sustained findings are punished more than twice as often as white officers.[118]

## Recommendations

**The City should engage the National Initiative for Building Community Trust and Justice to implement a "Reconciliation Process" in Chicago. Critical elements of the process involve the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination in police practices and making a public commitment to cultural change required to eliminate racial bias and disparity.**

Early in the Task Force's work, a South Side minister told one of its members, "If you don't face it, you can't fix it." This prescient comment captures the emerging best practice for acknowledging and attempting to repair fractures in community-police relations.

The President's Task Force on 21st Century Policing recommended that police departments "acknowledge the role of policing in past and present injustice and discrimination and how it is a hurdle to the promotion of community trust." The President's Task Force heard from police chiefs who described what they were doing to "recognize and own their history" and "change the culture within both their police forces and their communities."[119]

Similarly, the Department of Justice's Office of Community Oriented Policing Services ("COPS") has acknowledged the importance of reconciliation, which requires "frank engagements" between minority communities and the police "in order to reset relationships." As an initial step in the reconciliation process, COPS observed, "high-level police executives have been willing to make powerful public statements acknowledging history and seeking to foster reconciliation efforts." In particular, COPS cited recent remarks by NYPD Police Chief William Bratton that "[s]ome of the worst parts of black history would have been impossible without a perverted, oppressive law and order," and that "our history follows us like a second shadow. We can never underestimate the impact these had . . . As police, we must fix what we've done and what we continue to do wrong. It's ours to set right."[120]

To oversee a truth-telling and reconciliation process, the Task Force recommends that the City engage the National Initiative for Building Community Trust and Justice (the "National Initiative"). The National Initiative has developed a detailed reconciliation process and is already implementing the process working with police departments in Birmingham, Fort Worth, Minneapolis and Pittsburgh, as well as in Gary, Indiana and Stockton, California.

The National Initiative's process begins with a public acknowledgment of past harms, including the role of police in pre-civil-rights-era wrongs, harms during the civil rights era, some degree of racist or biased policing and outright illegality since then, disrespectful treatment by police officers and overuse of particular tactics like stop and frisk.[121] After publicly acknowledging past harms, the National Initiative process then calls for (1) sustained listening to community constituencies and stakeholders, (2) an explicit commitment to changing policing in specific ways, (3) fact-finding, (4) the identification of key experiences and narratives on both sides, (5) specifying concrete changes in policies and practices that will move toward new practices and relationships and (6) a mechanism for driving changes.[122]

**The Mayor and the President of the Cook County Board should work together to co-sponsor quarterly summits of key stakeholders and community leaders to develop and implement comprehensive criminal justice reform.**

**The Mayor and the President of the Cook County Board should work together to develop and implement programs that address socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.**

CPD is not the cause of, nor the solution to, all of the significant problems facing many of Chicago's minority communities. At the same time, in these communities, CPD is the public face of the broader criminal justice system, which is badly broken and need of significant reform. Through its daily contacts in underserved communities, CPD is also often the public face for government more broadly. While reforming CPD is vitally important, those changes will only accomplish so much unless we meaningfully address broader issues facing Chicago's disadvantaged communities.

Poverty and high unemployment are endemic in many of the Chicago communities that experience the highest levels of violent crime. Chicago is one of the most racially-segregated big cities in America, but Chicago's racial segregation is not the only issue. Chicago is socioeconomically unequal as well. People of color are disproportionately poor. Many black and Hispanic residents have been trapped for multiple generations in poor neighborhoods with little or no economic mobility and, as a result, no geographic mobility.

Both informal and formal local and national laws and policies have been identified as factors in contributing to racial and economic segregation, including discriminatory housing policies, barriers to healthcare services, inequity in the criminal justice system and unbalanced public school funding.[123] In effect, these long-standing practices have resulted in the creation and preservation of poor and isolated neighborhoods where minorities have been denied equal socioeconomic opportunity. The impact of these policies persists today, and the cumulative effects of poverty and isolation make it extremely difficult to break the cycle of poverty.[124]

In addition, minority teens and young adults experience the highest rates of being out of school and unemployed. In a recent study of Chicago, 41% of African-Americans between the ages of 20 and 24 were out of school and out of work, compared to 19% for Hispanics and 7% for whites.[125] Young African-Americans fared significantly worse in Chicago (41% out of school and unemployed) than in Los Angeles (29.3%) or New York (27.3%).[126]

Many of the City's policing problems could be avoided altogether by ensuring that African-American and Hispanic teens and young adults have adequate opportunities through education and employment. When people are in school or employed their self-esteem increases, their time



**OUT OF SCHOOL AND OUT OF EMPLOYMENT**
AGES 20 - 24 BY RACE

PERCENT

40%

0

41% BLACK   19% HISPANIC   7% WHITE

becomes more structured, they use energy in a constructive manner and, in the case of employment, they gain a legal means of providing for themselves and their families. Employing teens and young adults reduces crime and recidivism rates.[127]

There are no easy fixes to these problems. But our public officials must work together to study these problems and develop and implement meaningful solutions. Efforts are underway now, but they are often fragmented and do not lead to any real, significant change.

The Task Force therefore recommends that the Mayor and the President of the Cook County Board co-sponsor quarterly summits of criminal justice stakeholders, community leaders, faith-based organizations, businesspeople, legal and government organizations, civil and human rights organizations, academics and other leaders to develop and implement criminal justice reform. The Task Force also recommends that the Mayor and the President of the Cook County Board co-sponsor community-based programs that address socioeconomic justice and equality, segregation, systemic racism, poverty, education, health and safety.

## Is CPD doing enough to combat racial bias?

### POLICIES

The City and CPD each have antidiscrimination policies in place, which they have worked to improve over time. On paper, these policies generally say the right things. The challenge of course is ensuring that these policies translate to practice.

Chicago's human rights ordinance provides that "[i]t is the policy of the City of Chicago to assure that all persons within its jurisdiction shall have equal access to public services and shall be protected in the enjoyment of civil rights, and to promote mutual understanding and respect among all who live and work within this city."[128]

The ordinance declares that "prejudice, intolerance, bigotry and discrimination … threaten the rights and proper privileges of the city's inhabitants and menace the institutions and foundation of a free and democratic society," and that "behavior which denies equal treatment to any individual because of his or her race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, source of income, or credit history (as to employment only) undermines civil order and deprives persons of the benefits of a free and open society."[129]

Similarly, CPD has a general order on human rights acknowledging that while Chicago "encompasses a variety of communities, each with its own distinctive cultures, lifestyles, [and] customs," "all persons in each area of the City share the common need for protection and service through objective and impartial law enforcement."[130]

The order requires that officers "respect and protect each person's human rights," "treat all persons with the courtesy and dignity which is inherently due every person as a human being," "not exhibit a condescending attitude or direct any derogatory terms toward any person in any manner," and "not exhibit any bias or prejudice against any individual or group because of race, color, gender, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, or source of income."[131]

CPD also has a general order specifically prohibiting "racial profiling or other bias-based policing." In January 2016, CPD updated the order to provide that officers "may not use race" in making routine or spontaneous law enforcement decisions unless race is part of a specific suspect description.[132] The new language is taken nearly word-for-word from Department of Justice guidance to federal law enforcement agencies, which directs that race may not be used "to any degree" in making routine or spontaneous law enforcement decisions.[133] However, CPD's revised order does not include the "to any degree" language and still retains older language prohibiting officers from using race "as the sole basis" for developing grounds for a traffic or street stop—seemingly suggesting that race may be used as *a* basis.

### Recommendations

CPD should clarify in its general order prohibiting racial profiling and other biased-based policing whether race may be used to any degree in developing grounds for a stop, other than where race is part of a specific suspect description.

CPD's general order prohibiting racial profiling or other bias-based policing (G02-04) is unclear—and somewhat contradictory—on the role race may play in developing reasonable suspicion or grounds for a traffic or street stop. On the one hand, it says that officers "may not use race." On the other hand, it says that officers may not use race "as the sole basis" for a traffic or street stop, implying that race may be used as one of multiple factors taken into account. CPD should clarify whether race may be used to any degree in street and traffic stops, other than in cases where race is part of a specific suspect description. If there are circumstances where CPD believes race is an appropriate factor for officers to consider, it should spell out those circumstances both for officers and for the public.

## DATA COLLECTION, REPORTING AND TRANSPARENCY

Data collection, reporting and transparency provides a crucial check against racially-biased policing. The City is already subject to heightened requirements under state law and the terms of a settlement agreement with the ACLU, but more needs to be done.

By law, foot and traffic stops are each tracked to guard against racial bias. These requirements have increased in recent years. Since 2004, the Illinois Traffic Stop Statistical Study Act has required the collection of certain data—including on race—for traffic stops, even where no citation or warning is issued.[134] As of January 1, 2016, the law was revised to require that officers collect detailed information on pedestrian stops as well.[135]

In August 2015, CPD also reached an agreement with the ACLU concerning investigatory stops and protective pat downs.[136] In the agreement, CPD agreed to collect data through "Investigatory Stop Reports." The reports replaced the old "contact card" system and collect the same information now required to be collected under state law.[137] CPD also revised its policies on stops and pat downs and is

training its officers accordingly.[138] Moreover, CPD agreed to establish policies for continuous district-level supervisory review and quarterly or semiannual department-level audits of its stop and pat-down practices.[139]

As part of its agreement, the City agreed to provide data and other information to a retired federal magistrate judge who will review its stop and pat-down practices for substantial compliance with the agreement and other legal requirements. The judge will issue a public report twice a year. The agreement will terminate only when the judge finds that CPD has been in substantial compliance for at least a year (in mid-2017 at the earliest).

CPD's public reporting of many types of data is limited. While CPD reports detailed crime incident data on a daily basis through a "Data Portal,"[140] it provides little other information allowing the public to assess its performance. The "Statistical Reports" section of CPD's website does not contain *any* information since 2010. Rather, it provides Annual Reports for 1965 through 2010, monthly index crime reports for 1999 through 2010, crime trend reports from 1991 through 2007, beat-level data for 2007 through 2010, murder reports from 1999 through 2008 and juvenile reports from 1991 through 2008.[141]

### *Recommendations*

**Through its Data Portal, CPD should regularly release incident-level information on arrests, traffic stop reports, investigatory stop reports and predecessor contact cards and officer weapon use (firearm and nonlethal). To facilitate trend analysis, the incident-level data should reach back at least to January 1, 2010.**

For traffic stop reports, investigatory stop reports and predecessor contact cards, the incident-level information should include all collected information, including on each subject's apparent race. For arrests, the incident-level information should include the date, detailed arrest category, drug type (if applicable), central booking number, all text arrest description fields, FBI code and a linking crime incident number, if any. For officer weapon use, the incident-level data should include dates and beat locations, and cover Tasers, pepper spray or other chemical weapons, impact munitions, and firearm discharges of all kinds.

**CPD should resume publishing annual reports.**

**After the ACLU agreement terminates, CPD should continue supervisory review and audits of investigatory stop and pat-down practices, with oversight by the new Community Safety Oversight Board and Inspector General for the Public Safety.**

## RECRUITMENT, HIRING AND PROMOTION

A diverse police department is critical for policing a diverse city and reducing bias-based policing. In our community forums, residents often associated poor treatment with biases that officers held about them and their communities. And in both the community forums and our panels with youth, many individuals expressed a desire that more officers "look like" them and have deeper connections to their communities.

Minority recruitment, hiring and promotion has been a challenge for CPD. In the early 1970s, CPD was 83% white, 16% black and 1% Hispanic.[142] The Afro-American Patrolmen's League, other black and Hispanic officers and the United States sued alleging racial discrimination. A federal court found that CPD's patrolman's exam, background investigation and Sergeant's promotion exam were all racially biased.[143] In a later lawsuit, a federal court found that the Lieutenant's exam was racially biased as well.[144]

Though there was no finding of intentional discrimination, the substantial disparate impact on black and Hispanic applicants and officers led one federal court to conclude that CPD had "knowingly discriminated" against blacks and Hispanics.[145] To remedy these impacts, the court imposed quotas for hiring and promotions.[146] Over time, the quotas were reduced and eventually eliminated.[147] (Today, the use of racial quotas would be impermissible.)



By the mid-1990s, CPD was 65% white, 25% black and 9% Hispanic.[148]

Since then, Hispanics have seen significant gains within CPD, while blacks regressed slightly. In 2014, CPD was 52% white, 23% black and 21% Hispanic.[149] CPD is generally moving in the right direction, but it still has a ways to go to approach the racial makeup of the City.

The CPD has particular work to do when it comes to promotions. As of March 10, 2016, CPD Sergeants were 67% white, 14% black and 16% Hispanic. Lieutenants were 78% white, 11% black and 11% Hispanic. Captains were 70% white, 15% black and 9% Hispanic. And detectives were 64% white, 18% black and 16% Hispanic.[150]









In its most recent hiring sequence, which began in late 2015, CPD launched a recruitment drive aimed specifically at minorities.[151] In an interview with the Task Force, CPD's Director of Human Resources reported that, of the applicants who signed up for the test, approximately 40% were black, 40% were Hispanic and 20% were white. While these initial numbers are encouraging, minorities have been at greater risk of either dropping out or being screened out at various stages of the hiring process (e.g., the written exam, psychological exam or background check). More work on diversity still needs to be done.

### Recommendations

**CPD should develop and use recruitment, selection and promotion strategies that increase diversity and the likelihood that officers will be culturally competent, fair and impartial, especially when policing communities of color.**

The Task Force recommends that CPD develop and use recruitment, selection and promotion strategies geared to increasing diversity. As part of this work, CPD should analyze root causes for failing to attract minority candidates historically and assess the barriers to those candidates making it through the hiring and promotion process. Other departments have addressed these issues by strategically recruiting outside the city, reviewing cutoff scores for psychometrics exams and fitness tests, collaborating with local workforce development agencies and having a long-term strategy for mentoring youth of color.[152]

CPD should also seek to identify officers who have had exposure to diverse communities, are willing to reflect on their own behavior and inherent biases and have a desire to serve vulnerable populations. Officers certainly do not need to be of a certain race to effectively operate in communities of color, but CPD needs to do a better job of identifying officers who are likely to thrive in these communities and screening out officers who will not.

**CPD should hire a Deputy Chief of Diversity and Inclusion.**

Almost every large company or organization today has a diversity and inclusion program, typically overseen by a director or committee whose specific job is to manage diversity and inclusion efforts. CPD should be no exception. CPD should create a new Deputy Chief of Diversity and Inclusion position, with sufficient support staff. In addition to overseeing minority recruitment and promotion efforts, the Deputy Chief should be charged with overseeing the implementation of the Task Force's recommendations with respect to race, as well as overseeing how CPD's actions affect its minority "customers" in the community.

## TRAINING

Training is another important component to reducing racial bias. Everyone has biases. Police officers must learn to acknowledge and address their own.

In the Academy, probationary officers receive 24 hours of training in "Diversity Management," including "police citizen relationships, bias, prejudice, and hate."[153] Additionally, CPD reports that cultural competence is addressed at various points during training, as appropriate.[154] CPD generally teaches about bias and cultural competence through internal trainers. Often, police departments do not have a deep capacity for conducting training on fair and impartial policing and cultural competence issues. When the Task Force interviewed some of the trainers who deliver cultural-related content, not surprisingly, there seemed to be some lack of comfort in instructing officers on sensitive cultural topics and related issues.

CPD started, but has not completed, training on procedural justice. Procedural justice is a key component of 21st-century policing models. It is based on decades of research and practice showing that "people are more likely to obey the law when they believe that those who are enforcing it have the legitimate authority to tell them what to do. But the public confers legitimacy only on those they believe are acting in

procedurally just ways."[155] Procedurally just behavior is based on four principles: (1) treating people with dignity and respect; (2) giving individuals "voice" during encounters by listening to what they have to say; (3) being neutral and transparent in decision making; and (4) conveying trustworthy motives.[156]

In July 2012, CPD rolled out a first round of "Procedural Justice and Police Legitimacy" training. Nearly all officers have completed this 8-hour course.[157] In February 2015, CPD rolled out a second round of "Procedural Justice: A Tactical Mindset" training. So far, only approximately 2,500 officers—out of the more than 12,000 sworn officers in CPD—have completed this second 8-hour course.[158] CPD is currently in the process of developing a third round of procedural justice training that will specifically address implicit bias. CPD introduced the topic of implicit bias in the first two rounds, but the topic will be more fully developed in the third round. This training must not be allowed to stall.

### Recommendations

**CPD should adopt and promote a clear, progressive policing philosophy grounded in core values such as respect, protecting the sanctity of all life and protecting civil and human rights.**

Mission-driven organizations organize their cultures around core values that convey organizational aspirations, determine important outcomes and metrics, inform budgetary decisions and guide behavior. In organizations with a strong, mission-driven culture, these core values are made visible in numerous ways, including literally displaying them visually in words and images around the organization. Core values are then made "real" and "living" through practices and processes that shape the organization's employees, including through recruitment, selection, training, recognition and other incentives.

The President's Task Force on 21st Century Policing recommended that law enforcement embrace a "guardian" mindset to build public trust and legitimacy.[159] Historically, police have been trained more like soldiers, with a "warrior" mentality. But police officers are not soldiers. The President's Task Force observed that while "[s]oldiers come into communities as an outside, occupying force," "[g]uardians are members of the community, protecting from within."[160] The President's Task Force recommended that police departments adopt procedural justice as the "guiding principle" for the guardian mindset.[161]

Similarly, the Police Executive Research Forum ("PERF") has stressed the importance of a police culture of protecting "the sanctity of *all* human life."[162] Thus, rather than "think[ing] solely about their own safety," police officers should take "a broader approach designed to protect everyone's lives."[163] A number of police departments—including in Las Vegas and in Northern Virginia—have adopted use-of-force policies based on this broader approach.[164] The shift to a guardian model has many potential benefits for both communities and the police. Many police leaders believe that the approach increases police legitimacy, which ultimately results in more community collaboration and, in turn, decreases in crime.

CPD should adopt and promote a 21st-century model of policing where officers act as "guardians" of the community, not soldiers. This must be more than just a catchphrase. This philosophy must be promoted throughout the department, and at all stages of an officer's career—from recruitment to Academy training, field training and the field. This approach should be apparent not just to officers, but to the community as well.

**CPD should bring in experts and credible trainers to deliver comprehensive training on cultural competence and implicit bias for all recruits, officers and supervisors.**

CPD should expand its approach to teaching recruits, officers and supervisors about implicit bias and cultural competence. Because these are often uncomfortable topics and involve specialized knowledge, best practice is to bring in subject matter experts to teach this content and facilitate meaningful discussion. These trainers can also establish a "train the trainer" approach to build capacity within CPD. It is critically important that this training is provided from the "top down," signaling to the entire CPD that new approaches to building cultural competence and engendering fair and impartial policing are being taken. The Diversity People, Fair and Impartial Policing, Center for Police Equity and The Center for Human Diversity all have experience training police departments on these critical issues.

**CPD should involve the community in officer training that includes being trained by and partnering with community leaders, organizations and youth.**

Throughout its community engagement process, the Task Force heard from numerous community members about missed opportunities for CPD to leverage the strengths of communities. In its Academy and field training, as far as we can tell, CPD makes little effort to engage with communities in ways that enable them to educate officers about their strengths and assets. The Task Force recommends that CPD take an asset-based community development approach to training by bringing in members of the community to educate new officers on the assets that exist in the community, to discuss the roles that communities can play in helping to reduce crime and to partner with officers to achieve mutual goals.[165]

For example, CPD should consider integrating in its training: (1) youth panels, so that youth can talk to trainees and dispel negative stereotypes often held about youth of color and discuss how they would prefer to be engaged; (2) videos and other training materials created by community members that provide district-assigned officers with specific knowledge of the unique history and strengths of their communities; (3) youth- and community-led tours for district-assigned police officers that enable community members to highlight the assets in their neighborhoods; (4) tasking district-assigned officers with identifying key community leaders, institutions and organizations and developing relationships with these partners; (5) visits to neighborhood schools and regular roundtables with high school youth; and (6) participation in community service and other volunteer opportunities.

## DEPLOYMENT

CPD's current officer deployment strategies do little to reduce the potential for racially-biased policing. Because the deployment system is largely seniority-based, as mandated by collective bargaining agreements, younger and less experienced officers are often assigned to high-crime neighborhoods and the most difficult watches and beats. Many of these officers are placed in these high-stress situations with little to no experience or familiarity with the neighborhoods they will be policing. This is a recipe for trouble.

*Recommendations*

CPD, including the Deputy Chief of Diversity and Inclusion, should analyze deployment strategies to ensure officers are culturally competent and have a proper understanding of the neighborhoods where they are assigned.

As part of its analysis, CPD should also consider deploying more mixed race patrol teams whenever possible, particularly in communities of color.

Where possible, CPD should assign more experienced officers to high-crime districts, beats and shifts. If new officers are given these difficult assignments, they should be partnered with experienced officers with exemplary disciplinary histories and the proven ability to work with diverse populations.

## How should CPD involve the community in its policing efforts?

In the early 1990s, Chicago's Alternative Police Strategy ("CAPS") was designed to promote positive police interactions and engagement with the community as a key to long-term crime reduction. Its original architects were then-Deputy Chief of Patrol Charles Ramsey (recently retired Commissioner of the Philadelphia Police Department and co-chair of the President's Task Force on 21st Century Policing) and the civilian Director of CPD's Research and Development Division, Barbara McDonald. CAPS was tested in five police districts beginning in April 1993 and was rolled out City-wide in spring 1995.

As initially conceived, CAPS was based on five key features. First, CAPS adopted a problem-solving model. Rather than responding to individual calls, officers were expected to employ a proactive, prevention-oriented stance to neighborhood problems. The problem-solving model focused on chronic concentrations of related incidents, which could then be addressed by identifying and prioritizing problems, analyzing them, designing response strategies, implementing those strategies and assessing their success.[166]

Second, CAPS focused on turf orientation so that police would become more acclimated to the communities they served. Officers were supposed to stay in one place long enough to develop partnerships with and trust among community members and spend more time working with the community and less time answering radio dispatches. This was accomplished by assigning officers to particular beats, ideally for at least a year.[167]

Third, CAPS reorganized police to enhance communication and consultation with neighborhood residents. Community policing relies on active citizen engagement concerning the needs of the community, and it creates opportunities for resident involvement. This was accomplished through beat meetings between residents and police who work in the neighborhood and district advisory committees to advise Commanders in each police district.[168]

Fourth, CAPS expanded the police's role by allowing them to mobilize other city services to solve problems in particular neighborhoods (e.g., graffiti, abandoned vehicles and buildings, malfunctioning street lights and other signs of neighborhood disorder).[169]

Finally, CAPS relied on new tools to address chronic problems. These tools included crime maps and data to identify chronic problems, a roving task force to enforce housing ordinances and cooperation with

prosecutors, who would also get out into the community and work with beat officers on problem buildings.[170]

Over its first 5-10 years, CAPS had successes and failures. On the positive side, community involvement increased substantially. Beat meetings were held monthly, and nearly 390,000 Chicagoans attended beat meetings through the end of 2000.[171] Positive public perceptions of CPD increased, as measured in community surveys.[172] Crime dropped, though the extent of CAPS' contribution is not clear.[173] At least in the black community, surveys showed that neighborhood problems, such as physical decay, had dropped significantly.[174]

The results were mixed, however. CAPS never succeeded in involving youths.[175] Integrating Hispanic residents into the program was difficult.[176] The beat meetings were well attended but often failed to produce noticeable results, and few district advisory committees carved out a meaningful role.[177] Turf orientation proved difficult, as officers were called away on 911 calls, stretched too thin to spend significant time interacting with the communities and often transferred between districts or beats.[178] Similarly, it was difficult for officers to focus on problem-solving, as they dealt with large numbers of service calls.

CAPS also failed to tailor community outreach efforts to particular districts and instead relied on a uniform "cookie cutter" approach to community engagement.[179] Similarly, while beat meetings were well attended, CAPS did not succeed in consistently developing deep, genuine and lasting partnerships with local stakeholders.

By the late 2000s, funding for CAPS had been cut considerably.[180] Many CAPS personnel were based downtown, and civilian staff had been significantly reduced, resulting in fewer community outreach programs. Beat meetings were held less frequency (every two-three months instead of monthly) and often combined multiple beats at more distant locations. Attendance dropped off significantly after 2000.[181]

In early 2013, Mayor Emanuel tried to revitalize CAPS by shifting resources to individual districts, with each Commander responsible for tailoring the program to the neighborhood. Each district was assigned a CAPS Sergeant and two officers, along with a community organizer and a youth services provider. The overall budget for CAPS did not change, however.[182] The CAPS Sergeant and two officers in each district were still less than the Sergeant and six officers in each district at the height of CAPS.[183] The new initiative has not reversed the trend of decreased community participation, and public confidence in CAPS remains low.[184]

As the fate of CAPS sadly attests, community policing techniques are not self-sustaining. Unless it is thoroughly incorporated into the organizational structure of the police department at every level and continually rejuvenated with personnel, funding and other resources, community policing runs the risk of being marginalized and forgotten.[185] "Until community policing becomes the business-as-usual approach to policing—something that has probably been accomplished in relatively few departments—there is the grave possibility that it will vanish, even as it continues to be heralded as a sterling idea."[186]

### Recommendations

### CPD should adopt community policing as a core philosophy.

National best practices are clear—community policing must be treated as a core philosophy throughout CPD. Community policing cannot be relegated to a small, underfunded program. As the President's Task Force on 21st Century Policing recommended, community policing "should be infused throughout the culture and organizational structure of law enforcement agencies."[187] Similarly, the Department of Justice's Office of Community Orientated Policing Services recommends that police departments "adopt[] community service as the overarching philosophy of the organization" and make "an institutional commitment to community policing that is internalized throughout the command structure."

### CPD should replace CAPS with localized Community Empowerment and Engagement Districts (CEED) and support them accordingly.

The CAPS brand is significantly damaged and should be replaced. To promote community policing principles based on local community engagement, CPD should designate each of the City's 22 police districts as a "Community Empowerment and Engagement District." Within each CEED, district Commanders and other leadership should make a sustained effort to engage local stakeholders and develop strategies and partnerships for reducing crime. These CEED strategies should be individually tailored to each particular district.

Moreover, the CEED strategy should focus on developing a unified approach in each district, drawing from a variety of community programs that are already being pursued throughout the City. The CEED strategy should include training and developing officers on proven community empowerment and engagement approaches like Restorative Justice, Advanced Youth Development and Asset Based Community Development. These practices are currently being implemented by a variety of groups, including Bridging the Divide, Community Justice for Youth Institute, Alternatives, Inc., EMBRACE, RJ HUBS, FOUS Youth Development Services and the World Cafe.

### CPD should expand the methods it uses to communicate and work with neighborhood residents.

As part of CAPS, CPD often relied on a formulaic menu of methods for engaging the community. Those methods largely focused on beat meetings and district advisory committees. Especially as attendance dropped, those methods proved insufficient to consistently reach and engage members of the community. CPD should pursue alternative and flexible avenues for communicating and working with neighborhood residents. While it will not reach everyone, social media is a promising and largely untapped resource.[188] As part of a CEED strategy, district leadership should also proactively identify and contact key community stakeholders to develop strategies and partnerships for reducing crime.

### CPD should reinvest in civilian organizing staff.

One of the reasons CAPS is failing is because its civilian staff has dwindled to the point of ineffectiveness. As part of the CEED approach, CPD should invest in civilian staff to assist district leadership in organizing and mobilizing residents to address significant issues. CPD should ensure that the civilian staff has community organizing, restorative justice, advanced youth development

and other community development skills. While there will undoubtedly be a cost to building and maintaining this civilian staff, an effective community engagement strategy will pay dividends on the back end by reducing crime and increasing safety.

**CPD should renew its commitment to beat-based policing and work to expand community patrols.**

Beat-based policing is a critical component to any community policing approach. Officers must have time to get to know the communities they serve. The Task Force heard from many residents frustrated by frequent turnover of both officers and supervisory personnel in their neighborhoods. As the CAPS experience showed, it is very easy for beat-based policing to fall by the wayside as officers are pulled away on 911 calls or transferred between beats or districts. CPD must make a conscious effort to renew its commitment to beat-based policing and develop strategies that allow officers to truly learn their beats.

The community has a role to play as well. In addition to beat-based policing, community-led patrols have shown promise in reducing crime rates, increasing community safety and empowering the local community. For example, the City has successfully partnered with CPS and community-based organizations in the "Safe Passage" program, which creates routes where students can walk to school with safe passage workers.[189] Community-led patrols have also shown promise dealing with outbursts of violence, particularly during warmer weather. Police and community residents have also worked together to ensure the safety and success of community-wide events, such as midnight basketball and cultural-based community celebrations held in local public spaces. For these efforts to work, there must be strong, open communication between community patrols and the police, along with a clear shared decision-making structure at the local levels guided by both police and community residents.

**CPD should include information about how the public is being involved and how effectively neighborhood concerns are being addressed in CompStat.**

To show that community policing matters, CPD should include measures of community policing performance in CompStat. Before the recent Superintendent change, CPD was exploring a new "RespectStat" system, which would "analyze[] data on the quality of police-citizen interactions to provide constructive feedback to command-level personnel about performance in specific geographic areas."[190] The RespectStat proposal was based on community satisfaction surveys managed by the University of Illinois at Chicago.[191] CPD should integrate this data as part of CompStat. Also, as part of CompStat, CPD should gather and report information about how the public is being involved in each district.

# Are CPD officers adequately equipped to interact with youth?

The existing relationship between CPD and youth—particularly youth of color—can be described as antagonistic, to say the least. Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by those who have sworn to protect and serve them.[192] Throughout our community engagement efforts, including during our youth panels, we heard story after

story of officers treating youth with disrespect, humiliating them or worse. Overuse of stop and frisk practices, without any individualized reasonable suspicion, appears to be a particular problem.

The troubled relationship between CPD and youth is a significant missed opportunity. During our youth panels, we also heard positive stories from youth about police officers at their schools who had taken the time to get to know them, helped them solve problems and coached and mentored them. Many students had developed strong relationships with officers in their schools. Other youth talked about positive interactions with officers at a local station that hosted community events. However, the stories shared by local youth were overwhelmingly negative and painted a dark view of police-youth interactions.

Most CPD officers are not adequately trained or equipped to interact with youth. In the Academy, recruits receive 8 hours of training on juvenile law and processing and another 2 hours of training on intergenerational police-community relations. CPD has developed an advanced 40-hour "CIT-Youth" training for officers who have completed the basic 40-hour CIT training. Approximately 800 officers have completed "CIT-Youth" training.

In schools, in the late 1990s and early 2000s, CPS enforced a strict zero tolerance policy for misconduct by students. The zero tolerance policy merely accentuated a school to prison pipeline. Since then, CPS has undergone a shift from a "we need to get the bad apples out" approach to an approach of "we need to support student success and keep them in school," wherever possible. 75 schools now have officers assigned to the building, with an average of two officers per school. That number is down from 125 schools four years ago.[193]

CPS trains officers who will be assigned to schools and works closely with district Commanders to address and resolve concerns. These officers are generally expected to contribute to a culture and climate of calm by building relationships with students, supporting problem-solving and engaging in restorative justice practices. However, there does not appear to be a specific job description for officers in schools that provides a clear and shared understanding of their role. Based on our interviews, this lack of guidance leads to some inconsistency in what officers actually do from school to school.

### Recommendations

**CPD should evaluate and improve the training officers receive with respect to youths to ensure that all officers are prepared to engage with youth in ways that are age-appropriate, trauma-informed and based in a restorative justice model.**

Training police officers with respect to youth should have at least three key components. First, officers must learn age-appropriate treatment. Officers should work with an understanding of the fundamental differences between adolescents and adults and recognize that youth are biologically susceptible to impulsive, risk-taking and peer-influenced behavior. Officers should also know that youth possess a unique capacity for positive change. Youth are not miniature adults and should not be treated the same as the worst adult offenders.

Second, engagement with youth must be trauma-informed. Ultimately, police should protect the most vulnerable (children), even when they have done something wrong. To be trauma-informed means recognizing that most children who encounter the law—either as victims or offenders—tend to be some of the most abused, neglected and traumatized children in our society. Therefore,

officers should treat children with the utmost sensitivity to potential past trauma and do everything possible to not cause further harm. Subject matter experts are needed to train officers to respond appropriately and effectively to children who might have experienced trauma. The Substance Abuse and Mental Health Services Administration and the International Association of Chiefs of Police offer resources on these issues.

Finally, officers should be ready to use restorative justice models in appropriate cases. Arrest and detention should be reserved for the most violent youth offenders. Otherwise, diversion to community-based resources should be the first priority when working with youth. Restorative justice models have shown significant promise and typically involve inclusion of all parties (offender and victim), encountering the other side, making amends for the harm and reintegrating the parties into their communities. Again, CPD should bring in subject matter experts to develop a strategy for using restorative justice practices with youth.

**CPD and CPS should ensure that officers who are assigned to schools have clear job descriptions and expectations that are shared by CPS and CPD, receive extensive and ongoing training on how to engage with youth and crisis intervention and are swiftly reassigned if they fail to meet expectations.**

## Is CPD doing enough to protect human and civil rights?

Under the U.S. Supreme Court's ruling in *Miranda v. Arizona*, criminal suspects must be advised of their constitutional rights before statements they make to the police under interrogation can be used against them.[194] *Miranda* requires that the defendant be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[195] In addition to being advised of his rights, a defendant is also guaranteed the right to have counsel present at all "critical" stages of the criminal proceedings.[196] This constitutional right to counsel attaches at the defendant's initial appearance before a judicial officer.[197]

Illinois law supplements these constitutional safeguards with additional requirements for earlier access to legal counsel. State law provides that arrested individuals "shall have the right to communicate with an attorney of their choice and a member of their family."[198] Communication with counsel must be permitted by the police "within a *reasonable* time after arrival at the first place of custody."[199] A CPD general order also requires that individuals in custody be permitted to telephone a lawyer "within a reasonable period of time" after being taken into custody.[200] Finally, state law requires that all police stations advise persons in custody of their right to communicate with a lawyer by "post[ing] in every room, other than cells ... in conspicuous places where it may be seen and read by persons in custody and others, a poster" that explicitly outlines a defendant's right to counsel.[201]

And yet, few Chicagoans arrested by CPD consult counsel while in police custody. Based on our interviews, CPD generally provides phone access only at the end of processing, after interrogation and charging, while arrestees wait in lockup to be released or transferred to county custody. Remarkably, in 2014, only *3 out of every 1,000 arrestees* had an attorney at any point while in police custody.[202] In 2015, the City reports that out of a total of 113,018 arrests, only 702 Attorney Visitor Request Forms were filled

out by counsel—about 6 out of every 1,000 arrestees. The rates for filling out these forms varied widely by Area. In the North and Central Areas, there was 1 counsel visit for every 168 and 125 arrestees, respectively. In the South Area, there was 1 counsel visit for every 227 arrestees.[203]

Throughout our work, we have heard from community members that their rights are not protected. Individuals who have been taken into police custody frequently report being denied phone calls and access to an attorney. The police do not provide contact information for legal aid to arrestees. When individuals in custody attempt to invoke their legal rights to counsel, they report facing hostility from police. And counsel report that CPD often has difficulty telling them where an arrestee is being held at any given moment.

The City's youth are particularly vulnerable. Youth often lack awareness of their basic constitutional rights. CPS does not require instruction on this subject as part of the school curriculum. Further, as far as we can tell, CPD has not made the legal rights of juveniles a priority. We have heard that police frequently tell lawyers working on behalf of juveniles that their clients do not have a right to counsel or that the juvenile's guardian must approve a visit by a lawyer. Youth should be receiving more, not less, protection.

### Recommendations

**Train the community in Know Your Rights and Responsibilities, including by:**

(a) Creating a CPS policy and City Ordinance requiring that students receive instruction on how to exercise 4th, 5th and 6th Amendment rights; and

(b) Create a technology platform to assist with a public service announcement campaign and informational videos in police stations.

Everyone should know their rights. The Task Force recommends that CPS develop a compendium to teach all students their constitutional rights and how to exercise them when in contact with the police at some point between the 6th and 10th grades. The City should also create a technology platform to assist with a public service announcement campaign and informational video, to be broadcast at police stations, that will ensure that arrestees are made aware of their constitutional rights.

**The City should enact an ordinance, and CPD should promulgate general orders:**

(a) Mandating that arrestees be allowed to make phone calls to an attorney and/or family member(s) within one hour after arrest, allowing only for limited exceptions in exigent circumstances;

(b) Mandating that a legal aid or other provider be contacted within 30 minutes of the arrest of any juvenile, and that CPD wait for legal representation to arrive before any questioning of a juvenile occurs; and

(c) Confirming that CPD will prominently post information concerning rights to counsel, as already required under state law, and include any willing legal aid provider's name and 24-hour contact information.

The City and CPD should promulgate an ordinance and general order, respectively, expressly stating what time is "reasonable" for allowing arrestees to make calls to an attorney and/or family member(s). Several states, including California, Nevada, New Mexico, Rhode Island and Tennessee, require that an individual be able to telephone counsel within a specific time frame after arrest—ranging from one to three hours.[204] The Task Force recommends that arrestees be allowed to make calls within one hour of arrest. The ability for arrestees to call on counsel and to understand their constitutional rights "protects people at a time when they are most vulnerable, and is a key safeguard against … ill treatment."[205]

The Task Force recognizes that there may be limited instances where exceptions are warranted. The ordinance and general order should provide for exceptions where allowing arrestees to make phone calls within one hour would pose a clear and immediate threat to public safety, or where doing so would be impractical, such as if an arrestee is incapacitated due to a serious medical condition. If CPD invokes the exception in a given case, it should be required to explain and document the specific grounds in a particular case.

When CPD arrests a juvenile, the ordinance and general order should require that CPD contact a legal aid provider within 30 minutes of arrest, absent the same exigent circumstances as with an adult. CPD should then be required to wait for legal counsel to arrive and meet with the juvenile before any questioning occurs. This practice is consistent with Senate Bill 2370, which is currently pending in the Illinois Senate. That bill would require that all juveniles in police custody have legal representation before interrogation.

In addition, CPD should ensure that it complies with all laws—including existing state law—requiring posting of rights to counsel and that every reasonable attempt is made to ensure that detainees understand their rights. Postings should include any willing government or non-profit legal aid provider's name and 24-hour contact information.

## Endnotes

[72] Bill Ruthhart & Lolly Bowean, Distrust of Chicago Cops Helps Drive Emanuel's Low Approval on Crime, Chicago Tribune (Feb. 3, 2016), *available at* http://www.chicagotribune.com/news/local/politics/ct-rahm-emanuel-crime-poll-met-0203-20160202-story.html.

[73] African-Americans, Encyclopedia of Chicago, Chicago Historical Society (2005).

[74] Elaine Lewinnek, On the 95th Anniversary of the Chicago Race Riots, OUPblog (July 30, 2014), *available at* http://blog.oup.com/2014/07/chicago-race-riots-property-values-anniversary/.

[75] *Id.*

[76] *Id.*

[77] Report of the January 1970 Grand Jury, U.S. District Court, N.D. Ill. at 113 (May 15, 1970).

[78] *Id.* at 108.

[79] *Id.* at 86-89, 108-10.

[80] *Id.* at 126.

[81] *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979).

[82] Wilfredo Cruz, Minority Leaders Charge Police with "Disorderly Conduct," Chicago Reporter (Oct. 1, 1982), *available at* http://chicagoreporter.com/arrests-jump-sharply-minority-leaders-charge-police-with-disorderly-conduct/.

83 Maurice Possley, 800,000 Arrests Voided, Chicago Tribune (Mar. 31, 1984), *available at* http://archives.chicagotribune.com/1984/03/31/page/1/article/800-000-arrests-voided; William B. Crawford, Jr., Judge Criticizes City Lawyers for Arrest Suit Delay, Chicago Tribune (Apr. 4, 1984), *available at* http://archives.chicagotribune.com/1984/04/05/page/73/article/judge-criticizes-city-lawyers-for-arrest-suit-delay.

84 Partial Final Decree, *Nelson v. City of Chicago*, Case No. 83-C-1168 (N.D. Ill. Mar. 30, 1984).

85 Consent Decree, *Nelson v. City of Chicago*, Case No. 83-C-1168 (N.D. Ill. Aug. 3, 1990).

86 Unpublished article by Wesley Skogan, Public Complaints, Weapon Use and Force, Traffic Stops and Arrest Trends in Chicago (Jan. 2016).

87 Citing Race Angle in a Float, Parade Bars a Police Entry, New York Times (Mar. 10, 1993), *available at* http://www.nytimes.com/1993/03/10/us/citing-race-angle-in-a-float-parade-bars-a-police-entry.html.

88 Edward J. Egan & Robert D. Boyle, Report of the Special State's Attorney, Appointed and Ordered by the Presiding Judge of the Criminal Division of the Circuit Court of Cook County in No. 2001 Misc. 4 (July 19, 2006), *available at* http://www.aele.org/law/2006LROCT/chicagoreport.pdf.

89 U.S. Department of Justice Press Release, Former Chicago Police Commander Convicted of Perjury, Obstruction of Justice Related to Torture of Suspects (June 28, 2010).

90 *See generally People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶¶ 6-8.

91 *See, e.g., People v. Wilson*, 116 Ill. 2d 29 (1987).

92 Ryan Pardons 4, Chicago Tribune (Jan. 10, 2003), *available at* http://www.chicagotribune.com/chi-030110pardons-story.html.

93 *E.g.,* Jeremy Gorner, Former Chicago Police Cmdr. Jon Burge Released From Home Confinement, Chicago Tribune (Feb. 13, 2015), *available at* http://www.chicagotribune.com/news/chi-jon-burge-police-torture-released-20150213-story.html.

94 Hal Dardick & John Byrne, Mayor: "Sorry" for Burge Torture Era, Chicago Tribune (Sept. 11, 2013), *available at* http://articles.chicagotribune.com/2013-09-11/news/chi-city-council-settles-burge-torture-cases-for-123-million-20130911_1_burge-victims-burge-era-torture-era.

95 City Council Resolution (Apr. 14, 2015).

96 Working Group Interview.

97 *City of Chicago v. Morales*, 527 U.S. 41 (1999).

98 *Id.* at 56-58.

99 *Id.* at 56, 60-61, 64.

100 Data provided to the Task Force by the ACLU.

101 Independent Police Review Authority, Annual Reports, 2008-2015, Officer-Involved Shootings, *available at* http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports.html.

102 *Id.*, 2012-2015, Officer-Involved Taser Discharge.

103 *Terry v. Ohio*, 392 U.S. 1 (1968).

104 *Id.* at 24.

105 Stop and Frisk Practices in Chicago, supra *note* 16.

106 *Id.*

107 *Id.*

108 Wesley G. Skogan, Chicago Community Survey, Preliminary Survey of Findings (Dec. 29, 2015).

109 *Id.*

110 *Id.*

111 CPD Traffic Stops and Resulting Searches in 2013, *supra* note 15.

112 *Id.* at 4-5.

113 *Id.*

114 Angela Caputo, Chicago Police Sobriety Checkpoints Target Black, Latino Neighborhoods, Chicago Tribune (May 8, 2015), *available at* http://www.chicagotribune.com/news/watchdog/ct-dui-checkpoints-chicago-met-20150507-story.html.

115 Angela Caputo, Chicago Police DUI Checkpoints Still Concentrated In Minority Neighborhoods, Chicago Tribune (Sept. 11, 2015), *available at* http://www.chicagotribune.com/news/watchdog/ct-chicago-dui-checkpoints-met-20150909-story.html.

116 Citizens Police Data Project, 2011-2015 Use of Force, *available at* http://cpdb.co/data/bZQ5YL/20112015-use-of-force.

[117] Adeshina Emmanuel & Jonah Newman, Police Misconduct Complaints by Whites More Likely to be Upheld, Chicago Reporter (Nov. 10, 2015), *available at* http://chicagoreporter.com/police-misconduct-complaints-by-whites-more-likely-to-be-upheld/; Citizens Police Data Project, Findings, *available at* http://cpdb.co/findings/.

[118] Tanveer Ali, Black Officers Twice as Likely to be Punished by CPD: Data (Nov. 10, 2015), *available at* https://www.dnainfo.com/chicago/20151110/bronzeville/repeat-excessive-force-offenders-within-cpd-rarely-punished-data-shows.

[119] 21st Century Policing Task Force Report, *supra* note 48, at 12.

[120] National Initiative for Building Community Trust and Justice, Reconciliation, Community Oriented Trust and Justice Briefs, Washington, DC: Office of Community Orientated Policing Services (2015), *available at* http://ric-zai-inc.com/Publications/cops-w0794-pub.pdf.

[121] National Initiative for Building Community Trust and Justice, Reconciliation Process Overview (Draft).

[122] *Id.*

[123] Social Impact Research Center, Racism's Toll: Report on Illinois Poverty (Feb. 2016), *available at* http://www.ilpovertyreport.org/sites/default/files/uploads/PR16_Report.pdf.

[124] Patrick Sharkey, Stuck in Place—Urban Neighborhoods and the End of Progress Towards Racial Equality (Univ. of Chicago Press 2013).

[125] University of Illinois Chicago Great Cities Institute, Lost: The Crisis of Jobless and Out of School Teens and Young Adults in Chicago, Illinois, and the U.S. (Jan. 2016), *available at* https://greatcities.uic.edu/wp-content/uploads/2016/02/ASN-Report-v4.pdf.

[126] *Id.*

[127] University of Chicago Crime Lab, Short Term Results of the One Summer Plus 2012 Evaluation (2013); Safer Foundation Three-Year Recidivism Study (2010), *available at* http://www.saferfoundation.org/files/documents/Safer%20Recidivism%20Study%202008%20Summary.pdf.

[128] Chicago Municipal Code § 2-160-010.

[129] *Id.*

[130] CPD, General Order G02-01, Human Rights and Community Partnerships (July 4, 1992).

[131] *Id.*

[132] CPD, General Order G02-04, Prohibition Regarding Racial Profiling and Other Bias Based Policing (Jan. 1, 2016).

[133] U.S. Department of Justice, Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity (Dec. 2014), *available at* https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf.

[134] 625 ILCS 5/11-212(a)-(b).

[135] 625 ILCS 5/11-212(b-5).

[136] CPD/ACLU Investigatory Stop and Protective Pat Down Settlement Agreement (Aug. 6, 2015).

[137] *Compare id.* at I(1)(a) through (l) *with* 625 ILCS 5/11-212(b-5)(1) through (11).

[138] CPD, Special Order S04-13-09, Investigatory Stop System (Mar. 22, 2016).

[139] CPD/ACLU Investigatory Stop and Protective Pat Down Settlement Agreement, *supra* note 135, at II(3).

[140] CPD Data Portal, *available at* https://data.cityofchicago.org/Public-Safety/Crimes-2001-to-present/ijzp-q8t2.

[141] CPD, Statistical Reports, *available at* http://home.chicagopolice.org/inside-the-cpd/statistical-reports/.

[142] *United States v. City of Chicago*, 411 F. Supp. 218, 234 (N.D. Ill. 1976).

[143] *Id.* at 233-39, *aff. in part and rev. in part*, 549 F.2d 415, 429 (7th Cir. 1977).

[144] *Bigby v. City of Chicago*, 766 F.2d 1053 (7th Cir. 1985).

[145] 411 F. Supp. at 224; 549 F.2d at 435.

[146] 549 F.2d at 436.

[147] *E.g., United States v. City of Chicago*, 663 F.2d 1354 (7th Cir. 1981).

[148] CPD Data Systems.

[149] *Id.*

[150] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[151] WLS, CPD Is Hiring, Aims to Increase Diversity Among Ranks (Nov. 2, 2015), *available at* http://abc7chicago.com/news/cpd-is-hiring-aims-to-increase-diversity-among-ranks/1063634/.

[152] *See, e.g.,* Carl F. Matthies, Kirsten M. Keller & Nelson Lim, Identifying Barriers to Diversity in Law Enforcement Agencies, RAND Corporation (2012), *available at* http://www.rand.org/content/dam/rand/pubs/occasional_papers/2012/RAND_OP370.pdf; Alexa

Kasdan, Increasing Diversity in Police Departments: Strategies and Tools for Human Rights Commissions and Others, Kennedy School of Government, Harvard University (Oct. 2006), *available at* http://www.hks.harvard.edu/index.php/content/download/67469/1242686/version/1/file/increasing_police_diversity.pdf.

[153] Working Group Interview.

[154] Working Group Interview.

[155] 21st Century Policing Task Force Report, *supra* note 48, at 9; Tom Tyler, Why People Obey the Law (Princeton Univ. Press 2006).

[156] 21st Century Policing Task Force Report, *supra* note 48, at 10.

[157] Working Group Interview.

[158] Working Group Interview.

[159] 21st Century Policing Task Force Report, *supra* note 48, at 11.

[160] *Id.* (*quoting* Susan Rahr, Executive Director, Washington State Criminal Justice Training Commission).

[161] *Id.*

[162] Police Executive Research Forum, Re-Engineering Training on Police Use of Force, at 4 (Aug. 2015), *available at* http://www.policeforum.org/assets/reengineeringtraining1.pdf.

[163] *Id.*

[164] *Id.*

[165] John P. Kretzmann & John L. McKnight, Building Communities from the Inside Out, Evanston: Center for Urban Affairs and Policy Research, Northwestern University (1971).

[166] Wesley G. Skogan et al., Taking Stock: Community Policing in Chicago, National Institute of Justice, Office of Justice Programs, U.S. Department of Justice (July 2002), *available at* https://www.ncjrs.gov/pdffiles1/nij/189909.pdf.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.* at 8.

[172] *Id.* at 17-18.

[173] *Id.* at 20-24.

[174] *Id.* at 26.

[175] Wesley G. Skogan, *Trends in CAPS*, at 1 (Jan. 25, 2016).

[176] Skogan, *supra* note 165, at 2.

[177] Skogan, *supra* note 165, at 2-3.

[178] Skogan, *supra* note 165, at 8-13.

[179] Multiple Working Group Interviews.

[180] Phil Rogers, Emanuel, McCarthy Aim to Change CAPS, www.nbcchicago.com (Jan. 8, 2013), *available at* http://www.nbcchicago.com/blogs/ward-room/Emanuel-McCarthy-Aim-to-Change-CAPS-186084182.html.

[181] Skogan, *supra* note 165, at 8.

[182] Rogers, *supra* note 179.

[183] Working Group Interview.

[184] Multiple Working Group Interviews.

[185] *See* Mary Ann Wycoff, Making Sure Community Policing Is Here to Stay, at 210-11, in Community Policing: The Past, Present, and Future (Nov. 2004), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Community_Policing/community%20policing%20-%20the%20past%20present%20and%20future%202004.pdf.

[186] *Id.*

[187] 21st Century Policing Task Force Report, *supra* note 48, at 43.

[188] *See, e.g.,* 21st Century Policing Task Force Report, *supra* note 48, at 31-40; Community Orientated Policing Services, U.S. Department of Justice, and Police Executive Research Forum, Social Media and Tactical Considerations for Law Enforcement (May 2013), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Technology/social%20media%20and%20tactical%20consideratio ns%20for%20law%20enforcement%202013.pdf .

[189] City of Chicago, Chicago's Key Initiatives to Reduce Youth Violence: A Review of Investments and Results (2014), *available at* http://www.cityofchicago.org/content/dam/city/depts/fss/supp_info/YouthServices/YouthViolenceReport012814.pdf

[190] Garry F. McCarthy & Dennis P. Rosenbaum, From CompStat to RespectStat: Accountability for Respectful Policing, The Police Chief, 76-78 (Aug. 2015), *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=print_display&article_id=3812&issue_id=82015.

[191] *Id.*

[192] *See, e.g.,* Xavier McElrath-Bey, Brutal Treatment of Black and Brown Youths Reflects Disregard for Their Lives (Aug. 23, 2014), *available at* http://www.theroot.com/articles/culture/2014/08/police_brutality_toward_black_and_brown_youths_reflects_disregard_for_their.html.

[193] Working Group Interview.

[194] *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

[195] *Id.*

[196] *See United States v. Wade*, 388 U.S. 218, 227-28 (1967).

[197] *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 199 (2008).

[198] 725 ILCS 5/103-3(a).

[199] *Id.* (emphasis added).

[200] CPD, General Order G06-01-04, Arrestee and In-Custody Communications, Sec. VI. A (Jan. 29, 2015).

[201] 725 ILCS 5/103-7.

[202] *See* Bryan L. Sykes et al., The Fiscal Savings of Accessing the Right to Legal Counsel Within Twenty-Four Hours of Arrest: Chicago and Cook County, 2013, 5 U.C. IRVINE L. REV. 813, 816 n.13 (2015).

[203] Data provided by the City of Chicago via letter dated Mar. 18, 2016.

[204] *See* CAL. PENAL CODE § 851.5(a)(1); NEV. REV. STAT. § 153(1); N.M. STAT. ANN. § 31-1-5(A); TENN. CODE ANN. § 40-7-106(b); R.I. GEN. LAWS § 12-7-20.

[205] Early Access to Legal Aid in Criminal Justice Processes: A Handbook for Policymakers and Practitioners, United Nations Office on Drugs and Crime, at 7 (2014), *available at* http://www.unodc.org/documents/justice-and-prison-reform/eBook-early_access_to_legal_aid.pdf.

# Legal Oversight & Accountability

Chicago's police accountability system does not work. The system should identify and investigate police misconduct and then impose appropriate punishment. But at every step, there are enormous barriers. There are barriers that discourage citizens or police officers from reporting misconduct. There are barriers that make it difficult for CPD to identify misconduct. Once misconduct has been identified, there are barriers to investigating it fairly and thoroughly. Even in cases where there is some investigation, there are barriers to imposing discipline—including numerous ways to negate or dilute findings of misconduct that undermine real accountability. Standards are not clear for imposing discipline, so punishment is often arbitrary. And there is very little transparency, which further breeds mistrust.

The Task Force has repeatedly heard the frustrated conclusion of the community that the current system is a sham, and that it allows misconduct—including criminal behavior and other abuse—to go largely or entirely unpunished. The concerns are justified. Of the 28,567 allegations of misconduct filed against CPD officers between March 2011 and September 2015, only 2% of allegations result in actual discipline, after what was frequently a multi-year process.[206]

When case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity. It gives victims reason to question whether there is any point in reporting misconduct. It also leaves those who break the rules emboldened to continue doing so. Meanwhile, well-meaning officers are left to wonder why the system does not reward good behavior. The police oversight system must be fundamentally reformed in order to remove impediments to bringing complaints, identifying troubling behavior, investigating misconduct, intervening and, where necessary, imposing discipline. The system must operate in a timely manner, fairly and entirely without bias and with full transparency and accountability.

In this section, we begin by outlining the police oversight system as it currently exists. We then discuss fundamental questions that have been posed in the wake of high-profile police-involved shootings and how flaws in the current oversight system caused these realities to come into existence and continue unchecked. We then address specific recommendations, including the creation of a Community Safety Oversight Board, an Inspector General for Public Safety and a Civilian Police Investigative Agency ("CPIA"). The Community Safety Oversight Board and the Inspector General for Public Safety would be new and vital additions to Chicago's police oversight system, while CPIA would replace IPRA.



Overall, these reforms are intended to improve the transparency, independence and quality of the police oversight structure in Chicago. More technical details about recommended reforms are set forth in appendices at the end of this report.

## How does the existing police oversight system work?

The current police oversight system in Chicago developed piecemeal over time, without significant consideration of the whole. As a result, it is a tangled patchwork, involving hundreds of people in multiple entities, often working without any real oversight of their own work or coordination with each other. As a result, complaints can and often do take years to resolve, and frequently result in little or no discipline for the officer.

**IPRA.** The best-known piece in the current police oversight system is IPRA. IPRA is a 83-person civilian agency formed in 2007 and run by a Chief Administrator appointed by the Mayor and confirmed by the City Council.[207] IPRA is responsible for taking in all complaints against CPD members. Of the complaints it

receives, IPRA investigates many of the most serious types of officer misconduct such as excessive force, domestic violence, violent coercion or verbal, bias-based abuse.[208] IPRA also investigates any time an officer discharges a firearm or deploys a Taser, and any time a citizen is injured or dies in police custody. Over the past five years, IPRA has received 5,400 to 9,000 complaints per year, and opened another 1,300 to 3,000 investigations per year itself.[209]

**BIA.** Though IPRA serves as the initial intake point for all misconduct complaints, by law most are matters beyond its jurisdiction which it must therefore refer to the Bureau of Internal Affairs ("BIA"), within the CPD itself.[210] In 2015 BIA had a staff of 108 (though recent reports indicate a reduction to 93)—predominantly sworn CPD officers.[211] The complaints investigated by BIA typically include criminal misconduct, corruption, operational violations, substance abuse and off-duty incidents that warrant department oversight. The head of the BIA is a sworn CPD officer selected by the Superintendent. On average, BIA investigates approximately 3,000 complaints each year.[212]

BIA forwards complaints alleging lesser offenses—typically those that could result in a five-day suspension or less—to the 22 individual police districts. Over the past five years, on average, the police districts investigated approximately 2,200 complaints per year. While the police districts do not receive much attention in the public debate over the police oversight structure in Chicago, a significant number of cases land there.

**CPD Review.** If an IPRA or BIA investigation results in a sustained finding and the recommended discipline is not termination, the case is forwarded for review within the CPD by members of the accused officer's chain of command ("Command Channel Review"), and then to the Superintendent. If IPRA or BIA recommends termination, the case goes straight to the Superintendent. If the Superintendent agrees with the sustained finding and the recommended discipline, IPRA or BIA serve notice on the officer.

**Arbitration.** An officer can challenge sustained findings and disciplinary recommendations in arbitration. The specific procedure depends on an officer's rank and the level of discipline recommended. The arbitrator's decision is final.

**Police Board.** The Chicago Police Board is made up of nine civilians appointed by the Mayor and confirmed by the City Council. The Board's primary function is the adjudication of disciplinary cases where the recommended penalty is termination, as well as suspensions over 30 days for Sergeants, Lieutenants and Captains.[213] A contracted hearing officer presides over an evidentiary hearing, similar to a trial. The Board members review the record, and decide by majority vote whether the officer is guilty and, if so, what the penalty should be. The Board's decisions are appealable to the Circuit Court.





# Why does the community not have a role in the police oversight system?

At the Task Force's community forums, public comments repeatedly converged on two central themes: many residents across the City have lost trust in the current system of police accountability, and many will not trust an oversight system in which they do not play a meaningful role. The message is clear that substantial community involvement is an absolute necessity to build trust in the police accountability system.

The Task Force agrees that the police oversight system would benefit greatly from increased community involvement. A community oversight body is an increasingly common element of effective police accountability systems around the country. This would fill a gaping hole in Chicago's current system—one that would likely be required by the Department of Justice regardless of this Task Force's recommendations.

### *Recommendations*

**The City should create a Community Safety Oversight Board, allowing the community to have powerful involvement in the police oversight system.**

The Community Safety Oversight Board would be comprised entirely of community representatives and would have power to oversee CPD, the new CPIA and all police oversight mechanisms. The Community Board would ensure that CPIA and all components of the police oversight system are held fully accountable, operate with maximum transparency and perform their roles in a manner that is informed by community needs.

If the Community Board is to earn the legitimacy it requires and deserves, its precise powers and makeup should not be set by the Task Force, but should be developed with broad public input. The Mayor and the City Council should hold full and robust public hearings on the topic and fully vet the design and implementation of this critical body. Nonetheless, the Task Force does suggest that the Community Board's powers and authority include:

- Selecting the Chief Administrator of the new CPIA and conducting public hearings to make the selection.

- Requesting that the Inspector General for Public Safety perform specific audits and analysis of the policies, procedures and practices of CPD, CPIA and the Police Board that the community does not believe are being adequately addressed, and issuing recommendations based on the findings to which CPD or the relevant agency must respond.

- Requesting that the Inspector General for Public Safety perform specific audits of CPIA and BIA investigations of serious cases of alleged police misconduct or use of force to promote the quality and integrity of the investigations.

- Directing CPD, CPIA and the Police Board, through requests to the Inspector General for Public Safety, to collect and share data to facilitate community oversight.

- Analyzing all sustained findings and discipline recommended by CPIA, BIA or the Police Board to assess disciplinary trends, determine whether discipline is consistently applied and fair, and determine whether final disciplinary decisions are being executed.

- Conducting public hearings on any and all matters related to the CPD and its oversight entities.

- As representatives of the broader community, holding frequent public meetings.

In selecting Community Board members, it will be critical to establish a process that maximizes the Board's independence, ensures transparency and provides accountability to the public. The Task Force considered five methods for selecting Board members, which are summarized in Appendix 6. In sum, the Task Force considered elections, City Council or Mayoral appointment, a third-party application process and hybrid versions of these options.

Ultimately, each option has advantages and disadvantages, but a model that populates the Community Board solely through elections, or solely through Mayoral appointment, would undermine the Board's effectiveness and legitimacy at the outset.

The election model in particular has not been successfully implemented elsewhere, and brings a host of challenges. These include cooption by pre-existing power structures (e.g., well-funded groups could run slates of candidates and take over the Board), use by individuals looking for a political springboard, and a potential lack of diversity. Further, the cost and political nature of elections lead the Task Force to disfavor this method.

As part of any selection process other than direct election, the system should build in protections against manipulation. For example, qualifications should be established for the job, a screening committee could, after reviewing applications, select three people for every vacancy, and all could be required to participate in a series of public hearings to present their credentials and answer questions from a selection committee and the public. The Mayor, City Council or third party would then select or vote for one of three nominated candidates for each open position, or a selection committee could approve them.

## What are the barriers to identifying police misconduct? The Code of Silence and beyond.

The police cannot be held accountable for misconduct that is hidden. Yet there are many ways in which the current system serves to make it more difficult to identify potential misconduct. For years, people have talked about a "blue code of silence," an unwritten rule that says that a police officer will not report on another police officer's misdeeds.

In December 2015, Mayor Emanuel was asked if there is a "code of silence" that exists among Chicago police officers. "The short answer is yes," he said. Referring to the shooting death of Laquan McDonald, Mayor Emanuel conceded that "this isn't the first shooting where maybe there hasn't been honest reporting by officers who were there."[214] As he then explained in a December 9, 2015 speech to the City Council:

> *This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues. . . . We cannot ask citizens in crime-ravaged neighborhoods to break*

*the code of silence if we continue to allow a code of silence to exist within our own police department.[215]*

Current and former CPD officials have also increasingly acknowledged a "code of silence." Former Superintendent Richard Brzeczek (1980-83) has said that a code of silence "has always existed in the police department."[216] Eugene Williams, the current Chief of the Bureau of Support Services, and former Chief of the Bureau of Patrol, stated that:

> *[S]ix months of academy training cannot stand up to a career of "on the streets influence" by veteran officers who are all too anxious to show the rookies how things are really done on the streets. The way it is done on the streets is to protect and cover for your partner at all cost, even at the expense of sacrificing every ounce of one's integrity. This culture has been all too evident when we investigate thousands of allegations where the partner of the accused never sees, or hear[s] of any inappropriate conduct although they work in very close proximity of each other during their entire tour of duty. Yet, within this culture it is considered righteous to cut corners and embellish on the facts in a case report or arrest report to win a case in court.[217]*

The Task Force has found that the code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City. These impediments to identifying potential misconduct must be eliminated if CPD and the City are to end this persistent challenge.

## COLLECTIVE BARGAINING AGREEMENTS MAKE IT HARDER TO IDENTIFY MISCONDUCT

Police officers are often called upon to take great risks, and in order to protect themselves and the public, they are authorized to use force.[218] Any time an officer is alleged to have used excessive force, they are afforded all the due process protections the law provides. However, the Task Force found that in the interest of protecting police officers from unfair or unfounded allegations, the collective bargaining agreements (CBAs) between the four police unions and the City create unnecessary barriers to identifying and addressing police misconduct. Many provisions are out of step with national trends or pose impediments to accountability that are not sufficiently justified by the needs of due process.

Union leadership defends these CBA provisions, noting that they are the product of arm's length negotiations. But their members' foremost duty is to serve and protect the public. Any provision of the CBAs that impedes or obstructs accountability undermines that primary duty and violates the public trust. Eliminating or amending these provisions will allow valid complaints to be reviewed and make it easier to uncover patterns of abuse.

### *The CBAs discourage citizens from coming forward with complaints.*

The CBAs state that disciplinary proceedings cannot be brought against an officer unless they are based on complaints accompanied by a signed affidavit—a legal document in which the person filing a complaint swears that everything in the complaint is true and acknowledges that there are legal consequences for lying.[219] That may sound like a commonsense way to ensure that people do not bring false claims. But many citizens lack faith in the oversight structure or broader legal system and may think

that even if their complaint is justified, signing an affidavit could put them in legal jeopardy. The affidavit requirement keeps people from bringing complaints and helps some police misconduct remain hidden from view.

Without a signed affidavit, there is generally no investigation at all. Over the past five years, BIA closed an average of 537 complaints per year for lack of an affidavit. IPRA closed an average of 618 cases per year— or nearly 40% of investigations—over the past five years due to the absence of affidavits. Moreover, an analysis of CPD records from a four-year period ending in mid-December 2014 found that fully 58% of the 17,700 complaints of police misconduct filed with IPRA were tagged as having "no affidavit" and were therefore not investigated.[220] The amount of unsigned complaints leaves the City, and CPD, unable to fully understand the nature and challenges underlying these allegations of misconduct.

The CBAs allow for the Chief Administrator of IPRA and the BIA to in effect override the affidavit requirement after reviewing "objective verifiable evidence" and affirming that based on that evidence, "it is necessary and appropriate for the investigation to continue."[221] This provision is rarely used, and not to the extent it could and should be.

The CBAs also prohibit most anonymous complaints.[222] Like the affidavit requirement, this may discourage some people from bringing perfectly legitimate complaints. Indeed, more and more cities are recognizing that the cost of forbidding anonymous complaints greatly exceeds the benefits. Today there is a strong trend toward accepting them, including as part of court-enforced Department of Justice consent decrees (in New Orleans and Cincinnati).[223] Accepting anonymous complaints also allows a police department to use an additional set of data as a management tool for proactively addressing performance problems.

The CBAs also state that before an officer is questioned about alleged misconduct, he or she must be notified of the complainant's name.[224] If officers are put on trial for breaking the law, they clearly have a right to confront their accusers. And in an internal disciplinary hearing, if a complaint is sustained, fundamental fairness may warrant disclosure of the complainant, especially in cases in which the complainant is the primary witness. But there is a danger to enforcing this requirement while an investigation is still pending: it may invite an officer to intimidate a complainant, or even to seek retribution. Where many citizens already do not trust the police, this provision may provide one more reason not to come forward.

### *The CBAs make it easy for officers to lie in official reports.*

Under the CBAs, officers involved in shooting incidents cannot be required to provide a statement to IPRA until after at least a 24-hour period.[225] Critics contend that the waiting period provides officers time to protect themselves by agreeing on a false story they will all tell when they have their official interviews with investigators.[226] Chicago is not alone in providing this buffer of time and there is an argument that the memories of those involved in traumatic events are clouded by recent experiences. As scholars have noted, the evidence on the impact of stress on memory is very complex, with contradictory findings.[227] While the science is unsettled, the critics' view has gained support as evidence has emerged from more and more cases—including the shooting of Laquan McDonald—where police officers gave remarkably similar reports of incidents and later evidence made clear that the reports were simply not true. This makes it difficult to identify misconduct, especially where an incident was not captured on video.

Similarly, the FOP contract includes a provision that can be used to protect officers whose statements are contradicted by video or audio evidence. The contract provides that an officer cannot be charged with a false statement if the CPD, IPRA or BIA is in possession of video or audio evidence and (a) did not provide the officer an opportunity to review it prior to giving a statement, or (b) after giving a statement, the officer was not provided an opportunity to clarify and amend the original statement. This provision does not seem to serve any valid purpose. When an officer's report differs from the video or audio evidence, we should not assume that the officer knowingly made a false statement. But at the same time, we should not make it impossible to discipline an officer when there is evidence that a statement was knowingly false.

The CBAs further constrain investigations by dictating and micromanaging how interrogators may ask questions. For example, the FOP contract provides that: "Generally, the secondary interrogator will ask follow-up questions for clarification purposes. The primary interrogator will not ask any questions until the secondary interrogator has finished asking questions and invites the primary interrogator to ask follow-up questions."[228] Of course, CPD officers and detectives are not similarly constrained when they interrogate suspects.

As a result of the collective bargaining process, IPRA and BIA are also required to give officers highly specific notice of allegations, which threatens the efficiency and efficacy of the investigation.[229] For example, arbitrators have found that if an officer lies to investigators, IPRA must present the officer with a new set of allegations that specifically addresses the lie, or else IPRA cannot charge the officer with making a false statement.[230]

### The CBAs require officials to ignore and destroy evidence of misconduct.

Under some circumstances, the CBAs require that evidence of misconduct be ignored. For example, the CBAs forbid the investigation of complaints older than five years without permission of the Superintendent.[231] There is certainly a place for consideration of an applicable statute of limitations, as it is harder to prove or disprove events that happened long ago. And it is reasonable to require good proof before disciplining an officer. It is not reasonable to impose strict limitations on what matters can even be investigated. Misconduct may never come to light, and patterns may be more difficult to uncover. Principles of procedural due process, the application of evidentiary standards and consideration of mitigating factors better serves just outcomes consistent with the public interest than do absolute prohibitions on investigation.

Similarly, the CBAs require that in some cases where there is a finding that an officer engaged in misconduct, but the finding did not result in significant punishment, the information cannot be used against the officer after a short amount of time and must be removed from the officer's record entirely in a few years.[232] There is no compelling reason for these provisions. The CPD and the various police oversight entities should be able to draw on any relevant evidence and findings to identify potential patterns of misbehavior.

The CBAs also mandate the destruction of most disciplinary files after five years.[233] While the City has, in practice, not implemented the requirement for many years because it contradicts Illinois law, the language in the contract should be eliminated. Expunging records contradicts best practices, impedes the development of early intervention systems and deprives the public of information that is rightfully

theirs.[234] As noted above, it also deprives police oversight bodies of evidence of potential patterns of bad behavior. Moreover, it may also deprive wrongfully convicted persons of exonerating information.

Finally, the CBAs provide that CPD can only restrict secondary employment based on the nature of the employment or if the hours interfere with job duties.[235] Even that limited constraint is based on a system of officers policing themselves; unlike other City workers, police officers are not currently required to disclose secondary employment to CPD. The CPD is missing a key tool for identifying red flags that can be indicators of corruption, such as unexplained income, or addressing potential conflicts of interest and emotional stressors that may adversely impact performance that otherwise would not come to light.

### The CBAs make it harder to encourage officers to report misconduct.

The single best source of information about police misconduct is police officers themselves. Officers work extremely closely with other officers. Sometimes they are the only people who see what their fellow officers do. Officers have a duty to report misconduct,[236] though it seems clear that they routinely fall short of fulfilling that duty. The CBA disserves and arguably encourages noncompliance with this critical public duty by expressly prohibiting the CPD from rewarding officers who come forward as whistleblowers.[237]

## MISSED OPPORTUNITIES TO IDENTIFY MISCONDUCT

### No dedicated system exists to identify and address patterns or practices.

While they are charged with investigating police misconduct, IPRA and BIA historically have not engaged in efforts to identify officers whose records suggest repeated instances of misconduct or bias. They also historically have not engaged in efforts to identify broader patterns or practices either of misconduct or racially biased policing within CPD. The persistent failure of IPRA and BIA to examine pattern and practice evidence substantially contributes to the police accountability vacuum in Chicago.

Effective police oversight means not just examining individual incidents, but also information in the aggregate—identifying troubling trends and making sure that patterns of abuse or malfeasance are identified and prosecuted. That means identifying officers whose records suggest repeated instances of misconduct or bias, and exploring why a disproportionate number of complaints are concentrated in certain units.

Since its inception, IPRA has had the power to examine patterns of complaints when investigating police misconduct, but has not exercised it.[238] The tragedies and scandals involving CPD officers have consistently involved individuals and groups of officers who had amassed patterns of complaints that went unchecked and underinvestigated by CPD and the City. IPRA is positioned to function as a feedback loop to inform and improve CPD policies, practices and training. IPRA's failure to effectively analyze and apply its expansive knowledge of policing is a lost opportunity that perpetuates the status quo by shielding ineffective and illegal practices from scrutiny, and puts citizens at risk by allowing abusive officers to remain in the field.

### Police officers have no method to report misconduct confidentially.

In recognition of the inherent difficulties in reporting misconduct by coworkers, many organizations including corporations, federal agencies and—in a few instances—police departments, have implemented whistleblower hotlines to allow anonymous reporting of unethical or improper conduct.

The Task Force is aware of at least one police department that has established a hotline. San Diego established an anonymous, confidential hotline in 2011 with 24/7 availability.[239] The hotline received over 100 calls in the first month and then a total of 300 calls in the 18 months that followed. Calls are recorded as messages, and the Chief of Police conducts an initial review of messages on a daily basis before forwarding them for follow-up.

### Information from outside lawsuits is not used.

Additionally, police oversight bodies have not used valuable information from outside lawsuits to generate investigations. The civil rights and criminal defense bars in Chicago have, through decades of litigation, developed rich data regarding CPD policy and practice. This information has largely been untouched by the various oversight entities. This represents a significant missed opportunity to ensure accountability.

### Recommendations

**When the CBAs are renegotiated in 2016 and 2017, the Mayor and the Law Department should seek to eliminate or revise provisions that perpetuate the code of silence and make it more difficult to identify misconduct.**

The following CBA provisions should be removed or revised:

- The affidavit requirement should be removed so that investigators can identify additional cases of police misconduct.

- Anonymous complaints should be allowed to encourage reporting by those who fear retaliation, including whistleblowers.

- Officers should not be informed of the complainant's name prior to interrogation. There is little need for the officer to know the name of a complainant prior to interrogation if it is later disclosed during the resolution of the case.

- The provisions delaying interviews in shooting cases for at least 24 hours should be revised to ensure that officers are separated and remain separated from other officers until all officers have given statements. The Department of Justice's Consent Decree with the Los Angeles Police Department contains such a requirement.[240] When formal questioning begins, the inquiry will start with a recitation of any and all conversations that the officer has had with law enforcement between the shooting and the commencement of the interview.

- Officers should no longer have a right to amend statements if they have not been provided with the audio or video evidence, and reviews of the footage should not be pre-conditions to charging a Rule 14 violation.

- Investigations of complaints known to the CPD for five years or more should not require Superintendent permission. This is an unnecessary rule, as the statute of limitations will apply for criminal matters and, for administrative matters, the nature and severity of the conduct should determine whether the complaint should be investigated. Should an individual continue to make such decisions, the authority should be vested in someone outside of the CPD, such as the Chief Administrator of IPRA (or its successor, CPIA).

- The provision requiring destruction of records should be eliminated. The rule is in tension if not outright conflict with general principles of public record-keeping, and deprives the public of important information that is rightfully theirs and may include the destruction of information that serves numerous operational and public policy objectives.

- The provision that forbids the CPD from rewarding officers who act as whistleblowers should be removed.

- The CBAs should be amended to require police officers to disclose secondary employment, as other City workers are required to do.

- The FOP contract dictates the manner in which interrogators can ask questions, which presents an unnecessary burden on interrogators and potentially sets them up to violate the CBA for a technicality. The policy does not appear to comport with any best practices, and should be eliminated.

- Officers must be informed of the nature of the allegation prior to interrogation. This provision is presently interpreted very specifically to mean a detailed recitation of the facts that support all possible charges. Moreover, if the officer lies to investigators during the investigation, new allegations must be presented to the officer. This provision should be amended to allow for more general recitation of allegations.

### The Mayor and the City Council should create an Inspector General for Public Safety, to be housed within the City of Chicago Office of the Inspector General.[241]

The creation of an Inspector General for Public Safety will greatly enhance the transparency, accountability and quality of Chicago's police oversight structure. The Inspector General for Public Safety should have a broad grant of authority so that it is empowered to examine and make recommendations regarding the full scope of police department-related activity. Effective execution of its duties will require new, dedicated funding and specialized personnel.

Over the past few decades, the number of police inspectors general has grown substantially and a consensus has emerged that these auditors play a unique and essential role. In sum, this role will police the police as well as the entire police oversight system in Chicago. While there is need for police oversight bodies that focus on investigating individual allegations of misconduct, the Inspector General for Public Safety would go farther and work to identify and address patterns of police misconduct or racial bias. In its ideal form, it will review past acts within the system to uncover what is not working, monitor ongoing actions to improve the system of today and recommend policy changes to ensure systemic improvements for the future.

The Inspector General for Public Safety should be empowered to identify misconduct and racial bias and their sources by auditing and monitoring patterns of police activity and complaints. The pattern analysis should include, but not be limited to: officer use of force; police-involved shootings; use of any weapon used to inflict pain and/or gain compliance; allegations of warrantless searches, theft or other criminal activity; and potential bias including but not limited to bias in policing related to race, ethnicity, gender, sexual orientation, gender-identity and geography. The pattern analysis could also include analyses of lawsuits and other relevant data to identify individuals and groups of officers who may be engaged in a pattern of misconduct.

Analyzing patterns can be incredibly powerful. Many individual complaints are not sustained because the complainant tells one story and the officer tells another, and there is no independent evidence to support either side. But evidence that an officer may have a pattern of bad behavior, particularly a pattern of a specific kind of bad behavior, can identify problems that an investigation into a single "he said, she said" incident could not.

This kind of pattern analysis can also identify underlying management problems that are likely to lead to misconduct. Investigation of individual incidents places the focus on an individual bad actor, when the bigger problem may be the organizational culture that either promotes, acquiesces in or fails to address bad behavior or their indicators. Similarly, pattern analysis, focusing on police department policies and procedures may help to uncover the underlying causes of chronic misconduct, like when an outdated policy or a lack of training leads multiple officers to make bad decisions or engage in misconduct.

The Inspector General for Public Safety would also review policies and practices of CPD and the police oversight bodies in order to identify systemic problems and propose changes in policies and procedures, training and supervision. Further, the body should use complaint history for purposes of identifying patterns and share these results with CPIA and BIA. In this way, the Inspector General for Public Safety would help prevent future misconduct, criminal behavior and biased policing. In all areas, the Inspector General for Public Safety would also be authorized to follow up to determine whether changes have been implemented and are effective.

Pattern and practice analysis should not only be the job of the Inspector General for Public Safety. The new CPIA (discussed below) and BIA must conduct pattern and practice analysis both proactively and reactively as part of their disciplinary investigations. CPIA should conduct regular and systematic analysis of citizen complaints, civil rights lawsuits, uses of force, hearings on criminal motions to suppress, judicial findings, incidents where individuals were charged with offenses commonly believed to cover up police misconduct and other relevant evidence. When CPIA identifies potential patterns of abuse, it should launch disciplinary investigations as appropriate and refer its findings to the Inspector General for Public Safety for possible broader program analysis and recommendations.

The new CPIA and BIA should also be required by law to share specified information with the Inspector General for Public Safety in order to identify potential misconduct or sources of misconduct. This could include information uncovered through pattern and practice analysis. For example, CPIA and BIA should be required to report monthly to the Inspector General for Public Safety any problems and deficiencies relating to CPD's operations, policies, programs and practices

that would reasonably be expected to adversely affect the effectiveness of CPD, public safety, the exercise of civil liberties and civil rights or the public's confidence in CPD. New York City and Denver have similar requirements.

Within the Inspector General for Public Safety, there should also be a Diversity and Inclusion Monitor specifically charged with reviewing CPD's actions for potential racial and other bias, along with reviewing CPD's anti-discrimination policies and procedures and tracking the consequences for violations of these policies and procedures. The Diversity and Inclusion Monitor would make bi-annual reports to the new Community Safety Oversight Board on CPD's performance by race, any racial disparities or discrimination and the consequences administered for policy violations and other race-related misconduct.

Some key features of the new Inspector General for Public Safety are discussed in the remainder of this section, and are addressed in further detail in Appendix 6.

**CPD should create a hotline for department members, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.**

Hotlines are well documented in the private sector and federal government, and research into their experiences provides further guidance. Keeping hotlines open outside of normal work hours is important for facilitating reports from employees that feel more comfortable when they are able to report outside of the workplace.[242] Anonymity and explicit procedures for the protection of a whistleblower from retaliation are important to fostering the trust in the program.[243] Employees often trust third-party hotline services more than internally-operated hotline services, suggesting that a fellow police department colleague (or supervisor) should not be the one answering the phone.[244]

## Why are investigations ineffective and biased?

Citizens have little to no faith in police misconduct investigations. Officers, likewise, are not forced to take the existing system seriously. From start to finish, investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias.

### THE MEDIATION PROCESS UNFAIRLY PREEMPTS INVESTIGATIONS

IPRA and BIA preempt full inquiry into potentially serious misconduct and abuse allegations through what they call a "mediation" process. In reality, this process functions as a form of plea bargaining. It requires that an officer admit to alleged misconduct in exchange for reduced punishment. IPRA and BIA then close the case without a complete investigation. This mediation process was originally intended as an efficient way to address complaints about minor infractions for which multi-year investigations were unwarranted.

The mediation process is now used in cases involving serious misconduct that could warrant lengthy suspensions or even termination. This is especially troubling given the fact that CPD oversight agencies

have been using mediation more frequently. IPRA's use of mediation has increased considerably in recent years, going from just 15 cases in 2011 to over 100 in 2013 and 68 in 2015. [245] BIA reported performing an average of 11 mediations per year since 2012. In the first few months of 2016, BIA has performed 12 mediations.

IPRA has historically had no criteria or limitations to determine which complaints are eligible for mediation. In cases mediated in 2015, officers agreed to accept IPRA's sustained findings for: slapping, punching and directing profanities at a victim; striking a victim in the head while she was handcuffed and on her knees; hitting a victim/girlfriend multiple times, fracturing her nose; striking a victim's head on concrete and failing to render assistance; and strip-searching a minor without justification, authorization or completing documentation.[246] Closing cases like these without complete investigation deprives the City of important information about potentially criminal conduct and officer fitness and, as some reasonably argue, furthers CPD's code of silence.[247]

BIA has developed some standards and criteria regarding what types of complaints it will consider mediating—yet none of these standards are formalized in writing. At best, before approving mediation for an investigation, BIA reviews the case for appropriateness, especially when the request for mediation comes from the union.

This standardless plea bargaining system is an impediment to appropriate investigation and true accountability. However, a true mediation program can be a valuable part of an effective police accountability system. Other cities take a very different approach than Chicago. Unlike Chicago's program, mediation programs in many other cities involve face-to-face meetings between citizens who brought complaints and the police who are the subject of the complaints. In model programs, these meetings are facilitated by a neutral third party.[248] Such an approach both meets with best practices and, more importantly, is aligned with the objectives of restorative justice that is an important missing element of community-police relations.

Studies show that mediation programs that involve citizens produce positive outcomes for citizens as well as police. A study of the Denver mediation program found that almost 60% of complainants were satisfied with the outcome and 75% were satisfied with the process; officers' rates of satisfaction were high as well—68% were satisfied with the outcome and 79% with the process.[249] Additionally, in at least one study, mediation was found to correlate to fewer complaints in the follow-up period included as part of the evaluation, suggesting that mediation may have an impact on future officer behavior. Officers who engaged in mediation had statistically fewer discourtesy and improper procedure complaints following the mediation, compared to the control group officers.[250]

High satisfaction rates may be largely explained by the fact that traditional police misconduct investigations do not focus on providing what most complainants actually want. Studies of complainants' goals indicate that few want to see the officer punished, but many instead just want to report the incident, desire an apology or explanation from the officer or would like to meet in person and express themselves to the officer.[251]

## INVESTIGATIONS ARE COMPROMISED BY REAL AND PERCEIVED BIAS AND CONFLICTS OF INTEREST

Early on in its tenure, IPRA enjoyed relative independence from City Hall and spoke to the media freely, without prior approval of either timing or content. In contrast, the tragic fatal shooting of Laquan McDonald exposed levels of collaboration between the administration and IPRA with regard to messaging.

Personnel and staffing practices pose an unacceptable risk of producing biased investigations. IPRA is a civilian entity and therefore is intended to be free of bias in favor of the police. However, IPRA's leadership as recently as 2014 was comprised entirely of former law enforcement officials, which throws serious doubt upon the agency's ability to be independent and lends credence to concerns that bias pervades IPRA's findings. Additionally, the fact that candidates for certain IPRA positions must be reviewed by City Hall further compromises the independence of its staff.[252]

Shooting investigations show an institutional bias toward police. Of the 400 officer-involved shootings from 2007 (when IPRA was created) through 2014, less than 1% have been found unjustified.[253] This number appears to be particularly troubling in light of the fact that Chicago tops big cities in fatal police-involved shootings.[254] The legitimacy of these findings is further questioned by allegations that IPRA maintained a highly problematic policy permitting the Chief Administrator to order investigators to change findings without creating a record of the disagreement.[255]

Moreover, where investigations are carried out at the district level, an officer's direct supervisor is involved. That can easily create a conflict of interest for a number of reasons, including where the supervisor may have given orders that led to the officer's alleged misconduct. Additionally, the district investigations are structured inconsistently depending on the district—some have Sergeants and Lieutenants rotate doing investigations, others dedicate one specific person to this function—which poses an obstacle to oversight and accountability.

## RESOURCE AND STAFFING CONCERNS IMPEDE EFFECTIVE INVESTIGATIONS

IPRA's budget is insufficient and unprotected. IPRA's budget in recent years has not adequately supported the needs of the agency, and any increases are subject to the political process like most other agency budgets. For IPRA, a watchdog, this poses an inherent conflict of interest, as IPRA should not be at the mercy of the Mayor and City Council for its funding.

BIA struggles to recruit qualified sworn personnel, and both BIA and IPRA do not provide adequate training, which directly affects the quality of investigations. The ability to recruit a motivated and talented staff is critical to the success of any organization. It is difficult for BIA to attract qualified department members, as investigating misconduct is a politically challenging and often thankless task. For those staff it does have, BIA has been unable to secure sufficient funding for training, despite making requests. IPRA likewise has an inadequate non-personnel budget to meet, in addition to basic office needs, training and information technology needs critical to a high-functioning investigative agency.

Outdated, inadequate and fragmented technology systems are also a significant obstacle to effective investigations. IPRA and BIA use a computer case management system, CLEAR, a database CPD operates. IPRA's reliance on CLEAR hinders its effectiveness and transparency, and potentially compromises its independence in appearance and fact. However, IPRA lacks the technology, infrastructure and staff

expertise to manage its own data systems. As a result, IPRA lacks robust access to CPD information and data. The limited functionality of CLEAR needlessly causes challenges when IPRA attempts to carry out basic core functions, such as uploading and viewing video, and does not facilitate data analysis.

Case management at the district level is not done in CLEAR, but rather using a paper-based system. This poses an obstacle to coordination and timeliness of investigations, as BIA cannot systematically track the status of the investigations.

## UNNECESSARY INVESTIGATION DELAYS

IPRA investigations have consistently been suspended while the Cook County State's Attorney's determined whether or not it would move forward with criminal charges under the same set of facts IPRA was investigating. The practice led to long delays in investigating and resolving IPRA's cases after the State's Attorney's Office closed its investigation. This need not be the case. While it may sometimes make sense for an IPRA investigator to pause an investigation to preserve the integrity of the criminal matter, this rule should not be applied universally in all cases, particularly where a delay is adverse to the City's and the public's interests in administrative justice.

## INSUFFICIENT TRANSPARENCY IMPEDES OVERSIGHT OF INVESTIGATIONS

Overall, IPRA lacks transparency in both its processes and data, which makes it more difficult for independent entities or the public to assess the quality of its work. The data that IPRA does provide is confusing, incomplete and challenging to use. IPRA has not published an annual report since 2012, and is under no legal obligation to do so. While IPRA does post summaries of de-identified sustained investigations, the agency does not provide any substantive information related to other investigation dispositions. IPRA does not post any information about the final disposition of its investigations, which can occur years after IPRA's sustained finding and often result in different discipline. There are several critical activities IPRA engages in that are not sufficiently governed by written, thoughtful or transparent policies. Key among these are the affidavit override process, mediation criteria, early warning policies, discipline criteria and the litigation review process.

Investigations and discipline from BIA and the districts are not transparent in almost every respect. There is no way for the public to follow a complaint through the process. The only information BIA posts is contained in a single, 2-3 page annual report, listing the number of "complaint logs received by initial category" for the most recent and previous year. The report also includes basic Police Board data for the year. This information is difficult to locate on CPD's website. The report for 2015 is not yet posted as of April 2016. BIA and the districts do not provide the following information: the investigating entity (district or BIA), complaints closed for lack of affidavit, average duration of investigation, recommended discipline for sustained complaints, and summaries of sustained or not sustained investigations.

### Recommendations

**IPRA should be replaced with a new Civilian Police Investigative Agency. The City Council should enact legislation that ensures CPIA is established in accordance with the principles described in the report.**

There is little doubt that IPRA is badly broken. The more difficult question is what to do about it. The Task Force carefully considered whether IPRA should be allowed time to implement reforms, or if it

is simply beyond repair. The Task Force does not take this question lightly. Like CPD, IPRA undoubtedly has many employees who perform their job every day trying to do the right thing and are dedicated public servants. And IPRA's current leadership appears dedicated to enacting necessary reforms. They have done admirable work in a short amount of time, all while facing uncertainty over the agency's future.

Nonetheless, it is clear that IPRA has lost the public trust. IPRA has failed to perform its duties as a civilian police monitor and oversight agency fairly, competently, with rigor and independence. IPRA's record of incomplete and botched investigations, such as that reflected in public reports of court findings in the recent excessive force trial involving Commander Glen Evans, coupled with its dubious track record of finding virtually every police-involved shooting of civilians to be justified—all of these factors and more have seriously undermined IPRA's effectiveness and impaired its ability to build trust in the community. Without the public trust, IPRA cannot fulfill its critically important police oversight functions.

Recently appointed Chief Administrator Sharon Fairley has initiated substantial reform efforts at IPRA that should be applauded. However, the perception that IPRA is irretrievably broken remains widespread and profound. A police oversight body charged with investigating the most severe misconduct, abuse and brutality cannot fulfill its most basic function in the face of such widespread mistrust. According to a recent poll, 64% of all Chicagoans believe that cover-ups and a code of silence are widespread problems in CPD.[256] The Task Force believes that this view of policing is fueled by the clear message that bad police officers are able to act with impunity—that police oversight bodies, the most well-known of which is IPRA, do not hold police officers accountable.

For these reasons, the Task Force recommends that IPRA be stood down and replaced with a new, more independent and well-resourced CPIA. CPIA will serve the same core function as IPRA—taking citizen complaints and investigating serious cases of police misconduct. CPIA will not be the same body with a different name, however. The Task Force recommends reforms to create a true culture of accountability and transparency.

To provide greater independence and accountability to the community, the Chief Administrator of CPIA should be selected by the new Community Safety Oversight Board. The selection of this position should be insulated from politics, transparent and widely inclusive. Moreover, the City should establish hiring standards for CPIA investigators to avoid bias, or the perception of bias. Previous sworn CPD employees (and non-sworn if they have worked for CPD in the past five years) and employees of the Cook County State's Attorney Office should be prohibited from serving as investigators and/or the Chief Administrator. Individuals who hold these positions must reflect the city's diversity.

Additionally, CPIA's independence would be protected by giving it sufficient resources and powers to conduct prompt, unbiased and independent investigations. CPIA's funding would be set as a percentage of CPD's budget so that the office cannot be defunded. This funding should provide CPIA with sufficient resources and powers to conduct prompt, unbiased and independent investigations into police misconduct. Best practices within the field indicate that the budget should be tied to a minimum floor of 1% of CPD's budget and/or a ratio of at least one CPIA investigator for every 250 sworn CPD officers.

In order to further ensure CPIA's independence, CPIA should be able to retain its own counsel and represent itself in legal proceedings. It should have the power to collect evidence, conduct prompt interviews, subpoena witnesses and enforce subpoenas through its counsel. CPIA should be allocated technology and infrastructure resources sufficient to manage its own data systems, tracking software and case management capacity so that it does not need to rely on CPD for technology that might bring into question its independence.

CPIA's jurisdiction would be increased to include unlawful searches and seizures, false arrests and denial of access to counsel. At the end of CPIA's first year of operation, an independent entity will evaluate whether further expanded jurisdiction is appropriate or achievable. CPIA would also have jurisdiction to conduct follow-up investigations in any case where it has original jurisdiction—e.g., if an officer files a false police report.

CPIA should also be empowered to investigate any incidents that fall under its jurisdiction, even in the absence of sworn complaints. No credible allegation should be ignored because of technical complaint submission requirements. CPIA should be able to launch investigations based on any credible source, including media accounts, a review of use-of-force reports or referrals from other oversight entities.

CPIA should gather and leverage data generated by civil litigation and criminal motions to suppress to investigate potential police misconduct. CPIA should be charged with investigating all civil lawsuits, which if submitted as a complaint, would fall under its jurisdiction. Further, to determine if an investigation is warranted, CPIA should develop a process to analyze all criminal motions to suppress that allege facts, which if submitted as a complaint, would fall under its jurisdiction. As mentioned previously, CPIA should also be expected to play a role in investigating policies and practices and using the findings to inform its investigations. In addition, CPIA (along with BIA) should examine officers' complaint histories and relevant complaint investigative files as standard, required parts of every disciplinary investigation into police misconduct.

CPIA should ensure an accessible, professional and supportive complaint process. Victims should be able to file complaints via the internet, over the phone and in their communities. Practices should be informed by national models, such as the New York City's Civilian Complaint Review Board, which has developed a model of hosting meetings within city neighborhoods on a posted rotating basis to take and verify complaints. CPIA should also provide support services to complainants, including regular updates regarding investigations, information about the process and outcomes, and referrals to outside service providers when needed. CPIA should conduct community education and engagement campaigns to educate the public about the complaint/investigative process and their rights. All CPIA investigators should be trained to work with victims of trauma, and taught to conduct victim/trauma-sensitive interviews.

Finally, CPIA should operate with complete transparency. At present, there is simply no way for a citizen to easily track a complaint. In contrast, the New York City Citizen Complaint Review Board allows tracking of all cases via its website.[257] Chicago is behind the times and needs to catch up to sufficiently serve its citizens. CPIA must also prioritize keeping the general public informed by posting summary reports of each completed investigation; publishing comprehensive annual reports

on its work; and by establishing a transparent process to make training, policy and procedure recommendations to the CPD.

**The Inspector General for Public Safety should be given express authority to audit, monitor and review investigations of individual cases of police misconduct.**

The Inspector General for Public Safety should be authorized to audit, monitor and review the quality and integrity of individual investigations and findings. This may include reviewing a completed investigation or monitoring an ongoing investigation. It should be empowered to request that individual investigations be expanded or reopened and, if the investigating agency refuses, to conduct the investigation itself. When investigations into serious uses of force do not result in sustained findings, the Inspector General for Public Safety should be required to work with CPIA and CPD to conduct Force Analysis Panels to determine if the incident revealed any systemic deficiencies in training, policy, supervision or equipment.

**If CPIA and BIA continue "mediating" complaints alleging officer misconduct, they should develop clear standards for mediations and implement new processes.**

The Task Force understands that the current mediation system has some benefits, particularly when investigating cases that allege minor infractions, which may not warrant the use of limited resources to investigate fully, and domestic violence cases, which are notoriously difficult to prove. We recommend that if CPIA and BIA continue alternative dispute mechanisms such as "mediation," the process should be reformed to proceed on the basis of formal, jointly developed eligibility criteria that take into consideration, at a minimum, the severity of the allegations, the officer's disciplinary history and the quality and quantum of evidence. The criteria should (1) be informed by national best practices; (2) prohibit pleas in complaints concerning conduct that, if sustained, would result in serious discipline; (3) be tied to a discipline matrix; (4) be made publicly available; and (5) involve the complainant where appropriate.

Reasonable limits should be placed on the use of alternative dispute resolution to prevent potential abuse. For example, the policy could provide that officers cannot participate in plea bargaining more than once in any two-year period. Further, consideration should be given for banning the use of mediation in cases of significant physical harm.

As part of the mediation process, CPIA and BIA should invite citizens and officers to engage with one another to promote dialogue and understanding. Establishing a mediation program based on national best practices by involving citizens in the process could produce many potential benefits to complainants, police and the state of community-police relations in Chicago. This change might require amending the CBAs, which defines mediation as a method for agreeing on discipline.

**Civilian oversight should run concurrently with criminal investigations absent compelling criminal justice needs expressly stated by prosecuting authorities.**

It is better practice to presume that investigations should run concurrently. Prosecutors and the new CPIA should meet regularly to determine if one or the other's investigation should be paused or whether both matters can be investigated at the same time.

**BIA should be given the resources and staff it needs to conduct effective investigations, exercise more oversight over district investigations and increase the transparency of investigations.**

To ensure that BIA is staffed by qualified personnel and CPD personnel understand the important role BIA plays, anyone who wants to rise in the ranks should be required to rotate through BIA before being eligible for promotion to Commander.

BIA (and the new CPIA) should receive a dedicated training fund to provide sufficient training for its staff. BIA and the police districts should purchase a single, integrated case management system off the shelf, and sufficiently train their employees on it.

BIA should exercise more oversight over individual districts to ensure consistency throughout the districts with regard to the structure of investigations. BIA should institute an automatic process whereby once an officer receives a third complaint, the investigation at the district level would be led by the Deputy Chief in order to ensure greater independence from the officer's daily chain of command.

Finally, BIA and the districts should post all investigative data in a manner that is accessible and user-friendly, as well as summaries of all investigations, and should be held to the same transparency standard as the new CPIA.

# Why is it so hard to impose discipline on an officer?

A true police accountability system requires that individual officers who engage in misconduct face real consequences commensurate with the nature of the offense and any mitigating and aggravating circumstances. In its current form, Chicago's police oversight system is essentially structured to prevent this from happening in a meaningful way.

## THERE ARE NO CLEAR STANDARDS TO DECIDE THE APPROPRIATE LEVEL OF DISCIPLINE

IPRA, BIA, the Superintendent, the Police Board and arbitrators all make decisions at various points in the process regarding what the appropriate discipline should be for an officer who engaged in misconduct. At present, none use a discipline matrix, a national best practice that determines a fixed set of penalties for behavior and history, and takes into consideration any mitigating and aggravating circumstances. Instead, most of the entities turn to past precedent when making decisions about the level of discipline to impose. A discipline matrix not only helps to ensure an officer receives the appropriate level of discipline and therefore is held accountable, but it makes the oversight system more effective by sending the message that actions have real consequences because discipline is fair, predictable and consistent.

## CPD POLICIES AND PRACTICES CAN WEAKEN DISCIPLINE

### *Options*

When a CPD member is suspended, he or she is not necessarily required to miss work or lose pay. "Options" to suspension may be granted by the Superintendent to a member who has been ordered suspended for a specified number of days.[258] Subject to some limitations, the Superintendent may permit the member to satisfy all or part of the suspension by forfeiting leave time, such as vacation days, or working regular scheduled days off without compensation.

The ability to serve the suspension using options lessens the impact of the discipline on both CPD and the member. This reduces CPD's incentive to prevent misconduct and its consequences because CPD does not lose the member's services to a suspension. Similarly, the member feels no effect on his or her paycheck at the present time, if ever. It also disincentivizes the reporting of misconduct when an officer found to have engaged in serious misconduct has almost no disruption to time in duty and sends a signal to the rank and file generally that the disciplinary system lacks rigor and bite.

### *Command Channel Review*

When IPRA or BIA recommends suspension, the case goes through Command Channel Review, a process in which multiple members of an officer's chain of command review the investigative file and the appropriateness of the discipline recommendation.[259] Command Channel Review provides a platform for members who are potentially sympathetic to the accused officer to advocate to reduce or eliminate discipline.

Command Channel reviewers have an opportunity to influence the Superintendent's discipline decision, and also that of the arbitrator, who frequently makes the final decision. Some arbitration decisions reference the recommendations of CPD supervisors who participate in Command Channel Review.[260] For example, in an arbitration decided in 2015 the arbitrator quoted multiple officers who participated in Command Channel Review and recommended finding the case not sustained or unfounded.[261]

The CPD review process overall can add considerable time to the process, which weakens the quality of the record and delays holding officers accountable. When IPRA recommends discipline, CPD is required to respond within 90 days. When BIA recommends discipline, there is no limit and the process can take up to a year.[262] There are no guidelines regarding how much time each of the Command Channel reviewers should spend with the case, or any triggers built into the review process to move it along.[263] After the Command Channel Review, the case goes before the Superintendent.[264] There is no amount of time given for the Superintendent's review.[265]

## THE CBAS CREATE A GRIEVANCE SYSTEM THAT WEAKENS OR OVERTURNS DISCIPLINARY DECISIONS

Even after a misconduct complaint is sustained, the collective bargaining agreements provide a grievance procedure that can minimize the severity of the punishment or overturn it completely. The CBAs leave much of the final decision-making about discipline to arbitrators, who frequently reduce the discipline.[266] There are different processes to challenge the discipline, depending on the rank of the CPD member and the amount of recommended discipline. The most recent FOP CBA introduced a form of arbitration called the Summary Opinion process, intended to produce faster results. The arbitrator's decision is final, often results in reduced discipline and is not subject to oversight.[267]

The Task Force reviewed all 62 discipline-related grievances decided via arbitration in 2015—59 decided through a streamlined process and 3 through a full arbitration.[268] In 42 out of the 59 grievances decided via the streamlined process (more than 70%), the arbitrator reduced or eliminated the discipline. The three full arbitrations were decided in a single case, in which the arbitrator reversed IPRA's sustained finding. This pattern of arbitrators reducing discipline is not a new phenomenon. A review of 328 CPD arbitration cases decided from 1990-1993 found that discipline was "routinely cut in half by arbitrators."[269]

The decisions also varied dramatically from one arbitrator to another. One arbitrator upheld the full discipline in the majority of cases by dismissing two-thirds of the grievances presented to him. Another arbitrator upheld the discipline in only 20% of cases, reduced the discipline in 70% of cases and eliminated the discipline in 10% of cases.

The new Summary Opinion process may have some benefits, including potentially resolving matters more quickly. Of the 56 cases for which the Task Force was able to establish the date of conduct, 24 involved conduct from 2014 or 2015. In those cases, the average time between the conduct and the opinion was 447 days; 7 cases even came in under one year. In contrast, in all 56 cases (including those involving pre-2014 conduct), an average of 1,049 days elapsed between the conduct and the opinion. Thus, with the Summary Opinion process in the past 2 years, cases have been moving toward a final resolution more swiftly.

## THE POLICE BOARD'S HISTORIC FINDINGS MAY HAVE IMPEDED DISCIPLINE

The Police Board has historically only terminated officers in a low percentage of cases, either reversing the Superintendent's discharge recommendations or imposing a term of suspension instead. From 1999-2008, the Police Board agreed with the Superintendent's discharge recommendations in only 39% of cases.[270] Over the past five years, the Board upheld discharge recommendations in only 41% of cases.[271] In the remaining cases, the Board either found the officer guilty of misconduct and reduced the penalty to a suspension, or found the officer not guilty.[272] This practice not only has negative impacts internal to CPD—*e.g.*, perpetuating officers' feeling of impunity—but also further erodes community trust in the accountability and disciplinary process.

These numbers have changed of late, coinciding with a recent change of leadership on the Police Board. From September 2015 through February 2016, the Board decided cases involving nine officers. For eight of the nine officers, the Board upheld the Superintendent's discharge recommendation. In the single instance where the Board disagreed with the recommendation, the Board ordered a two-year suspension and three Board members authored a dissenting opinion arguing for termination as the more appropriate penalty.[273]

The precise reason for the historic discrepancy between the Superintendent's discharge recommendations and the Police Board's decisions is not clear. Beyond the makeup of the Board, the quality of the record may be a factor. Several years can pass between the alleged conduct and the evidentiary hearing. A review of Police Board cases over the past five years indicates that it takes an average of 28 months for a case to reach the Police Board if it originates with BIA, and 48 months if it comes from IPRA.[274] When so much time passes before the evidentiary hearing, which resembles a trial and involves live witness testimony, the quality of the City's case, including witnesses' recollections, can be negatively affected.

Prosecuting attorneys also may not be sufficiently supported in putting on their cases before the Police Board. The attorneys, who work for the City's Law Department, are not involved in the underlying investigations. Rather, they work from the written file already compiled by IPRA or BIA, which may be several years old. Once a case makes it before the Board, witnesses may no longer remember what occurred, they may testify differently from the facts in the written file, or the original charges may not match the live testimony.

The Police Board is relatively transparent but the organization of its information presents some obstacles to effective analysis. The Board issues monthly, quarterly and annual reports, posts the full written decision for each case it hears, and its monthly meetings and evidentiary hearings are open to the public. However, some information that could easily be placed in its regular reports is only available in the Board opinions themselves, such as the number of suspension days, where relevant, and the rank of the CPD member. The Board also does not post monthly or quarterly report archives—only the reports for the most recent month and quarter are available online. Finally, reports and data are located in several different places on the website, making it challenging to navigate without prior knowledge about where information is housed.

The Police Board is fairly streamlined and efficient. In 2015, the median number of days from filing of charges to Police Board decision was 209 days.[275] Given the Police Board's process of taking live testimony and performing a de novo review of each disciplinary case before it, it would be difficult to cut time from this stage of the process.

## THERE IS NO INDEPENDENT OVERSIGHT OF HOW DISCIPLINE IS IMPOSED

The public is largely deprived of basic information regarding what discipline is imposed in response to complaints of misconduct. State statutes, the Municipal Code, CPD Orders, CBAs and Police Board procedures govern CPD's disciplinary process. It is difficult for the public to obtain a complete picture of the process.

Because only a small fraction of complaints result in discipline, it is deeply troubling that so many systems exist for determining final discipline and no entity tracks them or knows the degree to which the recommended discipline is maintained, reduced or eliminated. Of the methods for imposing final discipline, IPRA mediations and Police Board decisions are made public, while BIA mediations, all arbitrations and instances in which the officer simply accepted the discipline are not. This is particularly significant because in the majority of cases reviewed by the Task Force, including both cases that go through the grievance and arbitration process and those heard by the Police Board, the ultimate discipline imposed was lower than what IPRA or BIA initially recommended.

The fragmented system involving IPRA, the Superintendent, BIA within CPD, numerous arbitrators and the Police Board compromises the strength and significance of the investigative findings and recommendations over time, and discourages systemic accountability and transparency. Each stage of the disciplinary process must be publicly posted, and an entity within the police oversight system must report on the data.

### Recommendations

**The CPD and IPRA should finalize a discipline matrix and all oversight entities should be required to follow it when recommending or imposing discipline.**

The Task Force understands that IPRA already has a draft penalty matrix, and IPRA, the Police Board and BIA are awaiting its formal review and implementation. The matrix should establish clear penalties for failure to cooperate. It should require that officers who lie during misconduct investigations be fired, and officers who retaliate against any complainant be fired and referred for criminal prosecution.

**The CPD should develop standards regarding when options may and may not be granted by the Superintendent.**

This should also be included in any discipline matrix. Further, the granting and utilizing of options should be publicly disclosed.

**Command Channel review should be eliminated entirely, and Superintendent review of BIA cases should also be limited to 90 days, like with IPRA.**

**The arbitration process should be subject to oversight.**

The arbitration process should be scrutinized and monitored by the Inspector General for Public Safety and the Community Safety Oversight Board, and decisions must be made easily accessible to facilitate such accountability measures. Additionally, the Police Board's suspension decision should be binding on Sergeants, Lieutenants and Captains. CPD members should not be allowed to grieve a reduced suspension.

**The City should conduct further analysis regarding the role of prosecuting attorneys in Police Board proceedings and whether they are sufficiently supported and best situated to prosecute cases of police misconduct before the Board.**

In the meantime, the City Law Department should use training and enhanced trial advocacy protocols to support its prosecutors who try cases before the Board. New York City's model may provide some useful lessons and ideas for future reforms. New York City found when it implemented a program allowing its Civilian Complaint Review Board to prosecute cases using its own prosecutors, there were considerable benefits.[276]

**The Inspector General for Public Safety should audit CPD policies and procedures that may create barriers to imposing discipline for misconduct.**

The Inspector General for Public Safety should conduct pattern analysis that includes review of all discipline that is recommended by the new CPIA and BIA in order to assess disciplinary trends, to determine whether discipline is consistently applied and fair and to determine whether final disciplinary decisions are being executed as resolved.

**The disciplinary process should be made fully transparent.**

Immediately when BIA or IPRA serve a suspension to a CPD member, the process should be publicly posted and tracked. In real time, the public must be able to see if the member accepted the discipline, grieved the discipline or sought Police Board review, where applicable; how much time was spent in each stage; and the final disposition. While the disciplinary system is dispersed through several entities, it must always run through the CPD at some point.

## *Other Considerations*

Some have questioned whether the Police Board should continue to serve as yet another fact-finding entity that adds an extra layer to the police oversight system, given its historically-high rate of overturning Superintendent discharge recommendations. Instead of reviewing the evidence anew (usually years after the fact), some argue that the Board could serve more of a traditional appellate role by reviewing

investigatory findings and discipline recommendations under a more deferential abuse-of-discretion standard.

These changes would negate the need for Police Board hearings as they are currently conducted. An officer appealing discipline would have the opportunity to file a written brief outlining why the findings or the discipline imposed were an abuse of discretion, and the City would have the opportunity to file a brief in response, defending its actions. The Board would then render its decision, taking into account the standard of review.

While this approach has some appeal, the Task Force has not adopted it. In the current process, the Police Board represents an officer's only opportunity to be heard in termination cases. Further study would be needed before eliminating this fundamental level of due process. Moreover, the recent trend of officers universally choosing arbitration over the Police Board for suspension cases seems to suggest that officers do not view the Board as a favorable venue.

# Why aren't the police held accountable through the courts and other systems?

## POLICE MISCONDUCT SETTLEMENTS LACK TRANSPARENCY AND ADEQUATE OVERSIGHT

Currently, the Corporation Counsel must seek approval from the City Council for litigation settlements (including those relating to police misconduct) in excess of $100,000. For every case for which City Council settlement approval is sought, the Corporation Counsel provides oral presentations or memorandums to the Finance Committee explaining the reasons why the proposed settlement is being recommended. The Corporation Counsel claims attorney/client privilege for these presentations and memoranda, so they are not made public. In addition, the Corporation Counsel provides the Finance Committee a monthly report about all settlements, including those below the $100,000 City Council threshold.

The Law Department posts on its website a list of judgment and settlement payment requests sent to the Comptroller from 2008 to the present.[277] The downloadable spreadsheets include the case number, payee name, amount, fee costs, primary cause, city department involved, disposition and date. The primary cause field is typically limited to a few words such as "fall down/sidewalk," "illegal search/seizure" or "false arrest," although many entries— approximately 25% in 2015—are abbreviations or acronyms that are not explained. While the Law Department should be commended for placing settlement data on the web that can be tracked, more can and should be done to make the system fully transparent.

Information as to the Corporation Counsel's police misconduct docket and the attorneys' evaluation of the cases on that docket is essential for the City Council to know in order to discharge its oversight responsibility. The Corporation Counsel has a duty pursuant to Rule 1.4 of the Illinois Rules of Professional Conduct to inform the members of the City Council with respect to all ongoing litigation relating to the CPD.

Additionally, the City's lawyer has conflicts that may make it more difficult to hold officers accountable for misconduct and to make the system transparent. The Corporation Counsel, the City's top lawyer, is charged with conducting "all the law business of the city."[278] That includes representing the Mayor, the City Council, IPRA and the Office of Inspector General, as well as individual police officers in some cases. This can create all kinds of complicated situations, because fundamentally a lawyer has a duty of loyalty

to his "client," but if the same legal department represents multiple clients whose interests diverge, conflicts may significantly compromise the multiple, simultaneous representations. The Corporation Counsel has some process in place that attempts to address some of these inherent conflicts.

These conflicts—or at least the appearance of conflict—can frequently arise in police misconduct lawsuits. The Corporation Counsel often represents both the police officer and the City, which is often also named as a defendant. The potential for conflict is even greater when the Corporation Counsel wishes to settle a case by making a payment to the victim.

## LITIGATION PRACTICES MAY IMPEDE ACCOUNTABILITY IN THE COURTS

Inefficiencies and delays arising in litigation of civil rights and other cases against the police, particularly discovery issues, significantly slow down the processing of civil lawsuits by citizens. Civil rights attorneys with extensive experience litigating against the City have raised concerns about the City's compliance with discovery requests. They maintain that documentation is frequently withheld through a system in which discovery is delegated to paralegals, City attorneys maintain ignorance of available documents within CPD, and discovery obligations are not treated with appropriate seriousness.

The City recently retained Winston & Strawn to conduct an independent review of the Law Department's Federal Civil Rights Litigation division. In deference to that review, the Task Force is not making substantive findings or recommendations on these issues.

## BIAS OR THE PERCEPTION OF BIAS MAY TAINT THE STATE'S ATTORNEY IN POLICE MATTERS

The relationship between police officers and the Cook County State's Attorney's Office creates actual bias or the perception of bias that undermines trust in the system and may result in criminal behavior by police going unpunished.

CPD and the Cook County State's Attorney's Office are required to work in close collaboration. CPD investigates cases that the State's Attorney ultimately prosecutes. Police officers often testify in cases brought by the State's Attorney and the strength of the State's Attorney's case may depend on the strength of the police officer testimony. Because of that close working relationship and interdependence, many wonder whether the State's Attorney can be fair and impartial when deciding whether to bring charges against police officers accused of misconduct, or when deciding the severity of the charges to bring.

Indeed, many believe that the State's Attorney's office has a bias in favor of police officers, especially in cases that may involve more serious misconduct where police officers might face severe penalties. They believe that the long time that elapsed from the Laquan McDonald shooting to the day charges were brought against Officer Jason Van Dyke reflects that bias.

Though it is difficult to prove whether some State's Attorneys do in fact fail to zealously prosecute cases of police misconduct, it is certainly the case that even the perception of bias undermines trust in the system. However, Illinois law does not currently permit the appointment of a special prosecutor in these situations.

Aside from the specific issue of police prosecutions, in its day-to-day work the State's Attorney regularly encounters police misconduct. However, the State's Attorney has no mandatory information-sharing protocol with IPRA and BIA. The Task Force is aware of troubling incidents where the Cook County State's

Attorney's Office has failed to pursue perjury charges when CPD members have lied or are otherwise found not credible in court. In order for the CPD to take meaningful steps toward breaking the "code of silence," it must be made aware of such conduct and take swift action.

## THE PENSION SYSTEM HOLDS FEW POLICE ACCOUNTABLE FOR MISCONDUCT

Police officers found guilty of serious misconduct can sometimes continue to receive publicly funded pensions. None of the entities involved in the disciplinary infrastructure have any ability to impair an officer's pension benefits.

Under Illinois law, pension benefits may not be paid to any person who is "convicted of any felony relating to or arising out of or in connection with his service as a policeman."[279] The Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago authorizes payments to fund members. Historically, the Retirement Board has rarely voted to deny officers their pensions, even in the face of serious findings of misconduct. For example, the Retirement Board in 2011 voted 4-4 to allow Jon Burge to keep his pension. Burge argued that his convictions for obstruction of justice and perjury related to conduct *after* he had left the CPD.[280] The tie vote meant that Burge would continue to receive pension benefits.

Following the Burge case, a new state law was passed that specifically permits the Attorney General to file a civil action to cease pension payments to public employees convicted of felonies related to employment.[281] The Attorney General's ability to bring these actions is an important check on the police oversight system because non-parties, such as the City of Chicago, are very limited in their legal ability to challenge Pension Board decisions. But it is still difficult and rare to deny a former police officer a publicly funded pension, even if the officer was found to have engaged in serious misconduct while on the job.

### *Recommendations*

### The City should disclose more information on police misconduct settlements to the City Council and the public.

The text of oral presentations and written memoranda from the Corporation Counsel to the City Council describing the reasons for proposed settlements above the $100,000 threshold should describe the reasons for the proposed settlement in sufficient detail to enable the members of the City Council to make an informed decision as to whether to approve the settlement. Moreover, because taxpayer funds are at stake and because of the public importance of cases with a settlement value above the threshold, the memoranda should also be publicly available after a settlement is finalized.

The Corporation Counsel should provide the Public Safety Committee of the City Council with a quarterly police misconduct docket report listing all cases (regardless of settlement amount) and providing: (a) the case name and court number; (b) the names of the defendants and plaintiffs; (c) a brief description of the allegations (beyond the limited information currently provided by Law online); (d) where appropriate, information as to the disposition of the case, including, with respect to cases that have been settled or have resulted in judgments in favor of the plaintiff, the amounts in question; and (d) any additional information with respect to a specific case that, in the Corporation

Counsel's judgment, should be brought to the Committee's attention. (Note that this is a significant advance beyond annual reports currently created by the office.) Further, because of the public importance of the police misconduct docket, the docket report described above should be publicly available.

The new Inspector General for Public Safety should also provide a "red flag" coversheet for every proposed settlement that goes before the City Council. The coversheet should detail any history of complaints and allegations for the officers involved in the subject case.

**To avoid conflicts in police misconduct cases and other matters, the City Council should enact legislation that permits it to hire its own General Counsel to provide legal services and advice on legislative, policy and litigation matters.**

The General Counsel office must be adequately staffed and fully empowered to represent the interests of the City Council. This should include the legal authority to issue subpoenas to compel the attendance of witnesses for purposes of examination and the production of documents and other items for inspection and/or duplication, and the authority to hire outside counsel as appropriate. Similarly, CPIA should have the ability to retain and compensate counsel of the agency's choosing to represent the agency in actions to enforce subpoenas issued by the agency.

**The City should advocate for new state legislation that would require the appointment of an independent prosecutor, separate from the State's Attorney, to handle all phases of any prosecution of any case in which a police officer is charged with causing death or great bodily harm without justification.**

**The State's Attorney should be required to provide oversight bodies with evidence of police misconduct that is not the subject of an ongoing prosecution.**

The City should seek to secure a Memorandum of Understanding with the Cook County State's Attorney's Office and the Public Defender's Office that requires these entities to notify CPD, the Corporation Counsel's office and the police oversight bodies—BIA, CPIA and the Public Safety Inspector General—in any case where an officer is found to be lying or otherwise found to be not credible under oath. Such a notification should trigger a complaint log number and an automatic investigation, much like a firearm discharge notification.

**Further research into the Policemen's Annuity and Benefit Fund is required to determine if additional changes in law and policy can ensure that police officers are not rewarded for official misconduct.**

Understandably, the law makes it difficult to take away a pension benefit from someone who has earned it. But people should not be rewarded for abusing their power and violating the public trust and the law.

## Endnotes

206 Citizens Police Data Project, *supra* note 115.

207 Data provided by IPRA Chief of Staff Annette Moore via e-mail on Feb. 4, 2016.

208 Chicago Municipal Code §2-57-010.

209 Independent Police Review Authority, Annual and Quarterly Reports, *available at*
http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports/quarterly_report_2013.html.

210 Chicago Municipal Code §2-57-010; CPD General Order G08-01, Complaint and Disciplinary Procedures (July 17, 2015).

211 Data provided by the City of Chicago via letter dated Mar. 18, 2016.

212 Data provided by the City of Chicago via letter dated Mar. 24, 2016.

213 Chicago Municipal Code § 2-84-020.

214 Rahm Decries Police "Code of Silence" Ahead of Morning Speech to City Council, Chicagoist (Dec. 9, 2015) (quoting Dec. 8, 2015 Chicago Tonight interview), *available at* http://chicagoist.com/2015/12/09/rahm_gives_preview_of_city_council.php.

215 Remarks of Mayor Rahm Emanuel, Justice, Culture and Community (Dec. 9, 2015), *available at*
http://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2015/December/12.9.15MREremar
ks.pdf.

216 Mary Ann Ahern, Former Chicago Police Supt.: Code of Silence "Has Always Existed," www.nbcchicago.com (Mar. 3, 2016), *available at* http://www.nbcchicago.com/blogs/ward-room/Former-Chicago-Police-Supt-Code-of-Silence-Has-Always-Existed--370994101.html.

217 Eugene Williams, Superintendent Application, Essay Question No. 6.

218 Kevin M. Keenan & Samuel Walker, An Impediment to Police Accountability? An Analysis of Statutory Law Enforcement Officers' Bills of Rights, 14 B.U. Pub. Int. L.J., 185, 192, *available at* http://www.bu.edu/law/journals-archive/pilj/vol14no2/documents/14-2keenanandwalkerarticle.pdf.

219 FOP Contract Appendix L; Sergeants, Lieutenants and Captains Contracts§ 6.10.

220 Jeremy Gorner and Geoffrey Hing, Cops who pile up complaints routinely escape discipline, Chicago Tribune (June 13, 2015), *available at* http://www.chicagotribune.com/news/ct-chicago-police-citizen-complaints-met-20150613-story.html.

221 FOP Contract Appendix L ¶ 7.

222 FOP Contract § 6.1 D; Sergeants, Lieutenants and Captains Contracts § 6.1 E-F.

223 Samuel Walker, The New World of Police Accountability, at 78 (2005). Additional information can be found at http://www.cincinnati-oh.gov/police/linkservid/97D9709F-F1C1-4A75-804C07D9873DC70F/showMeta/0/ and http://www.nola.gov/nopd/nopd-consent-decree/.

224 FOP Contract § 6.1 (E); Sergeants, Lieutenants and Captains Contracts § 6.1 (G).

225 CPD, General Order G08-01-01, Department Member's Bill of Rights, Sec. III B-E (Mar. 17, 2013). This provision resulted from an arbitrator's ruling. *See also* Working Group Interview.

226 Multiple Working Group Interviews.

227 Samuel Walker, Police Union Contract "Waiting Periods" for Misconduct Investigations Not Supported by Scientific Evidence, at 5 (July 2015), *available at* http://samuelwalker.net/wp-content/uploads/2015/06/48HourSciencepdf.pdf.

228 FOP Contract § 6.1 (C).

229 FOP, Sergeants, Lieutenants and Captains Contracts § 6.1 (C).

230 *See* Grievance No. 016-02-001 (Arbitrator Peter R. Meyers, 2005) and Grievance No. 002-07-008 (Arbitrator Steven M. Bierig, 2010).

231 FOP, Sergeant, Lieutenant and Captain Contracts § 6.1 (D).

232 FOP, Sergeant, Lieutenant and Captain Contracts § 8.4.

233 FOP, Sergeant, Lieutenant and Captain Contracts § 8.4.

234 Samuel Walker, The Baltimore Police Union Contract and the Law Enforcement Officer's Bill of Rights: Impediments to Accountability, at 5-6 (May 2015), *available at* http://www.aclu-md.org/uploaded_files/0000/0681/walker_-_baltimore_police_union_contract_report.pdf.

235 FOP, Sergeant, Lieutenant and Captain Contracts § 16.

236 CPD, General Order G08-01-02, Specific Responsibilities Regarding Allegations of Misconduct, Sec. (B)(1).

237 FOP Contract § 6.1 (G); Sergeant, Lieutenant and Captain Contracts § 6.1 (I).

238 *See, e.g.,* http://www.iprachicago.org/resources.html.

239 Police Executive Research Forum, Critical Response, Technical Assessment Review: Police Accountability- Findings and National Implications of an Assessment of the San Diego Police Department, Washington D.C.: Office of Community Orientated Police Services (2015), *available at* https://www.sandiego.gov/sites/default/files/legacy/police/pdf/perfrpt.pdf.

240 Los Angeles Police Department Consent Decree, § 61, http://assets.lapdonline.org/assets/pdf/final_consent_decree.pdf.

241 The Inspector General, Joe Ferguson, was a member of both the Task Force and the Legal Oversight and Accountability Working Group. Mr. Ferguson recused himself and did not participate in Task Force discussions concerning where the new Inspector General for Public Safety should be housed.

242 Bill Libit, et al., Elements of an Effective Whistleblower Hotline, Harvard Law School Forum on Corporate Governance and Financial Regulation (Oct. 25, 2014), *available at* https://corpgov.law.harvard.edu/2014/10/25/elements-of-an-effective-whistleblower-hotline/#11b; Jim Ratley, Creating an Effective Whistleblower Program, Security Magazine (Aug. 1, 2012), *available at* http://www.securitymagazine.com/articles/83343-creating-an-effective-whistleblower-program.

243 *Id.*

244 *Id.*

245 IPRA, 2015 Sustained Case Reports, *available at* http://www.iprachicago.org/ipra/homepage/PublicationPress/archived_reports/quarterly_report_2015.html.

246 Independent Police Review Authority, Budget Statements to the City Council Committee on the Budget and Government Operations for Nov. 8, 2013 and Oct. 5, 2015, *available at* http://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2014%20Budget/2014BudgetHearingMaterials/IPRA2014_BudgetHearingMaterials_FINAL.pdf and http://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2016Budget/BudgetHearingStatements/2016_IPRA_Statement_merge.pdf, respectively.

247 Complaint Submitted to the United States Department of Justice Documenting the Role of the Independent Police Review Authority in Perpetuating a Code of Silence and Culture of Violence in the Chicago Police Department, submitted by Alexa A. Van Brunt, et. al., at 36, *available at* http://www.law.northwestern.edu/legalclinic/macarthur/projects/police/documents/Complaint%20to%20DOJ%20Concerning%20IPRA.pdf.

248 *See e.g.,* Eugene Police Operations Manual, Policy 1020, ch.1020.7.2, *available at* http://coeapps.eugene-or.gov/EPD_POM_EXT/docview.aspx?id=1393648; Albuquerque Police Oversight Ordinance 9-4-1-6 ( c) (3), *available at* http://www.cabq.gov/cpoa/documents/Amended%20Police%20Oversight%20Ordianance.pdf; San Francisco Office of Citizen Complaints Citizen-Police Mediation Program Brochure, *available at* http://sfgov.org/sites/sfgov.org.occ/files/migrated/ftp/uploadedfiles/occ/mediation_english.pdf.

249 Jon L. Proctor, Richard Rosenthal, and AJ Clemmons, Denver's Citizen/Police Complaint Mediation Program: A Comprehensive Evaluation, at 18 (Feb. 24, 2009), *available at* https://www.denvergov.org/content/dam/denvergov/Portals/374/documents/Mediation_Journal_Article_2-24-09.pdf.

250 *Id.* at 28.

251 Samuel Walker & Carol Archbold, Mediating Citizen Complaints against the Police: An Exploratory Study, 2000 J. Disp. Resol. 9-10, *available at* http://scholarship.law.missouri.edu/cgi/viewcontent.cgi?article=1376&context=jdr.

252 Working Group Interview.

253 Jennifer Smith Richards & Chad Yoder, IPRA Data of Police Involved Shootings, Chicago Tribune (Dec. 4, 2015), *available at* http://www.chicagotribune.com/ct-police-shooting-data-ipra-20151203-htmlstory.html.

254 Andrew Schroedter, Fatal Shootings by Chicago Police: Tops Among Biggest U.S. Cities, Better Govenment Association (July 26, 2015), *available at* http://www.bettergov.org/news/fatal-shootings-by-chicago-police-tops-among-biggest-us-cities.

255 Chip Mitchell, Fired Investigator: Policy Change Could Help Cover up Police Misconduct, WBEZ (Aug. 11, 2015), *available at* http://www.wbez.org/news/fired-investigator-policy-change-could-help-cover-police-misconduct-112614.

256 Bill Ruthhart & Lolly Bowean, *supra* note 72.

257 New York City Civilian Complaint Review Board, *available at* http://www1.nyc.gov/apps/ccrb-status-lookup.

258 CPD, Special Order S08-01-04, Suspension/Options, Sec. II (Mar. 17, 2013), *available at* http://directives.chicagopolice.org/lt2015/data/a9fe0202-12ce5c17-7e612-ce5e-c89e9add877a4f7d.html?ownapi=1.

259 CPD, Special Order S08-01-03 Complaint Summary Reporting and Review Procedures, Sec. III (May 14, 2013), *available at* http://directives.chicagopolice.org/lt2015/data/a9fe0202-12ce5c17-7e612-ce5e-c9c4fbeffbc626e7.html?ownapi=1.

260 Working Group review of Summary Opinions provided by CPD.

261 Grievance 019-12-110, 019-12-109/456; Grievance 019-12-110/455, 25-26.

262 MCC 2-57-060; Working Group Interview.

[263] Special Order S08-01-03, *supra* note 258, at Sec. III.

[264] Working Group Interview.

[265] Working Group Interview.

[266] While the Police Board is the more commonly known entity involved in deciding final discipline, it does not handle many suspension cases. The Board decide s 30-plus-day suspension cases for Sergeants, Lieutenants and Captains, though there are few of them—one in 2015 and five in 2014. The Board also decides suspension cases over one year for all ranks.

[267] Ron Safer, Preventing and Disciplining Police Misconduct: An Independent Review and Recommendation Concerning Chicago's Police Disciplinary System, at 16 (Dec. 2014), *available at* http://www.cityofchicago.org/content/dam/city/progs/safety/Preventing_Disciplining_Police_Misconduct_Dec_2014.pdf.

[268] The numbers 59 and 3 refer to the number of grievances not the number of opinions, which can involve disposition of multiple cases.

[269] Mark Iris, Police Discipline in Chicago: Arbitration or Arbitrary?, 89 J. Crim. L. & Criminology 216 (1998), *available at* http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6990&context=jclc.

[270] Chicago Justice Project, Chicago Police Board: A Ten-Year Analysis, *available at* http://chicagojustice.org/research/long-form-reports/chicago-police-board-a-ten-year-analysis.

[271] The Chicago Justice Project, Chicago Police Board: A Ten-Year Analysis (2009), *available at* http://www.chicagojustice.org/research/long-form-reports/chicago-police-board-a-ten-year-analysis/CJP_CPB_Report_2009.pdf.

[272] Chicago Police Board, Annual and Quarterly Reports, *available at* http://www.cityofchicago.org/city/en/depts/cpb/supp_info/annual_reports.html and http://www.cityofchicago.org/city/en/depts/cpb/auto_generated/police_discipline_archives.html.

[273] *See* Case No. 15 PB 2881 (Lightfoot, Conlon and Sweeny, dissenting), *available at* http://www.cityofchicago.org/content/dam/city/depts/cpb/PoliceDiscipline/15PB2881.pdf.

[274] Review of Police Board cases filed with the Board from 2011-2016, measured from date of primary incident to date filed.

[275] Chicago Police Board, Quarterly Report (Dec. 31, 2015).

[276] Civilian Complaint Review Board, The CCRB Announces Historic Agreement with the NYPD for Expanded Prosecutorial Authority (Mar. 28, 2012), *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/CCRB_APU_announcement.pdf.

[277] City of Chicago Department of Law, *available at* http://www.cityofchicago.org/city/en/depts/dol.html.

[278] Corporation Counsel and Law Department, Mission Statement, *available at* http://www.cityofchicago.org/city/en/depts/dol/auto_generated/dol_mission.html.

[279] 40 ILCS 5/5-227

[280] *See supra* note 90.

[281] Illinois Attorney General Press Release, Madigan Applauds Governor's Action on Bill to Stop Pension Benefits for Felons (Dec. 30, 2014), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2014_12/20141230.html.

# Early Intervention & Personnel Concerns

## Why does CPD lack a culture of accountability when it comes to the internal management of its police officers?

There is a sense within the community, which the Task Force has heard time and again, that police officers are not held accountable for their actions and misconduct. The larger discussion on policing that is taking place across Chicago has included the question as to why CPD has fostered a culture in which supervisors turn a blind eye to misconduct and do not provide sufficient oversight to ensure that officers perform their duties with integrity.

Community members are rightfully skeptical that enough is being done internally to adequately supervise officers and to identify officers whose actions are falling short of the community's expectations. CPD lags behind other police departments when it comes to managing risk posed by officer misconduct.

The fact of the matter is that there is a general absence of a culture of accountability within CPD, largely because no one in top leadership has taken ownership of the issue. Although so-called "problem officers" are either well known to their supervisors and CPD's leadership or easily identified, few steps are being taken to proactively manage and redirect those officers' conduct. The effective tools for providing greater oversight and supervision to officers are well known and widely used in other jurisdictions. There appears to be no urgency within CPD around accountability. Something must change, and that change must come from the highest levels of CPD.

CPD's efforts to actively monitor and improve officer behavior appear to be at a standstill, but the problem is not new. CPD's history is replete with examples of wayward officers whose bad behavior or propensity for bad behavior could have been identified much earlier if anyone had viewed managing this risk as a business imperative.

Take former CPD officer Jerome Finnigan as an example. In 2006, Finnigan, an 18-year CPD veteran, was arrested for leading a rogue group of officers in CPD's elite Special Operations Section in carrying out robberies, home invasions, kidnappings and other crimes. Finnigan was later charged with plotting to hire a hit man from a street gang to murder his former partner, who he believed was cooperating with prosecutors. Finnigan pled guilty to the murder-for-hire scheme and income tax-related charges stemming from money he stole and is serving a 12-year sentence in federal prison.

When Finnigan was arrested, many reported that he had been considered a model officer. Indeed, he won numerous commendations for his work in the Special Operations Section. In 1999, he received the Superintendent's Award of Valor for protecting a store owner during a robbery and helping apprehend the offenders, all while he was off duty. Even prosecutors conceded at his sentencing that Finnigan was at one point viewed as an outstanding officer.

But, despite outward appearances, red flags were piling up long before 2006. Between 2000 and the time he was indicted in 2006 and ultimately resigned in 2008, Finnigan racked up 89 CRs. Over the entire course of his career, he had 161 total CRs—a shocking number by any standard. These CRs were for a range of serious complaints, including numerous lawsuits; numerous warrantless, non-consensual searches; theft; and other felony crimes. And yet, according to CPD records provided by the City, no effort was ever taken to enroll Finnigan in the department's formal intervention programs or otherwise intercede in his obvious pattern of misconduct.[282] (Finnigan was later identified in CPD's manual efforts to identify and enroll more officers in the department's formal intervention programs—discussed in more detail below—but, by that point, Finnigan had already been indicted.)

In 2005, another CPD officer, Corey Flagg, was arrested for his part in a ring of five Englewood officers who used traffic stops and home invasions to rob drug dealers. Flagg pled guilty to conspiracy to distribute cocaine and marijuana, as well as possession of a firearm in a drug trafficking crime, and was sentenced to nearly 10 years in prison. Flagg's record also raised numerous red flags. As with Finnigan, Flagg incurred large numbers of CRs during his tenure at CPD—88 in total—and received a number of lengthy suspensions. (Unlike Finnigan, Flagg was enrolled in the department's behavioral intervention program in 2003.)

Some might argue that Finnigan's and Flagg's criminal conduct is aberrational. It is not. Police corruption cases in Chicago may not be commonplace, but neither are they rare occurrences. Former CPD Gang Crimes Officer Joseph Miedzianowski (sentenced to life imprisonment for racketeering, drug conspiracy and robbery), former CPD Chief of Detectives William Harnhardt (pled guilty to racketeering and conspiracy) and former CPD Narcotics Officer Glenn Lewellen (guilty of narcotics conspiracy) are but three of the most notorious instances of police corruption in recent memory.[283] But there have been others, and it is clear that some portion of the Chicago police force still is not meeting their professional and legal obligations.



Certainly, a great majority of CPD officers are principled, dedicated and ethical employees who serve our community with respect and care. However, for any number of reasons, unfortunately there are times when officer performance comes up short. For example, a review of CR histories of all CPD officers between 2007 and 2015 showed that approximately 1,572 officers had 10 or more CRs to their name during that time period (many with more than 10).[284] Of those officers, 189 were Sergeants, 21 were Lieutenants and 2 were Commanders.

The Task Force also took a close look at litigation and settlement data provided by the City for civil rights cases involving allegations against CPD officers. Given the often-disheveled state of this data, as the City provided it to the Task Force, it is difficult to report on these cases with absolute certainty, but we can provide reasonable estimates.[285]

From 2010 through 2015, the City has handled approximately 2,000 cases involving civil rights allegations against its police officers. The Task Force has been told that there are about 400 such cases pending against police officers at any one time. The amount of money the City pays to resolve these cases is staggering—over $600 million since 2004, with close to $400 million spent in the last five years alone.[286] Many of the names of CPD officers who appear frequently on the litigation and settlement lists are familiar with the public—Joe Dortha Parker (24 cases), Richard Fiorito (11 cases), Jerome Finnigan (10 cases) and Keith Herrera (8 cases). Clearly, a portion of CPD's officers are costing the City and its taxpayers many millions of dollars each year in settlements, judgments and lost man-hours and, in the most egregious circumstances, unnecessarily injuring or killing community members. The actions of these officers are significantly contributing to the erosion of trust between CPD and the public—the very people they have sworn to serve and protect.





One part of the solution to this deeply ingrained problem is improving oversight and management of police officers, something that is sorely lacking in today's CPD. When men and women choose to join the police force, it is often for life. CPD—and, in turn, the taxpayers and citizens of Chicago—make a huge investment in every police officer over the course of his or her career.

More can and should be done to support these officers and redirect their behavior before it is too late. Police departments around the country use tools to identify officers with at-risk behavior to receive additional non-disciplinary supports in order to redirect the behavior of wayward cops, including counseling, training and reassignment. It is up to CPD leadership to take responsibility for a pivot toward a culture of accountability and embrace these management tools to improve oversight of their officers and, in turn, improve policing outcomes for the community.

## What are the current internal mechanisms for holding CPD's officers accountable for their conduct?

Although it would be unfair to say that CPD is not taking any steps to understand and intervene in officer misconduct, the proactive steps that have been taken are significantly limited and woefully inadequate compared to best practices. Moreover, some steps have been subject to significant resistance from stakeholders, such as the police unions.

CPD relies on two formal early intervention programs to address officers exhibiting potentially problematic conduct. These are known as Behavioral Intervention System (BIS) and Personnel Concerns (PC), and both were implemented in 1980 and remain in place today.[287] BIS is a non-disciplinary system that seeks to provide "early indentification of members who engage in conduct which is contrary to the goals of the Department."[288] This program puts the onus on command and supervisory officers to monitor the performance of their subordinates. Police officers are placed in BIS upon approval by the command staff member of the Human Resources Division. The command staff member may consider officers for inclusion based on recommendations from certain high-level individuals within the CPD system. The program looks at certain "performance data" as "behavioral intervention indicators." Once admitted into the BIS, the police officer will be subject to an Individualized Performance Plan ("IPP"), which governs the steps used to resolve the unacceptable performance/behaviors.

PC is another non-disciplinary system that addresses the most serious problematic behavior or performance issues and is often the second line of intervention where BIS has not reformed undesirable conduct. CPD uses the system "to intervene in an employee's problems, behavior, or performance issues which, without assistance, may lead to severe disciplinary measures or separation from the Department."[289] As with BIS, any number of high-ranking individuals within the CPD system can recommend a police officer for placement into PC and must be approved by the command staff member of the Human Resources Division.

PC allows for a range of "corrective action[s] to address the identified behavior," including but not limited to, requesting a Psychological Fitness for Duty Evaluation, changing the officer's partner, weekly performance reviews and retraining. The steps taken are documented in the officer's IPP, and Personnel Concerns Progress reports are prepared and submitted up the chain of command to the command staff member of the Human Resources Division for review. For both the BIS and PC programs, supervisors are required to prepare reports regarding counseling sessions and other meetings, as well as compliance with the IPP. These reports are sent to CPD's Human Resources Division. The Human Resources Division only began tracking these reports with an Excel spreadsheet in 2014.[290]

In the mid-1990s, CPD was on the cutting edge of using technology to identify police officers who were engaging in blatant misconduct or whose behavior was otherwise out of step with department policies. CPD acquired a computer software system called BrainMaker Professional to sift through internal data on all officers and, based on computer code that identified behavioral patterns, picked out the officers who showed potential for problem behavior.[291] The idea was to divert the identified officers toward counseling before they committed any crimes.[292] According to reports, initial runs of the system showed that it was fairly adept at picking out problem officers, based on the fact that many of the officers identified by the system had already been singled out by supervisors for participation in CPD's formal intervention

programs.[293] But it also picked out others who, based on patterns of behavior hidden in the troves of data kept on them in CPD, were potentially at risk for problems; even though their disciplinary and intervention histories were clean.[294]

Eventually, CPD scrapped the BrainMaker system.[295] According to some, the program was discontinued in response to opposition from the FOP; others suggest that the program was never fully embraced by CPD leadership.[296]

In 1997, the Commission on Police Integrity promoted an "early warning" system in Chicago, which the Commission explained was embodied in CPD's existing BIS and PC programs.[297] To "enhance the Department's ability to identify and correct the behavior of officers at risk," the Commission called for expansion of those programs. Essentially, the Commission applauded steps CPD was already taking to add a requirement that officers who were participating in the BIS and PC programs to complete IPPs. Eventually, this requirement was implemented in both programs. Although it moved the ball forward, this recommendation clearly did not go far enough to promote a culture of accountability. (The Commission also recommended that CPD analyze unit-wide conduct as part of its "early warning" system. It does not appear that CPD ever adopted that recommendation.)

CPD undertook other efforts in the late 1990s and early 2000s to expand accountability measures and early intervention activities. One example was the implementation of the Citizen and Law Enforcement Analysis and Reporting ("CLEAR") system, which gave supervisory personnel a new tool to analyze officer behavior.[298] Numerous analyses were conducted using the CLEAR system to better understand police officer behavior and outcomes, including use and misuse of medical leave and factors that contribute to the lodging of citizen complaints against police officers. Another reform that was created was the use of management intervention for certain infractions that were viewed as minor.

But those reforms, in large part, were allowed to wither on the vine or were never executed at all. Money that was slated for the development of a computer-based early intervention system was diverted to other department priorities. Realizing that CPD still needed to address problem officers even without the help of a computer program, in 2006, CPD tried to manually conduct a review of employees and recommend police officers it viewed as requiring intervention for more supervision and monitoring. This assessment was based on the number of CRs filed against them and the number of TRRs they had completed over a certain period of time. Many of the officers who were identified were enrolled in BIS or PC.

In 2006, the FOP filed a grievance in response to this manual review and sought to have officers who were placed in BIS removed from the programs.[299] According to the FOP, the members who were placed in BIS did not satisfy the criteria for placement in the program as set forth in the corresponding general order, in violation of the CBA.[300] In a subsequent settlement agreement, CPD agreed to remove officers from BIS, as well as any officers who had been upgraded to PC.

A later innovation was the implementation in 2008 of a "dashboard" as part of CPD's Performance Recognition System, which tracks various data points for individual officers, including CRs, days off and trends in citations. The full list of data points for the Performance Recognition System dashboard is: Complaint Registers, Complaint Register Logs, Tactical Response Reports, Summary Punishment Action Requests, Awards, Arrests, Contacts, Driver Cards, Traffic Stop Statistical Study Cards, Recovered

Firearms, Search Warrants, Medical Events, Injured on Duty Days, Non-Injured on Duty Days, CR Ratio and TRR Ratio.[301]

The purpose of the Performance Recognition System and its complementary dashboard is ostensibly to "assist[] Department supervisors in recognizing exceptional or adverse behavior related to job performance of members under their command" and identify behavior that "may be improved by nondisciplinary options or methods."[302] The dashboard comes equipped with the ability to compare individual officers against others, with adjustments from unit to unit and supervisor to supervisor. Each officer is given a red, yellow or green designation with respect to the officer's CRs and TFFs. The CR Ratio is a percentage ratio of the number of CRs divided by the number of arrests. The TRR Ratio is a percentage ratio of TRRs divided by the number of arrests. For each percentage ratio, under 3% is a green designation, 3-10% is a yellow designation, and over 10% is a red designation.[303] The Performance Evaluation System policy also includes a range of "interventions" that a supervisor can take if he or she identifies exceptional or adverse behavior among any of their officers.

## Why are these current CPD accountability systems ineffective?

### INCOMPLETE DATA COLLECTION AND LIMITED ANALYSIS

Our research reveals that CPD engages in a wide range of data collection about officer behavior. But, as with other data collection activities across CPD, this collection is incomplete, and distribution and analysis is decentralized and limited. In addition, systematic follow-up or review does not appear to be required for shared data.

For instance, on a quarterly basis, the Office of Legal Affairs and the BIA distribute, respectively, summaries of lawsuits naming police officers as defendants and officers recommended for BIS/PC. These reports are pushed out to command personnel in CPD, but they are apparently used for information purposes only and no action is sought or required. Thus, distribution and analysis is limited, and follow-up on this crucial information is neither mandatory nor documented in any systematic way. Moreover, the information contained in the OLA reports is skeletal and provides very little useful information to command staff and supervisors about the nature of lawsuits lodged against their officers. Below are sample excerpts of these reports.

Sample Office of Legal Affairs Quarterly Report:

**Quarterly Report**

| Olname | Ofirstname | Docketnum | Daterecvd | Officer# | Unit Assign | category |
|--------|-----------|-----------|-----------|----------|-------------|----------|
| ███ | ███ | 13C4152 | 7/11/2013 | ███ | 001 | 03d |
| ███ | ███ | 13M1303255 | 12/16/2013 | ███ | 001 | TC |
| ███ | ███ | 13C4152 | 7/11/2013 | ███ | 001 | 03d |

Sample BIA Quarterly Report:



Other important litigation-related data points receive even less attention from CPD. One recent case highlighted the most dramatic manifestation of this problem, where a judge expressly ruled that an officer's testimony against a defendant was not credible.

In 2015, a Cook County court ruled against the detective in a hearing to suppress two incriminating statements that the detective said he obtained from the defendant.[304] The detective claimed that the defendant confessed to the alleged crime when he visited him in the hospital while he was heavily sedated after emergency surgery for multiple gunshot wounds. Nurses who were present for the questioning testified that the defendant was in no condition to be interviewed because of the heavy morphine sedation he was under at the time. In granting the motion to supress, the judge reportedly described the detective's testimony as "garbage" and concluded that he had "to seriously question whether [the defendant] ever did anything but maybe grunt or even knew who he was talking to."[305] Not long after the court excluded the alleged incriminating statements, the State's Attorney's Office dropped the charges against the defendant.[306]

Although some judges will go on record expressly finding that a police officer's testimony is not credible, explicit findings are the exception. More often, we hear that evidence is lacking against a defendant to sustain the charges, but the message is clear. There is no systematic or regular collection of information regarding adverse findings against individual officers in criminal or civil cases.

In addition, other sources of highly relevant information are currently available to CPD but not acted upon. For instance, we know that there is a problem with CPD officers showing up for court appearances. Data provided by CPD shows that, of the 20,922 Summary Punishment Action Requests ("SPARs") initiated by supervisors from January 1, 2010 to December 31, 2015, approximately 9,440 of the SPARs were opened under the "court appearance violation" complaint category. (SPARs are "[a]n alternative disciplinary procedure for conduct defined as a less serious transgression which is observed by or comes to the attention of a Department supervisor or command staff member."[307]) That means that 45% of all SPARs for that 5-year period relate to an officer's violation of a mandatory court appearance.

When an officer makes an arrest but then fails to show up to account for that arrest in open court, legitimacy is lost and trust diminishes. This high number of no-shows also raises serious questions about the underlying legitimacy of the arrests. Even in the face of a lack of accountability for this crucial element of their officers' job, it is not clear how CPD addresses this issue internally outside of issuing SPARs and, as a result, short suspensions.

Finally, notwithstanding the staggering amount of money that the City spends annually on legal settlements and judgments against officers, there is no action taken within CPD on the basis of that information. Officers who are creating significant liability for the City are among the first category of officers who warrant special attention for possible professional intervention. And yet this important metric is not being monitored closely, nor are any specific disciplinary or non-disciplinary actions taken in the face of the filing or disposition of a lawsuit. Moreover, if the City decides it must settle a case due to credibility questions or other indefensible actions by an individual officer, there currently exists no formal, systematic process for identifying problem officers and taking appropriate action. Clearly, the lines of communication between CPD and the City's Law Department, which is responsible for defending individual officers in legal proceedings, could be significantly improved. Moreover, CPD, particularly the BIA, Office of Legal Affairs and Human Resources, must develop a comprehensive plan for acting and intervening based on litigation information.

## DISCRETIONARY SUPERVISOR REVIEW OF PERFORMANCE DATA

Although supervisors have a potentially invaluable tool and data for each of the officers under their charge through the Performance Recognition System and the dashboard program, this monitoring and intervention system is literally not working.

First, there are no mandatory requirements that supervisors use the system to analyze data or intervene in officer misconduct. Review of the data is entirely discretionary—or it is at least treated that way.[308] Second, supervisors are not required to input information to explain the data or the reasons for the green-yellow-red designations or take any action in response to the data they receive.[309] As a result, there is no way to know if supervisors are even using the dashboard, much less how they are using it. Although the governing departmental policy says that it is a designated supervisor's responsibility to monitor, track and take action in response to "exemplary" or "adverse" behavior,[310] there do not appear to be any enforcement mechanisms and, according to our interviews, the system is considered far from mandatory. In fact, Task Force interviews with officers and supervisory personnel indicate that the dashboard has not been functional so far in 2016.[311]

## FORMAL INTERVENTION PROGRAMS ARE UNDER-UTILIZED

Even CPD's more formalized intervention programs—BIS and PC—are only lightly used. They are also not structured in a systematic way that is supported from top leadership and promotes buy-in from supervisors and the rank-and-file.



NUMBER OF OFFICERS IN BEHAVIORAL INTERVENTION AND PERSONNEL CONCERNS PROGRAMS COMBINED

276  219  134  82  22  13  0  7  13

2007 → 2015

Participation in the BIS and PC programs has dropped off precipitously in recent years. In 2007, 276 officers were included in either BI or PC. Participation quickly dropped off after the FOP filed a grievance against CPD for certain officers' inclusion. CPD and the FOP settled the grievance by agreeing to remove officers from the programs. By 2013, **zero** officers were being actively managed through either of those programs. In 2014, only 7 officers were enrolled in the program. In 2015, 13 officers were enrolled.

Logic tells us that far more officers should be in these programs. CPD has approximately 12,500 budgeted sworn officers. We know that, each year, thousands of CRs are lodged, and a consistently high number of lawsuits are filed. If supervisors and leadership were truly taking a hard look at the conduct of their officers, we would expect many more officers to be involved in the formal intervention programs.

In addition to being used for only a handful of officers (and for one year, not at all), the programs appear to be used on an ad hoc basis only. That is, officers are admitted to the programs if they are identified for inclusion by a select group within CPD, including their chain of command, BIA or IPRA, but no one is required to evaluate officers for potential inclusion in the programs in any systematic or mandatory way. Under those conditions, we can be sure that officers who warrant additional attention are falling through the cracks. Officers can also only be included in the program for intervention if approved by the department's top Human Resources staff, which makes it more likely that officers are only included in the programs when their conduct is so egregious as to call for action at the highest levels of the department. It also requires the attention of high-level administrators with innumerable demands on their time. The programs also focus mostly on problems that are identified through the department's disciplinary system, and trends of problematic behavior are not based on a more nuanced mosaic of data. On top of that, CPD does not use any metrics to measure or assess the effectiveness of the programs. This further diminishes the ability to hold officers and the entire intervention system accountable.

With that said, CPD did implement a nondisciplinary intervention program in 2004 to try to target one form of misconduct (verbal abuse) that is often the subject of CRs but is difficult to investigate because of the he-said/she-said nature of the allegation. Under the program, supervisors are responsible for implementing interventions when a verbal abuse complaint register is received for his/her direct report. The program provides a schedule of interventions that increase in magnitude as the number of verbal abuse complaint registers rack up against an officer. However, it does not appear that CPD has made any sustained efforts to measure or analyze the effectiveness of this program, even though the Special Order governing the program requires CPD to do so.[312] Although the Task Force was told that CPD performed one such assessment of the program around 2008,[313] CPD has not provided the relevant materials evidencing the results of that assessment in response to the Task Force's requests.[314]

## LITTLE FOCUS ON MANAGEMENT ROLE OF SUPERVISORS

Our review of CPD's policies has revealed that there is very little focus on the development of personnel management skills for officers in supervisory positions.

Sergeants are promoted through exam or merit appointment. Neither promotional process, however, formally evaluates Sergeant candidates for competency with personnel management principles or concepts. As CPD acknowledges, this process does not address the development of leadership skills or determine whether candidates for promotion are capable of handling the management roles regarding the health and well-being of supervisees they would assume. Although the panel reviewing candidates for promotion consider leadership potential, they do not consider metrics or requirements that are focused on the ability to manage the well-being or overall conduct of police officers under their supervision. Upon promotion, Sergeants receive very little additional leadership or management training. The sum total of newly promoted Sergeants' training on relevant issues includes seven hours of leadership training.

After officers are promoted to supervisor roles, there is no formal process in place to evaluate their performance. Supervisor evaluations are merely informal in nature, and any evaluation practice is completely dependent on the practices of each district's and district Commander's informal evaluation practices. The performance of a supervisor's officers may be addressed in this informal evaluation that is provided to supervisors, but it is not required and is provided only at the discretion of the leadership of the particular district in which a supervisor works.

Neither the message from the top nor the evaluation and promotion processes emphasize officers' performance and/or personnel concerns. Instead, the focus of top leadership at the department appears to be entirely concerned with crime statistics to the exclusion of any other metrics. For instance, command staff meets monthly for CompStat meetings. The meetings' focus is on discussion and dissemination of crime statistics, but, according to our interviews, there was, until very recently, no attention paid to personnel issues, much less discussion of addressing real or suspected misconduct.

As an indication of the lack of focus on management issues, it appears that training on the BIS and PC intervention programs was only provided to Commanders, Captains and Lieutenants during a CompStat meeting earlier this year.[315] So far as we can tell, this training has not been provided to Sergeants who are the direct supervisors of beat officers and on a daily basis teach more officers than any other supervisor. While we applaud this step toward elevating the importance of intervention within the department, much more must be done within CPD to ensure that active management of its police officers is a top priority.

## What is the right tool for CPD to use to hold police officers and their supervisors accountable on a range of issues, including use of force and respectful interactions with citizens?

A robust management system for police officers is essential. Pre-employment screening, recruit training, and in-service training are clearly not enough. And CPD's current monitoring and intervention system is woefully inadequate, lacking any sense of leadership or urgency and therefore failing to provide adequate oversight. To permit comprehensive management of the City's police officers, it is imperative that CPD has a system in place that allows for a 360-degree view on the conduct of its officers.[316] This comprehensive system will require the aggregation and analysis of data across a wide range of officer touch points to identify those officers requiring additional management and intervention.

The intention should be to provide a tool that CPD can use to identify problematic behaviors at the earliest possible instance so that it can get officers back on track or manage them out of the department. Implementing such a system will not require CPD to re invent the wheel. Indeed, as mentioned previously, many other jurisdictions across the country have led the way by implementing EIS as a way of proactively identifying officers who exhibit behaviors that put them at risk of misconduct.

In significant part, this widespread practice is the result of the Department of Justice requiring the implementation of EIS through the consent decrees that result from the type of pattern and practice investigation that it is currently conducting of CPD. Based on this precedent, if the Department of Justice substantiates a pattern and practice violation in Chicago, we fully expect that the Department of Justice will impose EIS on CPD at the end of its investigation. To varying degrees, a number of other jurisdictions have also implemented EIS independently of the Department of Justice. Indeed, as early as 1999,

approximately 27% of the law enforcement offices surveyed by the National Institute of Justice had already implemented some form of EIS.[317] The New York Police Department, for instance, has long had EIS to monitor officer conduct and intervene with additional supports where needed.[318] It is currently in the process of updating its EIS to create "a single, integrated database for both officer performance analysis and department-wide risk assessment."[319] The Miami-Dade Police Department's EIS may be the oldest such system, which was first developed around 1981.[320]

Studies of these systems show that they can work and are effective at reducing instances of officer misconduct.[321] EIS leverages numerous sources of data regarding officer conduct, including arrests, citizen complaints, missed training and much more, to spot officers whose behavior is outside of the acceptable range of other peer officers with similar assignments. Isolating these officers then allows the police department to use the system to apply non-disciplinary interventions to modify problem behavior or, on the flip side, acknowledge and commend exceptional conduct. But no EIS will have the intended impact without complete buy-in from CPD's top leadership, line supervisors and unions.

### Recommendations

**CPD leadership must take ownership of accountability issues and order the design and implementation of a mandatory EIS that centrally collects data across a broad range of data points to capture information on the totality of officer activity.**

CPD leadership must fully embrace a shift toward a culture of accountability. To that end, the Task Force recommends that CPD implement a mandatory EIS system. Support for this new accountability mechanism must come from the top. Our research shows that CPD has suffered from a crisis of leadership when it comes to taking ownership of accountability for the conduct of its officers and the impact they have in the community.

An accountability system requires buy-in from the whole spectrum of the law enforcement system— from CPD brass and rank-and-file to judges to prosecutors to all external investigatory bodies (currently IPRA and the Chicago Police Board). One challenge to implementing EIS is obtaining support from the relevant stakeholders. This includes police officers, supervisors and the unions. Many studies indicate great apprehension about the motivations for and effectiveness of an EIS from these stakeholders, but those studies also indicate that the problems that were feared are generally not realized.[322]

To get ahead of this challenge, experts in the field stress the importance of "operational change management" to promote buy-in.[323] That means owning the roll-out of EIS to ensure that those impacted understand the purpose and process of the new system and making sure that any necessary organizational changes are made to absorb the new activity required by the system. Educating officers that EIS is for intervention and not discipline can go a long way toward forging a smooth transition.[324]

This education process can also extend to community stakeholders. Informing community members about EIS can improve confidence in accountability practices and foster better community relations.[325] For instance, at the Detroit Police Department, leadership instituted a meeting similar to CompStat to discuss use of force issues and policy changes with respect to its EIS in which community members were invited to participate.[326] This was also meant to show community

members that these performance and policy issues were taken seriously, and, to do so, leadership made a point of discussing these topics in the stand-alone Command Accountability Meetings that they convened.[327]

In recommending that CPD adopt an EIS, it is not the Task Force's intention to lay out every specific detail of the EIS that should be adopted. Without careful study of the department's needs, that exercise would be impossible. However, our research has identified many consistent themes and insights that we believe should inform any EIS:

### (1) CPD's EIS must be non-disiplinary in nature.

First and foremost, as a best practice, it is important to be clear that an EIS is meant to be exactly what its name implies—intervention and *not* discipline.[328] EIS is meant to be complementary to a police department's disciplinary system as a "component of an agency's personnel management toolbox."[329] Numerous police departments that the Task Force interviewed regarding their EIS programs stressed the importance of this point.[330]

### (2) CPD's EIS should track all available data on officer activities.

The next issue that must be confronted is what types of data points or performance indicators will be fed into the system for analysis. Based on our review, current models vary between a dozen to a few dozen data points/indicators. In the Los Angeles Police Department and the San Diego Police Department, for instance, their EIS programs use 14 different data points on each individual officer.[331] The Detroit Police Department, on the other hand, tracks 52 different performance indicators.[332] There is a basic universe of data points that are common to the existing systems (e.g., uses of force, complaints), but some data points may also be adopted in response to issues or controversies that are specific to a given police department.[333]

In order to obtain a true 360-degree view on CPD officer conduct, the Task Force recommends that all trackable officer activities should be fed into its EIS. The system should be designed to integrate data from a variety of sources to capture information on the totality of officer activity. Minimum data collected should include: citizen complaints; SPARs; traffic accidents; missed court appearances; medical usage; traffic crashes; traffic chases; shots fired; discretionary "contempt of cop" arrests (e.g., resisting arrest, disorderly conduct); and legal actions naming police officers (tracking through resolution of civil lawsuit or criminal case and any adverse findings at any stage of case). Currently, CPD already collects a great deal of this data, but efforts to analyze that data are sorely lacking. CPD can better leverage the data it has at its fingertips to measure the performance of its officers in a systematic way and intervene with those officers who are sliding off track.

### (3) CPD's EIS should use peer-to-peer data comparisons to identify which officers receive interventions.

Once the relevant data points have been identified, the system must determine how to identify officers for intervention. Within the context of an EIS, this is often referred to as setting "thresholds" or "triggers." There is no consensus on the best set of thresholds or triggers, and a variety of different practices are used, including: (1) setting department-level thresholds; (2) setting them based on a comparison between officers who perform similar functions (known as "peer groups"); and (3) using performance ratios (e.g., uses of force to number of arrests).[334]

The Los Angeles Police Department analyzes each officer's data against the officer's designated "peer group," of which there are 33 in all. [335] The peer groups are designated so that officers performing similar activities are compared against other officers performing those same activities (i.e., similar rank, function, duty, and assignment); however, the peer groups do not take into account how those same activities can differ based on a geographic assignment across the city. In contrast, the Seattle Police Department's trigger thresholds are standard across the department for all officers. [336] This means that there are no peer groups to ensure that the thresholds are tailored to the different kind of functions that officers can perform across the police department.

Given the vast differences in policing across Chicago, CPD should use true peer-to-peer comparisons to allow for apples-to-apples comparisons. Therefore, officers who are performing patrol duties are compared against other patrol officers and officers assigned to "fast" districts are not held up against officers in relatively "slow" districts. One challenge with this approach is that the actual "task" that a given officer undertakes—both in terms of its potential productive value for society, and its risk of an adverse outcome—can vary enormously even within job assignments, police beats and shifts. In developing its peer-to-peer comparisons, CPD must ensure that EIS is not confounding the influence of officer risk with the challenge of the job or environment in which they are working to avoid disincentivizing officers from taking on the hardest assignments. With this in mind, the actual triggers that CPD would use in this system must be determined based on a careful study of the data. Appendix 8 explores the technical aspects of identifying the right triggers in more detail.

*(4) CPD's EIS should use a structured, tiered program where interventions are appropriate, escalated proportionally and are timely.*

Research also stresses the importance of having a varied menu of intervention options available to meet the varied needs of officers. [337] Some successful options suggested by the best practices research include informal counseling by the officer's supervisor, training opportunities, professional counseling on personal issues, officer-to-officer peer support program, crisis intervention teams, and reassignment or relief from duty. [338]

Our research of other police departments' programs showed that there can be a wide range of approaches to interventions. In Los Angeles, department policy delineates the types of interventions that may be adopted by an immediate supervisor, but which intervention is used is left to the discretion of the supervisor. [339] The San Diego Police Department utilizes a range of mandatory and discretionary interventions. [340] The mandatory interventions are applied in cases of officer-involved shootings and deaths in custody. Discretionary interventions are used in other cases where intervention is triggered and include a range of potential options, including counseling by immediate supervisor, substance abuse treatment, a peer officer program, meeting with the department's Wellness Unit and reassignment. Other departments, like the Seattle Police Department, leave the option of which intervention to use within the discretion of the officer's supervisor, although the choice is reviewed by the supervisor's chain of command and the internal body (the Performance Review Committee), which oversees the EIS program. [341]

The Task Force recommends that CPD create a structured, tiered program where interventions are appropriate, escalate proportionally and are timely. It should adopt a set of mandatory interventions to provide supervisors with a range of options for personnel actions. Intervention options should

include, but not be limited to, meeting with a direct supervisor, meeting with a commander, training, referral to employee assistance resources and/or reassignment or relief from duty.

*(5) CPD's EIS should track officer transfers and require supervisors to review and acknowledge data on new officers who are transferred onto their assignment.*

Given the reality that officers are often transferred around to different districts, it is imperative that the EIS should include tracking of all transfers and require the officer's new supervisor to log into that officer's activity history within the EIS and acknowledge a review of the history, and, to the extent that the officer is involved in a series of ongoing interventions, the supervisor must confirm participation in the interventions. This is an element of many of the EIS programs the Task Force reviewed, including the system in the Los Angeles Police Department[342] and the Detroit Police Department.[343]

*(6) CPD's EIS should require ongoing monitoring of interventions and develop an assessment tool to routinely examine the program for improvement.*

In addition, follow-through and ongoing monitoring of interventions is critical to ensuring that the interventions are fully implemented and to impart upon the officers that the process is being taken seriously.[344] CPD should also develop an assessment tool that routinely examines the EIS process and interventions to determine the program's effectiveness and to identify areas for improvement. Although the academic research on this aspect of EIS programs is not as developed, ongoing oversight of a program is a logical strategy for strengthening its efficacy and accountability. Routine monitoring, assessment and modification of EIS programs is required in other jurisdictions. The Seattle Police Department requires the Performance Review Committee, the internal body that oversees the EIS program, to review and make changes to the program as dictated by its outcomes.[345] In the Detroit Police Department, the Civil Rights Division manages the program and conducts performance and environmental audits, including examinations of command morale and department operations.[346]

As a final note, putting an EIS program into place will obviously represent a significant shift in CPD's culture of accountability, and many challenges are likely to accompany that change. As the experiences of other jurisdictions indicate, a major challenge lies in the creation of the technology and data environment that is necessary for building an EIS program.[347] Based on other jurisdictions' experiences, EIS programs often take years to design and implement. While much of the needed data might already exist, it is often siloed across different functions of the department, some of it may not be digitized, and there are important data security and privacy concerns to take into account. Then there are the more nuanced questions about how to actually build the data criteria that will trigger interventions. Implementing an EIS program within CPD is likely to carry many of these same challenges.

**CPD must make support and training of supervisors a top priority and create policies that hold supervisors accountable for the conduct of their officers.**

The literature is clear that one of the most critical elements of a successful EIS program is the prominent role of immediate supervisors.[348] Considering that immediate supervisors are the department employees with the most interaction with and responsibility for police officers, this finding makes sense. As representatives of the Los Angeles Police Department made clear, its EIS program's focus on supervisors helps to achieve the program's risk management aims, because it forces supervisors to pay attention to the behavior of their officers and, in turn, reinforces good behavior among their officers, because they know that their supervisors are paying attention.[349]

A robust EIS program can represent a sea change in the job responsibilities of a supervisor. The best practice research identifies the preparation of supervisors to conduct interventions as the most important issue challenging the implementation of an EIS program.[350] As such, it is essential to the success of the program that departments provide comprehensive training to supervisors regarding their new role in the EIS program well before the system is set into place. The San Diego Police Department has gone to great lengths to support its officers through the creation of its Wellness Unit.[351] The Wellness Unit staff—a total of four who provide 24/7 officer support—are responsible for providing resources to officers on a 24/7 basis. This includes assisting supervisors by checking in with officers if a supervisor cannot do so for any reason, and providing a neutral and trusted resources for discussing problematic officer behavior.

Studies point to some key principles for ensuring that supervisors have the skills and support they need to support a strong EIS program: (1) having supervisors who fully understand the EIS program in place in their department and their responsibilities, which requires training on the system's capabilities and processes; (2) providing supervisors with the tools and resources they need to create change; and (3) adopting mechanisms to ensure that supervisors are accountable for executing their responsibilities under the EIS program.[352] Training supervisors on leadership and basic management skills is imperative. EIS programs require supervisors to take a hands-on role in their officers' professional development, and many times interventions lead to the discovery of deep personal or professional issues that require deft management. Supervisors need to be trained to take on this new dynamic when they are promoted from officer to Sergeant.[353]

The Task Force makes several recommendations in this regard. First, CPD must provide training to supervisors on their responsibilities and obligations as the first line of defense in accountability generally and in the EIS process specifically. This means, at the very least, providing mandatory training and talking points that help guide supervisory interventions with officers.

CPD should also integrate regular accountability measures for supervisors to incentivize buy-in to the new system. As part of that effort, CPD should integrate supervisor responsibilities for EIS and personnel management into the testing and promotional requirements. Also, CompStat meetings must be expanded immediately to include information about personnel actions, and supervisors should be held accountable for the performance indicators of their officers, just as they currently are with crime statistics and trends.

In a broader sense, CPD must provide greater support to supervisors in their management roles. All Sergeants, Lieutenants, Captains and Commanders should be trained in managing the well-being of officers under their command and be compelled to use the dashboards that track officer activity.

**The individual in charge of human resources at CPD must be an expert in the field of human resources and related personnel matters.**

The Director of Human Resources for CPD must be an actual human resources professional with bona fide experience handling a diverse and complex work force in a complicated organization, such as CPD. The CPD Director of personnel plays a critically important role in the accountability system. Presently, the Director serves as the gatekeeper for who is admitted into the formal intervention programs, can act as a resource on very sensitive personnel matters, is heavily involved in developing strategies for the recruitment of new members to the department, and also has a hand in developing tests for promotions and managing the overall promotion process. Going forward, the Director must also have responsibility for making sure that the Early Intervention System is socialized through the entire department, that supervisors receive the kind of training and support that they need to intervene where appropriate, be conversant in and embrace the best practices in addressing the health and well-being of the department's most valuable assets, its people, and ensure that accountability becomes a core value of the department at all levels. Given the centrality of the position, the Director must be someone who has a track record of experience and success with implementing accountability systems such as the early intervention systems recommended in this report, expertise in managing relations with unions, and appropriate certifications and experience in managing a complex human relations function in a large organization like the CPD.

**Until a fully automated EIS program can be implemented, CPD should create a manual intervention system, which undertakes an immediate assessment of officer fitness for duty.**

CPD, working with IPRA and/or the new CPIA, and with reference to the time period January 1, 2010 – January 1, 2016, should immediately identify officers (1) with 10 or more CRs, whether or not an affidavit was completed; (2) who have a pattern of missing court; or (3) who have been named in two/three or more lawsuits during this time period.

During this time, CPD should conduct monthly meetings with the State's Attorney, Public Defender, Presiding Judge of Criminal Division, City Law Department and, separately, Chief Judge of the Northern District of Illinois for the purpose of determining any adverse findings against police officers that bear on credibility, training issues or patterns of behavior. All information gathered should be factored into the manual intervention system.

Any officers identified through these methods should be assessed for placement in BIS, PC or some other form of individualized work plan that involves their chain of command.

**The EIS program should include community outreach efforts by providing public access to data generated by the EIS program and inviting community stakeholders to CompStat-type meetings to discuss EIS data and outcomes.**

With all of the data that will be generated by the EIS program at its disposal, it is incumbent on CPD to make important information about its officers available to the public. As in many of the areas the Task Force examined, transparency into its non-disciplinary intervention programs and the data it

collects surrounding the performance of its police officers is essentially nonexistent. Although there are important privacy restrictions to keep in mind as it pertains to sensitive personnel matters, much of the information that CPD currently collects, and the information that we recommend it collects in the future, is information that can be made public.

In order to provide the community with this important data, the Task Force recommends that CPD publish, on a monthly basis, aggregate data on the following: new and pending complaints by unit, disciplinary actions, missed court dates, new civil legal proceedings against officers, new criminal legal proceedings against officers, vehicle pursuits, vehicle collisions, uses of force, employee commendations, use of firearms, injuries to persons in custody, judicial proceedings where an officer is the subjective of a protective or restraining order, adverse judicial credibility determinations against an officer, or disciplinary actions.

Moreover, additional steps must be taken to reach out to community stakeholders in a real and meaningful way about police interventions. As many thought leaders on the topic have explored, early intervention is consistent with the goals of community policy and can be another avenue to help improve community-police relations. In Detroit, for example, the police department's consent decree with the Department of Justice included recommendations for increased community outreach.[354] In response, the Detroit Police Department instituted quarterly meetings with community members to discuss performance issues, providing scorecards for units that outlined the number of officers trained, the number of officers that missed training and the number of use-of-force incidents, among other indicators.[355] The meetings include an opportunity for questions from the community audience.[356] The Task Force recommends that CPD establish a similar regular community-inclusive meeting to share data and insights from EIS.[357]

## Endnotes

[282] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[283] *See also* 1997 Report of the Commission on Police Integrity, *supra* note 47, at 9-10 (providing a history of police corruption in Chicago).

[284] Data provided by the City of Chicago via letter dated Mar. 11, 2016.

[285] Andrew Schroeder, Chicago Police Misconduct – A Rising Financial Toll, Better Government Association (Jan. 31, 2016), *available at* http://www.bettergov.org/news/chicago-police-misconduct-%E2%80%93-a-rising-financial-toll; Mark Iris, Your Tax Dollars at Work! Chicago Police Lawsuit Payments: How Much, and for What?, 2 Va. J. Crim. Law 25 (2014), *available at* http://virginiajournalofcriminallaw.com/wp-content/uploads/2014/08/2.1-Iris-SMW-3.31.14.pdf.

[286] Better Government Association, *supra* note 284.

[287] Data provided by the City of Chicago via letter dated Mar. 29, 2016

[288] CPD, Employee Resource E06-05, Behavioral Intervention System (Mar. 22, 2005).

[289] CPD, Employee Resource E06-06, Personnel Concerns Program (May 4, 2005).

[290] Data provided by the City of Chicago via letter dated Mar. 29, 2016.

[291] Taras Grescoe, The Brain and The Badge (June 30, 1996), *available at* http://articles.chicagotribune.com/1996-06-30/features/9606300363_1_police-force-internal-affairs-division-chicago-police-department (*cited in* Rob Arthur, We Now Have Algorithms to Predict Police Misconduct, FiveThirtyEight (Mar. 9, 2016), *available at* http://fivethirtyeight.com/features/we-now-have-algorithms-to-predict-police-misconduct/).

[292] Steve Mills, High-Tech Tool to Weed Out Bad Cops Proved a Bust, Chicago Tribune (Oct. 15, 1997), *available at* http://articles.chicagotribune.com/1997-10-15/news/9710150457_1_police-brutality-police-department-matt-rodriguez.

[293] Grescoe, *supra* note 290.

[294] *Id.*

[295] Mills, *supra* note 291.

[296] *Id.*

[297] 1997 Report of the Commission on Police Integrity, *supra* note 47, at 3, 20-21.

[298] *See* Wes Skogan et al., "Policing Smarter Through IT: Learning from 'Chicago's Citizen and Law Enforcement Analysis and Reporting (CLEAR) System," Washington, D.C.: Office of Community Oriented Policing Services (Dec. 2003), *available at* http://www.cops.usdoj.gov/html/cd_rom/tech_docs/pubs/policingsmarterthroughitlessonsenterprise.pdf.

[299] FOP Grievance No. 129-06-021.

[300] *Id.*

[301] Data provided by the City of Chicago via letter dated Mar. 7, 2016.

[302] CPD, Employee Resource E05-02, Performance Recognition System (Feb. 21, 2012).

[303] Data provided by the City of Chicago via letter dated Mar. 7, 2016.

[304] Steve Schmadeke, In Chicago Police Shooting, Judge Ripped Cop and Tossed Hospital Bed Testimony, Chicago Tribune (Jan. 29, 2016), *available at* http://www.chicagotribune.com/news/ct-chicago-cop-shooting-judge-outraged-met-20160128-story.html.

[305] *Id.*

[306] *See* Certified Statement of Conviction/Disposition, 14-cr-187202 (May 12, 2015 entry).

[307] CPD, Special Order S08-01-05, Summary Punishment (Apr. 26, 2013).

[308] Working Group Interview.

[309] Working Group Interview.

[310] CPD, Employee Resource E05-02, *supra* note 301.

[311] Working Group Interview.

[312] CPD, Special Order S08-01-08, Nondisciplinary Intervention Program, Sec. VIII (May 1, 2004).

[313] Working Group Interview.

[314] Data provided by the City of Chicago via letters dated Mar. 2, 2016 and Apr. 7, 2016.

[315] Data provided by the City of Chicago via letter dated Mar. 29, 2016.

[316] *See, e.g.*, Samuel Walker & Stacy Osnick Milligan with Anna Berke, Strategies for Intervening with Officers Through Early Intervention Systems, Washington, D.C.: Office of Community Oriented Policing Services, at 39 (Feb. 2006) (noting that EIS "gives a global picture of behavior"), *available at* http://www.cops.usdoj.gov/pdf/publications/e01060004.pdf.

[317] Samuel Walker, Geoffrey P. Alpert and Dennis J. Kenney, Early Warning Systems: Responding to the Problem Police Officer, National Institute of Justice, at 2 (July 2001), *available at* https://www.ncjrs.gov/pdffiles1/nij/188565.pdf.

[318] *See* U.S. Commission on Civil Rights, Who is Guarding the Guardians?, at 82, *available at* http://babel.hathitrust.org/cgi/pt?id=uc1.32106015219253;view=1up;seq=15.

[319] Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing, Office of the Inspector General for the NYPD (Apr. 2015), *available at* http://www1.nyc.gov/assets/oignypd/downloads/pdf/2015-04-20-litigation-data-report.pdf.

[320] Walker, Early Warning Systems, *supra* note 316, at 4.

[321] *Id.*, at 3.

[322] Samuel Walker, Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide, Washington D.C.: Office of Community Oriented Policing Services, at 73-81 (2003), *available at* http://www.cops.usdoj.gov/html/cd_rom/inaction1/pubs/EarlyInterventionSystemsLawEnforcement.pdf.

[323] Working Group Interview. *See also* Walker, Strategies for Intervening, *supra* note 315, at 11-12.

[324] Walker, Strategies for Intervening, *supra* note 315, at 11-12.

[325] Samuel Walker & Stacy Osnick Milligan with Anna Berke, Supervision and Intervention Within Early Intervention Systems: A Guide for Law Enforcement Executives, Washington, D.C.: Office of Community Oriented Policing Services, at 40-41 (Dec. 2005), *available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Early_Intervention_Systems/supervision%20and%20intervention%20within%20early%20intervention%20systems%202005.pdf.

[326] Working Group Interview.

[327] Working Group Interview.

[328] Walker, Strategies for Intervening, *supra* note 315, at 27.

[329] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 5.

[330] Multiple Working Group Interviews.

[331] Working Group Interview.

[332] Working Group Interview.

[333] Walker, A Planning and Management Guide, *supra* note 321, at 29-30.

[334] *Id.* at 31-33.

[335] Working Group Interview.

[336] Working Group Interview.

[337] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 21.

[338] *Id.* at 21-27; Walker, Strategies for Intervening, *supra* note 315, at 31-35.

[339] Working Group Interview.

[340] Working Group Interview.

[341] Working Group Interview.

[342] Working Group Interview.

[343] Working Group Interview.

[344] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 27-28; Walker, Strategies for Intervening, *supra* note 315, at 23-24.

[345] Working Group Interview.

[346] Working Group Interview.

[347] Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 31-33.

[348] Walker, Strategies for Intervening, *supra* note 315, at 1; Walker, Supervision and Intervention Within Early Intervention Systems, *supra* note 324, at 9-10.

[349] Working Group Interview.

[350] Walker, A Planning and Management Guide, *supra* note 321, at 37.

[351] Working Group Interview.

[352] Walker, Strategies for Intervening, *supra* note 315, at 9-26

[353] *Id.* at 28-29.

[354] Working Group Interview.

[355] Working Group Interview.

[356] Working Group Interview.

[357] The access and/or publishing of aggregated EIS data in any format will be most helpful if designed in a way as to not interfere with or jeopardize the integrity of the system. The primary function of an EIS is to accurately predict police officer behavior, and to provide the framework to then respond to those predictions with appropriate interventions.

# De-Escalation

It is critically important that all CPD officers approach each and every citizen encounter with an emphasis on respect and the sanctity of all life. That approach will avoid escalating even the most casual encounter. CPD officers must also seek to de-escalate situations so as to minimize the use of force. Minimizing the use of force not only prevents unnecessary injury and loss of life, it builds police legitimacy and trust. The recommendations throughout this report, if implemented, will contribute to overarching de-escalation efforts, such as developing a stronger, values-based policing philosophy, addressing racism and implicit bias, re-defining community policing, developing an early intervention system to identify problem officers, holding officers accountable for misconduct and continuing the rollout of body cameras. Out of deference to the Department of Justice's ongoing investigation, the Task Force did not conduct a detailed analysis of CPD's use-of-force practices. Rather, we focused our de-escalation analysis on the frequent situations where officers encounter citizens experiencing a mental health crisis.

The Task Force does not need to search very far to find examples of police encounters with persons experiencing mental health crises that went tragically wrong. In these situations, the person in crisis may be agitated, overwhelmed and frightened. Officers approaching in a command and control manner may increase the person's fear and agitation, reducing his or her willingness and ability to peacefully comply with instructions.

At the same time, officers perceive these situations as unpredictable and potentially very dangerous and understandably want to gain control of the scene quickly. Unfortunately, if officers do not have strong de-escalation skills, they may act in a way that inadvertently escalates the situation. In the worst case scenario, officers, the person in crisis or bystanders may get hurt or killed. At best, unnecessary escalation results in a stressful interaction and often an arrest of the person in crisis for behavior that occurred as a result of the police encounter (e.g., battery to a police officer) and entry into the criminal justice system.

These potentially avoidable outcomes are costly in terms of human life, as well as taxpayer dollars. They also further erode the relationship between the police and the community. There is an urgent need for policing approaches that embrace de-escalation and procedural justice over traditional command and control strategies for mental health-related and other types of police encounters with the public.

Changes in police procedures and practices are not the only challenge facing our local mental health system. The mental health care safety net has been eroded in recent years. Our bare bones mental health system fails to provide adequate treatment for early intervention, preventive mental health treatment or crisis mental health care. Neither Medicaid nor private coverage devotes to providers the resources necessary to effectively treat those living with mental illness. This is so despite national policy initiatives—most notably the Affordable Care Act—to improve and expand access to services. There are huge capacity shortages, and people who need and want help are not able to readily access it.

One in five people experience a mental illness in their lifetime.[358] Although most of those individuals will never need crisis intervention services, many will. Mental health treatment is extremely effective in restoring the health and well-being of people who are living with mental illness.[359] Some individuals with intellectual or developmental disabilities experience similar crises, sometimes arising from psychiatric co-

morbidities. These individuals also require appropriate crisis intervention and treatment outside the stigmatizing reach of the criminal justice system.[360]

The bottom line is that most people living with mental illness still do not receive treatment. Without treatment, mental illness—especially serious mental illness—can result in significant disability and decreased quality of life.

Sadly, those who suffer from mental illness often end up in jail and not in treatment. Even more sadly, there are countless stories of individuals acting in a purposefully criminal way so that they would get arrested in order to get their medications or mental health treatment. We have also heard from many families begging that their child get arrested as they see Cook County Jail as the only accessible treatment provider. On any given day, a significant percentage of intakes at Cook County Jail self-identify as mentally ill.[361] We are arresting and incarcerating people with mental illness in record numbers throughout the County. This is a national tragedy.

Without community care—services and supports, including insurance coverage to help them recover—people living with mental illness simply do not get treatment, and their illnesses get worse. When that happens, people living with mental illness end up in emergency rooms, in jail or on the streets with no place to live. Too often, all of the above happens. Here's a snapshot of what has happened in Illinois since funding cuts took place in FY2009:

- Emergency room visits for people experiencing psychiatric crises increased by19% between 2009 and 2012.[362]
- The total number of nights spent in a shelter statewide increased from 2,000,000 in FY2011 to 3,041,000 in FY2013.[363] The National Alliance to End Homelessness estimates that approximately 32% of the 14,144 individuals who currently experience homelessness on any given night in Illinois have a serious mental illness.[364]

These patterns reflect three real and solvable problems. First, studies show that emergency rooms and jails cost much more than community treatment.[365]

Second, a vicious cycle arises involving jails, homelessness and excessive emergency room use. People leaving jail who are living with mental illness have few, if any, housing options. Without a warm handoff to a service provider, they often become homeless. In 2015, 2,134 individuals experiencing homelessness were detained overnight at Cook County Jail, 34% of which were flagged for mental illness.[366] Once homeless, they lack access to health care services or do not seek services. Consequently, their mental health problems get worse. Then one of two things is likely to happen: they get arrested and end up back in jail, or they end up in an emergency room. At the emergency room, because there are so few housing options, hospitals often refer the homeless who are living with serious mental illness into expensive nursing home care. Many people do not need such an intensive, expensive level of care. They need the recovery-promoting combination of community care and supported housing shown to successfully help remove this population from homelessness.

Third, none of these are ideal treatment methods or outcomes for people living with mental illness. Their treatment options and outcomes should not be emergency rooms, jails, living on the street or in nursing homes. Instead, mental health treatment should involve a compassionate, comprehensive system of care that provides the effective treatment that breaks this cycle and renders these options unacceptable.

Police officers are too often the first responders to those living with mental illness and experiencing a crisis. This has been the status quo for far too long. No other chronic health condition is treated in this way. In turn, police officers are arresting individuals experiencing mental illness and are symptomatic in their illness. This occurs because symptoms of mental illness are sometimes demonstrated in behaviors that may look criminal. Furthermore, officers who are not well trained to identify the signs and symptoms of mental illness can further escalate a situation to the point that an arrest is made. Reliance on the police to respond to those living with mental illness or in crisis must stop. This costly and wasteful response often perpetuates trauma and limits recovery.

Even officers who have training to support those in crises have limited options to divert those living with mental illness to health care providers instead of jail. Currently, the only diversion option is the emergency room at various hospitals.[367] If someone is experiencing a mental health crisis and reports feeling like harming himself or someone else, he meets the criteria for hospitalization. However, many individuals whom officers encounter do not meet the criteria. Nevertheless, officers have no option but to transport those people to an emergency room that is designated a police drop-off. Officers report increased frustration when they see that same person back in their beat hours or days later untreated, with no change in their behavior. This demonstrates the poor use of manpower and wasted resources.

The police are being held responsible for responding to all the social ills in our communities but are left with few resources to respond proactively. We must shift the responsibility to other community partners and resources to support our community. This cannot be done without a well-thought-out and properly executed plan. A tremendous investment needs to be made by all parties. This includes CPD, hospital systems, social services, the Office of Emergency Management Communications ("OEMC") and other community stakeholders. As is the case with anything that creates change, this cannot happen in isolation. The task requires buy-in from the City and participating organizations, adequate funding and other resources, meaningful data collection and community engagement.

## Why are so few 911 calls to OEMC identified as mental health-related?

In 2015, there were approximately 5 million 911 calls made to OEMC.[368] Of those, approximately 2.45 million—slightly less than half—were dispatched to the police.[369] While only 25,000 of those calls were pre-identified by the caller as mental health-related, national estimates suggest that anywhere from 3-10% of police contacts are mental health-related.[370] This suggests that, last year alone, the OEMC fielded anywhere from 73,500 to 245,000 mental health-related calls, most of which were *not* flagged as mental health-related by the caller.

Emergency call takers and dispatchers are a critical component of mental health crisis response. Our observations indicate that OEMC suffers from recurring problems with its approach to determining whether calls involve a mental health crisis, including inadequate protocols, limited training, lack of data and other support, and gaps in communication with CPD.

OEMC's procedures emphasize speedy dispatch of emergency resources in response to service calls. Insufficient manpower may contribute to this emphasis on speed, at the expense of accurate identification of mental health calls and the quality of response.

OEMC personnel currently receive only a one-hour annual training about crisis intervention and mental health from a non-subject matter expert. OEMC personnel report that it is challenging to effectively probe callers to determine whether mental health may be at issue. Callers may not like to discuss mental health because of its stigma. Even if they do, callers often do not use clinical terms to describe their situations, and callers from different communities may use different words to explain the same mental health crisis. Additional training could improve call takers' ability and comfort in asking questions and identifying mental health calls.

Additionally, current OEMC data systems do not utilize data on prior calls to provide location or personal history that could assist in identifying likely mental health calls or other relevant background information for responding officers.

### Recommendations

#### OEMC should invest in a Smart911 system.

Some cities have worked to solve the challenge of the lack of information presented to dispatch by callers through implementing Smart911 systems. Smart911 allows citizens to create a "Safety Profile" for their household that includes any information they want 911 and emergency response teams to have in the case of an emergency. This can include health and medical information, including known mental health issues. When a household member makes a call to 911, his or her Safety Profile automatically displays to the 911 dispatcher, which enables the dispatcher to send the right response teams with the right information to the scene.

While Smart911 has been made available to the City in recent years, the City has yet to purchase and implement this effective program. This is so despite the fact that 32 states and more than 400 municipalities, including Washington, D.C., Seattle, Atlanta and Denver, are currently using the program. The effectiveness of Smart911 is tested every day. As an example, in Addison, Illinois, emergency responders received a 911 hang-up call from a resident who had registered a Safety Profile that showed her adult son had a cognitive disability and violent nature. The information provided through Smart911 alerted the responding officers that the son would not respond to verbal commands, but, by using other methods they were still able to de-escalate the situation without any physical injury to him.

Smart911 systems show significant promise and can deliver a substantial return on the investment. They can also help avoid tragic incidents like the shooting deaths of Quintonio LeGrier and Betty Jones. If LeGrier's mental health history had been entered into a Smart911 system and that information was made available to emergency dispatchers and responding officers, the entire incident could have played out very differently. The Task Force recommends that the OEMC invest in and implement a Smart911 system for Chicago immediately.

#### OEMC should implement a 16-hour mental health awareness training.

The Crisis Intervention Team ("CIT") model includes training emergency communicators as a key element of effective programs. There is currently no "best practice" approach, as some agencies have emergency communicators go through the full 40-hour CIT training with police officers, while others have developed training specifically designed for emergency communicators. The Alameda Police

Department provides 16 hours of training that covers mental health awareness and CIT information and, similar to CIT trainings, includes panels of persons with lived experience and family members. The Task Force believes that the Alameda model strikes a good balance and recommends that the OEMC implement a 16-hour mental health awareness training specifically tailored to call takers.

**OEMC should devote attention to supporting personnel in providing compassionate and effective service to the community and implementing stress management training that complies with national standards.**

Emergency communicators have a very stressful job dealing with members of the community in life-threatening and emotional situations. The nature of the job puts them at high risk for compassion fatigue, which can significantly impact their sensitivity to and patience with members of the public and lead to poor job performance (e.g., failing to recognize mental health calls or failing to obtain mental health information from callers).

Many studies have also found that the 911 worker populations often suffer from Post-Traumatic Stress Disorder and other stress-triggered issues. While research has not yet focused on the potential solutions to mitigate these problems, the National Emergency Number Association ("NENA") has established standards for implementing a Comprehensive Stress Management Program ("CSMP").[371]

NENA recommends that a CSMP: (1) provide stress management training; (2) offer on-site educational materials and resources about stress-related risks and managing stress; (3) establish internal operating procedures that will ensure employee participation in critical incident stress management activities; (4) establish and encourage employee use of Employee Assistance Programs that provide counseling services for their employees; (5) identify local resources and encourage proactive utilization of those resources; (6) establish peer support programs; (7) include comprehensive information on how to manage suicidal callers and calls that involve individuals with serious mental illness as part of general 911 training; and (8) incentivize personal health programs relating to lifestyle practices and changes.

The Association of Public-Safety Communication Officials International ("APCO") has also published minimum training standards for 911 call takers, echoing many of NENA's recommendations. APCO further recommends that an agency be responsible for providing information in both verbal and written form, though the call takers themselves are responsible for the "application of stress management principles."[372]

**The Chicago Department of Public Health ("CDPH") should partner with mental health agencies and advocacy groups to develop a two-step community education campaign on the signs of mental illness and how to best respond to a mental health or related crisis.**

CDPH should partner with mental health agencies and advocacy groups to develop and support mental health awareness and education in the community. An ideal time to do that would be when it rolls out a new Smart911 system. As part of the campaign, the City should sponsor the training and education of credible messengers in communities throughout the City on signs and symptoms of mental illness and on how to either enter information in Smart911 or otherwise request a CIT-trained officer when calling 911. Those credible messengers should then engage with the community

and pass on that same training and education. Particular constituencies, such as caregivers for individuals living with severe mental illness and intellectual disabilities, school systems, faith-based groups and agencies supporting those with disabilities, should be engaged in this process.

## What is CPD's current approach to mental health crisis response? Don't they have a Crisis Intervention Team Program? Why isn't it working?

In 2005, following a series of highly publicized shootings of persons with mental illnesses, CPD established its CIT program to ensure the "dignified treatment and safety of arrestees and other persons requiring assistance … to obtain mental health evaluation treatment, or hospitalization."[373] CIT, sometimes called the Memphis Model, includes partnerships between police, mental health agencies, advocates and persons with lived experience; 40 hours of specialized training for officers who volunteer to become CIT officers; designated points of access to emergency psychiatric assessment and care; and changes to policies and procedures to facilitate a more effective response to persons experiencing mental health crisis.[374] The CIT Center at the University of Memphis estimates that over 2,700 jurisdictions are implementing CIT programs.[375]

Consistent with the Memphis Model, CPD collaborated with community stakeholders to develop and implement the 40-hour training and to work through various system issues. The training educates officers on how to respond to mental health crises and collaborate between law enforcement and community mental health agencies.[376] The training also provides opportunities for officers to interact with persons with lived experience of mental illness, family members and mental health professionals. Both internal evaluations and externally funded studies indicate that officers find the training extremely useful and that it improves their ability to respond to persons in crisis.

CPD initially began by piloting the program in two districts, providing the 40-hour training to 30-40 officers and supervisors in each district.[377] In light of initial successes, CPD rapidly expanded the CIT program and was training roughly 30 officers throughout the City each month by July 2006.[378] Since 2006, the number of trainings provided annually has varied based on funding, which has come primarily from external sources. Today, approximately 15% of Chicago's more than 12,000 police officers are certified by the Illinois Law Enforcement Training and Standards Board as CIT officers.

In response to requests from CIT-trained officers based in Chicago public schools, in 2010, CPD became the first in the nation to offer an "Advanced" 40-hour CIT training program to focus on the unique needs of youth.[379] CIT-Youth trains officers to identify and divert juveniles with mental health needs to treatment, rather than incarceration.[380] CPD also offers a similar program targeting veterans.[381]

The CIT program has had a number of positive outcomes. A National Institute of Mental Health-funded research study found significant differences in how Chicago's CIT-trained officers respond to persons potentially experiencing a mental health crisis compared to their non-CIT-trained officers. Specifically, CIT-trained officers were less likely to use force with more resistant subjects, and they were more likely to take steps to link individuals to mental health services. CIT-trained officers also reported feeling better prepared to respond without needing to use force and that the skills they learned in CIT training really worked to de-escalate tense and potentially dangerous situations.[382]

# Why aren't all identified mental health crisis calls getting a CIT response?

Notwithstanding a promising beginning and strong training curriculum, the Critical Response Unit ("CRU") has been significantly constrained in its ability to fully implement the CIT model. With only four staff members assigned full-time to the unit, the CRU simply does not have the resources to fully support CIT officers in Chicago's 22 police districts; work with OEMC to ensure call-taker protocols and training support effective identification of mental health calls; liaise with other City agencies, community providers and stakeholders; respond to special call outs; track CIT call data; and run up to 30-week-long training sessions per year.

Additionally, the number of CIT-trained officers is insufficient to ensure CIT availability 24/7 in all districts. While existing data does not allow for accurate estimates of the needed capacity, it does suggest current capacity is not adequate to meet demand. For example, out of the nearly 60,000 calls in 2010 to 2012 that 911 call-takers initially identified as "mental health-related," only a quarter of them were handled by CIT officers, even though call-takers "make every effort" to dispatch the calls to them.[383] As noted above, OEMC significantly under-identifies mental health-related calls. As a result, the actual number of calls appropriate for CIT response is likely much higher, and the capacity issue may be more dire.

These problems are further exacerbated by a poor communications system between the OEMC and CPD. OEMC personnel are hindered in dispatching CIT officers on duty for each watch and district because they cannot easily and consistently identify them, even though station supervisors are supposed to send OEMC a list of officers that are CIT-trained at the beginning of each watch. Then, OEMC personnel have to manually enter daily watch rosters into their systems. These tasks could easily be automated to save time and improve accuracy of information. There is also no process in place for CPD to share changes in their General Orders or day-to-day operational practices in a consistent and timely manner.

### *Recommendations*

**CPD should increase the number of CIT-certified officers to 35% of all patrol officers, and ensure that individual districts with the highest number of mental-health calls are staffed to 35% or higher. All districts and all watches should staff at least two CIT-certified officers. Refresher courses should be developed and provided to CIT-trained officers. CPD should attach a permanent code "z" to officer names that OEMC can always access so dispatch can assign appropriate officers to calls.**

Ensuring that there are a sufficient number of CIT-trained officers during any watch to provide full coverage for mental health-related incidents is crucial. Yet, it is not necessary and may not be desirable to train all officers in CIT. The "Memphis Model" recommends having only a portion of a police force CIT-trained, reasoning that not all officers have the ability to be CIT officers and that volunteers may be more interested, invested and effective.[384]

Initial recommendations from the CIT Center at the University of Memphis suggested that 25% of a department's patrol force be CIT trained to ensure availability of CIT response. More recently, they have acknowledged that this may vary based on the needs of specific cities and that larger, more densely populated cities may need to train 35% or more to ensure coverage. Chicago does not

currently have adequate data to determine the precise capacity needed. However, it is clear that 15% is not sufficient. The Task Force recommends that Chicago increase its CIT capacity to 35% of patrol officers. We also recommend that data systems be improved so that the adequacy of CIT capacity can be empirically assessed.

**The City should create a "Mental Health Critical Response Unit" within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency coordination and data collection and houses the CRU.**

The Task Force recommends that the City create a new unit within CPD known as the Mental Health Critical Response Unit ("MHCRU"). MHCRU would be responsible for overall mental health crisis response functions, training, supporting community outreach and engagement, cross-agency coordination and data collection and would house the CRU. MHCRU should be housed within the Bureau of Support Services, in the Education & Training Division. It should be led by an officer with the rank of Lieutenant or higher, be adequately resourced and staffed and work with an advisory board of local stakeholders. MHCUR would oversee CIT training, support CIT officers in the field and operate a co-responder unit assisting with high-risk subjects or providing follow-up for persons who frequently come in contact with police.



In order for CPD's mental health crisis response strategies to be effective, the MHCRU unit must have the organizational support and resources to do its work. The CRU must be prioritized such that both the police department and the community give mental health crises the attention they merit, and the CRU can obtain the amount and quality of resources that it needs. The U.S. Department of Justice has recognized this and required the prioritization of these units in its consent decrees and settlement agreements with several cities.[385]

Given the breadth of functions of the MHCRU unit, it should be staffed by at minimum 8 full-time sworn personnel carefully selected and vetted based on experience and commitment to providing effective mental health response and an absence of excessive force complaints against persons experiencing crisis in the preceding three years. Pending a comprehensive assessment of personnel need, unit staffing may be increased beyond 8.

A full-time data analyst should be assigned to this unit to evaluate the CIT training program and inform personnel need, community feedback, and analysis of OEMC calls, as well as effectiveness of police interventions and evaluations of the training.

## Why are so many people with mental illnesses having repeat contacts with CPD and ending up in the criminal justice system?

Studies suggest that over 60% of incarcerated individuals meet diagnostic criteria for some mental illness.[386] That means that of the approximately 76,400 people who were admitted to Cook County Jail in 2012, approximately 46,000 were people living with mental illness.[387] It is therefore not surprising that following national trends, many jails and prisons in Illinois have become the de facto mental health treatment centers. The Cook County Jail is now considered one of the larger, if not the largest, mental health care providers in the country. In fact, many people do not receive mental health treatment until they enter the criminal justice system.

In the past decade, Illinois has made some of the largest cuts to mental health spending in the nation. During that same time period, the City of Chicago closed six of its twelve mental health clinics and other private agencies closed their doors. While there are community mental health agencies providing good services in Chicago and the Affordable Care Act has infused additional resources, long waiting lists are common. The current State budget crisis further threatens the ability of many facilities to stay open at all. The situation is particularly dire on the South and West sides of the City.

In the context of an overburdened mental health system, police officers frequently encounter persons with mental illnesses who are in crisis or struggling to get their basic needs met. Officers have few options for addressing these situations. They can arrest the person and take him or her to lock-up or jail, transport the person to the designated hospital emergency department for psychiatric evaluation or do nothing at all. Many individuals in crisis do not need or meet the criteria to be hospitalized nor are they engaged in criminal behavior. But an officer may recognize that without some type of intervention, the problem will continue and, in some cases, put the individual with mental illness or others at risk.

Interviews with officers indicate they are often frustrated with the time it takes to transport an individual to the hospital and then see the same individual back in their beat within hours, in the same or worse condition. Under current conditions, arresting the person and taking him or her to jail may be a more

efficient use of officer time, and ironically may also be more effective in obtaining the required mental health treatment. This is not an acceptable system response to the predictable challenges of severe mental illness. Emergency departments and jails are poor venues to provide proper treatment for persons experiencing mental health crises. And both are very expensive. The lack of appropriate resources needlessly criminalizes many men and women who could receive more effective and humane treatment outside the criminal justice system, with a more carefully organized and properly funded mental health system.

### Recommendations

**The City should create a crisis response system to support multi layer co-responder units where behavioral health providers are working with OEMC and CPD to link individuals with mental health issues to treatment, 24 hours a day.**

While providing CIT training to police officers is a key tool for de-escalating responses to mental health crises, many jurisdictions recognize the value of also going beyond traditional police functions to more directly address the problem of mental illness. The President's Task Force on 21st Century Policing recommended that law enforcement agencies "engage in multidisciplinary, community team approaches for planning, implementing, and responding to crisis situations with complex causal factors."[388]

The co-responder model is one such approach. The model's primary component is intensive collaboration with mental health professionals for responding to crises and persons with mental health issues who repeatedly come to the attention of police. Police may respond in tandem with mental health professionals, allowing them to maximize their respective skills and better share information. Instead of simply arresting a person experiencing a mental health crisis, these clinicians help assess whether an alternative intervention (e.g., connecting with a social worker, getting treatment) would be more appropriate. After an incident, a clinician may follow up with the person who experienced a crisis.

The crisis response system includes a crisis line that is staffed by clinicians and is well-connected to other systems (like OEMC) that can respond to mental health emergencies. Intensive training and development of this multi layer co-responder model is necessary and relies heavily on the City and its Department of Public Health. The crisis response system should also include mobile crisis workers that can respond and provide assessments. These clinicians may also respond at the request of police officers, and request police assistance when needed.

The Los Angeles Police Department's crisis response system includes co-response teams and has become nationally recognized as a best practice.[389] Its Mental Evaluation Unit ("MEU") consists of 61 officers and detectives and 28 clinicians with the Los Angeles County Department of Mental Health.[390] The MEU has teams that pair a clinician with a police officer or, for more complex cases, with a police detective. Deploying these teams for crisis calls saved more than 6,600 hours of patrol time and at least $10 million in 2014.[391] MEU officers and clinicians also help staff a crisis hotline that patrol officers—before taking action in a situation that appears to involve a mental health crisis—are required to contact for an assessment of the most appropriate intervention. Approximately two-thirds of these calls involved a "one-time crisis" resolved with the first contact.

Moreover, in Pawtucket, Rhode Island, the police department's partnership with the largest community provider of mental health services to respond to crisis calls resulted in further benefits. Besides providing people experiencing mental health crises with the help they needed and generating significant cost savings, the collaboration in Pawtucket enhanced transparency and rebuilt trust between law enforcement and mental health professionals, as well as between law enforcement and community members.[392]

**The City should expand and invest in Crisis Stabilization Units ("CSU") for individuals suffering from symptoms of mental illness who do not need to be psychiatrically hospitalized.**

Holy Cross Hospital has a small CSU for adults. In the 8 months the unit has been open, inpatient hospitalizations have decreased 42% because patients are immediately linked to mental health providers.[393] Holy Cross is not a CPD drop-off site nor does CPD's general order currently allow officers to drop off individuals experiencing symptoms of mental illness at a CSU as opposed to a designated emergency room. However, this is an important option for persons needing stabilization and has shown initial promising results:

- Prior to the CSU, 75% of individuals suffering from symptoms of mental illness in the emergency room were admitted as inpatients; after the CSU that number dropped to 34%.

- The Holy Cross CSU has served 466 people.

- The average length of stay is 14 hours.

- In the emergency room, for an individual with both mental illness symptoms and medical issues, the average wait time is 5 hours. For individuals with mental illness symptoms, the wait time for the CSU is only 1 hour, down from 18 hours in the emergency room.[394]

Several projects are also under way to better link individuals with mental illnesses who come in contact with the police to mental health services. Funded by the Bureau of Justice Assistance, CPD is working with Mt. Sinai Hospital and Thresholds to link persons transported to the Mt. Sinai emergency room for psychiatric evaluation. This pilot project also includes a hotline that officers can call for persons not needing transport but in need of linkage. This service is only available during business hours and not widely known within CPD. This is yet another reason why an MHCRU would be such an essential component to the internal and external communication of services and resources available to officers.

**The City and the MHCRU should identify frequent, high-use and high-need individuals and help them get mental health treatment.**

Some individuals in mental health crises are frequent players in both CPD and hospital emergency departments. The strain on both CPD and the healthcare system could be significantly reduced by identifying these high-use individuals and helping them get the mental health treatment they sorely need. Sharing data between the City's Department of Public Health, insurers, hospitals and other mental health providers, CPD and OEMC is critical to identifying frequent, high-use individuals for intervention.

For example, in response to a recognition that a small group of individuals were very high users of emergency room services, Illinois Masonic Hospital developed a program that identifies high users of

emergency services and links them to community treatment teams. Last year they intervened with a woman who visited the emergency department over 700 times costing the hospital $2.5 million.[395] With engagement and community treatment, employment support, medication management, and continual following up, this patient reduced her visits to only eight times the following year, saving millions of dollars.

Several recent demonstration projects and randomized trials explore strategies to address the medical and psycho social needs of individuals who come into repeated contact with law enforcement, medical and social service systems. Medical facilities across the United States pay increasing attention to "hot-spotters"—specific individuals and settings associated with repeated and costly use of medical and social services.[396] Many of these interventions implement cooperative interventions from housing, mental health and social service agencies to provide effective case management, secure housing and other services to address chronic risks.

To help frequent, high-use and high-need individuals receive treatment, the City should fully fund Assertive Community Treatment ("ACT") teams and Mobile Crisis Prevention to provide relentless engagement. ACT is an evidence-based program that is less expensive than hospitalization or jail and significantly reduces recidivism and re-admittance.

## Why are we only treating people after they are in crisis?

The current mental health system focuses on chronic care management for people who are living with severe, disabling mental illnesses. It does not address early intervention that might encourage recovering and support a high functioning individual avoiding long-term disability. It also does not address the needs of other individuals who do not experience severe mental illness, but who satisfy criteria for intellectual and developmental disabilities that may heighten risks of mental health crises. Without these less intensive, recovery-promoting services, persons living with mental illness fail to get timely treatment until their symptoms are so severe as to require costly crisis management. In other words, the current mental health system may treat pneumonia but not the common cold, so you have to wait until your cold turns into pneumonia before you can get treatment.[397]

Clinical research studies have long established the importance of early intervention following the first episode of psychosis.[398] Prolonged duration of untreated psychosis not only reduces the effectiveness of treatment, but also increases the risk of incarceration.[399] Persons experiencing the first episode of psychosis while still untreated are at an increased risk of substance abuse, violence and arrest.[400] Moreover, recent studies have found that changes in the brain caused by child trauma result in heightened sensitivity to stress often found in people diagnosed with psychotic disorders.[401]

Interventions found effective for promoting recovery after a first episode of psychosis include low doses of atypical antipsychotic medications, cognitive and behavioral psychotherapy, family education and support and educational and vocational rehabilitation.[402] Care and services should be offered over at least a two- to three-year period.[403] The RA1SE Early Treatment Program reflecting this programming has been implemented in 17 community clinics across the nation thus far.[404]

Early intervention is crucial to countering the progression of the illness and decreasing the risk of criminal justice involvement. This treatment is particularly important for young adults. Studies have

found that younger inmates generally suffer from the highest rate of mental health problems.[405] For example, 63% of state prisoners age 24 or younger had a mental health problem, while 40% of those age 55 or older had one.[406]

### Recommendations

**The City should invest in first episode programming so that young adults experiencing their first episode of psychosis or major depression are immediately linked to intensive services to reduce progression of illness and decrease the risk of criminal justice involvement.**

## How are police escalating trauma, including at crime scenes?

Many communities in Chicago are constantly traumatized due to community violence and other toxic stress. Over 75% of children in a high-violence urban area report contact with community violence, meaning they either have seen violence, been a victim of violence or known a victim of violence.[407] This level of trauma and violence is devastating—children exposed to gun violence report high levels of anger, withdrawal and post-traumatic stress.[408]

Youth living in violent communities may experience "pathological adaptions" and can find it hard to form trusting relationships, especially with police.[409] Repeated exposure to violence is traumatic and creates a constant state of fear for children and adults. When children are raised in this environment, they are continuously in a heightened state of arousal, which can lead to perceiving threats when there are none and to either respond by withdrawing or lashing out. This is the environment that officers are walking into when responding to calls. Many parts of our community are in a constant state of fear, mistrust and survival.

The vicious cycle of violence feeds into our criminal justice system when children experience such high levels of trauma that affects their development, leading to the development of mood and anxiety disorders, aggression, deficits in social skills and substance use. The high levels of trauma not only affect youth in their current lives, but affect their behaviors and development later on. Children who experience violence are more likely to perpetrate violence as an adult, including aggression, delinquency and other violent crimes. Community violence, toxic stress and trauma saturate our city, and efforts to break the cycle of violence will be suffocated unless we actively work to address the trauma that people are experiencing every day.

### Recommendations

**CPD should work to decrease trauma and escalation at crime scenes by reducing the show of heavy weapons and expanding the Chicago Survivors program.**

Police officers must be cognizant of the traumatized state of many communities when they respond to crime scenes so as to not exacerbate matters. Officers should seek to reduce a show of force and heavy weapons where appropriate.

In September 2015, the Chicago Department of Public Health's Crisis Response and Recovery Program partnered with Chicago's Citizens for Change on its "Chicago Survivors" program.[410] The collaboration sought to provide immediate responses to family members of murder victims in order

to provide services and assist them through the aftermath of loss due to violence.[411] Chicago Survivors is a promising program, but its funding cycle is ending and its efforts are constrained by current staffing. The program currently provides one-hour training to lead homicide investigators on "More Effective Engagement and Communication with Families Following Homicide." It also provides a fresher course on crime victims' services and a general overview of the symptoms of PTSD and complicated grief.

The City and CPD should expand the capacity of the Chicago Survivors program by using the program to: (1) respond to all homicides City-wide; (2) provide homicide scene de-escalation, which would lower arrests and agitation within the community; (3) conduct PTSD assessments; (4) provide links to six months of family support services; (5) provide officer training to promote more effective and compassionate engagement; (6) provide training to state prosecutors and the medical examiner's office; and (7) help ensure that working adults have sufficient time and ability to mourn the loss of loved ones.

# Endnotes

[358] National Institute of Mental Health, Any Mental Illness (AMI) Among U.S. Adults, *available at* http://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-ami-among-us-adults.shtml.

[359] *See, e.g.*, NAMI Chicago, White Paper, Making the Case for Funding and Supporting Comprehensive, Evidence-Based Mental Health Services in Illinois, at n.8 (May 2015), *available at* http://www.namigc.org/wp-content/uploads/2012/08/NAMI-White-Paper-NAMI-Chicago-May-2015.

[360] IDD and Community Policing, Tennessee Department of Intellectual and Developmental Disabilities (Apr. 2015), *available at* http://www.tn.gov/assets/entities/didd/attachments/DIDD_Materials_for_Law_Enforcement.pdf.

[361] *See* http://www.cookcountysheriff.com/index.html.

[362] The Path Forward: Investing in the Illinois Community Mental Health System, Improving Lives, Saving Money, Thresholds, at 9 (Nov. 2013), *available at* http://www.thresholds.org/wp-content/uploads/2013/11/Path-Forward_Investing-in-Illinois-Community-Mental-Health_Final.pdf.

[363] State of Illinois, Office of Management and Budget, Executive Office of the Governor, Department of Human Services Budgets, Executive Budget for Fiscal Year 2015, *available at* https://www.illinois.gov/gov/budget/Pages/BudgetBooks.aspx.

[364] National Association of Mental Illness-Greater Chicago, Mental Health 2013: An Important Public Health Issue, at 2 (July 2013), *available at* http://www.namigc.org/wp-content/uploads/2013/01/MentalIllnessFactSheet-July-2013.pdf

[365] Illinois Association of Rehabilitation Facilities, 51,447 to Lose Community Developmental Disability and Mental Health Services, 1,539 Lost Jobs Under Proposed Budget (Mar. 12, 2015), *available at* https://mentalhealthsummit.files.wordpress.com/2015/02/2015-03-11-iarf-press-statement-over-51000-to-lose-dd-and-mh-services-under-proposed-budget.pdf; Thresholds, *supra* note 361, at 2-4.

[366] Cook County Jail, Detainee Data, 2015.

[367] CPD, Special Order S06-08, Approved Medical Facilities (June 5, 2015).

[368] OEMC Report, *available at* http://www.cityofchicago.org/content/dam/city/narr/Transition%20Reports/OEMC.pdf.

[369] Working Group Interview.

[370] Matthew Tinney & Nils Rosenbaum, Police Perceptions of the Percentages of contacts in Albuquerque, NM that Involve People Living with Mental Illness (Dec. 2015), *available at* https://www.cabq.gov/mental-health-response-advisory-committee/documents/survey-of-police-officers-for-calls-for-services-as-mental-illness.pdf.

[371] National Emergency Number Association, Public Safety Answering Points Operations Committee, 9-1-1 Acute/Traumatic and Chronic Stress Working Group, NENA Standard on 9-1-1 Acute/Traumatic and Chronic Stress Management, at 23 (Aug. 5, 2013).

[372] APCO ANS 3.103.2.2015, Minimum Training Standards for Public Safety Telecommunicators, Association of Public-Safety Communications Officials International, at 22 (2015), *available at* http://www.apcointl.org/doc/911-resources/apco-standards/75-minimum-training-standards-for-public-safety-telecommunicators/file.html.

[373] Kelli E. Canada et al., Crisis Intervention Teams in Chicago: Successes on the Ground, 10 J. Police Crisis Negotiations 86 (2010), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2990632/.

[374] Randolph Dupont, Sam Cochran, and Sarah Pillsburg, Crisis Intervention Team Core Elements, The University of Memphis School of Urban Affairs and Public Policy, Department of Criminology and Criminal Justice, CIT Center, Crisis Intervention Team Website (2007), *retrieved from* http://cit.memphis.edu/CoreElements.pdf.

[375] National Model, University of Memphis CIT Center, *available at* http://cit.memphis.edu/overview.php?page=7.

[376] CPD, Special Order S05-14, Crisis Intervention Team (CIT) Program (Feb. 29, 2012); Crisis Intervention Teams (CIT), NAMI Chicago (2015), *available at* http://www.namigc.org/wp-content/uploads/2012/06/CIT-Advocacy-Sheet-2015.pdf.

[377] Canada, *supra* note 372.

[378] *Id.*

[379] Crisis Intervention Team, NAMI Chicago, *available at* http://www.namichicago.org/about-us/partnerships/crisis-intervention-team/.

[380] *Id.*

[381] Crisis Intervention Teams (CIT), NAMI Chicago (2015), *available at* http://www.namigc.org/wp-content/uploads/2012/06/CIT-Advocacy-Sheet-2015.pdf.

[382] Amy C. Watson, et al., Outcomes of Police Contacts with Persons with Mental Illness: The Impact of CIT, Administration and Policy in Mental Health and Mental Health Services Research, Vol. 37 (4), at 302-17 (2010), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3171588/.

[383] *Id.*

[384] Amy C. Watson & Anjali J. Fulambarker, *The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners*, 8 Best Practices in Mental Health 71 (2012), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3769782/.

[385] *See, e.g.,* Settlement Agreement, *United States v. City of Portland*, Case No. 3:12-cv-02265 (D. Or. Dec. 17, 2012).

[386] Fred Osher et al., Adults with Behavioral Health Needs Under Correctional Supervision: A Shared Framework for Reducing Recidivism and Promoting Recovery, Washington D.C., U.S. Department of Justice, Bureau of Justice Assistance (2012), *available at* https://www.bja.gov/Publications/CSG_Behavioral_Framework.pdf.

[387] Cook County Sheriff's Reentry Council, An Examination of Admissions, Discharges & The Population of the Cook County Jail, 2012, Chicago, IL: Cook County Sheriff's Office (2013), *available at* http://ecommons.luc.edu/cgi/viewcontent.cgi?article=1015&context=social_justice.

[388] 21st Century Policing Task Force Report, *supra* note 48, at 44.

[389] *See, e.g.,* LAPD, News Release, The Los Angeles Police Department to Serve as National Learning Site on Responding to People with Mental Illnesses (Jan. 19, 2011), *available at* http://www.lapdonline.org/january_2011/news_view/46989.

[390] Stephanie O'Neill, Police and the Mentally Ill: LAPD Unit Praised as Model for Nation, 89.3 KPCC (Mar. 9, 2015), *available at* http://www.scpr.org/news/2015/03/09/50245/police-and-the-mentally-ill-lapd-unit-praised-as-m/.

[391] *Id.*

[392] Jacqueline B. Helfgott, et al., A Descriptive Evaluation of the Seattle Police Department's Crisis Response Team Officer/Mental Health Professional Partnership Pilot Program, 44 Int'l J. Law & Psychiatry 109, 111 (2016).

[393] Working Group Interview.

[394] Working Group Interview.

[395] Shannon Heffernan, Emergency Room Visits for Mental Health Skyrocket in Chicago, WBEZ News (Apr. 16, 2015), *available at* https://www.wbez.org/shows/wbez-news/emergency-room-visits-for-mental-health-skyrocket-in-chicago/b59a93f9-f6dc-447d-b9d4-37378fcd8b8d.

[396] David Meltzer & Gregory Ruhnke, Redesigning Care for Patients at Increased Hospitalization Risk: The Comprehensive Care Physician Model, Health Affairs (May 2014).

[397] NAMI Chicago White Paper, *supra* note 358, at 8.

[398] Robert K. Heinssen, et al., Evidence-Based Treatments for First Episode Psychosis: Components of Coordinated Specialty Care, RA1SE 2 (2014), *available at* http://www.nimh.nih.gov/health/topics/schizophrenia/raise/nimh-white-paper-csc-for-fep_147096.pdf.

[399] John Read, et al., The Traumagenic Neurodevelopmenal Model of Psychosis, 4 Neuropsychiatry 65 (2014).

[400] *Id.*

[401] Andrea K. Blanch, et al., Toxic Stress, Behavioral Health, and the Next Major Era in Public Health, Mental Health America 7 (2014), *available at* http://www.mentalhealthamerica.net/issues/toxic-stress-behavioral-health-and-next-major-era-public-health.

[402] Heinssen, *supra* note 397, at 2-3.

[403] Heinssen, *supra* note 397, at 3.

[404] John M. Kane, et al., Comprehensive Versus Usual Community Care for First-Episode Psychosis: 2-Year Outcomes From the NIMH RAISE Early Treatment Program, American Journal of Psychiatry (2015).

[405] Doris J. James & Lauren E. Glaze, Special Report: Mental Health Problems of Prison and Jail Inmates, U.S. Department of Justice, Bureau of Justice Statistics (2006), *available at* http://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[406] *Id.*

[407] *See, e.g.,* Guerra, N. et al., Community Violence Exposure, Social Cognition, and Aggression Among Urban Elementary School Children, Child Development, Vol. 74, No. 5, at 1561-1576 (Sept./Oct. 2003); Deborah Gorman-Smith & Patrick Tolan, The Role of Exposure to Community Violence and Developmental Problems Among Inner-City Youth, Development and Psychopathology, at 101-116 (1998).

[408] James Garbarino, Catherine P. Bradshaw, and Joseph A. Vorrasi, Mitigating the Effects of Gun Violence on Children and Youth, The Future of Children (Summer/Fall 2002), *available at* http://futureofchildren.org/publications/journals/article/index.xml?journalid=42&articleid=166&sectionid=1068.

[409] *Id.*

[410] CPD, Special Order S12-08, Crisis Response and Recovery Program, at 1 (Sept. 24, 2015).

[411] *Id.*

# Video Release Policy

The Task Force developed a policy for the public release of video and audio recordings of certain critical incidents involving police officers, in particular those involving the use of deadly force or in which death or serious injury results. The Task Force produced this policy on a somewhat expedited basis due to the need to address pending issues and incidents.

The Task Force released the proposed policy on February 16, 2016, and the Mayor immediately adopted it. The adoption of the policy made Chicago the first city in the nation to have a specific, written policy that guarantees the public's timely access to video and audio recordings relating to sensitive police-involved incidents. Nevertheless, and in keeping with the overall timetable for the presentation of its final report, the Task Force has continued to review the policy as it was adopted, and has received and reviewed additional comments and relevant materials. This section of the report will address the process by which the policy was created and some of the concerns behind it, as well as some changes the Task Force proposes in light of information received since its adoption.

The Task Force received and reviewed a considerable quantity of material related to the issue of the public release of recordings of police incidents. While no other city had a written policy, there was a wealth of material to consider, including proposed policies as well as commentary from people and groups on all sides of the issue. The Task Force obtained input directly from a number of concerned entities and individuals, including members of the public, City agencies (including the Law Department and IPRA), prosecutors, criminal defense attorneys, leadership of the FOP, and attorneys who litigate claims against police officers and who pursue FOIA claims directed at obtaining the release of recordings of police incidents. After the policy was released by the Task Force and adopted by the Mayor, the Task Force received a number of comments and additional information, some of which is reflected in proposed changes to the policy that are described below.

## Why does the City not immediately release all video, audio and police reports on every police shooting or death in custody?

Before the Mayor's adoption of the policy on February 16, 2016, the practice in Chicago was generally to withhold from public release any video recording of a police incident until investigations, whether criminal or merely disciplinary, were concluded. This practice, like the absence of any written policy, was consistent with many jurisdictions the Task Force surveyed. However, the Task Force found that the absence of a clear, written policy led to inconsistencies, confusion and mistrust on the part of the public, as well as a proliferation of expensive and time-consuming litigation conducted under the Freedom of Information Act. In many cases, it also left the public in the dark about matters of serious public interest.

In deciding what the video release policy should say, the Task Force was keenly interested in how other jurisdictions handled this issue. As noted, the Task Force's survey of policies around the nation found that as of February 16, 2016, no other city had a written policy on the release of audio and video of police-involved incidents. But other jurisdictions have considered the issue, and their experiences were

informative. This report will summarize two of the many jurisdictions that were considered—New Orleans and Seattle.

New Orleans, by coincidence, issued a written policy on February 24, 2016, just eight days after the Mayor adopted the video release policy produced by the Task Force. New Orleans is under a police-related federal consent decree, and the new policy was also approved by the Federal Monitor and the U.S. Department of Justice.

The New Orleans policy provides that, within 48 hours of a critical incident involving a police officer, the Public Integrity Bureau ("PIB") of the New Orleans Police Department ("NOPD") must provide any recording recovered from the scene to: (1) the Orleans Parish District Attorney's Office; (2) the City Attorney's Office; (3) the NOPD Compliance Bureau; and (4) the local United States Attorney's Office. Those agencies then advise the Superintendent of the NOPD on whether the recording should be made public. The PIB considers the nature of the incident, the safety and privacy concerns of individuals involved, and whether the release would interfere with an ongoing investigation. Taking the advice of those agencies into account, the PIB must make a final recommendation to the Superintendent no more than seven days following the incident. The Superintendent then determines, within 48 hours of receiving the PIB's recommendation, whether any recordings may be released to the public. Any recordings that are released may be redacted to protect the identity of juveniles, victims, witnesses, and suspects, and to ensure the safety and security of anyone involved with the incident. If the Superintendent decides recordings will not be released, the NOPD must inform the federal judge overseeing the consent decree, the Department of Justice, and the Federal Monitor.

The New Orleans policy arises in a somewhat different context than that present in Chicago, principally because of the presence of the consent decree. That said, differences between the New Orleans policy and the policy produced by the Task Force should be noted. The most prominent is the affording of discretion to the NOPD Superintendent, albeit after consultation with other concerned entities, as to whether a recording should be released. By contrast, the Task Force's policy eschews discretion on the part of any official in favor of mandatory release after a specific and limited interval. The Task Force felt that this model was more likely to serve the interests of transparency and trust that were its paramount goals. In addition, the Task Force found that use of a model in which some official or agency was charged with deciding whether to release a recording on a case-by case basis would raise difficult issues regarding in what City office or agency such an official would be lodged and what criteria would be applied in deciding whether recordings should be released—issues addressed more fully below.

Many commentators, including some who provided input directly to the Task Force, suggested that it consider how the issue of the release of recordings is handled in Seattle. Aumber in fact claimed that Seattle followed a policy of releasing all such recordings immediately, and touted that approach.

When the Task Force contacted responsible Seattle officials, it turned out that was not the case. First, Seattle does not have, and never has had, a department-wide immediate release rule, and it has no written policy at all. From December 2014 to July 2015, the Seattle Police Department ("SPD") operated a pilot project in which 12 police officers (out of approximately 1,300 in the department) wore body cameras while on duty. With the assistance of local hackers, software was developed that allowed the video and audio recorded by those 12 body cameras to be redacted to obscure all images and eliminate audio, and then to be uploaded to a YouTube channel, where it was available for public

review within a day of its being recorded. The recordings covered by this policy were not limited to incidents involving the use of force; rather, they included everything that was recorded on the officer's body cameras. The pilot project ended, and currently there are no Seattle officers wearing body cameras or uploading recordings. Nor has the pilot project been expanded to include more officers. The SPD continues to assess its pilot project.

So how, after having the benefit of the pilot program, does Seattle actually handle these issues? Seattle's current policy gives discretion to the Chief of Police to release a video when she deems it appropriate and necessary. If the Chief of Police declines to release a recording, the Washington Public Records Act ("WPRA," equivalent to Illinois' FOIA) allows interested parties to request release of a video and, if necessary, sue to obtain its release. The WPRA includes an exemption from release for pending criminal investigations. The authority to declare an investigation of a police-involved incident a "criminal investigation" exempt from release under WPRA rests solely with the Director of the SPD's Office of Professional Accountability, who reports to the Chief of Police, but is otherwise outside the SPD chain of command. Moreover, under Washington state law the criminal investigation exemption to WPRA ceases to apply once a matter is actually referred to a prosecutor's office. Like the New Orleans model, and unlike the policy produced by the Task Force, the Seattle policy that is actually currently in force affords at least some discretion to the SPD to withhold a recording from release for some period of time, subject to litigation seeking its release.

### Recommendations

**The Task Force's video release policy provides that recordings and reports related to certain specified types of police incidents be automatically released to the public no later than 60 calendar days from the date of incident, or at an earlier date when possible. Law enforcement agencies, or IPRA (or its successor), may by written request obtain a one-time extension of that deadline, limited in length to 30 days.**

This policy makes Chicago the first city in the nation to have a specific, written policy guaranteeing the public's timely access to information relating to sensitive police-involved incidents, including police-involved shootings and deaths in custody. The policy strikes a balance between the public's need for information about police activity and the interests of law enforcement agencies in conducting investigations without risk of compromising important sources of evidence. The policy is attached as Appendix 10.

In formulating the policy, the Task Force attempted to balance the interests of various concerned people and entities. These interests included, but were not limited to, the public's need to be informed about the way its police officers conduct themselves, especially where the use of force is concerned, as well as the need for agencies charged with addressing the consequences of police incidents to be able effectively to investigate them. While the public's interest in being informed is obviously substantial, the Task Force believes that it is also in the public's interest to assure the ability of prosecutors and other agencies to investigate these incidents and to address their consequences, legal or otherwise.

The Task Force believes this policy addresses these and other concerns effectively in a way that will foster greater transparency and trust between the community and its police force. It is important to

note, though, that the Task Force believes that consideration of these issues needs to be an ongoing process. The policy expressly provides that it should be reviewed after one year (or less) to determine whether earlier release (or other changes designed to further increase transparency) might be appropriate in light of experience and implementation.

**Specific Provisions of the Policy.** After stating its purpose in Section I, the policy sets forth the considerations behind it in Section II. These include the public's interest in timely access to recordings and reports about certain kinds of serious incidents involving the use of force by police officers, the interests of persons depicted in those recordings, and the interests of agencies investigating those incidents in avoiding the compromise of their investigations by, for example, prematurely making such materials available to potential witnesses. As Section II indicates, the goal of the policy was to balance those interests, and in that respect, Section II speaks for itself. The Task Force regards all of those concerns, including not impairing the investigative process, as being in the public interest.

Section III of the policy defines its scope, both with respect to the kinds of incidents it covers and the kinds of recordings and reports it covers. As to the former, the Task Force considered, but did not entirely mirror, the categories of incidents that are within the power of IPRA to investigate under Chicago Municipal Code § 2-57-040(c) and (d). The policy covers incidents in which force is used both "on the street" and when an individual is in police custody. While some suggested that covered incidents involving the discharge of firearms be limited to those in which an individual is actually struck, the Working Group and the Task Force rejected that view, deeming an instance in which an officer fires at a civilian but misses to be well within the zone of interests governed by this policy.

In light of comments received since its adoption, the Task Force does recommend some modifications to Section III A as it was adopted by the Mayor. One concerns the inclusion of incidents involving the use by police officers of stun guns or Tasers. After the policy was produced, the Working Group received, and relayed to the Task Force, concerns related to the administrative burden that would be imposed by including the literally hundreds of such incidents that take place each year within the scope of the policy. While the Task Force does believe that the issues raised by those types of incidents are indeed of public concern, it does not want to see what it views as an otherwise workable policy dragged down by its own administrative weight. Accordingly, the Task Force recommends that at this time incidents involving Tasers and stun guns be included only if they result in death or in great bodily harm, a concept that is already defined in Section III A.

Another proposed change, offered mainly for purposes of clarification, would clarify that covered incidents involving the discharge of firearms do not include accidental discharges.

Finally, the Task Force recommends modifying the policy to make clear that incidents resulting in death or great bodily harm to a person in CPD custody refers to those incidents where the death or great bodily harm results from the use of force by another person.

Section III B addresses what kinds of materials are covered by the policy. The policy applies to both audio and video recordings, as well as certain specified police reports. Notably, the policy is not limited in its application to recordings made on City equipment; rather, it includes any recordings made on private or other equipment that come into the possession of the City later. As a matter of

clarification, the Task Force notes that recordings made during and as part of an investigation of an incident, including recordings of witness statements, are not intended to fall within the scope of this policy.

Section IV of the policy governs the release of materials that it covers. The Working Group and the Task Force considered a number of possible models and intervals with respect to when and whether recordings and reports should be released, including immediate release of all materials, mandatory but delayed release, and release unless delay was approved by some responsible official or agency. Here, as in all of its considerations regarding this policy, the Working Group and the Task Force balanced the interests of those seeking release as soon as possible with those seeking to delay release.

The possibility of charging some official of the City with determining whether and for how long the release of material covered by the policy should be delayed was considered at length, but was ultimately rejected for several reasons. One was the concern that trust and transparency would not be fostered by affording such discretion to an official of the City's executive branch. Another was the difficulty in setting forth the criteria under which such an official would decide whether to delay release, and for how long. A third reason was that no City official could accurately evaluate the concerns of law enforcement agencies as well as they could themselves. The Task Force also considered the possibility of subjecting the question of whether and when to release to a court process, but determined that doing so would require an exercise of jurisdiction not currently afforded to Illinois courts. Ultimately, the Task Force opted for a policy that mandated release rather than leaving it, as other jurisdictions do, to the discretion (however cabined) of an official.

Having decided to mandate release, the Task Force also felt that immediate release in every case would not necessarily serve the public interest. Just as it has an interest in knowing how its police officers are doing their jobs, the public also has an interest in seeing that the agencies charged with investigating incidents involving the use of force by police, including prosecutors and IPRA, are able to conduct their investigations without fear that the release of recordings or reports would compromise their efforts. The Task Force recognized that, under certain circumstances, making recorded evidence or reports available to the public during the early stages of an investigation could result in those materials influencing witness accounts of the incident. Accordingly, the Task Force concluded that while release should be mandatory, some period of delay should be provided to allow for the conducting of witness interviews and other early investigatory functions.

Informed by the experience of a number of members of the Task Force and the Working Group with investigating cases involving the use of force by police officers, as well as the views it received from others, including criminal defense attorneys whose clients' interests could be adversely affected by an earlier release, the Task Force settled on a 60-day delay from the date of the incident (or, if the recording was made on non-City equipment, from the date a City agency comes to possess it) before release. Section III C of the policy makes it clear that material can be released earlier if it can be determined that doing so will not compromise an investigation.

Recognizing also that not all investigations proceed on the same timetable, the Task Force provided for an additional, one-time, 30-day extension upon written request made by a law enforcement agency or IPRA. Written requests need not contain investigative detail, but should invoke concerns

similar to one or more of the exemptions included in FOIA. Written extension requests will themselves be made public, so that the cause of the additional delay can be known to persons interested in the issue. Following this period of up to 90 days, the policy does not allow for any further delay in release of these materials.

Section V of the policy addresses notice to affected parties. It requires IPRA, prior to the release of any material it covers, to provide notice of the pending release to any individual who was the subject of the police action depicted or described in it, or to the person's family or legal representative if they are deceased. The policy permits them to view the recording themselves and requires IPRA to brief them on the status of the investigation in a way and to an extent that does not itself compromise that investigation.

Section VI, as noted above, calls for review of the policy in one year or less to determine whether, after the policy has been in use, the period of delay in releasing material can be shortened. The Task Force recommends that this section be modified to make clear that ongoing review should address any provisions of the policy that might appropriately be modified, including, for example, whether to add all incidents involving Tasers and stun guns back into the policy's coverage.

Finally, Section VII makes it clear that the policy is not intended to supersede any legal obligation with respect to the release of any material, including any court order, any legal obligation to withhold identifying or other sensitive information of any person, or any obligation under FOIA, including those relating to privacy and safety.

The policy is intended to balance the interests of a range of stakeholders with varied, and sometimes opposing, interests in the issue of when the recordings and reports it covers are made public. Like any balancing effort, the result will not make everyone happy, and the Task Force recognizes that implementing it will impose burdens and costs. But those concerns must, in the view of the Task Force, give way in some respect to what the Task Force views as the paramount interest of the public in timely access to the best available information regarding how the police officers that serve them exercise their unique ability to use force in performing their duties. Indeed, nowhere is the public's interest more strongly implicated than in situations in which an officer uses deadly force on a civilian, or when harm comes to one held in police custody. It was for this reason, in large part, that the Task Force chose mandatory release, as opposed to release at the discretion of some official or agency.

The Task Force hopes that the policy will foster transparency and thus encourage trust. The more informed members of the community are about how officers act at their most critical moments, the more grounds they will have to trust their police force, and to trust that officers who violate rules or the law will be dealt with justly. But the Task Force recognized that the public interest is also served by protecting the efficacy of the processes by which police incidents of this kind are investigated. Just as transparency regarding what police officers do will foster trust between the police and the community, so will the sense that relevant agencies can effectively determine what has occurred as a first step to determining what the consequences should be.

# Overarching Issues

## Does CPD's training need significant overhaul?

The answer is yes. The Task Force found that CPD has consistently failed to devote adequate resources to training officers once they leave the Academy. While CPD provides almost double the state-mandated time for new recruit training, once an officer leaves the Academy, over the remaining decades of an officer's career, there is virtually no annual, mandated training. The only annual mandated training is for firearms certification, nothing more. To be sure, there are occasional mandated Academy trainings, such as the recent trainings for procedural justice and Taser use. However, unlike in other jurisdictions that have a portfolio of annual, mandatory, trainings, survey their members and supervisors on training needs and develop a strategic plan for training, no such processes exist for CPD training. Therefore, the Task Force recommends that CPD should address several aspects of its training programs that cut across all subject areas.

### CONTINUING EDUCATION

Based on the Task Force's interviews and review of materials, it appears that CPD does not have a robust strategic approach for ensuring that all officers have ongoing training and professional development opportunities to develop and maintain the professional competencies needed to perform well. Other than an annual, under-resourced firearms qualification, there is no regular in-service training or certification requirement. Even though all officers complete pre-service training, training changes over time based on best practices and needs.

Any additional mandatory in-service training appears to be reactive, rather than systematically planned to address identified needs and changes in policing. For example, CPD is currently developing a 16-hour, two-part force mitigation training for patrol officers to begin in spring 2016 and end July 2016. There is no information about the frequency or decision to make this an annual or refresher training, however. CPD has developed and is continuing to develop procedural justice training, but, as discussed earlier in the report, the roll-out of this important training has not been fully implemented.

The International Association of Directors of Law Enforcement Standards and Training ("IADLEST") endorses mandated annual in-service law enforcement training, although it leaves the number of training hours and the selection and/or approval of subjects to the discretion of local law enforcement administrators. There is some variation here, with Utah, Portland, and Massachusetts requiring 40 hours annually; Indiana, Missouri, and Washington requiring 24 hours annually; and California requiring 24 hours every two years.

Additionally, practices in other jurisdictions suggest that it is highly important to regularly assess training needs, conduct in-service training, and engage the community. For New Orleans, the Department of Justice recommended that the police department establish an executive training education task force—including both law enforcement leadership and community members—that would provide the superintendent with information on current training priorities and broad training goals.[412] Moreover, the Education and Training Division Commander conducts an annual training needs assessment to update its

training, and its plan includes having subject matter experts help create, implement, and teach the curriculum. The New Orleans Consent Decree also requires that the department provide eight hours of in-service training annually on community policing and problem solving.[413]

### Recommendations

**Provide an annual 40-hour in-service training for all sworn personnel, including periodic refresher classes on procedural justice.**

Law enforcement is an ever-changing occupation. Laws, court decisions, techniques, technology, and the broader community are in a constant state of flux. As a result, it is imperative that police officers keep abreast of changes and community needs in the areas they serve so that they can more effectively serve the citizens, help the agencies that employ them avoid civil liability, and develop necessary supervisory and management skills.

**Implement a systematic approach to identify training needs and revise in-service training curriculum on an annual basis.**

This systemic approach will require CPD to conduct a thorough training review and needs assessment to inform the development of annual in-service training. The training review should be conducted annually and take into consideration: (1) analysis of officer safety issues; (2) misconduct complaints; (3) problematic uses of force; (4) input from all levels of CPD; (5) community input; (6) recent court decisions; (7) best practices research; (8) the latest law enforcement trends; (9) individual district needs; and (10) any changes to Illinois or federal law, Chicago law, or CPD policy. Training priorities should reflect CPD's commitment to transforming the department by incorporating problem-solving, community-focused and trauma-informed goals that are represented in all policing strategy.

## FIELD TRAINING OFFICER PROGRAM

CPD relies on FTOs to train probationary officers after they leave the Academy. The FTO program has great potential, but it has long needed improvement. When the Commission on Police Integrity reviewed the FTO program in 1997, it found the program "understaffed" and recommended that the number of FTOs should be increased from the then-current level of 67 officers "to at least 200 officers."[414] The Commission also recommended that the salaries for FTOs should be raised to attract more officers.[415]

Unfortunately, not much has changed over the past 18 years. There are currently 88 FTOs, and, at times, there are four probationary officers for every FTO. Ideally, the ratio would be closer to 1:1. Otherwise, probationary officers have less time to interact with and learn from their FTOs and must spend significant time without FTO supervision.

Moreover, there still does not appear to be sufficient incentive for experienced officers to become FTOs. Although there is a pay increase (about $3,000) and opportunity for overtime, the extra pay is not substantial. For a short period, CPD created training districts, which limited FTOs' options for where they could work. They are not eligible to work in specialized units due to their assignments with PPOs. FTOs work without a partner if they are not currently supervising a PPO unless it is third watch. Officers report that working with a random partner with whom they have not developed rapport or trust is

troublesome. FTOs have a tremendous amount of responsibility and none of the authority or incentive to take on the job.

Finally, although there is an initial training program for when an officer first becomes an FTO, the program lacks ongoing or regular refresher courses for its FTOs.

### Recommendations

### Reinvigorate the Field Training Officer program.

CPD needs to attract, train and employ more FTOs to provide valuable training and mentoring to probationary police officers. Current staffing levels of FTOs are not sufficient. CPD should analyze the current impediments to attracting FTOs and develop additional incentives for officers to become FTOs. For example, CPD could consider giving officers some form of credit for serving as FTOs during the Sergeant promotion process.

### Implementation of Policy Changes

Changes in policy directives are reflected in general and special orders, and they are made accessible online and available 24 hours a day. However, there is no documentation of or any record that officers read and understood the orders. Officers may be reminded of an order during roll call to reflect a current instance, but this occurs infrequently. In general, officers are not held accountable for keeping up to date with orders.

The International Association of Chiefs of Police ("IACP") has recommended disseminating information in multiple ways, including (1) roll calls, (2) training bulletins, (3) email messages, and (4) a three-ring binder in squad cars.[416] The orders could also include checklists of the required procedures that the officers have to submit along with their incident reports. However, the IACP recommendations, published in 2004, likely need to be updated based on advances in technology and the availability of additional tools for ensuring that officers are knowledgeable about current policies.

There does not appear to be much data available on the practices of other jurisdictions regarding ensuring that all officers are regularly updated on new policy changes. Washington, D.C.'s Metropolitan Police Department, however, has issued a special order mandating that all sworn and civilian members must sign for the receipt of the General Orders, Special Orders, Standard Operating Procedures, and General Order Changes.[417] At a minimum, there must be (1) a signature roster that each member will sign and date upon receipt of newly published directives and (2) a signature roster file that contains copies of all signature rosters that have been completed and submitted.

### Recommendations

### Implement procedures to ensure that sworn personnel remain informed on all directives and policies.

Within 30 days of the release of new directives and policies, all sworn officers should be provided copies and be required to sign a statement acknowledging that they received and reviewed the directive or policy and had an opportunity to ask questions. CPD could also use brief online quizzes to ensure officers understand new directives and policies.

Officers should also be held accountable for knowing how and where to access CPD guides and manuals and for knowing the contents. Officers should be required to sign a receipt acknowledging this responsibility and that they have received instructions on how and where to access the guides and manuals. Officers should also have adequate resources, such as working computers in their squad cars and at the stations, so they can review general orders as needed. CPD should also consider investing in technology, such as a Smartphone app, to provide easy access to general orders and other important communications.

## Are there enough Sergeants to effectively supervise the large number of patrol officers?

Sergeants are the linchpin to ensuring that patrol officers are accountable to the communities in which they serve. Sergeants work directly with their officers on a regular basis and are in the best position to notice, document and address officer behavior. But, due to budget constraints, the number of available Sergeants per shift does not always provide appropriate coverage to ensure all patrol officers are adequately supervised.

Currently, CPD's average "span of control" is a ratio of 1 Sergeant to every 11 officers. But, when other elements are factored in, such as vacations, sick leave and other events that disrupt officer and Sergeant availability, the ratio is often closer to 1:20. "Span of control" is defined as the number of individuals or resources that one supervisor can manage effectively during emergency response incidents or special events.[418] One commentator has defined "span of control" as simply representing the number of people a manager has responsibility for communicating with.[419] High spans of control mean that there is not enough time for a supervisor to evenly disperse his or her time among subordinates.

How did this state of affairs come to pass at CPD? The problem starts with structural issues. Years of budget cuts and the flattening of supervisory ranks have caused a staffing shortage in supervisory personnel. The career ladder within CPD is broken, and surveys show that 98% of officers believe that promotions are due to connections, not merit.[420] This sentiment is compounded by the fact that almost 10 years passed between the two most recent Sergeant promotion exams, which left many out of the promotion process for years.[421]

There are additional, on-the-ground issues that further strain supervisors' ability to do their job. First, as a result of the CBA's bidding process, junior officers, who need the most support, are placed in the most difficult neighborhoods at the most difficult times. Second, personnel information does not follow officers around as they move between assignments and supervisors. Thus, Sergeants are not provided documentation about their officers' prior behavior or disciplinary history, which hampers their ability to monitor the officers' actions in the field. Third, officers often work with several different Sergeants over the course of a week-long shift in order to maximize coverage. Fourth, due to the limited number of Field Training Officers, Sergeants often take time away from supervising their patrol officers to check on officers who are still on their probationary periods. Finally, Sergeants must respond to calls due to a lack of available officers, which additionally reduces their ability to supervise.

*Recommendations:*

CPD should increase the number of Sergeants on patrol.

CPD should implement monthly meetings of all Sergeants in a district to ensure the sharing of officer performance, to provide mentoring opportunities to newer Sergeants, and to provide a forum for best practice sharing to prevent officer misconduct.

## Why aren't all CPD officers already wearing body cameras?

Body cameras are a promising technological tool to protect both the public from police misconduct and police officers from false allegations of misconduct. They promote accountability and transparency. The presence of body cameras can also de-escalate encounters, resulting in improved behavior among both police officers and the public. The commander in charge of CPD's body camera pilot program, Marc Buslik, recently explained this phenomenon: "When they know they are being recorded, both sides, everything becomes less intense"; "[t]he camera brings everything down on both sides. Officers noticed right away."[422]

CPD is already embracing the use of body cameras. In January 2015, CPD initiated a body camera pilot program.[423] The program initially involved 30 body cameras on officers working the 2:00 p.m. to midnight shift in the Shakespeare District (14th). Though the sample size is small, initial results were promising. Since the program was launched, complaints filed against officers for that district/watch fell by 26%, and excessive force complaints fell to zero in 2015 compared with seven in 2014.[424] In 2016, CPD is expanding the pilot program to all three watches in six additional police districts—Wentworth (2nd), South Chicago (4th), Gresham (6th), Deering (9th), Ogden (10th), and Austin (15th).[425]

Police departments nationwide are increasingly using body cameras. As of early 2015, about 25% of the nation's 17,000 police agencies were using them in whole or in part, with 80% evaluating the technology.[426] In Los Angeles, the LAPD is outfitting every officer with body cameras.[427] While empirical data is still trickling in, several studies have documented substantial decreases in citizen complaints, use of force, and assaults on officers after body cameras were distributed.[428] There is some debate about whether these declines are attributable to improved officer behavior, improved citizen behavior, or citizens being less likely to file frivolous complaints (or some mix). Regardless, these are all positive developments.

*Recommendations*

CPD should continue rolling out and evaluating body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians.

Body cameras show significant promise. Only a small percentage of the many thousands of complaints filed against CPD officers result in sustained findings, often because there is insufficient evidence of what happened aside from a "he said, she said." Body cameras can provide objective evidence to support meritorious complaints, while also discouraging and reducing the filing of unfounded complaints. In either case, the use of body cameras would greatly improve the functioning of Chicago's police oversight system. To the extent body cameras improve officer

behavior, they also could help pay for themselves by reducing the more than $600 million the City has paid to resolve police misconduct cases since 2004.

CPD should continue its roll-out and evaluation of body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians. The City should also continue to evaluate policies governing the use of body cameras, which raise a variety of issues (e.g., what to record, how to record and store recordings, and how to ensure that officers comply with the policy and properly use the cameras). Some of these questions are already addressed in a new state law that went into effect on January 1, 2016, the Law Enforcement Officer-Worn Body Camera Act.[429] The Act creates "standardized protocols and procedures" on such issues as when cameras must be turned on, how citizens are notified, access, retention, and discipline.[430]

## Endnotes

[412] New Orleans Police Department Policy Manual (2014).

[413] New Orleans Consent Decree (2012), *available at* http://www.nola.gov/nopd/nopd-consent-decree/.

[414] 1997 Report of the Commission on Police Integrity, *supra* note 47, at 19.

[415] *Id.*

[416] W. Dwayne Orrick, Best Practices Guide: Developing a Police Department Policy-Procedure Manual, International Association of Chiefs of Police (2014), *available at* http://www.theiacp.org/portals/0/pdfs/BP-PolicyProcedures.pdf.

[417] Special Order: Dissemination of Written Directives, Metropolitan Police Department D.C. (2006), *available at* https://go.mpdconline.com/GO/SO-06-13.pdf.

[418] Management Span of Control: Introduction to the Incident Command System (ICS100), Federal Emergency Management Agency, Washington, D.C.

[419] Robert L. Bailey, Span of No Control (Mar. 1, 2015).

[420] Wesley G. Skogan, Summary, Chicago Officer Survey 2013 (Oct. 8, 2013).

[421] Working Group Interview.

[422] Paul Biasco, How Chicago Police Hope Body Cameras Will Restore The Public's Trust, dnainfo.com (Jan. 7, 2016), *available at* https://www.dnainfo.com/chicago/20160107/logan-square/how-chicago-police-hope-body-cameras-will-restore-publics-trust.

[423] CPD, Body Worn Camera Pilot Program – Phase 1, Department Notice D15-01 (Jan. 1, 2016).

[424] *Id.*

[425] CPD, Office of News Affairs, Mayor Emanuel and Police Superintendent Escalante Announce Districts for Body-Worn Camera Expansion (Dec. 23, 2015), *available at* http://4abpn833c0nr1zvwp7447f2b.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/23Dec15-Release-Body-Worn-Camera-Expansion.pdf.

[426] Jay Stanley, Police Body-Mounted Cameras: With Right Policies in Place, A Win For All, ACLU (Mar. 2015), *available at* https://www.aclu.org/police-body-mounted-cameras-right-policies-place-win-all.

[427] Kate Mather, A Fight Over Access to Video from LAPD Body Cameras is Shaping Up, Los Angeles Times (Feb. 5, 2015), *available at* http://www.latimes.com/local/crime/la-me-lapd-cameras-20150205-story.html.

[428] Michael D. White, Police Officer Body-Worn Cameras, Washington D.C.: Office of Community-Orientated Policing Services (2014), *available at* https://www.ojpdiagnosticcenter.org/sites/default/files/spotlight/download/Police%20Officer%20Body-Worn%20Cameras.pdf.

[429] 50 ILCS 706/10-1, 35.

[430] 50 ILCS 706/10-5.

# Disclaimer

This report is the product of the Police Accountability Task Force and its affiliated Working Groups, with participants of diverse expertise and affiliations addressing many complex and contentious topics. It is inevitable that arriving at a consensus document in these circumstances entailed some compromise. Accordingly, it should not be assumed that every Task Force (or Working Group) member embraces in totality every formulation in this report or even that all participants would agree with any given recommendation if it were taken in isolation. Rather, the Task Force reached consensus on these recommendations as a package.

Moreover, while the Task Force formed Working Groups to address five general subject areas, there was inevitably overlap between the Working Groups and subject areas. The discussion of a particular issue in this report under a particular Working Group should not be construed to mean that only that Working Group contributed to the Task Force's findings and recommendations. In the end, the findings and recommendations in this report represent the work of the entire Task Force.

# Appendix 1

## Police Accountability Task Force Members

**Lori E. Lightfoot**, Chair, is President of the Chicago Police Board, a partner at Mayer Brown LLP, and a former federal prosecutor. She served as Chief Administrator for the Office of Professional Standards of the Chicago Police Department, where she managed a 100-person office of civilian investigators charged with investigating police-involved shootings, allegations of excessive force and other misconduct alleged against Chicago police officers.

**Deval Patrick**, Senior Advisor, was formerly Governor of Massachusetts and is a native of Chicago. Governor Patrick served under President Bill Clinton as the U.S. Assistant Attorney General for the Civil Rights Division of the Justice Department, where he worked on issues including racial profiling and police misconduct.

**Joe Ferguson**, Technical Advisor, is Inspector General of the City of Chicago and a former federal prosecutor with experience representing the United States in cases involving employment discrimination, civil rights, environmental law and government program fraud.

**Randolph Stone** is a clinical professor at the University of Chicago Law School, director of the Criminal and Juvenile Justice Project Clinic, and a former Cook County Public Defender. He serves on the boards of the Youth Advocate Programs, Inc., the Federal Defender Program, and the Illinois Department of Juvenile Justice, and writes and teaches on criminal law, juvenile justice, indigent defense, and race and criminal justice.

**Sergio Acosta** is a partner at Hinshaw & Culbertson LLP and is an experienced criminal litigator, investigator, former federal prosecutor, and member of the National Hispanic Prosecutors Association and the Hispanic National Bar Association.

**Victor B. Dickson** is the President/CEO of Safer Foundation, which is a national leader in the fields of community corrections, prisoner re-entry, and workforce development. He worked for more than 20 years in the corporate sector with AT&T and Sprint and in 2014 was appointed to the Illinois Human Services Commission. He also serves on the Illinois Commission to Eliminate Poverty and the Illinois Workforce Investment Board.

**Maurice Classen** is a Program Officer with the MacArthur Foundation, where he focuses his work on public safety, justice, police reform, municipal and neighborhood growth, and policy issues. Prior to joining the MacArthur Foundation, he was a Senior Deputy Prosecuting Attorney in King County (Seattle), Washington.

**Alexa James** is the Executive Director of NAMI Chicago, which is the largest mental health advocacy agency in Chicago and supports those impacted by mental illness. Prior to joining NAMI Chicago, she worked with children and adults living with mental illness, as well as those impacted by poverty and trauma.

**Sybil Madison-Boyd** is the Director of the Learning Pathways Program at Digital Youth Network in DePaul University's College of Computing and Digital Media. Her work addresses barriers to equitable educational outcomes for urban youth through systems change and innovative reform and, for the past 20 years, in partnership with Chicago Public School leaders, teachers, social workers, and students.

# Appendix 2

## Police Accountability Task Force Working Group Members

### COMMUNITY-POLICE RELATIONS

**Leader: Victor Dickson**, Safer Foundation; President and CEO

**Leader: Sybil Madison-Boyd**, DePaul University; Learning Pathways Director, Digital Youth Network

**Leader: Randolph Stone**, University of Chicago Law School; Clinical Professor of Law

**Keith Ahmad**, Law Office of the Public Defender – Cook County; First Assistant Public Defender

**Karina Ayala-Bermejo**, Legal Aid Society of Metropolitan Family Services; Executive Vice President of Human Resources & General Counsel

**Todd Belcore**, Social Change (Chicago International Social Change Film Festival); Executive Director

**Amy Campanelli**, Law Office of the Public Defender – Cook County; Public Defender

**Herschella Conyers**, University of Chicago Law School; Clinical Professor of Law

**Sol Flores**, La Casa Norte; Founding Executive Director

**Craig Futterman**, University of Chicago Law School; Clinical Professor of Law

**Steve Gates**, Youth Advocate Programs; Director

**Benny Lee**, National Alliance for the Empowerment of the Formerly Incarcerated (NAEFI); CEO

**Xavier McElrath-Bey**, Campaign for the Fair Sentencing of Youth; Youth Justice Advocate/ICAN; Co-Founder & Coordinator

**Jonathan Peck**, Alternatives Inc.; Restorative Justice Coordinator

**Howard Saffold**, Positive Anticrime Thrust; CEO

**Rabbi Michael Siegel**, Anshe Emet Synagogue; Senior Rabbi

**Wesley Skogan**, Northwestern University; Professor

**Eliza Solowiej**, First Defense Legal Aid; Executive Director

**Debra Wesley**, Sinai Community Institute; Founder and President

**Richard Wooten**, Gathering Point Community Council; President and CEO

## POLICE OVERSIGHT

**Leader: Maurice Classen**, MacArthur Foundation; Program Officer

**Advisor: Joe Ferguson**, City of Chicago Office of the Inspector General; Inspector General

**Anthony Beale**, 9th Ward, City of Chicago; Alderman

**Sheila Bedi**, MacArthur Justice Center; Attorney

**Locke Bowman**, MacArthur Justice Center; Executive Director

**Mark Flessner**, Holland and Knight LLP; Partner

**Adam Gross**, Business and Professional People for the Public Interest Chicago; Director of Justice Reform Program

**Janine Hoft**, The People's Law Office; Attorney

**Kwame Raoul**, 13th District, State of Illinois; State Senator

**Freya Rigterink**, City of Chicago Office of the Inspector General; Assistant Inspector General

**Ronald Safer**, Riley, Safer, Holmes and Cancila LLP; Partner

**Gretchen Slusser**, Thred Partners; President

## EARLY INTERVENTION & PERSONNEL CONCERNS

**Leader: Lori Lightfoot**, Mayer Brown LLP; Partner

**Anthony Berglund**, University of Chicago Crime Lab; Research Manager

**Craig Chico**, Back of the Yards Neighborhood Council; Executive Director

**Monica Haslip**, Little Black Pearl; Founder and Executive Director

**Daniel O'Neil**, Smart Chicago Collaborative; Executive Director

**Julia Quinn**, University of Chicago Crime Lab; Research Manager

**Dave Williams**, Youth Advocate Programs; Regional Director

## DE-ESCALATION

**Leader: Alexa James**, National Alliance on Mental Illness Chicago; Executive Director

**Fred Coffey**, Chicago Police Department; Former Deputy

**John O'Malley**, United States Marshal Service; Retired Chief Deputy

**Harold Pollack**, University of Chicago School of Social Services Administration; Helen Ross Professor

**Carolyn Vessel**, I AM ABLE Center for Family Development; President and CEO

**Amy Watson**, University of Illinois at Chicago; Associate Professor

**Ronnie Watson**, Chicago State University; Retired Chief of Police

## VIDEO RELEASE
**Leader: Sergio Acosta**, Hinshaw & Culbertson; Partner

**Joel Bertocchi**, Hinshaw & Culbertson LLP; Partner

**Lori Lightfoot**, Mayer Brown LLP; Partner

**Barry Miller**, Illinois Torture Inquiry and Relief Commission; Former Executive Director

**Lisa Plaza**, Hinshaw & Culbertson LLP; Paralegal

**Randy Samborn**, Levick; Senior Vice President (Former PIO for the US Attorney)

**Jeff Urdangen**, Northwestern University Pritzker School of Law; Clinical Associate Professor of Law

**Adam Vaught**, Hinshaw & Culbertson LLP; Associate

# Appendix 3

## Police Accountability Task Force Interviews

Below is a list of the subject matter experts and community members consulted as part of our fact finding. In the course of our work, Task Force and Working Group members consulted with numerous subject matter expects at various points in the process. While we have tried to capture them all here, we have inevitably missed some, and we acknowledge everyone's contributions and apologize for any omissions.

### INDIVIDUALS:

**Keith Ahmad**, Law Office of the Cook County Public Defender; First Deputy Public Defender

**Arif Alikhan**, Los Angeles Police Department; Director, Office of Constitutional Policing and Policy

**Roseanna Ander**, University of Chicago Crime Lab; Executive Director

**Scott Ando**, Independent Police Review Authority; Former Chief Administrator

**Dean Angelo**, Fraternal Order of Police, Chicago Lodge 7; President

**Greg Bella**, Fraternal Order of Police, Chicago Lodge 7; Recording Secretary

**Lucius Black**, Community Renewal Society, Police Issue Team

**Rebecca Boatright**, Seattle Police Department; Senior Legal Counsel

**Merrick Bobb**, Federal Court-Appointed Monitor Overseeing Seattle Police Department and Police Assessment Resource Center; Executive Director

**Brian Buchner**, National Association for Civilian Oversight of Law Enforcement; President

**Alexander Bustamante**, Los Angeles Police Department; Inspector General

**Max Caproni**, Chicago Police Board; Executive Director

**Keith Calloway**, Chicago Police Department; Deputy Chief and Director of Education and Training Division

**Amy Campanelli**, Law Office of the Cook County Public Defender; Public Defender

**Jadine Chou**, Chicago Public Schools; Chief Safety and Security Officer

**Sarah Creighton,** San Diego Police Department; Assistant Chief of Police

**Joseph De Angelis**, University of Idaho; Assistant Professor of Criminology and Sociology

**Kathe Dellacecca**, Sinai Health System; System Vice President for Behavioral Health

**Richard Emery**, New York City Civilian Complaint Review Board; Chair

**Jason Ervin**, City of Chicago – 28th Ward; Alderman

**John Escalante**, Chicago Police Department; Interim Superintendent

**Philip K. Eure**, Office of the Inspector General for the NYPD, NYC Department of Investigation; Inspector General

**Sharon Fairley**, Independent Police Review Authority; Chief Administrator

**Joe Ferguson**, City of Chicago Office of Inspector General; Inspector General

**Pastor Cy Fields**, Community Renewal Society | New Landmark Missionary Baptist Church, Senior Pastor

**Peggy Flaherty**, Thresholds; Senior Vice President, Clinical Operations

**Lorie Fridell**, Police Executive Research Forum; Former Director of Research

**Craig Futterman**, University of Chicago Law School; Clinical Professor of Law

**Mike Gennaco**, OIR Group; Principal

**Mike Golden**, Office of the State's Attorney, Cook County; Assistant State's Attorney

**Maggie Goodrich**, Los Angeles Police Department; Chief Information Officer

**Cheryl Graves**, Community Justice for Youth Institute; Executive Director

**Rev. Christopher Griffin**, Community Renewal Society | First Baptist Congregational Church

**Norris Henderson**, Voice of the Ex-Offender (VOTE); Founder and Executive Director

**Susan Hutson**, New Orleans Office of the Independent Police Monitor; Independent Police Monitor

**Mark Ishaug**, Thresholds; Chief Executive Officer

**Beth Johnson**, Cabrini Green Legal Aid; Director, Legal Programs

**David Johnson**, Franczek Radelet; Partner

**Jeff Jordon**, San Diego Police Department

**Jamie Kalven**, Invisible Institute; Executive Director

**Walter Katz**, Office of the Independent Police Auditor; Independent Police Auditor for the City of San Jose

**Annette Kelly**, FOUS Youth Development Services; President

**David Kennedy**, National Network for Safe Communities; Director

**Dan Kirk**, Office of the State's Attorney, Cook County; First Assistant State's Attorney

**Robert Klimas**, Chicago Police Department, Bureau of Internal Affairs; Commander

**Armand Lemoyne**, Los Angeles Police Department; Sergeant

**Anne Levinson**, Seattle Police Department; Civilian Auditor for the Office of Professional Accountability

**David LeValley**, Detroit Police Department; Deputy Chief

**Lori Lightfoot**, Chicago Police Board; Chair

**Marc Loveless**, Coalition for Justice and Respect; Founding Director

**Jon Lucas**, Seattle Police Department; Sergeant

**Mina Malik**, New York City Civilian Complaint Review Board; Executive Director

**Garry McCarthy**, Chicago Police Department; Former Superintendent of Police

**Todd Miller**, Rave Mobile Safety; Vice President of Public Safety

**Nicholas Mitchell**, Denver Police and Sheriff Departments; Independent Monitor

**Dr. Julie Morita**, Chicago Department of Public Health; Commissioner

**Kim Neal**, Cincinnati Citizen Complaint Authority; Director

**Roger Nunez**, Los Angeles Police Department; Sergeant

**Donald O'Neill**, Chicago Police Department; Director of Human Resources

**Emily Owens**, University of Pennsylvania; Associate Professor of Criminology, Business Economics, and Public Policy

**Stephen R. Patton**, City of Chicago; Corporation Counsel

**Ursula Price**, New Orleans Office of the Independent Police Monitor; Executive Director for Community Relations

**Sheri Richardt**, Advocate Illinois Masonic Medical Center; Management Team, Behavioral Health Services Department

**Dennis Rosenbaum**, University of Illinois at Chicago; Professor, Department of Criminology, Law and Justice

**Ilana Rosenzweig**, Independent Police Review Authority; Former Chief Administrator

**Ralph Russo**, New Orleans Police Department; Insight Project Director

**Dr. Rashad Saafir**, Bobby E. Wright Comprehensive Behavioral Health Center; Psychiatrist/President and CEO

**Ron Reid**

**Seretha Reid**

**Ron Safer**, Riley Safer Holmes & Cancila LLP; Partner

**Bob Scales**, Sanford, Olson & Scales; Partner

**Ora Schub**, Community Justice for Youth Institute

**Michael Schlosser**, University of Illinois at Urbana-Champaign Police Training Institute; Associate Director

**Karen Sheley**, ACLU of Illinois; Director, Police Practices Project

**Andre Simenauer**, Motorola Solutions; Senior Public Safety Solutions Consultant

**Tracy Sitka**, Chicago Justice Project; Executive Director

**Wes Skogan**, Northwestern University; Professor, Department of Political Science, Legal Studies and the Institute for Policy Research

**Brandon Smith**, Journalist

**Sandra Sosa**, Alternatives, Inc.; Restorative Justice Manager

**Dr. Carrie Steiner**, First Responders Wellness Center; Clinical Psychologist

**Flint Taylor**, People's Law Group; Partner

**Michael Tobin**, Office of Police Complaints, Washington D.C.; Executive Director

**Matthew Topic**, Loevy & Loevy; Attorney

**John Vassal**, Office of the State's Attorney, Cook County

**Ciera Walker**, Community Renewal Society, Congregational Organizer

**Samuel Walker**, University of Nebraska – Omaha, School of Criminology and Criminal Justice; Professor Emeritus

**Eric Washington**, Chicago Police Department; Deputy Chief of Community Policing

**Ronnie Watson**, Chicago Police Department; Deputy Chief - Retired

**Vanessa Wesley**, Chicago Police Department; Officer and Coordinator - Bridging the Divide

**Chuck Wexler**, Police Executive Research Forum; Executive Director

**James White**, Detroit Police Department; Assistant Chief of Police

**Alex Wiesendanger**, Community Renewal Society; Director of Organizing

**Camille Williamson**, Adler University; Director of Community Engagement

**Linda Zerwin**, Emergency Telephone System Board of DuPage County; Executive Director

## THE TASK FORCE CONVENED AND MET MULTIPLE REPRESENTATIVES FROM THE FOLLOWING ORGANIZATIONS:

Chicago Coalition for Police Accountability

Chicago Survivors/Chicago Citizens for Change

Civil Rights and Criminal Defense Attorneys

Fraternal Order of Police Chicago Lodge 7

## THE TASK FORCE MET WITH YOUTH FROM THE FOLLOWING ORGANIZATIONS:

Mikva Challenge – Emilo Araujo, Shacretta Bernard, Kristine Hernandez, Dwayne Lewis, Daniel Mercado, Amber Snelling

Precious Blood Ministry of Reconciliation

Sullivan High School

## THE TASK FORCE MET WITH SENIOR STAFF FROM THE FOLLOWING AGENCIES/DEPARTMENTS:

Chicago Police Department – Commanders, Current and Retired Officers, District Advisory Council Volunteers

Chicago Police Department Taser Training Team

City of Chicago Law Department

City of Chicago Office of Emergency Management and Communications

Cook County Public Defender

Cook County State's Attorney

Independent Police Review Authority

Seattle Police Department

# Appendix 4

## Community Relations Working Group Checklist

- The City should engage the National Initiative for Building Community Trust and Justice to implement a "Reconciliation Process" in Chicago. Critical elements of the process involve the Superintendent publicly acknowledging CPD's history of racial disparity and discrimination in police practices and making a public commitment to cultural change required to eliminate racial bias and disparity.

- The Mayor and the President of the Cook County Board should work together to co-sponsor quarterly summits of key stakeholders and community leaders to develop and implement comprehensive criminal justice reform.

- The Mayor and the President of the Cook County Board should work together to develop and implement programs that address socioeconomic justice and equality, housing segregation, systemic racism, poverty, education, health and safety.

- CPD should clarify in its general order prohibiting racial profiling and other biased-based policing whether race may be used to any degree in developing grounds for a stop, other than where race is part of a specific suspect description.

- Through its Data Portal, CPD should regularly release incident-level information on arrests, traffic stop reports, investigatory stop reports and predecessor contact cards and officer weapon use (firearm and nonlethal). To facilitate trend analysis, the incident-level data should reach back at least to January 1, 2010.

- CPD should resume publishing annual reports.

- After the ACLU agreement terminates, CPD should continue supervisory review and audits of investigatory stop and pat-down practices, with oversight by the new Community Safety Oversight Board and Inspector General for the Public Safety.

- CPD should develop and use recruitment, selection and promotion strategies that increase diversity and the likelihood that officers will be culturally competent, fair and impartial, especially when policing communities of color.

- CPD should hire a Deputy Chief of Diversity and Inclusion.

- CPD should adopt and promote a clear, progressive policing philosophy grounded in core values such as respect, protecting the sanctity of all life and protecting civil and human rights.

- CPD should bring in experts and credible trainers to deliver comprehensive training on cultural competence and implicit bias for all recruits, officers and supervisors.

- CPD should involve the community in officer training that includes being trained by and partnering with community leaders, organizations and youth.

- CPD, including the Deputy Chief of Diversity and Inclusion, should analyze deployment strategies to ensure officers are culturally competent and have a proper understanding of the neighborhoods where they are assigned.

- Where possible, CPD should assign more experienced officers to high-crime districts, beats and shifts. If new officers are given these difficult assignments, they should be partnered with experienced officers with exemplary disciplinary histories and the proven ability to work with diverse populations.

- CPD should adopt community policing as a core philosophy.

- CPD should replace CAPS with localized Community Empowerment and Engagement Districts (CEED) and support them accordingly.

- CPD should expand the methods it uses to communicate and work with neighborhood residents.

- CPD should reinvest in civilian organizing staff.

- CPD should renew its commitment to beat-based policing and work to expand community patrols.

- CPD should include information about how the public is being involved and how effectively neighborhood concerns are being addressed in CompStat.

- CPD should evaluate and improve the training officers receive with respect to youths to ensure that all officers are prepared to engage with youth in ways that are age-appropriate, trauma-informed and based in a restorative justice model.

- CPD and CPS should ensure that officers who are assigned to schools have clear job descriptions and expectations that are shared by CPS and CPD, receive extensive and ongoing training on how to engage with youth and crisis intervention and are swiftly reassigned if they fail to meet expectations.

- Train the community in Know Your Rights and Responsibilities, including by:

- Creating a CPS policy and City Ordinance requiring that students receive instruction on how to exercise 4th, 5th and 6th Amendment rights; and

- Create a technology platform to assist with a public service announcement campaign and informational videos in police stations.

- The City should enact an ordinance, and CPD should promulgate general orders:

- Mandating that arrestees be allowed to make phone calls to an attorney and/or family member(s) within one hour after arrest, allowing only for limited exceptions in exigent circumstances;

- Mandating that a legal aid or other provider be contacted within 30 minutes of the arrest of any juvenile, and that CPD wait for legal representation to arrive before any questioning of a juvenile occurs; and

- Confirming that CPD will prominently post information concerning rights to counsel, as already required under state law, and include any willing legal aid provider's name and 24-hour contact information.

# Appendix 5

## Oversight Working Group Flowchart



**CURRENT COMPLAINT TRIAGE, INVESTIGATION & DISCIPLINE RECOMMENDATION STAGES**

# CURRENT REVIEW, GRIEVANCE & ADJUDICATION STAGES

## Chicago Police Department

Termination? → No → ⑥ Command Channel Review → Superintendent Review → CPD member served notice → CPD member accepts discipline? → Yes ▶ End / No → Level of Discipline? → Police Board / Arbitration

Yes → Legal Affairs reviews for legal sufficiency, Superintendent signs, City Corp Counsel drafts changes. Officer is served with separation charges. → Police Board

## Arbitration ⑦

**Suspend 1 to 10 days**
Summary Opinion (Paper Review Arbitration)

**Suspend 11 to 30 days**
Is CPD Member an Officer?
No → Full Expedited Arbitration
Yes → Grievance or Summary Opinion

**Suspend 31 to 365 days**
Is CPD Member an Officer?
No → Police Board
Yes → Police Board or Full Arbitration

## Chicago Police Board ⑧

Conducts Evidentiary Hearing and Issues Opinion

**Not Guilty**

**Guilty**
Different discipline imposed
⑨ If suspension is reduced to 30 days or less, can seek arbitration | Can appeal to Circuit Court

**Guilty**
Recommended discipline imposed
Can appeal to Circuit Court

# PATF PROPOSAL CHANGES

The Task Force recommendations will significantly streamline and bring much-needed accountability and transparency to the complaint, investigation and adjudication processes. The descriptions of proposed changes correspond to numbers on the Complaint Flowchart diagram to highlight some major areas of reform.

## Current Complaint Triage, Investigation & Discipline Recommendation Stages

**IPRA & CPD BIA**

 The affidavit step, which is an obstacle to the reporting of misconduct, requires investigators' time and resources and leads directly to the closure of numerous cases each year, would be eliminated. Anonymous complaints and a community engagement process would also facilitate easier reporting.

**CPD BIA**

 Improvements to the investigations conducted by individual police districts, such as requiring a consistent investigative structure and updating data and case tracking systems, would streamline operations and improve accountability.

**IPRA & CPD BIA INVESTIGATION PROCESS**

3 The "mediation" program, which presently functions like plea bargaining and preempts a full investigation of the complaint, would be reformed. Mediations of allegations that could result in serious discipline would be prohibited. Additionally, the City would be encouraged to establish a mediation program based on national best practices that involves both police and citizens to promote dialogue and better understanding in accordance with restorative justice principles and objectives.

4 IPRA would be replaced by a more independent Civilian Police Investigative Agency (CPIA). Investigations by CPIA and BIA would be informed by pattern and practice analysis, and would be improved through regular audits by the Inspector General for Public Safety, greater oversight through the Community Safety Oversight Board, enhanced technology and new training. Numerous steps currently mandated by the collective bargaining agreements that hinder the efficiency and effectiveness of investigations would also be eliminated. Examples of current CBA-based practices include allowing officers to amend prior statements after viewing video footage, limitations on when and how interviews of officers may be conducted and limitations on how closed complaint files can be used in disciplinary proceedings.

5 The investigative oversight entities (currently IPRA and BIA) would be required to make disciplinary recommendations according to a single, formal, publicly available discipline matrix, thereby bringing more predictability and fairness to the disciplinary system. Additionally, there would be greater transparency in their reporting of investigatory findings.

## Current Review, Grievance & Adjudication Stages

**CPD**

 6 Command Channel review, a process by which multiple CPD members in the accused's chain of command can recommend changing the finding and discipline recommendation made by IPRA or BIA, would be eliminated. This process adds time to the process and is a redundant layer of due process.

**ARBITRATION**

 7 Increased transparency and scrutiny would bring much needed accountability to the arbitration process, where the majority of suspension decisions (other than those which are mediated) are ultimately resolved. When IPRA and BIA recommend discipline, arbitrators frequently eliminate or reduce the discipline and only maintain the recommended discipline in a minority of cases.

**CPB**

8 There would be greater oversight of termination cases before the Police Board through regular, publicly reported Public Safety Inspector General assessments of disciplinary trends and impediments to imposing discipline.

9 The opportunity for sergeants, lieutenants, and captains to challenge a suspension through the grievance process after the Police Board has already issued a decision on the case would be eliminated.

# Appendix 6

## Oversight Working Group Checklists

### OVERSIGHT TOP LINE RECOMMENDATIONS

1. The creation of a new Inspector General for Public Safety, which would audit and monitor CPD and the entire police oversight system.

2. The creation of a new Community Safety Oversight Board, which would allow the community to have a powerful platform and role in the police oversight process.

3. The creation of a new Civilian Police Investigative Agency, which would replace the Independent Police Review Authority in investigating serious cases of police misconduct.

4. The implementation of reforms to other components of the police oversight system, including BIA and the Chicago Police Board, to improve investigations and transparency within the system.

5. The implementation of additional reforms to remove roadblocks to accountability, including reforms to improve the mediation program across the oversight entities and elimination of command channel review.

6. Overhaul to the City's collective bargaining agreements with policing employee entities.

## Collective Bargaining Agreement Checklist

The contracts for Sergeants, Lieutenants and Captains expire on June 30, 2016. The FOP contract expires a year later, on June 30, 2017. Preparation for the negotiation of all four contracts is currently under way.

**The following CBA provisions should be removed or revised:**

- The affidavit requirement should be removed so that investigators can identify additional cases of police misconduct.

- Anonymous complaints should be allowed to encourage reporting by those who fear retaliation, including whistleblowers.

- Officers should not be informed of the complainant's name prior to interrogation. There is little need for the officer to know the name of a complainant prior to interrogation if it is later disclosed during the resolution of the case.

- The provisions delaying interviews in shooting cases for at least 24 hours should be revised to ensure that officers are separated and remain separated from other officers until all officers have given statements. The Department of Justice's Consent Decree with the Los Angeles Police Department contains such a requirement. When formal questioning begins, the inquiry will start with a recitation of any and all conversations that the officer has had with law enforcement between the shooting and the commencement of the interview.

- Officers should no longer have a right to amend statements if they have not been provided with the audio or video evidence, and reviews of the footage should not be pre-conditions to charging a Rule 14 violation.

- Investigations of complaints known to CPD for five years or more should not require Superintendent permission. This is an unnecessary rule, as the statute of limitation will apply for criminal matters, and, for administrative matters, the nature and severity of the conduct should determine whether the complaint should be investigated. Should an individual continue to make such decisions, the authority should be vested in someone outside of CPD, such as the Chief Administrator of IPRA (or its successor, CPIA).

- The provision requiring destruction of records should be eliminated. The rule is in tension, if not outright conflict, with general principles of public record-keeping, deprives the public of important information that is rightfully theirs, and may include the destruction of information that serves numerous operational and public policy objectives.

- The provision that forbids CPD from rewarding officers who act as whistleblowers should be removed.

- The CBAs should be amended to require police officers to disclose secondary employment, as other City workers are required to do.

- The CBA dictates the manner in which interrogators can ask questions, which presents an unnecessary burden on interrogators and potentially sets them up to violate the CBA for a technicality. The policy does not appear to comport with any best practices and should be eliminated.

- The CBA requires that officers must be informed of the nature of the allegation prior to interrogation. This provision is presently interpreted very specifically to mean a detailed recitation of the facts that support all possible charges. Moreover, if the officer lies to investigators during the investigation, new allegations must be presented to the officer. This provision should be amended to allow for more general recitation of allegations.

# Civilian Police Investigative Agency Checklist

IPRA should be replaced with a new Civilian Police Investigative Agency (CPIA). The City Council should enact legislation that ensures the new civilian oversight entity is established in accordance with the principles described below.

- **Design an open and public selection process for a Chief Administrator.**
  The new Community Safety Oversight Board should select the Chief Administrator. It is important that CPIA be perceived as legitimate; the selection of this position should be insulated from politics, transparent and widely inclusive. The selection process should also include multiple opportunities for significant community input that will be seriously considered by the selection committee.

- **Establish selection requirements for the Chief Administrator and investigators to avoid bias.**
  In order to prevent bias (and the perception of bias), previously sworn employees of CPD (and non-sworn employees who have worked for CPD within the past five years) and the Cook County State's Attorney Office should be prohibited from serving as investigators and/or the Chief Administrator. Individuals who hold these positions must reflect the City's diversity.

- **Provide a grant of jurisdiction that ensures that CPIA is informed by community complaints.**
  CPIA must be empowered to investigate the issues that are of most pressing concern to the community. CPIA's jurisdiction should be expanded beyond IPRA's current jurisdiction to include unlawful search and seizures and denial of access to counsel. At the end of CPIA's first year of operation, an outside, independent entity should evaluate whether the expanded jurisdiction of CPIA is appropriate and achievable.

- **Establish a clear, easy-to-understand mission statement.**
  This is essential to provide civilians and officers with a fair and impartial complaint system and to employ the preponderance of the evidence standard when deliberating on complaints.

- **Remove barriers to accountability.**
  No credible allegation should be ignored because of technical complaint submission requirements (like an affidavit requirement) or because the civilian involved is hesitant or unable to provide a complaint form. The Chief Administrator should be empowered to investigate any incidents that fall under her jurisdiction, even in the absence of sworn complaints. Complaints must be accepted from anyone with personal knowledge of the incident. The Chief Administrator may launch investigations based on any credible source, including media accounts, a review of use of force reports or referrals from other oversight entities.

- **Gather and leverage data generated by civil litigation and criminal motions to suppress to learn more about trends in citizen complaints.**
  The civil rights and criminal defense bars in Chicago have, through decades of litigation, developed rich data regarding CPD policy and practice. This information has largely been untouched by the various oversight entities. This represents a significant missed opportunity to ensure accountability. CPIA should be charged with investigating the facts of all civil lawsuits, which, if submitted as a complaint, would fall under its jurisdiction. Further, CPIA should develop a process to gather the facts contained in all criminal motions to suppress that allege facts, which if submitted as a complaint, would fall under its jurisdiction to determine if a full investigation is warranted.

- **Establish clear lines of jurisdiction.**
  Misconduct investigations often reveal multiple layers of wrongdoing. For example, in a use of force investigation, it may become clear that an officer filed a false police report. CPIA does not have original jurisdiction to investigate false reporting, but, if the false reporting is related to a force investigation, the monitor should be empowered to investigate it and issue appropriate findings.

- **Empower CPIA with the authority needed to investigate.**
  CPIA must have the ability to collect evidence, conduct prompt interviews, subpoena witnesses and enforce its subpoena power by retaining outside, independent counsel. This is an existing power within IPRA and should be continued in a new body unabated.

- **Civilian oversight should run currently with criminal investigations.**
  In the past, IPRA investigations have consistently stalled while the Cook County State's Attorney determined whether or not it would move forward with criminal charges under the same set of facts as IPRA was investigating. The practice led to long delays in investigating and resolving IPRA's cases after the State's Attorney's Office closed its investigation. This need not be the case. While it may sometimes make sense for an IPRA investigator to pause her or his investigation to preserve the integrity of the criminal matter, this rule is not universal. Rather, it is better practice to presume that the matters should be run concurrently, and both entities should meet regularly to determine if one or the other investigation should be paused during the process or, in the ideal, if both cases can be investigated at the same time.

- **Ensure an accessible, safe and comfortable complaint process.**
  Civilians must be able to file complaints via the internet, over the phone and in their communities. The new body should use national models, such as New York City's Civilian Complaint Review Board, which has developed a model of hosting meetings within city neighborhoods on a posted rotating basis to take and verify complaints.

- **Conduct community education regarding rights and the oversight process.**
  CPIA must be responsible for launching a public education/community engagement campaign that educates the public about their rights and the complaint/investigative process.

- **Establish community oversight over CPIA.**
  CPIA must be legitimately accountable to members of the community. The community must have the power to require that CPIA hold public hearings through the new Community Safety Oversight Board, CPIA must develop (and be responsive to) a civilian feedback process, and CPIA must be audited by an independent third-party entity selected by those on the selection committee if an auditing function is not otherwise available in the City. Additionally, CPIA must hold regular community meetings to inform the public of its actions.

- **Proactively prevent abuse and misconduct through policy and practice recommendations and use-of-force analyses.**
  CPIA must conduct pattern and practice analyses both proactively and reactively where it has subject matter jurisdiction. This should include proactive analyses of potential patterns of police misconduct that are within its subject matter jurisdiction, including information found in court filings, judicial findings, internal CPD documents and incidents where individuals were charged with offenses commonly believed to cover up police misconduct (such as assault on a police officer, disorderly conduct, resisting arrest and misconduct investigations), and other potential pattern evidence, and the

establishment of a transparent process (that is informed by community concerns) for CPIA to make training, policy, and procedure recommendations to CPD. In turn, CPD must publically respond to these recommendations.

- **Operate with complete transparency.**
  CPIA must prioritize keeping the public informed by posting summary reports of each completed investigation; publishing comprehensive annual reports on its work; and establishing a transparent process to make training, policy and procedure recommendations to CPD and a transparent process to make public CPD's response. CPIA should also promptly respond to all requests from the new Community Safety Oversight Board.

- **Provide resources to be rigorous and independent.**
  In order to provide sufficient oversight and meet the demands of an expanded jurisdiction that includes explicit obligations regarding community engagement and policy and practice recommendations, CPIA must have sufficient resources, and those resources should, to the extent possible, be insulated from the political process. CPIA's funding should be a percentage of CPD's budget so that the office cannot be defunded. This funding should provide CPIA with sufficient resources and powers to conduct prompt, unbiased and independent investigations into police misconduct that are of the highest quality. Best practices within the field indicate that the budget should be tied to 1% of CPD's budget and/or a ratio of 1 CPIA investigator for every 250 sworn CPD officers.

- **Provide complainant support.**
  CPIA should provide supportive services to complainants, including regular updates regarding the investigation, information about the process and outcomes and referrals to outside service providers when needed. All of the investigators who work for CPIA and BIA should be trained to work with victims of trauma and taught to conduct victim/trauma-sensitive interviews.

- **Develop and adopt standardized penalties.**
  As with other oversight entities, CPIA should adopt a discipline matrix, a national best practice that determines a fixed set of penalties for behavior and history. A matrix has been used informally at IPRA for over a year and should be formally reviewed and adopted.

- **Establish penalties for CPD's failure to cooperate.**
  Require CPD to fire officers who lie during misconduct investigations. Require CPD to fire and refer for criminal prosecution any officer who retaliates against any person who reports police abuse.

- **Ensure the appropriate use of the mediation program.**
  CPIA should establish clear and bright line rules regarding the cases and procedures for its mediation program. To the extent possible, CPIA should create a program that is in line with national best practices for mediation for citizen oversight organizations.

- **Address limits imposed by the CBAs.**
  Require that the collective bargaining agreements conform with rigorous, transparent and accountable civilian oversight.

## IRPA Recommendation Checklist

We recommend that IPRA should continue to conduct police misconduct investigations until CPIA is able to assume responsibility for those investigations. During this interim period, the following actions should be taken:

- **IPRA should contract with an independent, third-party entity**, such as the Police Assessment Resource Center (PARC) or the National Association for Civilian Oversight of Law Enforcement (NACOLE), to conduct an ongoing audit of IPRA's operations and to audit each completed investigation prior to finalization. IPRA staff should defer to the outside entity's findings regarding deficiencies in investigative practices and findings.

- **IPRA should immediately begin implementing, where possible, the transparency** requirements recommended for CPIA.

- IPRA, with oversight and guidance from the City of Chicago Inspector General and the incoming Chief Administrator of CPIA, **should begin the process of drafting a series of transition memos** that will attempt to memorialize institutional knowledge regarding technology infrastructure, complaint intake processes, investigative protocols, interactions with the police department, and all other topics identified as critical to a successful transition to CPIA.

- **IPRA should engage in the community outreach activities** described for CPIA.

- **IPRA should review and clarify its process and criteria for the affidavit override process and keep data related to it.** IPRA should also be more proactive in seeking affidavits. Investigators used to actively seek out the affidavits, sometimes even knocking on doors. Investigators now play a much more passive role and have placed the burden on the complainant.

- **IPRA should develop and adopt a clear discipline matrix** that provides a range of potential penalties for different types of misconduct, along with aggravating and mitigating factors that can be considered.

# Independent Inspector General for Public Safety Checklist

Based on our review of the national experience with police oversight generally and police auditing specifically, we have concluded that Chicago would benefit tremendously from the creation of an independent monitoring entity. The creation of this position would greatly enhance the transparency, accountability and quality of the oversight structure. The Task Force recommends that the new entity be housed within the City of Chicago Office of the Inspector General because it already has relevant expertise, the general authority to conduct this work and has begun to audit some police department functions and build up institutional knowledge. We also recommend the following related to the new Inspector General's powers and obligations:

- **Give the inspector general a broad scope of authority to review and make recommendations.** Enabling legislation should follow the models set out in Los Angeles, Denver and New York, where the inspector general or monitor's powers are defined in broad terms, rather than providing a list of narrow functions, which could be interpreted as significantly restricting the auditor's authority. The enabling legislation should leave no doubt that the inspector general may perform the functions laid out below. While the inspector general would have the power to make findings and issue recommendations, the inspector general could not override the decision of another investigative body.

- **Auditing/Monitoring/Reviewing individual cases.** While CPD and IPRA or its successor have primary responsibility for investigating civilian complaints and incidents involving death, serious injury or serious use of force, the inspector general would work to ensure the quality and integrity of individual investigations.

  - The inspector general should be authorized not just to raise concerns about the quality and integrity of an investigation generally, but also about the quality and integrity of specific findings from the investigation.

  - The inspector general should be empowered to request that individual investigations be expanded or reopened. If CPD or IPRA (or its successor) does not expand or reopen the investigation, or complete it to the satisfaction of the inspector general, the inspector general's office should be authorized to conduct additional investigation.

  - When investigations into serious uses of force do not result in sustained findings, the inspector general should be required to work with IPRA (or its successor) and CPD to conduct Force Analysis Panels to determine if the incident revealed any systemic deficiencies in training, policy, supervision, or equipment.

- **Auditing and Monitoring patterns of police activity and complaints.** When reviewing complaints and data about police behavior, the inspector general should be empowered to examine not just individual incidents as described above, but also information in the aggregate. The inspector general should identify patterns, determine whether the patterns reflect systemic problems, and, if so, make recommendations about how to address them.

  - Pattern analysis should include, but not be limited to: officer use of force; police shootings; use of Tasers or any weapon used to inflict pain and/or gain compliance; citizen complaint log numbers; and potential bias, including, but not limited, to bias in policing related to race, ethnicity, gender, sexual orientation, gender identity and geography.

  - Pattern analysis could also include reviewing all sustained findings and discipline recommended by IPRA or its successor, the Police Board and BIA in order to assess disciplinary trends, to determine

whether discipline is consistently applied and fair, and to determine whether final disciplinary decisions are being executed as resolved.

– Pattern analysis could also include analyses of citizen complaints, use of force, lawsuits, and other relevant data to identify individual and groups of officers who may be engaged in a pattern of misconduct.

- **Auditing operations, policies and procedures.** The inspector general should have broad authority to review police operations, policies, supervision, training and procedures. The goal is to review and analyze all relevant information (including litigation and settlement data) in order to identify systemic patterns and problems, including, but not limited to, those that may correlate to race, ethnicity, gender, sexual orientation, gender identity and geography, and propose changes in policies and procedures, training and supervision.

- **Provide broad power to initiate audits.** The inspector general should not be required to seek approval to conduct any specific audit or investigation. Enabling legislation should incorporate language like Los Angeles' "The Inspector General is empowered to initiate and conduct investigations of the Department, without limitation as to the type of the activity of the Department, including on-going and in-progress matters."

- **Oversight authority should not be limited to CPD.** The inspector general should be authorized to make recommendations for all departments whose work directly affects CPD operations, including, but not limited to, IPRA (or its successor), the Police Board, OEMC, the Fire Department and the City's Department of Law.

- **The inspector general should serve for a fixed term and should only be removed for cause.** City ordinance should establish a fixed term of office for the inspector general, though, at the conclusion of a term, an inspector general could be considered for reappointment. The removal process should also require a City Council hearing. These provisions will make it much more difficult to remove the inspector general for political reasons and will make it easier to issue critical reports without fear of reprisal.

- **Job qualifications should be established.** There should be clearly articulated educational and employment history requirements for leadership positions. Job qualifications could include relevant certification. In addition, in order to prevent bias and the perception of bias, former police officers should be prohibited from serving as inspectors general.

- **There should be public engagement in the selection process.** The selection of an inspector general must incorporate meaningful community input. The City of Chicago Inspector General should have the ultimate authority to hire the Inspector General for Public Safety, but the process should include extensive public engagement. At minimum, CPIA should have an opportunity to review applications and interview finalists, and finalists should be required to participate in several public forums where they would answer questions from the general public. The position should require City Council confirmation. It is essential that the selection process be perceived as fair, open and uninfluenced by politics, and that it include genuine opportunities for community engagement.

- **There should be public engagement with the office of the Inspector General for Public Safety.** Either the civilian oversight entity should have regular meetings with the Inspector General for Public Safety to facilitate communication with the broader community, or a Citizen Advisory Board should be

created for the Inspector General for Public safety for this purpose. The civilian oversight entity should have the authority to request that the inspector general perform an audit into a particular area. In addition, the inspector general should have a community outreach staff and budget. The outreach should include public events to solicit feedback and input on the auditing entity and its work and public education initiatives to inform the public about the office and the scope of its work. The outreach should include both youth and adult populations. Engagement and outreach will help to ensure that people have enough information to take full advantage of the office's skills and capacity, especially in communities where trust in CPD is lowest. A civilian oversight entity or Civilian Advisory Board and a committed, engaged, sensitive and thoughtful community outreach staff can help to ensure that the office reaches its full potential.

- **The office of inspector general must be authorized to legally represent itself, including as necessary, retaining outside, private legal counsel** in any legal matter, enforcement action or court proceeding when the inspector general determines that the City of Chicago's Corporation Counsel would have a conflict in representing the interests of the inspector general.

- **The inspector general must have sufficient resources to meet the substantial demands of the office.** Additional research should be conducted to determine an appropriate funding and staffing level, but our assessment based on the interviews we have conducted so far suggests that the office should maintain a ratio of approximately 1 staff person for every 250 sworn officers, with sufficient discretion vested in the Inspector General to determine the appropriate balance of staffing levels and qualifications.

- **The budget should be insulated from politics.** City ordinance should mandate a specific staffing ratio and require funding to provide for that staffing level. The ordinance should establish a minimum annual budget for the office.

- **City ordinance must specify that the inspector general have unfettered access to data from CPD, IPRA (or its successor) and other agencies such as the law department, except where the law prohibits it, and that access must be clearly spelled out in legislation.** Access to data must include direct access to CPD databases and, to protect the integrity of investigations, the ability to use information from the databases in a way that is invisible to CPD. The access to data must include litigation and settlement data, data from body and car cameras and early warning system data. The inspector general should have direct access to information wherever possible, and the rest should be provided in a timely fashion unless a written explanation is provided. There should be a presumption of disclosure. The City should consider including a provision that permits sanctions in the event that any entity fails to cooperate in any request for data. The inspector general should be provided documents without charge.

- **The ordinance should include affirmative obligations for some law enforcement-related officials to share specified information with the inspector general.** For example, IPRA or its successor and BIA should be required to report monthly to the inspector general any problems and deficiencies relating to CPD's operations, policies, programs and practices that would reasonably be expected to adversely affect the effectiveness of the department, public safety, the exercise of civil liberties and civil rights, or the public's confidence in the police force.

- **The ordinance should specify protections afforded to sources in order to prevent retaliation and encourage people to come forward with information.** City ordinance should require the inspector general to keep confidential the identity of a complainant, as well as all information and documents, except when necessary for the inspector general to carry out its duties and when the law so requires. Among other things, the City should not be able to subpoena the inspector general's notes of interviews with complainants. City ordinance should also prohibit retaliation against any employee who has contact with the inspector general. If retaliation is suspected, the inspector general should be authorized to open an investigation into the matter and issue a complaint to the appropriate entity.

- **The inspector general should be required to produce an annual report.** The report should summarize the audits and investigations conducted in the past year, reporting the analysis of information including patterns and trends, the outcomes of individual investigations/complaints and all recommendations. Annual reports should also provide status updates on the adoption of previous policy recommendations. All reports should be available to the public on the inspector general's web site.

- **The inspector general should be required to prepare a written report for every investigation, review, study or audit it conducts, including any recommendations that come out of the investigation, review, study or audit.**

- Though the inspector general should have broad discretion to initiate investigations about anything within the scope of its jurisdiction, **the inspector general should also be required to perform regularly scheduled audits on certain subjects**, including but not limited to:

  – sustained findings and discipline recommended and implemented by IPRA or its successor, the Police Board, and BIA in order to assess trends, consistency, fairness, and whether final disciplinary decisions are being executed as resolved;

  – citizen complaints and investigations, use of force, lawsuits and settlements to identify individuals and groups of officers who may be engaged in a pattern of misconduct and to identify areas for reform; and

  – video footage from officer body and officer car dashboard cameras to evaluate whether they are fully operational and being used according to policy and to ensure that all possible officer violations of CPD policy and/or law captured on video footage are properly investigated.

- **The inspector general should be required to provide reports to the City Council prior to any vote regarding a payout providing information on litigation and settlement trends, as well as any information or trends regarding the officer or supervisor involved.**

- **The CPD Superintendent or head of any entity that is the subject of recommendations should be required to publicly respond to reports in writing within 60 days of the issuance of the report.**

- **The inspector general should provide the City Council with an analysis of the complaint history of those officers who are the subject of potential civil lawsuit settlements before the Council considers said settlement proposals.**

## Community Safety Oversight Board Checklist

We propose the creation of an entity compromised of community representatives that will have the power to oversee CPD, its BIA, the new CPIA and all other police oversight mechanisms. The particular powers of this Community Safety Oversight Board and the process for selecting its members should not be decided until the Mayor and City Council hold full and robust public hearings on the topic and fully vet the design and implementation of this critical body. Though we do not provide a specific design and implementation process for the Board, the Task Force makes the following general recommendations about powers and responsibilities:

- Selecting the Chief Administrator of the new CPIA and conducting public hearings to make the selection.

- Requesting that the Inspector General for Public Safety perform specific audits and analyses of the policies, procedures and practices of CPD, CPIA and the Police Board that the community does not believe are being adequately addressed, and issuing recommendations based on the findings, to which CPD or the relevant agency must respond.

- Requesting that the Inspector General for Public Safety perform specific audits of CPIA and BIA investigations of serious cases of alleged police misconduct or the use of force to promote the quality and integrity of the investigations.

- Directing CPD, CPIA and the Police Board, through requests to the Inspector General for Public Safety, to collect and share data to facilitate community oversight.

- Analyzing all sustained findings and discipline recommended by CPIA, BIA or the Police Board to assess disciplinary trends, determine whether discipline is consistently applied and fair, and determine whether final disciplinary decisions are being executed.

- Conducting public hearings on any and all matters related to the CPD and its oversight entities.

- As representatives of the broader community, holding frequent public meetings.

## Selection Methodology for Community Safety Oversight Board

In selecting Community Board members, it will be critical to establish a process that maximizes the Board's independence, ensures transparency and provides accountability to the public. The Task Force considered five methods for selecting Board members. In sum, the Task Force considered elections, City Council or Mayoral appointments, a third-party application process and hybrid versions of these options:

- **City Council Appointment.** This model would follow an extensive process of public application among a number of citizen constituent groups (noted below), hearing and selection, with the determination of eventual selection made by the Council, which could manage it through one or more of its standing committees (e.g., the Police and Fire Committee and the Human Relations Committee) or working through or in conjunction with a non-partisan external body with expertise in community relations and/or police accountability. One advantage of this model is that it would leave to the most locally elected political actors the determination of balance and inclusivity of representation across the broad array of constituent groups and interests directly impacted by policing and police accountability.

- **Inspector General (IG)/third-party body Appointment** (the "good governance" actor model). This model would follow the same selection process as highlighted above but would leave the application process and ultimate selection to an entity somewhat removed from City government. This model could include a selection committee run by the inspector general's office or the Better Government Association, with eventual ratification by the City Council. The model is attractive as it is removed from government, but that same attribute may also lead to a delegitimization of current bodies.

- **Election.** A process by which each member of the Board is elected by district or neighborhood, arriving at a fully representative body. This model does not exist, has not been successfully implemented anywhere else in the country, and is disfavored because it brings with it a host of challenges, which include being susceptible to cooptation by pre-existing power structures, use by individuals looking for a political springboard and a potential lack of diversity. Additionally, the cost and political nature of this process lead us to be concerned about this approach.

- **Mayoral Appointment.** This model would involve a public application process and eventual appointment by the Mayor. This method would accord with recent practices in such cities as Seattle and Cleveland, which have recently undergone Department of Justice investigations. However, in our current political climate, it is likely this process would be perceived as highly influenced by politics. Thus it is not recommended.

- **Hybrid Model.** Some hybrid of the foregoing options.

- As part of the selection process in the Mayoral, City Council or third-party selection processes, candidates will submit their applications to a specified office to ensure proper qualification. These applications will then be posted to the internet and nominated by a proscribed process (e.g., for every vacancy on the Board of the civilian oversight entity, the screening committee will interview candidates and recommend three people, who would participate in a series of public hearings to present their credentials and answer questions from the selection committee and the public). The Mayor/City Council/third-party would then select/vote for one of three nominated candidates for each position, or the selection committee would approve them.

## Selection for Community Safety Oversight Board Checklist

Whether selected by the Mayor, the City Council, a third party or otherwise, the membership of the Board would include the following:

- **9 to 11 members** (an odd number) selected from across the City, representing various communities and a cross-cut of interests.

- 2-year (or 4-year) terms that are **staggered to ensure regular review of the membership**. Individuals will have to apply to be reappointed and max out after two or three terms.

- **Diversity requirements stated expressly to require inclusion** of representatives of each of the following communities: faith, LGTBQ, immigrant, previous complainants about police abuse, youth, civil rights advocates and neighborhood leaders. There will also be requirements for geographic diversity, as well as one representative each from the Mayor's office and CPD (retired or active).

- **No payment for participation.**

- The members must be residents of Chicago, **cannot be employees, officials or appointees of the City** or its delegate agencies or affiliated non-for-profits, and cannot have run previously for public office.

- Meetings and **votes for the body will be public.**

A coalition of community groups has proposed the creation of a Civilian Police Accountability Council (CPAC) to establish direct community oversight over CPD. The proposal here strives to honor the principles established by CPAC. We recommend that, as soon as possible, the City Council hold public hearings with the goal of developing the specific details of the Board—based on direction of the community—and selection of the Board members within 90 days of the start of the hearings. Among the issues, these hearings should address:

- The role and responsibilities of the Board.

- The selection of those involved in the Board, including, but not limited to, the feasibility of electing representatives to fill certain roles.

- The staff and resources that will be made available to the Board.

### *Remaining Recommendations*

- CPD should create a hotline for department members, whether civilian or sworn, to lodge complaints, and develop a third-party system for the processing and follow-up of all comments and complaints reported to the hotline.

- BIA should be given the resources and staff it needs to conduct effective investigations, exercise more oversight over district investigations and increase the transparency of investigations.

- CPD and IPRA/CPIA should finalize a discipline matrix and all oversight entities should be required to follow it when recommending or imposing discipline.

- CPD should develop standards regarding when options may and may not be granted by the Superintendent.

- Command Channel review should be eliminated entirely, and Superintendent review of BIA cases should also be limited to 90 days, like with IPRA.

- The City and CPD should ensure that the arbitration process should be subject to oversight.

- The City should conduct further analysis regarding the role of prosecuting attorneys in Police Board proceedings and whether they are sufficiently supported and best situated to prosecute cases of police misconduct before the Board.

- The City must ensure that the disciplinary process be made fully transparent.

- The City should disclose more information on police misconduct settlements to the City Council and the public.

- To avoid conflicts in police misconduct cases and other matters, the City Council should enact legislation that permits it to hire its own General Counsel to provide legal services and advice on legislative, policy and litigation matters.

- The City should advocate for new state legislation that would require the appointment of an independent prosecutor, separate from the State's Attorney, to handle all phases of any prosecution of any case in which a police officer is charged with causing death or great bodily harm without justification.

- The State's Attorney should be required to provide oversight bodies with evidence of police misconduct that is not the subject of an ongoing prosecution.

- Further research into the Policemen's Annuity and Benefit Fund is required to determine if additional changes in law and policy can ensure that police officers are not rewarded for official misconduct.

# Appendix 7

## Early Intervention & Personnel Concerns Working Group Checklist

- CPD leadership must take ownership of accountability issues and order the design and implementation of a mandatory EIS that centrally collects data across a broad range of data points to capture information on the totality of officer activity.
  - CPD's EIS must be non-disciplinary in nature.
  - CPD's EIS should track all available data on officer activities.
  - CPD's EIS should use peer-to-peer data comparisons to identify which officers receive interventions.
  - Create a structured, tiered program where interventions are appropriate, escalate proportionally and are timely.
  - CPD's EIS should track officer transfers and require supervisors to review and acknowledge data on new officers who are transferred onto their assignment.
  - CPD's EIS should require ongoing monitoring of interventions and develop an assessment tool to continuely examine the program for improvement.
- CPD must make support and training of supervisors a top priority and create policies that hold supervisors accountable for the conduct of their officers.
  - Provide training to supervisors on their responsibilities and obligations as the first-line of defense in accountability generally and in the EIS process specifically.  This means, at the very least, providing mandatory training and talking points that help guide supervisory interventions with officers.
  - Integrate regular accountability measures for supervisors to incentivize buy-in to the new system.  As part of that effort, CPD should integrate supervisor responsibilities for EIS and personnel management into the testing and promotional requirements.  Also, CompStat meetings must be expanded immediately to include information about personnel actions, and supervisors should be held accountable for the performance indicators of their officers, just as they currently are with crime statistics and trends.
  - Provide greater support to supervisors in their management roles.  All sergeants, lieutenants, captains and Commanders should be trained in managing the well-being of officers under their command and be compelled to use the dashboards that track officer activity.
- The individual in charge of human resources at CPD must be an expert in the field of human resources and related personnel maters.
- Until a fully automated EIS program can be implemented, CPD should create a manual intervention system, which undertakes an immediate assessment of officer fitness for duty.
  - CPD, working with IPRA and/or the new CPIA, and with reference to the time period January 1, 2010 – January 1, 2016, should immediately identify officers (1) with 10 or more CRs, whether or not an affidavit was completed; (2) who have a pattern of missing court; or (3) have been named in two/three or more lawsuits during this time period.
  - During this time, CPD should conduct monthly meetings with the State's Attorney, Public Defender, Presiding Judge of Criminal Division, City Law Department and, separately, Chief Judge of the Northern District of Illinois for the purpose of determining any adverse findings against police

officers that bear on credibility, training issues or patterns of behavior. All information gathered should be factored into the manual intervention system.

– Any officers identified through these methods should be assessed for placement in BIS, PC or some other form of individualized work plan that involves their chain of command.

- The EIS program should include community outreach efforts by providing public access to data generated by the EIS program and inviting community stakeholders to CompStat-type meetings to discuss EIS data and outcomes.

– Publish, on a monthly basis, aggregate data on the following: new and pending complaints by unit, disciplinary actions, missed court dates, new civil legal proceedings against officers, new criminal legal proceedings against officers, vehicle pursuits, vehicle collisions, uses of force, employee commendations, uses of firearms, injuries to persons in custody, judicial proceedings where an officer is the subjective of a protective or restraining order, adverse judicial credibility determinations against an officer, or disciplinary actions.

– Establish a regular community-inclusive meeting to share data and insights from EIS.

# Appendix 8

## Early Intervention System – Identifying Triggers

### I.    OVERVIEW

The hope for an EIS system is to improve relations between police and the community, reduce officer misbehavior, and save both taxpayer dollars and the career prospects of individual police officers. Many police departments around the country now employ these tools, including several departments that are working with the Department of Justice. However, one limitation of most EIS systems is that they are not validated—the way they select officers to receive additional non-disciplinary supports is not based on any real data or empirical evidence about what indicators actually predict which officers will engage in unproductive practices or future misconduct. The University of Chicago Crime Lab intends to work closely with CPD in the coming months to develop such a data-driven system.

### II.    CHALLENGES TO BUILDING PRODUCTIVE EARLY INTERVENTION SYSTEMS

EIS tools are only as useful as they are accurate. Every police department has limits on resources that can be used to provide non-disciplinary supports to officers. EIS systems that recommend services to officers who are actually at low risk of engaging in misconduct waste valuable resources that could have benefited another officer to a greater degree. And EIS systems that fail to recommend officers who are truly high risk miss an opportunity to help that officer as well as the rest of the department and community at large. Many reports have noted that these are challenges with many EIS systems that are in operation around the country.

Perhaps the main reason so many EIS tools have low predictive accuracy is that they are not validated, which means that the "triggers"—or thresholds of behavior that automatically initiate an intervention targeted toward an officer—were not developed by using data to determine statistically which early indicators are truly predictive of future misconduct or unproductive performance. Instead many EIS triggers are simply set at certain levels because departments, unions, and the Department of Justice decided on them based on educated assumptions—that is, based on guesses.

A different challenge for every EIS system is that typically we do not have access to "ground truth" measures of officer misbehavior or any other aspect of officer productivity. Many measures that are used in EIS systems capture whether a given police action resulted in a bad outcome. But given the inherent challenges of policing, particularly in big-city, high-crime environments, even correct police actions will sometimes result in bad outcomes. What an EIS system would ideally wish to predict is inappropriate police actions, rather than bad outcomes.

A third challenge for EIS systems is difficulty in isolating the contribution of the individual officer from the potentially confounding effects of the specific job assignment or context in which the individual is working. The challenge is analogous to one that is frequently encountered in the education field, where focusing on measures of teacher performance (like the test scores of students in a teacher's classroom) runs the risk of conflating the contribution of the teacher-to-student learning from the contribution of community social factors that affect student outcomes and are beyond the control of the teacher. If a performance system does not adequately control for differences among teachers in the socio economic

and related challenges faced by the students in the teacher's classroom, the result will be to effectively penalize those teachers that choose to take on the most challenging assignments.

A similar problem arises in the case of policing, where a good EIS system should not disincentivize officers from choosing to work in the most challenging jobs and communities where arguably the importance of and need for high-quality policing is the greatest. Some EIS systems try to address this problem by making "peer-to-peer" comparisons. One challenge with this approach is that the actual "task" that a given officer undertakes—both in terms of its potential productive value for society, and its risk of an adverse outcome—can vary enormously even within job assignments, police beats, and shifts (for example, due to differences in the amount of self-initiated activities that officers undertake). We refer to this as the "task confounding" problem. Attempts to address this task confounding problem by accounting for officer activity often rely on fairly crude measures, such as arrests made, which inevitably miss many other aspects of variation across officers as to what they actually do on the streets. Ultimately, a good performance measure has to take the features of task and context into account.

## III. BUILDING A NEW EIS TOOL IN CHICAGO

A top priority for any new EIS tool for CPD would be to make better use of the rich set of data that the department collects to build a tool that is as accurate as possible in predicting future officer behavior. The key outcome that existing EIS tools within CPD are currently oriented around is to predict which officers will be fired by the department in the future. A different type of outcome that many EIS systems predict, including many of the EIS systems developed by departments working under a consent decree with the Department of Justice, is some indicator of an officer's use of excessive force. There is a long list of officer behaviors that could, in principle, be predictive of those outcomes. Which behaviors are actually most predictive in practice is a statistical question.

The University of Chicago Crime Lab will work closely with the CPD to try to build the most accurate possible validated EIS, using the best possible analytic techniques, including new methods from the computer science field of machine learning or statistical learning.

One challenge in forming accurate predictions of which officers might benefit from early intervention is the sheer quantity of candidate indicators that could potentially be considered. The City of Chicago collects vast amounts of information about individual officers and policing outcomes that are distributed across multiple different data systems. These include various measures of misconduct originating from BIA, IPRA, and the department's automated complaint system (AutoCR), which includes allegations that have been founded as well as those that have not. The City also collects measures of officer activity while out on the street (arrests, guns confiscated, field interrogations conducted, use of force), in court (including disposition of court cases, or even attendance rates at court), and other aspects of job performance, such as commendations received or use of medical leave. Most EIS systems focus on just a subset of these candidate predictors, chosen through some combination of professional judgment (that is, a best guess) and other practical or political considerations. There is no guarantee that the subset of candidate predictors that are selected in this way is the most predictive possible set of predictors—which, in turn, means that the EIS system that results is not nearly as effective as it could or should be.

Machine learning provides a powerful technique to search over very large numbers of candidate predictors to find the optimal combination that is the most predictive, given the data that are available.

These tools are built by assembling information about the experiences of previous officers while on the force at CPD, and allowing the data to determine which patterns of behavior or outcomes are predictive of outcomes such as being terminated by the department in the future or being found to have used excessive force. The tool can then help flag similar patterns that arise to individual officers in the future who could then be diverted to non-disciplinary supports to reduce the chances that they wind up either harming the public, themselves, or their own prospects at a successful career at CPD.

Machine learning also has distinct advantages over traditional statistical methods given its ability to detect subtle patterns among variables that would never occur to a human data analyst. As an example, previous job records predict how well individuals perform as officers, but only for officers below a certain age. Traditional statistics would require the analyst to know and specify this interactive effect, whereas statistical learning algorithms could discover that age and previous job, together, hold predictive power.

In building an EIS tool with machine learning algorithms, we address the task confounding problem through two steps. First, whenever possible, we will incorporate fine-grained features of the task (such as beats in which the officers are working, the shift, the time of year, and indicators of individual officer activity levels) into the model. Controlling for these differences will help facilitate comparisons of officers facing similar circumstances. Second, whenever possible, we plan to predict a measure of officer performance as reflected in CPD's own disciplinary and personnel decisions. For example, we can predict which officers will be fired by CPD, which is the focus of the department's current EIS. Analogously, we can predict which officers will face sustained complaints of misconduct. The presumption behind this approach is that CPD, IPRA and other related actors have already invested resources in investigating these situations, and the resulting decisions take into account the specific context (task) in which an officer was working in deciding if his or her behavior warrants disciplinary action or some other form of intervention. If the disciplinary system is functioning properly then by focusing on this type of outcome, part of the task confounding problem has already been taken into consideration.

For the sake of being as helpful as possible to individual officers and to the members of the public who might be affected by adverse officer behavior, there would be great value in being able to tell as soon as possible when an officer starts down a path that might result in founded misconduct. The usual tradeoff for prediction systems is that the closer in time to the outcome being predicted, the greater the predictive power of the system—but the more harm that has already resulted. Any new EIS system could explore the possibility of enhancing the ability to predict future misconduct as early in an officer's career as possible by potentially drawing on non-standard sources of data, such as even including what the department collects from officers at the hiring stage and how they perform in the Academy.

Finally, other departments around the country have found that the ability of such tools to be helpful for early intervention can be enhanced if the tool is part of a larger performance measurement system for officers. The methods we develop for predicting misconduct can easily be extended to positive performance. As an example, these techniques can be used to predict which officers receive commendations for their exceptional service at CPD. In addition, a more general performance measurement system could, in principle, be used to help inform other department human resource decisions, for example by predicting which patrol officers will be successful in specialized roles like detective, FTO, or even supervisory positions. Overall, these tools can be used to help the department identify highly productive officers within their ranks.

Ultimately, frontline officers and supervisors must view the EIS tool as helpful to their day-to-day jobs in order for it to be deemed worthwhile by CPD. The Crime Lab intends to work closely with CPD, as well as with key stakeholders, to ensure a full range of perspectives is considered. Whether these prediction tools translate into any changes in CPD personnel choices is a policy decision that will be made by CPD and the City, and is beyond the purview of our analytical work. Our goal would be to build a set of predictions that can highlight for the City the potential gains that could come from incorporating these predictive analytics into different aspects of CPD's day-to-day operations. Which of these predictive analytic tools should ultimately be incorporated into those operations, and how, is ultimately a policy question, not a social science question.

# Appendix 9

## De-Escalation Working Group Checklist

- OEMC should invest in a Smart911 system.
- OEMC should implement a 16-hour mental health awareness training.
- OEMC should devote attention to supporting personnel in providing compassionate and effective service to the community and implementing stress management training that complies with national standards.
- The Chicago Department of Public Health ("CDPH") should partner with mental health agencies and advocacy groups to develop a two-step community education campaign on the signs of mental illness and how to best respond to a mental health or related crisis.
- CPD should increase the number of CIT-certified officers to 35% of all patrol officers, and ensure that individual districts with the highest number of mental-health calls are staffed to 35% or higher. All districts and all watches should staff at least two CIT-certified officers. Refresher courses should be developed and provided to CIT-trained officers. CPD should attach a permanent code "z" to officer names that OEMC can always access so dispatch can assign appropriate officers to calls.
- The City should create a "Mental Health Critical Response Unit" within CPD that is responsible for mental health crisis response functions, training, support, community outreach and engagement, cross-agency coordination and data collection and houses the CRU.
- The City should create a crisis response system to support multi layer co-responder units where behavioral health providers are working with OEMC and CPD to link individuals with mental health issues to treatment, 24 hours a day.
- The City should expand and invest in Crisis Stabilization Units ("CSU") for individuals suffering from symptoms of mental illness who do not need to be psychiatrically hospitalized.
- The City and the MHCRU should identify frequent, high-use and high-need individuals and help them get mental health treatment.
- The City should invest in first episode programming so that young adults experiencing their first episode of psychosis or major depression are immediately linked to intensive services to reduce progression of illness and decrease the risk of criminal justice involvement.
- CPD should work to decrease trauma and escalation at crime scenes by reducing the show of heavy weapons and expanding the Chicago Survivors program.

# Appendix 10

## Proposed Video Release Policy

### I. PURPOSE.

This policy will provide direction to officials and agencies of the City of Chicago ("City") with respect to the public release by the City of videotape and audiotape recordings and certain specified police reports that relate to certain types of incidents involving Chicago Police Department ("CPD") officers, and shall prescribe procedures under which requests can be made to delay temporarily the release of those items to the public.

### II. POLICY CONSIDERATIONS.

This policy is intended to strike a balance between competing and sometimes conflicting interests of (a) the public in timely access to video and audio recordings and particular related initial police reports pertaining to certain incidents involving the use of force by police officers; (b) individuals who are the subject of the police action; and (c) units of local, state and federal government (including agencies of the City) involved in investigating or otherwise addressing the consequences of those incidents. Government institutions and officials with appropriate jurisdiction may have an interest in temporarily delaying the release of such information to the public in circumstances where it might compromise their efforts to address these incidents, including (but not limited to) criminal, disciplinary or other types of investigations; those interests may include a desire to avoid instances where early release of information could cause fact witnesses, whether civilian or otherwise, intentionally or inadvertently to conform their recollections of events to fit what they see in a video, hear in an audio recording, or read in a report. In addition, certain individuals, such as persons injured in these incidents or their families, may also have interests concerning the release of these items. Despite those interests, however, the people of the City have an undeniable, and in some cases paramount, interest in being informed, in a timely fashion and based on the most accurate information possible, about how their police force conducts its business, especially where the use of force by the police results in the death of, or great bodily harm to, a civilian.

This policy attempts to balance those competing interests by permitting specifically interested entities to request a temporary delay in the public release of recordings or reports in order to protect the integrity and effectiveness of their investigations, while assuring that these materials will become available to the public within a limited and certain period of time. The goal of this policy is to increase transparency with respect to the operations of CPD, and in doing so to foster increased trust and communication between the community and the police officers who serve it.

### III. SCOPE.

**A. Incidents.** Consistent with (though not identical to) Municipal Ordinance Code Section 2-57-040(c) and (d), this policy encompasses the following types of incidents: (1) those in which a CPD officer discharges his or her firearm in a manner that strikes, or that potentially could strike, another individual, even if no allegation of misconduct is made; (2) those in which a CPD officer discharges his or her taser or stun gun in a manner that strikes another individual and results in death or great bodily harm; and (3) those in which, as a result of the use of force by a police officer, the death of, or great bodily harm to, a person

occurs while that person is in police custody. (Referred to hereinafter as the "Incident.") "Great bodily harm" means any injury that is serious enough to require treatment in a hospital or similar facility located in a correctional institution.

**B. Recordings and Reports.** This policy applies to the following items that relate to any Incident: all video and audio recordings relating to the Incident, including tapes of 911 calls, OEMC dispatch recordings, CPD radio calls, video and audio from CPD dash or body cameras, videos from CPD or OEMC POD cameras, as well as any video or audio recordings made using cameras or equipment not owned or controlled by the City that come into the possession or control of CPD or IPRA; and any arrest reports, original case incident reports, tactical response reports (TRR's), and officer's battery reports (OBRs) (Referred to hereinafter as the "Information.")

## IV. RELEASE OF INFORMATION

**A. Timing of Release of Information.** Any Information covered by this policy shall be released to the public no more than 60 calendar days from the date of the Incident unless a request is made to delay the release of any or all of the Information pursuant to this policy. Where any video or audio recording covered by this policy made using cameras or equipment not owned or controlled by the City comes into the possession of the City after the date of that incident, it shall be released to the public no more than 60 days after it comes into the possession of the City, but the City shall make every effort to provide for the release of such recordings simultaneously with the release of other Information related to the Incident.

**B. Requests to Delay Release.** Upon written request from a government entity specified herein, the City will delay release of Information for a period not to exceed 30 calendar days. Any such request shall be made in writing and shall be directed to the City Corporation Counsel. Such a request may be made by the United States Attorney for the Northern District of Illinois, the Cook County State's Attorney, the Attorney General of Illinois, IPRA, or any other federal, state, county or local law enforcement agency. Any request must set forth with specificity the length of the delay requested (not to exceed an additional 30 calendar days) and shall set forth as reasons supporting the requested delay one or more of the factors listed at 5 ILCS 140/7(d)(i) through (vii). In addition, any such request must identify the specific item(s) sought to be temporarily withheld from release. The written request to delay release will itself be released to the public immediately upon receipt using a portal or website used for the distribution of Information subject to this policy. The City will not honor any further requests to delay release beyond the initial request, and will not honor a request for a delay of release that exceeds 30 calendar days.

**C. Early Release of Information.** Where doing so will not compromise an ongoing investigation, any Information covered by this policy may be released before the expiration of 60 calendar days, and may occur as soon as possible after the Incident.

**D. Manner of Release of Information.** The City shall create and maintain a publicly accessible website, dropbox or similar portal dedicated to the posting of the Information covered by this policy.

## V. NOTICE TO AFFECTED PARTIES.

Prior to the release of the Information, IPRA will attempt to notify any person who was the subject of the police action and is depicted in any video recording, or if that person is deceased or otherwise unavailable, that person's legal representative and/or next of kin, that the video recording and any related Information will be released and the date of release. IPRA will also offer to promptly show such

individuals (and/or, if applicable, their legal representative and/or next of kin) the video recording(s) in which that person was depicted, and to play any related audio, in advance of its public release, and to answer questions and provide other information concerning the Incident and the status of any investigation of the Incident, to the extent that information can be provided without compromising any investigation.

## VI. ONGOING REVIEW.

The provisions of this policy should be reviewed by the City after it has been in effect for one year (or sooner if appropriate) in order to determine whether experience with its implementation and application supports revision of the policy with respect to any issue, including (but not limited to) whether the 60-day period and the 30-day extension it provides for may be shortened or whether its scope may be expanded to cover additional types of incidents.

## VII. LEGAL PROCESS.

This policy is intended solely to govern the conduct of the City and its agencies and officials with respect to the matters it covers. It is not intended to displace or supersede any legal right or remedy available to any person or entity. It is also not intended to prevent or hinder compliance by the City with respect to any legal obligations, including (but not limited to): (a) any order of court; (b) any obligation to redact identifying or other information from any item covered by this policy before its release to the public; or (c) any obligations imposed by the Freedom of Information Act, 5 ILCS 140/1 *et seq*.

# Appendix 11

## Overarching Recommendations Checklist

- Provide an annual 40-hour in-service training for all sworn personnel, including periodic refresher classes on procedural justice.
- Implement a systematic approach to identify training needs and revise in-service training curriculum on an annual basis.
- Reinvigorate the Field Training Officer program.
- Implement procedures to ensure that sworn personnel remain informed on all directives and policies.
- CPD should increase the number of sergeants on patrol.
- CPD should implement monthly meetings of all sergeants in a District to ensure the sharing of officer performance, to provide mentoring opportunities to newer sergeants, and provide a forum for best-practice sharing to prevent officer misconduct.
- CPD should continue rolling out and evaluating body cameras with the ultimate goal of providing body cameras to every police officer who regularly comes into contact with civilians.



