# Exhibit F:

# City of Chicago Office of the Inspector General "Gang Database" Report

APRIL 2019

# CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL

## REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"






REPORT OF THE PUBLIC SAFETY SECTION OF THE OFFICE OF INSPECTOR GENERAL



CITY OF CHICAGO
OFFICE OF INSPECTOR GENERAL
740 NORTH SEDGWICK STREET, SUITE 200
CHICAGO, ILLINOIS 60654
TELEPHONE: (773) 478-7799
FAX: (773) 478-3949

JOSEPH M. FERGUSON
INSPECTOR GENERAL

## APRIL 11, 2019

## TO THE MAYOR, CHAIR OF THE COMMITTEE ON PUBLIC SAFETY, CITY COUNCIL, CITY CLERK, CITY TREASURER, AND RESIDENTS OF THE CITY OF CHICAGO:

The Office of Inspector General's (OIG) Public Safety Section has issued a review of the Chicago Police Department's (CPD or the Department) so-called "gang database." Rather than a unified standalone system, as publicly perceived, the Department has, over time, built a patchwork of data systems, visualization tools, and computer applications where gang information has been entered, stored, and accessed. OIG's review found that: 1) CPD lacks sufficient controls for generating, maintaining, and sharing gang-related data; 2) CPD's gang information practices lack procedural fairness protections; 3) CPD's gang designations raise significant data quality concerns; and 4) CPD's practices and lack of transparency regarding its gang designations strain police-community relations..

Chicago's communities, police, and elected officials are engaged in an ongoing discussion about how CPD collects, maintains, uses, and shares gang-related data. Public forums, media coverage, litigation, and academic studies have deliberated on the topic, but a lack of clarity around what is known as CPD's "gang database" remained. As soon as the Public Safety section of the Office of the Inspector General (OIG) became operational in 2017, OIG began fielding concerns from members of the public about the "gang database." Those concerns included the accuracy of the information, the length of time such information is maintained, and the potential life-altering impact the use of such information can have on individuals, particularly young Black or African American and Latinx men.[1]

Consistent with many of the concerns raised to OIG by members of the public, our review concluded that CPD's current gang information systems present certain risks that, if left unaddressed, will continue to undermine public trust and confidence in the police and, because of the broad perception and the lived experience of many, that the current system causes significant collateral consequences for individuals and communities.

---

[1] Of the 134,242 individuals designated as gang members in Gang Arrest Cards over the past 20 years, Black or African American and Latinx males comprise 91.3%.

More specifically, CPD's gang information contains incomplete and contradictory data. OIG's analysis of data from CPD's Gang Arrest Cards found numerous instances in which individuals are listed with blank or conflicting Identification Record numbers, birthdates, and other classifications. OIG identified records in which individuals had birth dates prior to 1901, and other records in which an individual's age was listed as zero. Over 15,000 individuals designated as gang members by CPD had no specific gang membership listed and no reason provided for why the individual was listed as a gang member. Individuals designated as gang members are not notified of their designation and have no ability to appeal the designation. CPD does not regularly review, correct, or purge inaccurate gang information; those with inaccurate designations have no opportunity to clear their name and mitigate the impact of incorrect or outdated gang designations. Ultimately, CPD's gang designations are permanent and inescapable. Once designated, an individual is listed as a gang member in CPD's systems forever.

Additionally, some entries in the "gang database" raise serious concerns about how CPD officers perceive and treat the people with whom they interact. OIG found that CPD officers entered occupations for individuals on gang arrest cards that included "SCUM BAG," "BUM," "CRIMINAL," "BLACK," "DORK," "LOOSER [*sic*]," and "TURD." Such entries demonstrate CPD's lack of controls around its data entry practices and how such information systems can be employed to demean and dehumanize members of the public.

CPD shares its "gang database" information with over 500 external agencies, including immigration and criminal justice agencies. CPD lacks sufficient control and oversight of external agencies' access and use of this information. This unchecked and widespread use—more than one million gang-related queries by external agencies in the past ten years—may contribute to a variety of negative consequences for individuals and communities.

Furthermore, CPD's practices and lack of transparency regarding its gang designations have strained police-community relations. Community members reported personal accounts to OIG in which their experiences of CPD's "gang database"-related strategies—including misidentification, harassment, obstacles to immigration, and racial profiling—furthered the historical divide between themselves and the police and contributed to inequities, especially in communities of color.[2] Community members expressed concerns that the "gang database" serves as a mechanism for "criminalizing people in certain neighborhoods." Personal accounts of these experiences can be viewed on OIG's website at www.igchicago.org.

---

[2] Thirteen of the City's 77 community areas account for over 50% of Gang Arrest Cards produced. All 13 of these community areas are on the South and West Sides of Chicago. Austin, North Lawndale, Humboldt Park, and South Lawndale collectively account for approximately 24% of all Gang Arrest Cards produced.

To address these concerns, OIG provided 30 recommendations to encourage CPD to evaluate the utility of tracking gang designations for the Department's violence reduction efforts and to immediately address the risks associated with collecting, maintaining, and sharing unverified and potentially damaging information. Key recommendations for CPD include:

- evaluating – in partnership with stakeholders – whether collecting, maintaining, sharing, and using gang information best serves violence reduction efforts in the City;
- requiring evidentiary support for the assignment of gang designations;
- codifying processes for reviewing gang designations;
- notifying individuals that they have been designated as a gang member;
- establishing processes for contesting or appealing one's gang designation;
- regularly reviewing gang designations to identify inaccurate or outdated designations;
- developing a means to purge inaccurate or outdated information;
- establishing formal agreements with external agencies and regularly audit their use of CPD's gang information; and
- providing regular public reports on CPD's collection, storage, use, and sharing of gang-related data.

In its response to this report, CPD agreed with OIG's findings, largely concurred with many of OIG's recommendations, and partially concurred or disagreed with others. CPD acknowledged that its gang information policies, practices, and technology had impeded the Department's ability to maintain updated and relevant information. In its response, the Department proposed the development of a new system to collect and store gang information, the Criminal Enterprise Database (CED). As proposed by the Department, the CED will be a single, unified system that ensures the inclusion of updated and vetted information, purging of outdated gang information, and a process for members of the public to ascertain and appeal their designation as a gang member or affiliate. CPD also indicated that the new system will incorporate regulations on sharing gang information with third parties.

While the Department has signaled intentions to reform its gang-related technology and information practices, CPD's response and proposed measures diverge from OIG's recommendations in several critical ways. First, CPD states that it has already conducted an internal evaluation, affirmed the utility of collecting gang information, and drafted policies for a new system. By doing so, CPD has missed an opportunity to collaborate and enhance the legitimacy of its reforms. OIG encourages CPD to partner with community stakeholders and to participate in a community-based stakeholder committee to reform its gang information practices. A more robust, proactive approach to community engagement will likely be necessary to overcome the level of mistrust and alienation that currently shapes the relationship between

police and communities. CPD's response also deviates from OIG's recommendations with the proposal of an appeals process that involves several substantive barriers and no additional protections for juveniles.

As the City and the Chicago Police Department embark on a historic period of reform in the context of a consent decree, court monitor, and new administration, the recommendations of this report—along with the reforms to which CPD has committed—present an opportunity to diminish the division between police and the communities they serve. In Chicago, where unconstitutional policing has disproportionately impacted communities of color, the need for transparency and meaningful community input is all the more critical.

Moreover, although the police currently play a role in keeping communities safe through enforcement strategies, every stakeholder OIG spoke to—including members of CPD—indicated that stopping violence requires more resources—such as violence prevention workers; equitable opportunities for education, employment, and housing; and access to mental healthcare resources. CPD, City Council, and the Mayor's Office must undertake holistic and comprehensive actions to enhance violence reduction efforts and they must include community voices.

OIG thanks CPD for its cooperation during this evaluation. We also extend our gratitude to the community members and organizations, local and national law enforcement officials, academics, auditing agencies, and criminal and civil rights attorneys who shared their perspectives for this review.


Respectfully,

Joseph Lipari
Deputy Inspector General for Public Safety
City of Chicago

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ...................................................................................3
   A.    OVERVIEW OF FINDINGS ...........................................................................5
      1.    CPD lacks sufficient controls in generating, maintaining, and sharing gang-related data ...........................................................................5
      2.    CPD's gang information practices lack procedural fairness protections.........5
      3.    CPD's Gang Arrest Cards raise significant data quality concerns.........6
      4.    CPD's practices and lack of transparency regarding its gang designations strain police-community relations ...........................................6
   B.    OVERVIEW OF KEY RECOMMENDATIONS .......................................6
II.   OBJECTIVES, SCOPE, AND METHODOLOGY .................................................8
III.  BACKGROUND ...........................................................................................10
   A.    STAKEHOLDER CONCERNS ......................................................................10
   B.    DEPARTMENT OF JUSTICE FINDINGS .....................................................11
   C.    LOCAL ACADEMIC STUDIES AND MEDIA ...............................................11
   D.    RECENT "GANG DATABASE" LITIGATION ..............................................12
   E.    LEGISLATIVE PROPOSALS .........................................................................13
   F.    RECENT CPD STATEMENTS ON GANG INFORMATION .........................13
   G.    CPD'S GANG INFORMATION ..................................................................14
   H.    POTENTIAL COLLATERAL CONSEQUENCES OF CPD'S GANG DESIGNATIONS.......... 28
IV.   DATA ANALYSIS .......................................................................................32
   A.    GANG ARREST CARDS .............................................................................32
V.    FINDINGS ....................................................................................................44
   A.    CPD LACKS SUFFICIENT CONTROLS IN GENERATING, MAINTAINING, AND SHARING GANG-RELATED DATA ...........................44
   B.    CPD'S GANG INFORMATION PRACTICES LACK PROCEDURAL FAIRNESS PROTECTIONS ...........................................47
   C.    CPD'S GANG ARREST CARDS RAISE SIGNIFICANT DATA QUALITY CONCERNS.......... 48
   D.    CPD'S PRACTICES AND LACK OF TRANSPARENCY REGARDING ITS GANG DESIGNATIONS STRAIN POLICE-COMMUNITY RELATIONS ...........49
VI.   RECOMMENDATIONS .............................................................................52
   A.    UTILITY AND ALIGNMENT WITH CPD'S VIOLENCE REDUCTION EFFORTS ...........52
   B.    CONTROLS AND PROCEDURAL FAIRNESS PROTECTIONS ...................54
   C.    POLICE LEGITIMACY AND COMMUNITY INVOLVEMENT ....................58
VII.  DEPARTMENT RESPONSE ......................................................................60
VIII. APPENDIX A: CPD BUREAUS AND DIVISIONS INVOLVED IN GANG DESIGNATION, TRACKING, AND ENFORCEMENT ....................................61
IX.   APPENDIX B: ADDITIONAL INFORMATION REGARDING POTENTIAL COLLATERAL CONSEQUENCES OF CPD'S GANG DESIGNATIONS .............64
X.    APPENDIX C: GANG INFORMATION SYSTEMS DIAGRAM PROVIDED BY CPD .............72
XI.   APPENDIX D: DATA COLLECTION, REPORTING, AND VISUALIZATION POINTS............74
XII.  APPENDIX E: LIST OF EXTERNAL AGENCIES WITH ACCESS PROVIDED BY CPD.......................100
XIII. APPENDIX F: APPLICATION FOR EXTERNAL AGENCY ACCESS TO CLEAR....................114
XIV.  APPENDIX G: GANG ARREST CARD ALLEGATIONS ...............................116

XV.   APPENDIX H: GANG ARREST COUNTS BY COMMUNITY AREA (JANUARY 1, 1997, THROUGH NOVEMBER 7, 2018) .................................................................... 118
XVI.   APPENDIX I: GLOSSARY ................................................................................................ 120
XVII. APPENDIX J: CPD'S RESPONSE LETTER .................................................................. 123
XVIII. APPENDIX K: DRAFT GENERAL ORDER G10-01-03 .............................................. 151

# ACRONYMS

| | |
|---|---|
| CCSAO | Cook County State's Attorney's Office |
| CED | Criminal Enterprise Database |
| CI | Confidential Informant |
| CLEAR | Citizen and Law Enforcement Analysis and Reporting |
| CPD | Chicago Police Department |
| CPS | Chicago Public Schools |
| DACA | Deferred Action for Childhood Arrivals |
| DOC | Deployment Operations Center |
| DOJ | United States Department of Justice |
| FOIA | Freedom of Information Act |
| ICRA | Illinois Civil Rights Act |
| ICE | Immigration and Customs Enforcement |
| IDOC | Illinois Department of Corrections |
| ISP | Illinois State Police |
| ISR | Investigatory Stop Report |
| LEADS | Law Enforcement Agencies Data System |
| LRA | Local Records Act |
| OIG | Office of Inspector General |
| UIC | University of Illinois at Chicago |

# I. EXECUTIVE SUMMARY

The Public Safety Section of the City of Chicago's Office of Inspector General (OIG) concluded a review of the Chicago Police Department's gang-related data, commonly referred to by the public as the "gang database."[3] OIG's review found that while the Chicago Police Department (CPD or the "Department") deploys a host of strategies, tactics, and technology in relation to gangs, it does not have a unified, stand-alone "gang database" as publicly perceived. Instead, the Department collects and stores information on individual and geographic gang involvement through a multitude of internal databases, forms, visualization tools, and repositories. CPD also receives gang-related data generated by external agencies. Therefore, any effort to address public concern over the purpose and practices associated with the Department's collection and use of gang information must begin with an accurate understanding of the various components and current technological limitations.

To conduct this review, OIG examined CPD's policies on gangs; observed gang-related trainings at CPD's Training Academy; interviewed Department personnel across ranks and Bureaus regarding gang information; analyzed CPD's gang-related data in Arrest Reports; and examined external agencies' access to CPD's gang-related data. Further, OIG attended public forums with community members regarding CPD's gang designations; reviewed local, federal, and state statutes; reviewed policies regarding gang designations from other jurisdictions; and spoke with local and national law enforcement, community-based, research, criminal justice, legal, and auditing agencies regarding gang designations.

CPD designates both individuals and geographic areas as gang-involved. Individual gang designations can be based on factors such as being in the presence of others designated as gang members, pictures of the individual displaying perceived gang signals on social media, and/or the individual stating to CPD that they are a gang member. Area gang designations can be based on factors such as the number of individuals designated as gang members living in an area, and/or graffiti in the area. OIG found that CPD has captured, reported, and visualized gang-related data in at least 18 different forms, records, and systems of records in the past 10 years, although CPD was not able to definitively account for all such information in its possession and control. According to CPD, it shares gang information with over 500 external agencies, including education, immigration, and criminal justice agencies. These designations may contribute to a variety of adverse consequences for individuals and

---

[3] OIG uses the terms "gang designation," "gang information," and "gang-related data" instead of "gang database" because CPD does not have a single, unified database where such information resides. For the purposes of this report, "gang designation" means the labeling of an individual or area as gang-involved. "Gang information" or "gang-related data" indicate gang designations documented by CPD in Department forms and systems – this information can also appear in various Department reports and visualization tools.

communities in, among others, law enforcement, criminal justice, immigration, and employment contexts.

OIG focused its analysis on gang designations appearing in CPD Gang Arrest Cards, which are completed for individuals who an arresting officer believes is a gang member. OIG did so because these data relate to individuals whose identities are most reliably verifiable as compared to numerous other CPD records containing gang information. OIG's analysis of Gang Arrest Card data found that Black, African American, and Latinx persons comprise 95% of the 134,242 individuals designated as gang members during arrest, and are designated at both younger and older ages as well as issued more Gang Arrest Cards per person than White gang designees. OIG's analysis further revealed that 11.3% of individuals designated as gang members during arrest (15,174 people) have no specific gang listed for which they are a member and 11.7% (15,648 people) have never had a reason listed for their gang designations.

OIG's review found that: 1) CPD lacks sufficient controls for generating, maintaining, and sharing gang-related data; 2) CPD's gang information practices lack procedural fairness protections; 3) CPD's gang designations raise significant data quality concerns; and 4) CPD's practices and lack of transparency regarding its gang designations strain police-community relations.

As a result of the insufficient controls, lack of procedural fairness protections, data quality concerns, and impact on police-community relations, CPD:

- Cannot confirm that all of its gang designations are accurate and up-to-date;
- Cannot ensure that CPD members designate individuals as gang members with sufficient, reliable evidence corroborating actual gang involvement;
- Maintains gang information for long periods of time despite state records retention laws that allow such information to be destroyed and Department policies requiring this destruction;
- May not be able to produce all relevant gang-related documentation as may be legally required in response to Freedom of Information Act (FOIA) requests and during litigation;
- Lacks sufficient control over external agency access and has limited capacities to monitor the use of its gang information by external agencies and hold them accountable; and
- May not be able to ensure that all gang-related data collection tools serve a legitimate law enforcement purpose and are used appropriately, among other effects.

## A.   OVERVIEW OF FINDINGS

### 1.   CPD lacks sufficient controls in generating, maintaining, and sharing gang-related data

In generating gang-related data, CPD lacks sufficient training, criteria, evidence, supervisory review, and internal mechanisms to mitigate, identify, and address inaccurate information.

With respect to maintaining gang-related data, the Department was unable to provide OIG with a complete list or comprehensive accounting of all the various forms, records or systems of records in which gang information could be and has been recorded, reported, and visualized in the last 10 years. OIG's review further revealed that Department members were unaware of certain records retention requirements, and that CPD may be out of compliance with its own policies regarding record retention.

In relation to sharing gang-related data, CPD has no agreements with external agencies beyond the initial application for access to one of CPD's data systems, Citizen and Law Enforcement Analysis and Reporting (CLEAR), which only provides broadly that the information be used for "law enforcement purposes." Further, OIG's analysis of external agencies with access to CPD's gang information revealed external agencies with access CPD did not disclose to OIG, and the Department was unable to explain why the list it provided to OIG was incomplete.

### 2.   CPD's gang information practices lack procedural fairness protections

The Department does not inform individuals that they have been designated as a gang member; does not have processes for individuals to contest or appeal gang designations; does not have processes to regularly review or purge outdated or faulty designations; and has no internal mechanism to amend inaccurate gang information. CPD has no minimum age for designating individuals as gang members, and there is no exit or end time for individuals designated as gang members by CPD. OIG's review found that the youngest person designated as a gang member on a Gang Arrest Card was designated at the age of 9 and has remained designated for 19 years. Another person was first designated as a gang member at the age of 75 and has remained designated for 10 years. The coupling of a lack of controls with the absence of procedural fairness protections inhibits the Department's ability to assure the accuracy of its information, and potentially undermines public confidence in the Department's legitimacy and effectiveness in the service of its public safety mission.

### 3.    CPD's Gang Arrest Cards raise significant data quality concerns

According to CPD, the Department's most verified gang-related data is captured in Gang Arrest Cards. However, OIG's analysis of data from this source found numerous instances in which individuals are listed with blank or conflicting Identification Record (IR) numbers, birthdates, and other classifications. For example, OIG found 90 records in which an individual had a birth date prior to 1901, and another 80 records in which an individual's age was listed as zero.

### 4.    CPD's practices and lack of transparency regarding its gang designations strain police-community relations

In interviews and at public forums, OIG heard from Chicago community members who expressed fear and uncertainty about the criteria, use, structure, and purpose of the "gang database." During the review, community members also reported personal accounts to OIG in which their experiences of CPD's "gang database"-related strategies—including misidentification, harassment, obstacles to immigration relief, and racial profiling—furthered the divide between themselves and the police. Based on the accounts and testimonies provided to OIG, it is apparent that the lack of transparency around CPD's "gang database," coupled with community experiences of CPD's "gang database"-related strategies, strain police-community relations.

## B.    OVERVIEW OF KEY RECOMMENDATIONS

Based on insufficient controls, absent procedural fairness protections, data quality concerns, and the impact on police-community relations, CPD should undertake a holistic evaluation of the ongoing utility and impacts of continuing to collect gang designations. If the Department elects to continue collecting these data, CPD and the City of Chicago must implement comprehensive changes to address the issues detailed in this report. OIG offers 30 recommendations on the utility, collection, maintenance, sharing, impacts, and data quality of CPD's gang designations. Key recommendations to CPD and the City include:

- Evaluate, in partnership with stakeholders, whether collecting, maintaining, sharing, and using gang information best serves violence reduction efforts in the city, including with consideration of the collateral consequences of these practices. Avenues for partnership may include, but are not limited to: conducting a formal and publicly reported evaluation, holding public hearings, and participating in City Council hearings;
- Codify processes for supervisory and/or expert-level review of gang designations;
- Formally require the inclusion and assessment of specified types of evidence required to support proposed gang designations;
- Notify individuals who have been designated as a gang member;

- Establish a process by which individuals can contest or appeal their gang designation;
- Regularly review gang designations to evaluate ongoing accuracy;
- Develop and implement a means to purge inaccurate or outdated gang designations;
- Establish formal written agreements with external agencies and regularly audit external agency access and use based on clearly defined metrics;
- Provide regular public reports on CPD's collection, storage, use, and sharing of gang-related data;
- Consider implementing additional protections and restrictions for sharing gang-related data with external agencies including, but not limited to, immigration enforcement agencies;
- Establish a committee of stakeholders with a formal role in ongoing reforms; and
- Consider legislative amendments to the Welcoming City Ordinance that would remove exceptions based on the individual being "identified as a known gang member either in a law enforcement agency's database or by his own admission."

In its response to this report, CPD agreed with OIG's findings and largely concurred with many of OIG's recommendations and partially concurred or disagreed with others. CPD acknowledged that its gang information policies, practices, and technology had impeded the Department's ability to maintain updated and relevant information. CPD proposed the development of a new system to collect and store gang information, the Criminal Enterprise Database (CED). As proposed by the Department, CED will be a single, unified system that ensures the inclusion of updated and vetted information, the purging of outdated gang information, and a process for members of the public to ascertain and appeal their designation as a gang member or affiliate. CPD also indicated that the new system will incorporate additional protections when sharing gang information with third parties. However, it should be noted that these proposed controls and reforms do not apply to the gang information currently maintained by the Department and that this unverified, outdated information will remain available to any officer or department that currently has access to this information.

While the Department has signaled intentions to reform its gang-related technology and information practices, CPD's response and proposed measures diverge from OIG's recommendations in several critical ways. The Department's response indicates that CPD will not engage with community stakeholders in the fashion that OIG recommends. CPD's response also deviates from OIG's recommendations with the proposal of an appeals process that involves several substantive barriers and no additional protections for juveniles.

# II.  OBJECTIVES, SCOPE, AND METHODOLOGY

This report focuses on CPD's collection, maintenance, and sharing of gang-related data. The purposes of this report are to: provide greater transparency about CPD's gang designation practices, identify the risks associated with these practices, and provide recommendations to address such risks. This report does not examine the accuracy of individual gang designations nor the efficacy of the Department's use of the information after it is collected, including for investigative purposes.

In the course of its review, OIG examined relevant Department directives, attended gang-related trainings at the Training Academy, and interviewed Department personnel across ranks from the Bureaus of Patrol, Detectives, Organized Crime, Organizational Development, and Technical Services. OIG also examined various forms, databases, and visualization tools the Department uses to capture, store, access, and formally share gang information.

OIG additionally reviewed policies and interviewed representatives from other municipalities that collect and store gang information, including New York City, New York; Los Angeles, California; Providence, Rhode Island; Boston, Massachusetts; and Portland, Oregon. OIG also interviewed the California State Auditor regarding its 2016 report on the CalGang Criminal Intelligence System.[4] OIG also interviewed academics with expertise in matters pertaining to gangs.

OIG interviewed members of the Illinois State Police (ISP), Cook County State's Attorney's Office (CCSAO), Chicago Public Schools (CPS) Safety and Security, Cook County's Juvenile Temporary Detention Center, and Illinois Department of Juvenile Justice to determine how CPD shares information about gang designations with external agencies.[5]

OIG also reviewed pertinent federal, state, and local statutes to identify ways in which gang designations may contribute to potential consequences in the areas of criminal justice and immigration, as well as to identify various standards pertaining to gang designations and data sharing. OIG also relied on state statutes, administrative regulations, and CPD policies when examining local file retention requirements.

---

[4] The CalGang Criminal Intelligence System, accessed February 2, 2019, https://www.auditor.ca.gov/pdfs/reports/2015-130.pdf.

[5] OIG was unable to engage all of the entities relevant to this topic.  The Illinois Department of Corrections (IDOC) responded that they could not speak with the OIG because their directives did not permit them to disclose requested information about how IDOC tracks and utilizes gang-related data and receives and shares gang-related data with CPD. Five separate requests to arrange an interview with the Cook County Department of Corrections (CCDOC) to gain an understanding about how CCDOC tracks and utilizes gang-related data and receives and shares gang-related data with CPD was, on each occasion, unfulfilled.

The data analysis included in this report extends to data from January 1, 1997, through November 7, 2018 for which CPD provided direct access to the data. OIG validated the final dataset for all Gang Arrest Cards through a random selection process and compared this information to data in CPD's system Citizen and Law Enforcement Analysis and Reporting (CLEAR). Additionally, OIG examined arrest allegations associated with Gang Arrest Cards, as well as the frequency with which external agencies access CPD's gang information, between January 1, 2009 and October 31, 2018.

Finally, OIG participated in public forums in four Chicago communities on the South and West Sides, attended community events about the "gang database," and interviewed community organizations to hear the concerns and perspectives of Chicago community members regarding CPD's "gang database."[6]

OIG uses the terms "gang designation," "gang information," and "gang-related data" instead of "gang database" because CPD does not have a single, unified database where such information resides. For the purposes of this report, "gang designation" means the labeling of an individual or area as gang-involved. "Gang information" or "gang-related data" indicate gang designations documented by CPD in Department forms and systems – this information can also appear in various Department reports and visualization tools.

OIG conducted this review in accordance with Green Book standards under the authority of City of Chicago Municipal Code §§ 2-56-210 and §§ 2-56-230(d).

---

[6] OIG participated in four "Community Conversations" in Garfield Park, Austin, Little Village, and Back of the Yards in March and April of 2018. The sessions provided a forum for participants to communicate their concerns and experiences surrounding the "gang database." Two sessions were held in Chicago Public Libraries, one session was held in a Chicago Park District, and one was held in a Chicago Public School. OIG staff also observed two "gang database" community events in June of 2018.

# III.  BACKGROUND

A number of police departments and communities around the country are assessing the utility and ramifications of tracking gang-related data. The national discussion has been and continues to resonate as an issue of great local concern.  OIG conducted this review in response to and in consideration of a variety of stakeholder concerns.

## A.  STAKEHOLDER CONCERNS

OIG interviewed a diverse collection of local and national stakeholders including: law enforcement officials, community organizations, criminal justice agencies, academics, auditing agencies, criminal and civil rights attorneys, and members of numerous communities in Chicago. Among these stakeholders, OIG consistently heard the following:

- Violence is a critical concern for individuals and communities.
- Gangs typically form out of a context of inequality, such as discrimination, poverty, lack of employment opportunities, and lack of safety.
- Although gangs play a role in violence, an over-reliance on gang designations may obscure the fact that numerous violent incidents are the result of interpersonal disputes rather than on the basis of gang affiliations.
- If law enforcement agencies continue to utilize gang databases, controls and procedural protections must be instituted to ensure accuracy and procedural fairness for designated individuals.
- The criteria utilized to identify individuals as gang members may be overly inclusive, resulting in over-identification, criminalization, and resulting stigmatization that alienates individuals and communities from the police.
- Gang designations can result in serious collateral consequences for individuals designated as gang members and their families, in areas including, but not limited to: criminal justice, education, public benefits, immigration, and differential treatment in encounters with the police.
- The majority of individuals designated by law enforcement as gang members are Black or African American and Latinx, disproportionate to local and national demographics.

In Chicago, recent investigations, publications, lawsuits, and legislation have raised questions about CPD's application, maintenance, use, and sharing of gang designations, and whether these are based on accurate information, improve public safety, provide procedural fairness protections, impact police-community relations, and result in collateral consequences for individuals and communities.

## B.　DEPARTMENT OF JUSTICE FINDINGS

The January 2017 Department of Justice (DOJ) investigation of CPD found that the Department's gang-related intelligence-gathering methods potentially place individuals at risk. These practices included arresting or detaining individuals and refusing to release them until they share information about gang-related activities. The practices cited by DOJ also included officers taking youth to a rival gang neighborhood and either leaving the individual there or displaying the individual to rival members, "immediately putting the life of that young person in jeopardy by suggesting he has provided information to the police."[7]

DOJ cited experiences from youth who stated that, when interacting with CPD, officers suspect that youth are engaged in criminal activity or members of a gang based solely on their appearance. Members of various Chicago communities also expressed to DOJ being "very concerned" about the presumption of gang affiliation "not only because of the assumptions it made about people, but because it also provides a false narrative that can follow these individuals in future interactions with the police and the criminal justice system."[8]

## C.　LOCAL ACADEMIC STUDIES AND MEDIA

The University of Illinois at Chicago (UIC) Policing in Chicago Research Group released two iterations of a report regarding CPD's "gang database"—the first in February 2018 entitled "Tracked and Targeted" and the second in June 2018 entitled "Expansive and Focused."[9] Both reports detail concerns that CPD's "gang database" is inaccurate and promotes racial discrimination.[10] In addition, press outlets in 2017 and 2018 reported on alleged inaccuracies and racial inequalities found in gang-related data released by

---

[7] United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois, "Investigation of the Chicago Police Department," January 13, 2017, page 143, accessed February 1, 2019, https://www.justice.gov/opa/file/925846/download, see p. 15-16 regarding the practices of officers taking youth to a rival gang neighborhood.

[8] United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois, "Investigation of the Chicago Police Department," January 13, 2017, p. 143, accessed February 1, 2019, https://www.justice.gov/opa/file/925846/download.

[9] The Policing In Chicago Research Group, "Tracked and Targeted: Early Findings on Chicago's Gang Database," February 1, 2018, accessed February, 2019, http://erasethedatabase.com/wp-content/uploads/2018/02/Tracked-Targeted-0217.pdf.

UIC Policing In Chicago Research Group, in collaboration with The Chicago Coalition To Expand Sanctuary and The Campaign To Erase The Gang Database, "Expansive and Focused Surveillance: New Findings on Chicago's Gang Database," June, 2018, accessed February 1, 2019, http://erasethedatabase.com/wp-content/uploads/2018/07/Expansive-and-Focused-Surveillance-June-2018_final.pdf.

[10] OIG has not evaluated the methodology of the UIC studies and therefore cannot confirm its findings.

CPD through FOIA requests.[11] Finally, over the past two years community groups hosted "teach-ins" and workshops to discuss concerns with respect to CPD's "gang database" and mechanisms to advocate for changes.[12]

## D.    RECENT "GANG DATABASE" LITIGATION

In May 2017, the MacArthur Justice Center filed a federal lawsuit on behalf of Wilmer Catalan-Ramirez alleging violations of 42 USC § 1983, the *Monell* doctrine, and the Illinois Civil Rights Act (ICRA), for injuries arising from his designation as a gang member by CPD.[13] Catalan-Ramirez's ICRA claim specifically alleged that CPD's gang designations violated the prohibition on racial and ethnic discrimination through the methods used for gathering and sharing information about alleged gang members. Catalan-Ramirez further alleged that his inclusion in the database violated his right to due process, and that he was denied immigration relief as a result, thus leaving him wrongfully vulnerable to deportation. On December 5, 2017, the City of Chicago settled the suit. In the settlement, CPD acknowledged: "CPD cannot verify that Mr. Catalan-Ramirez is a gang member as defined by the Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147)."[14]

On June 19, 2018, several organizational plaintiffs[15] and four individual plaintiffs[16] filed a federal civil rights class action complaint alleging systematic deficiencies and constitutional violations in the creation, use, and maintenance of CPD's gang database. The suit states that CPD's gang database is "arbitrary, discriminatory, over-inclusive, and error-ridden," and that CPD disproportionately targets Black and Latinx

---

[11] Celeste LeCompte, "Download the Gang Databases We Got From Illinois State Police, Cook County Sheriff's Office and Chicago Police Department," *ProPublica Illinois*, July 20, 2018, accessed February 1, 2019, https://www.propublica.org/article/chicago-illinois-gang-databases-download-propublica-data-store, and Annie Sweeney and Paige Fry, "Nearly 33,000 juveniles arrested over last two decades labeled as gang members by Chicago police," *Chicago Tribune*, August 9, 2018, accessed February 1, 2019, https://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-gang-database-juveniles-20180725-story.html.

[12] Chicago Teachers Union, "Black & Brown Educators: A Teach-In on the Gang Database," June 8, 2018, accessed February 1, 2019, https://www.ctulocal1.org/posts/event/black-brown-educators-a-teach-in-on-the-gang-database/, and Organized Communities Against Deportations (OCAD) *et al*, "Erase the Database," accessed February 1, 2019, http://erasethedatabase.com/press/.

[13] Catalan-Ramirez v. Wong, *et al.*, No. 17-cv-3258 (N.D. Ill filed May 01, 2017) and Pedrote-Salinas v. Johnson, *et al.*, No. 17-cv-5093 (N.D. Ill filed July 11, 2017).

[14] Settlement Agreement at 8, Catalan-Ramirez v. Wong, et al., No. 17-cv-3258 (N.D. Ill. Dec. 5, 2017).

[15] Chicagoans for an End to the Gang Database, Black Youth Project 100 Chicago, Blocks Together, Brighton Park Neighborhood Council, Latino Union, Mijente, and Organized Communities Against Deportations. Chicagoans For An End To The Gang Database v. City of Chicago, *et al.*, No. 18-cv-4242 (N.D. Ill filed June 19, 2018). Chicagoans for an End to the Gang Database is a coalition of community organizations as well as individuals.

[16] Donta Lucas, Jonathan Warner, Lester Cooper, and Luis Pedrote-Salinas. Chicagoans For An End To The Gang Database v. City of Chicago, *et al.*, No. 18-cv-4242 (N.D. Ill filed June 19, 2018).

people for inclusion in the database. This pending lawsuit[17] additionally alleges that CPD "shares its Gang Database with numerous third-party agencies, causing significant known and unknown harm to class members, including deprivations of employment, licensures, bond, immigration relief, and more.'"[18]

## E.    LEGISLATIVE PROPOSALS

On July 25, 2018, legislation with 46 aldermanic sponsors regarding CPD's "gang database" was introduced in the City Council which referred it to the City Council Committee on Public Safety. As introduced, the ordinance proposes, among other provisions:

1.    Prohibition of CPD from designating individuals as gang members and maintaining a gang database, absent [independent analysis] establishing that CPD's gang designations have a legitimate law enforcement-related purpose that outweighs the harm caused to individuals who are designated as gang members;

2.    CPD's gang designations [must be] verified in accordance with professionally accepted standards and regularly audited;

3.    Individuals included in the database [must] receive notice and opportunity to challenge their designation;

4.    CPD is prohibited from sharing gang designations and/or information contained in the gang database with any third party; and

5.    CPD's gang designations must be free from racial discrimination.[19]

As of the date of publication of this report, the proposal remains pending in the Public Safety Committee of the City Council where a hearing has not been set.

## F.    RECENT CPD STATEMENTS ON GANG INFORMATION

In response to the recent public concern regarding CPD's "gang database," CPD Superintendent Eddie Johnson stated in an interview on April 9, 2018, "we recognize that some people may be mis-identified [as gang members], and we are looking at processes in terms of...taking them out [of that designation]. It's important for us [CPD] to know who the people are in this city as well as in this state who are

---

[17] The suit is still pending as of the date of publication.

[18] *Chicagoans For An End To The Gang Database v. City of Chicago, et al.,* No. 18-cv-4242 (N.D. Ill filed June 19, 2018).

[19] City of Chicago, Committee on Public Safety, "Amendment of Municipal Code Chapter 2-84 by adding new Sections 2-84-501 through 2-84-504 to regulate Chicago Police Department gang database," July 25, 2018, accessed February 1, 2019, https://chicago.legistar.com/LegislationDetail.aspx?ID=3584670&GUID=8042C182-BD43-4AA5-8531-3EE0782E6CAC&Options=Advanced&Search=.

committing crimes and are affiliated with gangs, but I also think we have a responsibility to get it right." During the course of OIG's review, CPD was working independently on revising protocols and practices regarding its gang information.

## G.   CPD'S GANG INFORMATION

### PURPOSE

In interviews with OIG, Department members identified the following purposes for collecting gang-related data:

- Officer safety, because gang membership indicates that "someone is prone to violence or has a history of resisting arrest";
- Safety of the individual if they become incarcerated, to ensure they are not housed with "rival gang members";
- Investigative, to help Department members identify associations between people;
- Preventing retaliations through the deployment of police resources;
- Solidifying Racketeer Influenced and Corrupt Organizations Act charges for gangs; and
- Strengthening criminal charges when gang membership is an element of the crime.

### DEFINITION OF A GANG

There is no single definition of a gang—laws, policies, research, and individuals vary in their conceptualization of gangs. CPD as well as national and local laws focus specifically on criminal gangs. Federally, "criminal street gang" is defined in 18 U.S. Code § 521 as an ongoing group, club, organization, or association of five or more persons:

- that has as one of its primary purposes the commission of one or more of the criminal offenses described in subsection (c);[20]
- the members of which engage, or have engaged within the past five years, in a continuing series of offenses described in subsection (c); and
- the activities of which affect interstate or foreign commerce.

The Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147) defines a gang as, "any combination, confederation, alliance, network, conspiracy,

---

[20] Offenses described in subsection (c) are: "(1) a Federal felony involving a controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802)) for which the maximum penalty is not less than five years; (2) a Federal felony crime of violence that has as an element the use or attempted use of physical force against the person of another; and (3) conspiracy to commit an offense described in paragraph (1) or (2)."

understanding, or other similar conjoining, in law or in fact, of three or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity."[21]

CPD has defined gangs in different ways. As recently as 2018, CPD's website defined gangs as, "group[s] of people who form an allegiance for a common purpose and engage in violent, unlawful, or criminal activity."[22] In CPD's gang-related training that OIG observed, the Department provided officers with a "practical definition" of a street gang: "an organized group that participates in criminal, threatening, or intimidating activity within the community."[23]

## TRAINING

Incoming Department members currently receive six hours of training regarding gangs, comprised of two modules. The first module entitled "Gangs" addresses gang-related history, criteria, and groups in Chicago. The second module entitled "Gang Violence Reduction Strategy" addresses the Department's policies and programs relating to gangs, as well as technological tools available for policing gangs. All of the training occurs at the Training Academy when CPD members are considered recruits—there are no official CPD refresher or update trainings after graduating from the Academy.[24] Further, according to Departmental interviews, CPD teams with a specialization in gangs, such as the Gang Enforcement Teams and the Gang Investigations Teams, receive no additional internal gang-related trainings beyond the six hours members received as new recruits at the Training Academy.

## INTERNAL ENTRY/ACCESS

According to Departmental interviews, every sworn member has access to certain sources of CPD's gang-related data, including gang designations recorded on Investigatory Stop Reports (ISRs) and Gang Arrest Cards. Any sworn member can designate an individual as a gang member on these forms.[25] CPD members further indicated in interviews that the majority of gang designations are generated by officers in the Bureau of Patrol. However, Bureaus and Divisions across the

---

[21] 740 ILCS 147/10

[22] City of Chicago, Chicago Police Department, "Introduction to Gangs," accessed January 16, 2018, https://home.chicagopolice.org/community/gang-awareness. This webpage is no longer active and this definition can no longer be found on CPD's website.

[23] OIG attended CPD's "Gangs" training on June 4, 2018.

[24] In interviews with CPD, Department members frequently stated that training on gangs after the Academy occur "on the job."

[25] According to interviews, CPD members generally complete forms electronically in various CPD databases rather than on paper.

Department vary in their access to other Departmental sources of gang-information and their tools for entering gang-related data.[26]

## DESIGNATION OF INDIVIDUALS AS GANG-INVOLVED

CPD designates individuals as gang members on a multitude of forms, and some of these designations can later be searched in CPD's systems by the individual's name, home address, nickname, tattoo description, and other identifiers.

CPD's Special Order[27] (S.O.) 10-02-03 entitled "Gang and Narcotics-Related Enforcement" delineates criteria for identifying "criminal street gangs" and "criminal street gang membership."[28] Identification of a criminal street gang must be based on "specific, documented, and reliable information," including:

- analysis of crime pattern information;
- observations by Department members;
- witness interviews;
- interviews of admitted criminal street gang members; and
- information received from informants who have proven themselves to be reliable in the past.[29]

As enumerated in S.O. 10-02-03, identification of an individual as a criminal street gang member requires "probable cause...substantiated by the Department member's experience and knowledge of criminal street gangs and corroborated by specific, documented, and reliable information," including, but not limited to:

- the individual's admission of membership;

---

[26] For additional information on the various Bureaus and Divisions CPD described to OIG as involved in gang designations, tracking, and enforcement, see Appendix A.

[27] CPD's policies, also known as "directives," are called either "General Orders" or "Special Orders." Publicly available directives can be found at http://directives.chicagopolice.org/directives/.

[28] City of Chicago, Chicago Police Department, "S10-02-03 Gang and Narcotics-Related Enforcement," January 01, 2016, Section II, accessed February 1, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-d845218c69a1f912.html. Criteria for criminal street gang membership is also described in lesser detail in CPD's Gang Violence Reduction Strategy directive: City of Chicago, Chicago Police Department, "G10-01 Gang Violence Reduction Strategy," January 1, 2016, accessed February 1, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf.

[29] The order further states: "these are merely examples, and information for identifying a criminal street gang may be gathered from a variety of law enforcement sources or analyses." City of Chicago, Chicago Police Department, "S10-02-03 Gang and Narcotics-Related Enforcement," January 01, 2016, Section II, accessed February 1, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-d845218c69a1f912.html.

- the wearing of distinctive emblems, tattoos, or similar markings indicative of a specific criminal street gang;[30]
- the use of signals or symbols distinctive of a specific criminal street gang;
- identification of the individual as a member or affiliate of a specific criminal organization by an individual who has provided reliable information to the Department in the past and whose information can be independently corroborated; and
- identification of individuals as a member of a specific criminal organization by another Department member who has specialized knowledge and expertise concerning the subject criminal organization.[31]

Notably, these criteria do not require participation in criminal activity for an individual to be designated by CPD as a gang member.

In interviews with OIG, Department members indicated additional ways in which these designations may occur. Members stated that an officer may also designate an individual as a gang member when the individual is "in the company of" other individuals designated as gang members, or when officers observe what they believe to be gang signals, in person or on social media. In gang-related investigations, the Bureau of Organized Crime can use "raw intelligence" from Confidential Informants (CIs) and wiretaps to establish individuals as gang members.

Department members further indicated to OIG that CPD's criteria for identifying gang membership may be over-inclusive and less relevant to the landscape today. Members stated, "You can't use the direction of someone's hat anymore, people tip their hats as a fashion statement nowadays," "Even if an individual may bear the visible tattoos of one gang, he or she may have recently joined another gang," and "Color of clothing isn't as relevant today."

## DESIGNATION OF GEOGRAPHIC AREAS AS GANG-INVOLVED

The Department also designates areas as gang-involved, including identifying geographic boundaries of gang activity and gang territories in Chicago. According to CPD S.O. 10-02-02 "Selection of Designated Enforcement Areas," areas may be designated as gang-involved based on the following criteria:

---

[30]As per S.O. 10-02-03, "these criteria apply only when such emblems, tattoos, or similar markings would not reasonably be expected to be displayed by any individual except a member of that specific criminal street gang. Membership may not be established solely because an individual is wearing clothing available for sale to the general public."

[31] City of Chicago, Chicago Police Department, "S10-02-03 Gang and Narcotics-Related Enforcement," January 01, 2016, Section II, accessed February 1, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-d845218c69a1f912.html.

- analysis of crime;
- objective input from the executive officer, watch operations lieutenants, station supervisors, the district tactical lieutenant, and the CAPS sergeant;
- information from Beat Community Meeting;
- input from community members, local community-based organizations, and elected officials;
- personal observations;
- intelligence; and other verifiable statistical information.

In interviews with OIG, Department members stated that CPD may designate areas as gang-involved based on any of the following: the type of graffiti in the community, the number of gang-identified individuals living in the area, and CPD's understanding of the gang-related history in the area. Further, when designating an area as a gang "Hot Spot," the Bureau of Patrol will examine stops purportedly involving gang-related activity and the number of gang-related loitering citations previously issued in the area.

Once an area has been designated as gang-involved, CPD may deploy specific strategies to target gang members and activity in those areas. These strategies can include: Targeted Vehicle Enforcement, dispersing and/or arresting individuals believed to be gang members loitering with others believed to be gang members in the designated area, and "Gang Missions" that can include "aggressive patrol and violence suppression missions."[32]

Through CLEAR, Department members can access a module called "Caboodle," a map-based data visualization tool that allows CPD officers to look up gang boundaries and gang-identified individuals. People designated as gang members can be linked to areas designated as gang-involved.

## CPD's GANG-RELATED DATA TOOLS

Although often characterized as a uniform system, CPD's "gang database" rather consists of many forms and webpages contained in CLEAR, CPD databases external to CLEAR, paper files, and information captured by external entities. CPD does not have a single gang database.[33]

Designations of individuals and areas as gang-involved can appear in a number of places in CPD's data systems, and there are distinctions between where the information can be entered and searched, saved and reported, and visualized.

---

[32] See Appendix B for more information about these area-related strategies.
[33] See Appendix C for a diagram provided by CPD to OIG with the Department's depiction of relationships between various systems in which gang-related data exist.

## Citizen and Law Enforcement Analysis and Reporting (CLEAR)

The CLEAR system consists of transactional applications, a data warehouse, and visualization tools.[34]

The transactional applications (through which officers can enter and search for data) in CLEAR allow Department members to complete reports such as Tactical Response Reports and Investigatory Stop Reports, as well as search for completed reports. Each application is separate from every other application; therefore, Department members can search for information about individuals in each application, or through the search tool "Name Check." Name Check searches across several applications, including Investigative Alerts, Sex Offenders, Cases, Adult and Juvenile Arrests, Search Warrants, Illinois Department of Corrections (IDOC) Records, Adult and Juvenile Warrants, Traffic Stops, Tactical Response, Contact Cards, Missing Persons, and Inventories. Information entered into CLEAR applications by officers is automatically saved to CPD's data warehouse.[35]

CPD's data warehouse enables Department members to generate summary reports on aggregate data from CLEAR applications. The data entered into the applications and saved in the warehouse can then be utilized to generate reports regarding gang-related information, such as District Intelligence Bulletins. Further, information from the data warehouse is used to generate visualization tools.

Some visualization tools accessed through CLEAR allow Department members to view synthesized information—data from various applications in CLEAR and other Departmental forms that are connected and displayed. Two examples of CPD's gang-related visualization tools are Link Analysis and Caboodle; the former connects individuals with records of the crimes for which they were arrested as well as individuals with whom they were arrested, and the latter displays maps of areas designated as gang-involved as well as individuals designated as gang-involved, drawing on information generated during Gang Audits.[36] Caboodle also displays other information not specifically related to gangs, such as maps pertaining to block clubs, Safe Passage routes, and schools.

Unlike other gang-related tools, gang information displayed in Caboodle involves review processes relating to the Gang Audit. The Gang Audit is conducted periodically

---

[34] See Appendix D for images of select data points described below.

[35] The data warehouse includes a variety of data entered by CPD, not just gang-related data.

[36] Gang Audits are periodic assessments of gang boundaries and conflicts conducted by CPD personnel. City of Chicago, Chicago Police Department, "Gangs: Hour 4, Gang Identifiers – Resources and Strategies for Dealing with Gangs," 2014.

in each district.[37] During the Audit, Department members from several units complete the Gang Audit Questionnaire detailing the following district-specific information:

- gang names
- gang faction names
- territorial borders
- faction size
- criminal activity and documentation of such
- rivals and active conflicts
- alliances and active alliances
- organizational level
- violence level
- the most active or influential members of each faction[38]

To complete the Questionnaire, each district reviews the previous year's Audit to evaluate whether the conflicts, boundaries, members, and other components are still applicable—drawing on data sources such as Gang Arrest Cards, information from CIs, and subject-matter knowledge from Department members such as representatives from the Gang Investigations Division. According to interviews, once each district completes the Questionnaire, CPD's Deployment Operations Center (DOC) "verif[ies] the intelligence [and] work[s] in GIS[39] to ensure the maps properly represent the information" in the Caboodle visualization tool. DOC Gang Analysts verify the intelligence in the Questionnaire through examining information sources such as interviews, Contact Cards/Investigatory Stop Reports, reports of shots fired, and incidents.

In interviews, Department members frequently described Caboodle as "the closest thing to a gang database." Images of the Caboodle application, as well as a diagram of the Gang Audit process are provided below.

---

[37] According to Department directives, Gang Audits must occur at least once per year, but "more if necessary." Districts may also request Gang Audit Update Sessions to add or modify information from the yearly audits.

[38] According to Department directives, the following members must be present for each district's Gang Audit: District commander; district tactical team lieutenant; District Intelligence Officer; district members selected by the district commander based on their knowledge of gang activity in their districts; representatives from the Gang Enforcement Division, Narcotics Division, Gang Investigations Division, and Bureau of Organized Crime; and a crime analyst from the Deployment Operations Center. For images of the Gang Audit questionnaire, see Appendix D.

[39] GIS is mapping software.

## FIGURE 1: GANG AUDIT PROCESS



| District | → | DOC |

Review previous Gang Audit and evaluate new data using CIs, Department member expertise, Gang Arrest Cards, etc. → Complete Gang Audit Questionnaire → Review Questionnaire for accuracy using ISRs, incidents, interviews, etc. → Generate maps and ensure info is entered into Caboodle

## FIGURE 2: VISUALIZATION IN CABOODLE



## FIGURE 3: VISUALIZATION IN CABOODLE



### CPD Databases External to CLEAR, Paper Files, Information Captured by External Entities

There are several sources of gang information that exist outside of CLEAR. For example, CPD has an Administrative Message System where officers may send information to Department members, including messages about gang-related concerns—this system can be searched by keyword. This information may be documented in reports such as Officer Safety Alerts. In addition, the Information Report System houses Information Reports circulated internally within the Department that outline information about "police concerns," including gangs. Beyond these sources, CPD also collects gang-related information through contact with CIs, wire-tapping during investigations, and other mechanisms outside of CLEAR. Department interviews indicated that CPD has paper files regarding gangs

dating back to the 1900s.[40] Additionally, CPD has access to gang-related data generated by IDOC and other agencies.[41]

OIG's review of CPD directives, forms and documents, as well as interviews with Department members, revealed that CPD has collected, reported, and visualized gang-related data in at least 18 different forms, records or system of records throughout the past 10 years. However, according to interviews and Departmental responses to document requests, CPD does not know all of the places where gang-related data exist. See Appendix D for a list of locations where OIG determined gang information resides within CPD's information systems.

## VERIFICATION

When designating an individual as a gang member, CPD has limited processes for verifying the identity of the individual being designated, as well as for verifying the accuracy of the gang designation itself.

### Verified Identity

According to the Department, the only method through which an individual's identity can be verified—meaning that their identity has been established as unique, their own, and unable to be confused with that of anyone else's—is through fingerprinting, which typically occurs during an arrest. As such, as per Departmental interviews, the only gang-related data source where the identities of individuals are verified are Gang Arrest Cards, which are a section on the Arrest Report for designating an individual as a gang member. In all other interactions between CPD and community members where an individual may be designated as a gang member, the individual's identity is not verified. This means that an individual designated as a gang member during an Investigatory Stop, for example, who stated their name as "John Doe" may or may not be the same "John Doe" listed in a Gang Arrest Card, or the "John Doe" listed in another Investigatory Stop Report (ISR).

Further, according to the Department, between January 1997 and July 2018 there were 841,776 Contact Cards indicating gang affiliations and 524,676 Gang Arrest Cards. Because individuals were not fingerprinted—and may not have presented any form of identification—during Contact Card interactions, CPD is unable to determine whether each Contact Card was completed for a unique individual, and whether individuals recorded on the Contact Cards are the same as those recorded in Gang Arrest Cards. As a result of the lack of fingerprinting in every encounter in which gang

---

[40] The Department was unable to definitively report when CPD began tracking gangs. According to Departmental interviews, CPD may have started tracking gangs as early as the 1800s.
[41] See section *External Agencies Sharing Gang-Related Data with CPD* for more information on gang-related data shared with CPD by external agencies.

designations occur, the Department cannot definitively report how many unique individuals have been designated as gang members across all data collection methods. Further, the Department cannot ensure that gang designations collected without fingerprinting are used by CPD in relation to the actual individual featured in the designation, and not another individual with the same name and/or other characteristics.

## Verified Intelligence

CPD does not have any verification processes for ensuring the accuracy of gang membership designations, such as formal supervisory review of the designation, documentation of supporting evidence, or review by an expert in gangs.[42] CPD considers court documentation designating an individual as a gang member and "self-admission" to be verified intelligence.[43] However, interviews with both CPD and community members highlighted potential limitations in considering self-admission in particular as verified. For instance, interviewees reported that individuals may claim to be a member of a different gang than their actual affiliation, young people might experience peer-pressure to identify as a gang member even if uninvolved, and individuals may feel compelled by police to confess gang membership.

## RETENTION AND MODIFICATION

CPD forms, including forms where gang designations can appear, fall under the purview of the Illinois Local Records Act (LRA) and thus constitute public records. The LRA establishes that altering, concealing, and destroying these public records is illegal, except where permitted by law.[44]

Under the LRA, CPD must retain the public records for certain periods of time. After the retention period for the public records has elapsed, CPD may seek permission from The Local Records Commission of Cook County for the destruction of those records. Retention timeframes can range from "none," meaning that the Department does not have to retain the record, to "permanent," meaning that the Department must retain the record forever. Retention timeframes listed as "pending" have yet to

---

[42] Qualification as an expert can include, but is not limited to, receiving specialized trainings in gangs, experience in violence prevention, and academic expertise relating to gangs.

[43] In interviews, Department members stated that most individuals designated as gang members by CPD "self-admit."

[44] An example of a lawful destruction of records is when a juvenile record is expunged through a court order, or depending on the offense, automatically after a certain period of time elapses. The Juvenile Court Act states that "expunge" means "to physically destroy the records and to obliterate the minor's name from any official index or public record, or both." Similarly, an adult may seek expungement of certain arrest reports and/or convictions under the Illinois Criminal Identification Act. The LRA also states that if an individual is arrested and is later determined not to be the intended arrestee, the arrest report can be retracted or deleted altogether.

be determined by the Local Records Commission. If CPD is not required to retain a record permanently, the Department may legally destroy the record once the time required by the retention timeframe elapses and the Department has petitioned and received clearance from the Local Records Commission.[45] Further, CPD's directive S.O. 09-03-01 "Records Management" states: "records may be accumulated beyond the authorized retention period for an additional period of time not to exceed six police periods [months]."[46] According to interviews with CPD, this means that the Department, by its own policy, requires that records past their retention timeframe cannot be retained for more than six months.

In various previous versions of the retention schedule, CPD was required to retain Gang Arrest Cards between two and ten years. After this time elapsed, CPD could destroy these records with permission from the Local Records Commission. However, in the current retention schedule, Gang Arrest Cards are not listed.

According to CPD, if information in a form completed by a Department member is later determined to be inaccurate, such as an individual incorrectly designated as a gang member, the information can be changed through a court order. Beyond court orders, the Department addresses incorrect information by attaching a Supplementary Report to the original form. The Supplementary Report will describe which information in the original form was inaccurate.

## EXTERNAL AGENCY ACCESS AND AGREEMENTS

CPD shares gang-related data with agencies external to the Department, and also accesses gang-related data from external agencies.

### External Agencies with Access to Gang-Related Data in CLEAR

According to CPD, over 500 agencies external to CPD can access various sources of gang-related data in CLEAR.[47] Among others, these agencies include the Cook County Sheriff's Office, IDOC, CCSAO, Homeland Security/ICE, US Citizenship and Immigration, FBI Gang Intelligence Center, High Intensity Drug Trafficking Area, and US Customs and Border Protection-Chicago. CPD reported that all agencies must complete an application for access to CLEAR.[48] Each agency, once approved for

---

[45] Records cannot be destroyed if there is any pending or anticipated litigation, or other state, local, or federal requirements pertaining to the retention. According to Departmental interviews, CPD cannot currently destroy any records due to an order from DOJ relating to a specific case.

[46] CPD members indicated that "police periods" are synonymous with "months."

[47] For the list of external agencies with access to CLEAR provided by CPD to OIG, see Appendix E. According to Departmental interviews, agencies vary in the specific sources of CPD's gang information they can access.

[48] See Appendix F for the application for CLEAR access.

access, may have an unlimited number of users.[49] Beyond this initial application, CPD does not have any agreements with user agencies delineating the ways in which agencies use CLEAR data, including information on gang designations.[50]

OIG analyzed internal and external agency access to gang-related tables from January 1, 2009, through October 31, 2018, through the Gang Query Audit.[51] OIG's analysis of all gang-related queries of CPD's gang information revealed that over 35% of queries were conducted by external agencies.[52]

## TABLE 1: COUNT OF QUERIES BY AGENCY CLASSIFICATION

| Agency Classification | Number of Queries | % of Total |
|---|---|---|
| External Agency | 1,384,162 | 35.5% |
| Chicago Police Department | 2,512,109 | 64.5% |
| Grand Total | 3,896,271 | 100.0% |

*Table 1 displays the distribution of records based on agency classification. External agencies are defined as any agency that is not CPD.*

Outside of CPD, the some of the most frequent users of CPD's gang information include the Cook County Sheriff's Department, IDOC, and the FBI. The top ten external agencies represent approximately 92.3% of all external queries. The remaining 327 external agencies that ran queries accounted for less than 8% of all external queries. Over a quarter of external agencies that have run gang-related queries (27.8%) have averaged less than one query annually over the past ten years.

---

[49] Criteria for users include: "users must be full time criminal justice agency employees or certified as police officers in the State of their employment of the participating police department /criminal justice agency. Users must have no history of felony convictions: participating local criminal justice agencies in Illinois must submit a State of Illinois Identification (SID) Number for each user as evidence that a criminal history background check was previously conducted for an employee. Outside of Illinois each CLEAR user must be uniquely identified."

[50] The only limitation listed in the application is that "all inquiries [in the CLEAR system] must be for criminal justice purposes only." The application also enumerates mandatory security requirements and notes that "audits will be conducted to review usage by agencies and individuals authorized to make such inquires." However, the application does not indicate which agency will conduct such audits.

[51] CPD's Gang Query Audit tracks external gang-related queries: however, according to the Department it also tracks five other types of queries in applications that are not related to gangs. These applications were added to the list tracked by the Gang Query Audit after the Audit was created, for operational rather than strategic purposes. Non-gang-related applications include "Facility Information Management" and "Probationary Police Officer Evaluation Approvals." According to CPD, these queries unrelated to gang information account for less than 4% of external queries tracked by the Gang Query Audit.

[52] CPD reported over 500 external agencies with access to CLEAR. OIG's analysis found 337 agencies that have queried CPD's gang-related data in the past 10 years as tracked in the Gang Query Audit. Some of the 337 external agencies identified in OIG's analysis were not present in the list CPD provided to OIG.

There were seventeen agencies that ran only one gang related query during the entire period.

## TABLE 2: COUNT OF QUERIES FOR TOP 10 EXTERNAL AGENCIES

| Agency Name | Agency Type | Rank | Number of Queries | % of External | % of Total |
|---|---|---|---|---|---|
| COOK COUNTY SHERIFF | Criminal Apprehension & Booking System | 1 | 755,096 | 54.55% | 19.38% |
| ILLINOIS DEPARTMENT OF CORRECTIONS | Illinois Agencies Outside Chicago | 2 | 252,265 | 18.23% | 6.47% |
| CHICAGO PUBLIC SCHOOLS[53] | Chicago Public Schools | 3 | 87,302 | 6.31% | 2.24% |
| F.B.I. | Federal Agencies | 4 | 80,182 | 5.79% | 2.06% |
| COOK COUNTY ADULT PROB | Criminal Apprehension & Booking System | 5 | 37,368 | 2.70% | 0.96% |
| HOMELAND SECURITY / ICE | Illinois Agencies Outside Chicago | 6 | 17,269 | 1.25% | 0.44% |
| OFFICE OF EMERGENCY COMM. | Chicago Law Enforcement Agencies | 7 | 16,161 | 1.17% | 0.41% |
| USD HS / ICE – DRO | Federal Agencies | 8 | 12,201 | 0.88% | 0.31% |
| ILLINOIS STATE POLICE | Criminal Apprehension & Booking System | 9 | 10,224 | 0.74% | 0.26% |
| ALCOHOL TOBACCO AND FIREARMS | Alcohol Tobacco and Firearms | 10 | 10,093 | 0.73% | 0.26% |
| | | Grand Total | 1,278,161 | 92.34% | 32.80% |

*Table 2 displays external agencies with the highest number of queries.*

Collectively, immigration-related agencies accounted for over 32,000 or 2.3% of external agency queries over the analyzed period.

## TABLE 3: COUNT OF QUERIES FOR IMMIGRATION-RELATED AGENCIES

| Agency Name | Agency Type | Number of Queries | % of External | % of Total |
|---|---|---|---|---|
| HOMELAND SECURITY / ICE | Illinois Agencies Outside Chicago | 17,269 | 1.25% | 0.44% |
| USD HS / ICE - DRO | Federal Agencies | 12,201 | 0.88% | 0.31% |
| ICE / NCFIU | Illinois Agencies Outside Chicago | 2,467 | 0.18% | 0.06% |
| US CUSTOMS AND BORDER PROTECTION - CHICAGO | Federal Agencies | 234 | 0.02% | 0.01% |
| US CITIZENSHIP & IMMIGRATION | Federal Agencies | 53 | 0.00% | 0.00% |
| | Grand Total | 32,224 | 2.33% | 0.83% |

*Table 3 displays the number of queries run by immigration-related agencies over the time period.*

---

[53] OIG's analysis of external agency queries of CPD's gang information indicated that CPS constitutes 2% of external agency queries. However, CPS Safety and Security stated to OIG that CPS (including CPS Safety and Security) does not have access to CPD's gang information systems. Explanations for this difference may include automated reports that were previously established and continue to be transmitted but are not currently monitored or received by CPS.

### External Agencies Sharing Gang-Related Data with CPD

IDOC is mandated by law to record gang information, and the governing statute expressly allows IDOC to share that gang information with outside law enforcement agencies to assist in the investigation and prosecution of gang-related crime.[54] The IDOC Records Data Feed displays gang-related information captured by IDOC and shared with CPD.[55]

CPD also accesses the state-wide data system administered by the Illinois State Police, entitled the Law Enforcement Agencies Data System (LEADS). LEADS contains records of individuals identified as gang members by ISP and other law enforcement and criminal justice agencies throughout the state of Illinois, as well as other data.

## H.    POTENTIAL COLLATERAL CONSEQUENCES OF CPD'S GANG DESIGNATIONS[56]

CPD's gang designations may contribute to potential consequences in the areas of law enforcement, criminal justice, immigration, and employment.[57]

### LAW ENFORCEMENT

CPD's designation of an individual as a gang member may contribute to enhanced surveillance through gang-related strategies, as well as enrollment in law enforcement-related programs. CPD employs numerous strategies specifically targeting gangs and individuals designated as gang-involved including: Focused Deterrence, Gang Missions, Gang Loitering Ordinance Enforcement, Gang Investigations, Targeted Vehicle Enforcement, Area Gang Strategy Meetings, Parole Compliance Checks, the Gang Intervention Probation Program, and the Targeted Repeat Offender Apprehension and Prosecution Program. Two are described in brief below; for additional information on each of these strategies, see Appendix B.

Focused Deterrence, a component of CPD's "Gang Violence Reduction Strategy," involves partnerships between law enforcement officials, social service providers, and community members that deliver messages of "alternatives" and "swift, targeted enforcement" with respect to violence.[58] For areas designated as "Hot Spots," "High Level Gang Conflict Locations," and "Areas Associated with a Heightened Level of Violence," CPD may issue Gang Loitering Ordinance dispersal orders if two or more persons are loitering in the area and one of the people is a "known gang member."

---

[54] 730 ILCS 5/3-5-1(a)(10)

[55] According to CPD, the IDOC Data Feed contains gang information on individuals incarcerated at IDOC and is searchable in CLEAR.

[56] This assessment is not intended as an evaluation of the appropriateness of the consequences or the frequency at which such consequences are applied.

[57] For additional information on these potential consequences, see Appendix B.

[58] For additional information on Focused Deterrence, see Appendix B.

These dispersal orders can require that the individual not return to the specified area for 8 to 12 hours.[59] If individuals return within "sight or hearing" of the area, they can face imprisonment for not more than six months, a fine between $100 and $500, or both. Subsequent violations of dispersal orders can result in additional penalties.[60]

## CRIMINAL JUSTICE

Gang membership, gang designation in a database, or gang affiliation may have an effect on bail and bond, sentencing, sanctions, probation, prison, and parole.[61] The magnitude of any effect will vary based on the discretion of prosecutors introducing gang-related evidence, as well as the weight Courts give to any presented evidence. All gang information will need to satisfy the applicable admissibility standards, depending on the phase of the criminal proceeding, before it is accepted into evidence.

As with adults, information relating to gang membership could impact juveniles within the criminal justice system. Instead of a bond hearing, juveniles charged in juvenile court will appear before the Court for a formal reading of criminal charges and a "shelter-care hearing."[62] Designation as a known gang member by CPD may be offered as evidence in a shelter-care hearing for the Court to determine whether the juvenile will be detained or released with restrictions. Sentencing for a juvenile designated as a gang member could include an order that the juvenile undergo medical treatment to remove gang-related tattoos. Additionally, if a juvenile is sentenced to the Department of Juvenile Justice, certain restrictions will be placed on the juvenile once the juvenile is eligible for parole (called "aftercare"). One of those restrictions requires that the juvenile does not associate with persons who are "members of organized gangs."

## IMMIGRATION

According to Chicago's Welcoming City Ordinance, City agencies[63] are prohibited from: making threats based on citizenship or immigration status; conditioning benefits, services, or opportunities on immigrant status; and arresting or detaining individuals based solely on civil immigration violations. The ordinance and CPD directives also state that unless there is a legitimate law enforcement purpose, unrelated to civil immigration enforcement, no Department member shall permit

---

[59] The amount of time depends on the classification of the area—areas designated as Heightened Level of Violence are 12-hour dispersal areas. In all other circumstances, the dispersal period is eight hours.
[60] For additional information on dispersals, see Appendix B.
[61] For additional information on potential criminal justice consequences, see Appendix B.
[62] For additional information on shelter-care hearings, see Appendix B.
[63] According to the ordinance, "agency" means "every City department, agency, division, commission, council, committee, board, other body, or person established by authority of an ordinance, executive order, or City Council order." City of Chicago, Municipal Code, § 2-173.

Immigration and Customs Enforcement (ICE)[64] agents access to individuals being detained or in the custody of CPD, permit ICE agents to use Departmental facilities for investigations, or expend time on duty responding to ICE inquiries about an individual's custody status or release date. However, both the ordinance and CPD's directives exclude these protections from certain classes of individuals, including individuals "identified as a known gang member either in a law enforcement agency's database or by [their] own admission."[65]

Gang designations by CPD may also contribute to obstacles for individuals seeking immigration relief through Deferred Action for Childhood Arrivals (DACA) and U-Visas. DACA allows approved individuals who are undocumented and were brought to the US as children to remain in the US for a period of two years, during which time the individual is also eligible for work authorization. U-Visas allow individuals who are undocumented and have been victims of certain crimes,[66] and who "were helpful, are helpful, or are likely to be helpful" in the investigation or prosecution of the crimes, to remain in the US and receive work authorization.[67] After three years with a U-Visa, individuals may pursue a green card for permanent residency and eventually, full US citizenship. According to US Citizenship and Immigration Services, individuals may be denied authorization because they are considered a "threat to national security or public safety" for which "indicators" include gang membership.[68]

## EMPLOYMENT

According to interviews with CPD, CPD's gang designations do not appear on employment-related background checks unless the individual is applying to work for CPD. Further, according to interviews with the Illinois State Police (ISP), background checks conducted by ISP do not include any gang designations unless the individual is applying to work for a criminal justice agency. OIG did not evaluate the validity of

---

[64] ICE is a federal agency that investigates, identifies, apprehends, detains and deports individuals who may be undocumented in the United States.

[65] MCC § 2-173-042-(c)-(4)

[66] Qualifying crimes include: "Abduction, Abusive Sexual Contact, Blackmail, Domestic Violence, Extortion, False Imprisonment, Female Genital Mutilation, Felonious Assault, Fraud in Foreign Labor Contracting, Hostage, Incest, Involuntary Servitude, Kidnapping, Manslaughter, Murder, Obstruction of Justice, Peonage, Perjury, Prostitution, Rape, Sexual Assault, Sexual Exploitation, Slave Trade, Stalking, Torture, Trafficking, Witness Tampering, Unlawful Criminal Restraint, and Other Related Crimes." United States Department of Homeland Security, "U Visa Law Enforcement Certification Resource Guide for Federal, State, Local, Tribal and Territorial Law Enforcement," p. 3, accessed February 1, 2019, https://www.dhs.gov/xlibrary/assets/dhs_u_visa_certification_guide.pdf.

[67] United States Department of Homeland Security, "U Visa Law Enforcement Certification Resource Guide for Federal, State, Local, Tribal and Territorial Law Enforcement," p. 2, accessed February 1, 2019, https://www.dhs.gov/xlibrary/assets/dhs_u_visa_certification_guide.pdf.

[68] United States Citizenship and Immigration Services, "Consideration of Deferred Action for Childhood Arrivals (DACA)," accessed February 1, 2019, https://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca.

claims by CPD and ISP that gang information does not appear on employment- and licensure-related background checks for non-criminal justice occupations. Further, although gang information according to CPD and ISP does not appear on background checks for non-criminal justice employment queries, criminal charges do appear on background checks. Some criminal charges include allegations of gang relationships, such as "Unlawful Possession of a Firearm by a Street Gang Member" (720 ILCS 5/24-1.8), "Obstructing Justice in Furtherance of Gang Related Activity (720 ILCS 5/31-4(b)(2))," and "Streetgang Criminal Drug Conspiracy (720 ILCS 570/405.2)."

CPD considers gang information when an individual is applying for a position with the Department. CPD's Bureau of Organizational Development directive S.O. 18-01 "Pre-Employment Disqualification Standards for Applicants for the Position of Police Officer" states, "An applicant who is a member or affiliate of any criminal organization, including but not limited to a street gang, will be found unsuitable for employment [with CPD]. Prior membership in a criminal organization may be grounds for disqualification. An applicant who is a former member or affiliate of a criminal organization will be required to produce acceptable evidence to show that the membership in or affiliation with the criminal organization ceased for a period of five (5) years...and that the applicant has no current membership or affiliation with any criminal organization at the time of processing or hire."[69] When an individual applies to work for the Department in a civilian or sworn position, CPD and/or vendors involved in the Department's hiring process will search CPD databases for gang designations relating to the individual—including sources the Department considers "unverified,"[70] to determine eligibility for employment at CPD.[71]

---

[69] Although CPD does not have specific policies on the requirements for individuals to establish that their "membership...ceased for a period of five (5) years," CPD provided the following potential sources of evidence: references, no record of criminal activity in the required timeframe, and verification from the candidate. For more, see City of Chicago, Chicago Police Department, "Background Investigation for Prospective Applicants," accessed February 1, 2019, https://home.chicagopolice.org/wp-content/uploads/2017/01/BackgroundInvestigationForProspectiveApplicants.pdf.

[70] Department members involved in hiring described gang designations as "only as good as the people putting [the data] in," and emphasized the need for deeper investigations into the data prior to determining whether an applicant qualifies for employment. According to Departmental interviews, employment investigators will follow up with both the officers who generated gang-related data and the applicant regarding the designation.

[71] CPD emphasized that hiring background investigations related to any alleged gang membership involve discretion and examining the totality of the circumstances. CPD further stated that candidates may be determined unsuitable for employment based on their association with others identified as gang members. As an example, Department members stated that court-ordered visits between a candidate and an individual designated as a gang member may not disqualify the candidate from employment, but ongoing "association" without a court order could result in disqualification. If an applicant is denied employment with CPD, including based on gang designations, the applicant can appeal the denial with the Human Resources Board.

# IV.  DATA ANALYSIS

## A.  GANG ARREST CARDS

When an officer arrests an individual and believes the individual is a member of a gang, the officer may complete a Gang Arrest Card in the Arrest Report. Although gang-related data can be captured, reported, and visualized in at least 18 CPD forms and systems, OIG analyzed Gang Arrest Cards because CPD has previously released these data to the public with respect to gang designations, and because fingerprinting during arrest allows for the identification of unique individuals.

The Department was unable to report to OIG when it began collecting Gang Arrest Cards, but the earliest Directive provided to OIG featuring Gang Arrest Cards was issued in 1997. According to the Department, CPD switched from paper Gang Arrest Card forms to electronic Gang Arrest Card forms in 2004.[72]

In the course of completing this review, OIG analyzed gang designations captured in Gang Arrest Cards from January 1, 1997, through November 7, 2018. During this time period, 134,242 individuals were designated as gang members on 523,075 Gang Arrest Cards.[73]

---

[72] For an image of the electronic Gang Arrest Card, see Appendix D.

[73] OIG used the employment status indicated for first arresting officers and determined that 4.0% of the 523,075 Gang Arrest Cards analyzed for this report may not have been completed by CPD officers. According to CPD, some law enforcement agencies in Cook County enter Arrest Reports and accompanying Gang Arrest Cards in CPD's CLEAR system.

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

## FIGURE 4: NUMBER OF RECORDS AND INDIVIDUALS IN GANG ARREST DATA FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



The top graph in Figure 4 above represents the number of Gang Arrest Cards completed by CPD officers from January 1, 1997, through November 7, 2018. In that time period CPD completed 523,075 Gang Arrest Cards. The number of Gang Arrest Cards completed by CPD peaked in 2013 with the Department completing 48,245 Gang Arrest Cards.

The bottom graph represents the number of new individuals (those who had never previously been designated as gang members in Gang Arrest Cards) CPD designated as gang members on a Gang Arrest Card. From January 1, 1997, through November 7, 2018, CPD has designated 134,242 individuals as gang members in Gang Arrest Cards.

CPD's annual classification of new individuals as gang members in Gang Arrest Cards peaked in 2006 with 17,209 new individuals, yet the number of Gang Arrest Cards completed continued to rise in subsequent years peaking at 48,245 in 2013, when the number of new individuals designated was 6,473. This indicates that CPD continued to issue Gang Arrest Cards for the same individuals who were previously designated in Gang Arrest Cards.

## FIGURE 5: GENDER OF INDIVIDUALS DESIGNATED AS GANG MEMBERS BY CPD FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



CPD classifies individuals by gender using the following categories: "Female," "Male," and "Gender Unknown." OIG utilized "Inconclusive Gender Classification" when an individual's gender could not be determined through CPD's data.[74] Figure 5 above shows the gender (as determined by CPD officers at the time of the arrest) of individuals designated as gang members. According to these data, males account for 95.9% of all individuals designated by CPD as gang members in Gang Arrest Cards.

---

[74] OIG calculated how many records an individual had associated with multiple gender classifications. Then the most frequently used gender classification was assigned to that individual. The aforementioned method classified the gender of 798 individuals, approximately 0.6% of the total number of individuals. In the case of a tie, an individual was not given a gender classification. There was a total of 105 individuals that had received an inconclusive gender classification, approximately 0.1% of the total number of individuals. Gender classifications were validated using random selection and CLEAR data.

## FIGURE 6: RACE OF INDIVIDUALS DESIGNATED AS GANG MEMBERS BY CPD FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



| Race | Count of Individuals | % of Total |
|---|---|---|
| Black or African American | 93,704 | 69.8% |
| Latinx | 33,812 | 25.2% |
| White | 5,348 | 4.0% |
| Inconclusive Race Classification | 1,021 | 0.8% |
| Asian or Pacific Islander | 247 | 0.2% |
| Race Unknown | 59 | 0.0% |
| American Indian or Alaskan Native | 51 | 0.0% |
| Grand Total | 134,242 | 100.0% |

CPD classifies individuals by race using the following categories: "American Indian/Alaskan Native," "Asian/Pacific Islander," "Black," "White Hispanic," "Black Hispanic," "White," and "Race Unknown." For the analyses, OIG utilized these categories as such: "American Indian or Alaskan Native," "Asian or Pacific Islander," "Black or African American," "Latinx," and "White."[75] OIG utilized "Inconclusive Race Classification" when an individual's race could not be determined through CPD's data.[76]

As depicted in Figure 6 above, Black or African-American and Latinx individuals combined make up 95% of the 134,242 individuals who have been designated as gang members by CPD at the time of arrest. The Census estimates individuals identifying as "Black or African American alone" constitute 30.5% of the population in Chicago.[77] Individuals classified as Black or African American by CPD constitute 69.8% of those

---

[75] "Black" was reclassified as "Black or African American," as "African American" was not originally captured and those individuals that identify as such are often designated as "Black." "White Hispanic" and "Black Hispanic" were combined into "Latinx," a gender-neutral term for Latino/a, or an individual of Latin American descent.

[76] OIG calculated how many records an individual had associated with multiple race classifications. Then the most frequently used race classification was assigned to that individual. The aforementioned method classified the race of 5,212 individuals, approximately 3.9% of the total number of individuals. However, in the case of a tie, an individual was not given a race classification. There was a total of 1,021 individuals that had an inconclusive race classification, approximately 0.8% of the total number of individuals. Race classifications were validating using random selection and CLEAR data.

[77] "Quick Facts Chicago city, Illinois," United States Census Bureau, accessed February 4, 2019, https://www.census.gov/quickfacts/fact/table/chicagocityillinois/PST045217#PST045217.

identified as gang members in Gang Arrest Cards.[78] Individuals identifying as "White alone, not Hispanic or Latino" as per the Census constitute 32.7% of the population in Chicago and 4.0% of those identified as gang members in Gang Arrest Cards. [79]

Black or African American and Latinx males accounted for 91.3% of all individuals designated as gang members in Gang Arrest Cards.

## FIGURE 7: COUNT OF GANG ARREST CARD ARRESTS BY RACE OF ARRESTEE AND YEAR[80]



Figure 7 above depicts the number of Gang Arrest Cards per year, disaggregated by race.[81] Whereas arrests with associated Gang Arrest Cards decreased steadily over the time period for Latinx and White individuals, arrests of Black or African American individuals with associated Gang Arrest Cards peaked in 2013 while arrests for other groups continued to decline.

---

[78] The Census estimates individuals identifying as "Hispanic or Latino" constitute 29.0% of the population of Chicago. Individuals categorized as either "White Hispanic" or "Black Hispanic" by CPD constitute 25.2% of those identified as gang members in Gang Arrest Cards.
[79] "Quick Facts Chicago city, Illinois," United States Census Bureau, accessed February 4, 2019, https://www.census.gov/quickfacts/fact/table/chicagocityillinois/PST045217#PST045217.
[80] This graph excludes arrestees with no valid IR number, along with those classified as American Indian or Alaskan Native, Asian or Pacific Islander, Race Unknown, and Inconclusive Race Classification.
[81] Whereas other figures in this section span January 1, 1997-November 7, 2018, this graph spans January 1, 2009-October 31, 2018. These data were analyzed in conjunction with Gang Arrest Card allegations, for which the timespan was January 1, 2009-October 31, 2018.

## FIGURE 8: AGE AT FIRST ARREST WITH GANG ARREST CARD FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



Figure 8 above displays the ages of individuals listed at first arrest with an associated Gang Arrest Card.[82] The most frequent age for first arrest with a gang designation in Gang Arrest Cards was 17. The data show that most of those who were designated as gang members by CPD were designated as such for the first time between the ages of 18 and 31.[83] CPD has no minimum age for designating an individual as a gang member; 25% of individuals designated as gang members by CPD were under 18 when they were first designated as a gang member on a Gang Arrest Card.

There is no exit or end time for individuals designated as gang members in Gang Arrest Cards.[84] Therefore, the longest an individual could be designated as a gang member in this analysis is 21 years, as that is the difference from the start time of the analysis in 1997 to the end time of the analysis in 2018. Within this dataset, the average

---

[82] OIG used two methods to determine date of birth when inconsistent. The first method, similar to race and gender classification in previous steps, was based on the number of records associated with the individual's date of birth. OIG calculated how many records an individual had associated with multiple dates of birth. Then the most frequently used date of birth was assigned to that individual. The aforementioned method determined 18,161 individual's dates of birth, approximately 13.5% of the total number of individuals. In the case of a tie, OIG used a new method to determine the individual's date of birth. If the minimum and maximum dates of birth were less than or equal to 365 days, then the median date was assigned to that individual. There were 2,298 individuals that were assigned dates of birth using this method, approximately 1.7% of the total number of individuals. If the minimum and maximum dates of birth were greater than 365 days, then the individual was assigned an NA value. Overall, there were 922 individuals that did not get an assigned date of birth, 0.7% of the total number of individuals. Dates of birth generated from this step were validated using random selection and CLEAR data.

[83] Although 17 is the most frequent age for designation in Gang Arrest Cards, the largest share of ages designated at first arrest with a Gang Arrest Card falls between 18 and 31.

[84] CPD members reported to OIG that it may be possible to remove a gang designation if the entire record on which the designation appears is expunged through the Courts.

number of years for which individuals have been designated gang members is 10 years. One person who was first designated in Gang Arrest Cards when they were 9 years old has carried this designation for 19 years. One person who was first designated in Gang Arrest Cards when they were 75-years-old has carried this designation for 10 years—this person is now 85 years old. There are 4,029 persons aged 50 and above currently designated as gang members.

## FIGURE 9: RACE AND AGE OF INDIVIDUALS DESIGNATED AS GANG MEMBERS BY CPD FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



Figure 9 above depicts both the age and race listed at first arrest with an associated Gang Arrest Card. The data show that individuals ages 10 through 29 who were designated as Black or African American and Latinx accounted for 90,802 individuals, approximately 67.6% of the total number of individuals in the Gang Arrest Cards data. Black or African American and Latinx individuals are designated at both younger and older ages than White individuals in Gang Arrest Cards.

Case: 1:21-cv-01640 Document #: 4-6 Filed: 03/26/21 Page 45 of 165 PageID #:446

## FIGURE 10: COUNT OF GANG MEMBERSHIP(S) OF INDIVIDUALS DESIGNATED AS GANG MEMBERS BY CPD FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



Fig. 10 provides a visualization of OIG's analysis of the publicly stated stakeholder perception that some individuals had been listed as members of multiple and/or rival gangs. OIG's data analysis revealed that 18.7% of individuals designated as gang members were listed as members of multiple gangs. For example, one individual has been classified as a member of nine different gangs, and according to CPD's own training materials several of these groups are rivals of each other.[85] While it is possible that individuals have been members of multiple gangs, OIG was unable to determine from the data why individuals have been listed as members of multiple gangs and whether any of those designations are accurate or inaccurate.

Notably, OIG found that another 11.3% of individuals had no gang membership listed in any of the Gang Arrest Cards assigned to them, despite being designated as a gang member. Of 134,242 individuals, 15,174 were classified as gang members, but with no gang listed for which they were a member—the second largest "gang" to which individuals are assigned as members is "blank."

---

[85] The groups included: "VICE LORDS, GANGSTER STONES, GANGSTER DISCIPLES, BLACK P STONES, CONSERVATIVE VICE LORDS, UNKNOWN VICE LORDS, EL RUKNS, BLACK DISCIPLES, MAFIA INSANE VICE LORDS."

## TABLE 4: COUNT OF REASON GIVEN FOR GANG DESIGNATIONS FROM JANUARY 1, 1997 – NOVEMBER 7, 2018

| Designation Description | Designation Type | Count of Individuals | % of Total |
|---|---|---|---|
| Multiple Reasons for Gang Designations | CLOTHING & SELF | 1 | 0.00% |
| | CLOTHING, TATTOO, & SELF | 1 | 0.00% |
| | SIGNS & SELF | 2 | 0.00% |
| | TATTOO & SELF | 221 | 0.16% |
| | Total | 225 | 0.17% |
| No Reason for Gang Designation | | 15,648 | 11.66% |
| | Total | 15,648 | 11.66% |
| Self Admission Gang Designation | SELF | 118,369 | 88.18% |
| | Total | 118,369 | 88.18% |
| Grand Total | | 134,242 | 100.00% |

The above table depicts the reason an individual was assigned a gang designation, as indicated by the officer making the designation. There were 15,648 individuals for which CPD has never listed a reason for gang designation during arrest in any Gang Arrest Card, 11.7% of the total. Further, there were 24,151 Gang Arrest Card records where there was no reason for designation listed. Less than 0.2% of the individuals had multiple reasons for a gang designation. The remaining 118,369 individuals self-identified as gang members according to the officer who made the designation. Alleged "self-admission" comprised 88.2% of all designations in the Gang Arrest Cards data.

## FIGURE 11: GANG ARREST CARDS PER INDIVIDUAL AND RACE FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



Fig. 11 above depicts the number of Gang Arrest Cards per individual, broken down by race. The number of Gang Arrest Cards per individual ranges from one to 82. Whereas individuals identified as White constitute 4.0% of those designated as gang members in Gang Arrest Cards, they accounted for 6.2% of those with only one Gang Arrest Card and 2.8% of those with more than one Gang Arrest Card. 35 White individuals have 20 or more Gang Arrest Cards (2.0% of those with more than 20), whereas 1,772 Black or African American/Latinx individuals have 20 or more Gang Arrest Cards (97.8% of those with more than 20). Further, 97.6% of Black or African American/Latinx individuals in the dataset have five or more cards. 2.2% of White individuals have five or more cards.

## FIGURE 12: GANG ARREST CARDS BY COMMUNITY AREA OF ARREST FROM JANUARY 1, 1997 – NOVEMBER 7, 2018



Fig. 12 above maps arrests documented with a Gang Arrest Card by community area. The lowest number of Gang Arrest Cards produced in any single community area was 27 and the highest was 46,093. On average, 6,290 Gang Arrest Cards were produced in each community area. In 47 of the 77 community areas, the Gang Arrest Cards completed by CPD in each area account for less than 1% of the total respectively. In

contrast the top 13 of the 77 community areas account for over 50% of locations of Gang Arrest Cards produced. All 13 of these community areas are on the South and West Sides of Chicago. Austin, the community area with the highest concentration of Gang Arrest Cards produced, carries 8.8% of Gang Arrest Cards alone. Austin, North Lawndale, Humboldt Park, and South Lawndale collectively account for approximately 24% of all Gang Arrest Cards produced.[86]

## GANG ARREST CARD ALLEGATIONS

The data analysis in this section examines arrests for which there is an associated Gang Arrest Card, and the corresponding arrest charges.[87] Arrest charges predominately fall within three large groups: felonies, misdemeanors, and petty offenses/ordinance violations. Felony charges are based on serious or violent crime and are further divided according to the statutory severity of the crime. Misdemeanors are generally low-level crimes and are not as serious, either in nature or impact, as felonies. Lastly, petty offenses and ordinance violations are the least serious group of charges. Generally, an arrestee will be fined if found in violation of a petty offense or ordinance provision. For more information on the various levels of criminal charges, see Appendix G.

OIG analyzed 10 years of Gang Arrest Card data, from January 1, 2009, through October 31, 2018. During this timeframe, there were 363,688 arrests with associated Gang Arrest Cards. The following table shows the number of Gang Arrest Cards issued, organized by the highest severity charge during the arrest, and presented in descending order of frequency.[88]

---

[86] To review the Gang Arrest Card counts of individual community areas, refer to Appendix H.
[87] The charges listed on an arrest report and used in the data analysis are charges that CPD determined to be the most appropriate. It is ultimately the responsibility of those in the Cook County State's Attorney's Office (CCSAO) to determine the charges to prosecute. This analysis does not examine the charging decisions of CCSAO or the outcomes of any prosecutions stemming from an arrest.
[88] In a single arrest, an individual may be charged with multiple offenses. If an individual was charged with multiple offenses, OIG utilized the highest severity charge among all listed.

## TABLE 5: ALL ARRESTS WITH ASSOCIATED GANG ARREST CARDS BY ARREST SEVERITY DESCRIPTION RANKED BY ARREST COUNT FROM JANUARY 1, 2009 – OCTOBER 31, 2018

| Arrest Severity Description | Distinct count of Arrest ID | % of Total |
|---|---|---|
| Class A Misdemeanor | 108,628 | 29.87% |
| Unknown | 60,617 | 16.67% |
| Class 4 Felony | 47,115 | 12.95% |
| Business/Petty/Local | 37,517 | 10.32% |
| Class B Misdemeanor | 36,232 | 9.96% |
| Class C Misdemeanor | 19,079 | 5.25% |
| Class 2 Felony | 16,800 | 4.62% |
| Class X Felony | 14,005 | 3.85% |
| Class 3 Felony | 12,132 | 3.34% |
| Class 1 Felony | 9,546 | 2.62% |
| Class Murder | 2,017 | 0.55% |
| Grand Total | 363,688 | 100.00% |

OIG found that Gang Arrest Cards most frequently had a Class A Misdemeanor as the highest severity charge, 29.9% of Cards issued. Examples of Class A Misdemeanors include minor drug-related charges as well as reckless conduct, disorderly conduct, gambling on the street, and gang contact by a parolee.[89]

---

[89] The category of "Unknown" is listed in CPD's system, and largely consists of arrests based on warrants.

# V.　FINDINGS

## A.　CPD LACKS SUFFICIENT CONTROLS IN GENERATING, MAINTAINING, AND SHARING GANG-RELATED DATA

### GENERATION OF GANG-RELATED DATA

The Department lacks sufficient controls in the generation of gang-related data with respect to training, criteria, evidence, supervisory review, and the ability to correct inaccurate information.

Department members reported to OIG that CPD's current training on gangs is "out of date" and needs to be "better." Further, sections specializing in gangs such as the Gang Investigations Division receive no additional internal training from CPD on gangs beyond the six hours all recruits receive at the Training Academy. Department members reported to OIG that they receive no training from CPD on the "nuances of gang identification and enforcement." The failure to properly train officers on the complex and evolving landscape of gang activity increases the risk of inaccurate gang designations and may undermine the effectiveness of gang-related enforcement.

Although CPD focuses specifically on criminal gangs, the criteria for identifying an individual as a member of a gang do not require any documented criminal activity. As previously noted, although Gang Arrest Cards produced during an arrest are one way in which individuals can be designated as gang members, other membership designations that appear on ISRs and Contact Cards do not require arrest or criminal activity. This raises questions about whether CPD's criteria for gang membership is sufficiently tailored to achieve the Department's goal of addressing criminal gangs, as well as the collateral impact of designating individuals as gang-involved despite an absence of criminal behavior.

CPD does not require Department members to provide evidence[90] in support of a gang designation, which increases the likelihood that gang designations are assigned without sufficient justification and leaves CPD members vulnerable to accusations of inaccuracy or bias.

Once a gang designation is documented, CPD does not require any formal review or approval of the accuracy of the membership designation by a supervisor or Department member with subject matter expertise.[91] This inhibits quality assurance and accountability.

---

[90] Department members stated that an officer's signature on an Arrest Report or ISR could be considered "evidence" to support the gang designation.
[91] While the Gang Audit process includes additional review, the initial application of gang designations does not.

CPD currently does not have any internal mechanism to alter incorrect information—such as an inaccurate gang designation—or to delete this information. The only internal tool to indicate that information is incorrect is the attachment of a Supplementary Report to the original report, but the original gang designation, for example, would not be modified or deleted through this method.[92] Regarding deletion, CPD members reported to OIG that, "Currently there is no way to have gang affiliation removed from Department records, unless the entire record for the individual is expunged through the courts." The lack of these internal mechanisms prevents the Department from correcting or removing invalid or out-of-date designations, enabling inaccurate designations to follow individuals permanently.

Moreover, although some prior gang-related data tools are no longer authorized, reports from the Department indicate that they are still in use. For example, CPD ceased utilizing Contact Cards on January 1, 2016, yet individuals were designated as gang members 1,241 times on Contact Cards since this date—including 186 times between January 1, 2018, and July 2, 2018. Therefore, individuals may be continuing to receive gang designations through mechanisms no longer permitted by CPD.

As a result of these insufficient controls, CPD is unable to confirm that all of its gang designations are accurate and up-to-date, nor can they confirm the utility for the Department's mission to address criminal activity. In addition, the Department is unable to ensure that CPD members designate individuals as gang members with sufficient cause.

## MAINTENANCE OF GANG-RELATED DATA

The Department also lacks sufficient controls in the maintenance of gang-related data, including a complete inventory of all forms, records, and system of records where gang information is and can be recorded, reported, and visualized. The Department was unable to provide data system diagrams depicting the relationships between various gang-related data. Further, in interviews with OIG, Department members were unaware of certain records retention requirements, and CPD may be out of compliance with its own policies regarding retention.

The Department was unable to provide a complete list of all of the various forms, records, and systems of records in which gang information can be recorded, reported, and visualized in the last 10 years. This raises concerns about the Department's quality control of gang-related data, its ability to produce all relevant gang-related documentation for FOIA requests and litigation, and its capacity to ensure that all

---

[92] According to interviews with CPD, Courts may mandate that CPD modify original reports—a process external to CPD.

gang-related data collection tools serve a legitimate law enforcement purpose and are used appropriately.

Additionally, the Department does not have any data flow diagrams or entity relationship diagrams displaying the relationships between tables and variables for gang-related data. This inhibits the Department's ability to report on the ways in which originating gang designations may feed into reports, maps, linking tools, and other databases, as well as its capacity to ensure that if an originating record is modified or deleted, this change is implemented in all places where the data from this record exist.[93] For example, such diagrams could be used to assess whether a change made to a Gang Arrest Card is then reflected in Caboodle, where this information can be visualized.

CPD additionally maintains gang information for long periods of time despite state records retention laws that allow such information to be destroyed and Departmental policies requiring this destruction, and does not have finalized retention timeframes for several forms on which gang designations can appear.[94] In interviews, Department members stated that they had "never heard of" the provision in CPD's S.O. 09-03-01 requiring that records past their retention timeframe cannot be retained for more than six months, and articulated that CPD "doesn't throw anything [any records] away." As such, the Department cannot ensure that records containing gang-related data are retained for appropriate amounts of time and may be in violation of its own policy to destroy records no more than six months past their retention timeframe.

## SHARING OF GANG-RELATED DATA

The Department further lacks sufficient controls in sharing gang-related data, including a lack of a definitive list of all external agencies with access to gang-related information; clear, signed agreements delineating the ways in which external agencies may use the data; and strong accountability mechanisms to ensure fidelity to these agreements.

The Department was unable to provide OIG with a comprehensive list of all external agencies with access to gang-related information.[95] OIG's analysis of external agencies with access to gang-related information in CLEAR revealed external agencies with access that CPD did not disclose to OIG, and the Department was unable to explain why the list provided to OIG was incomplete. This raises serious concerns about the

---

[93] According to CPD interviews, the only mechanism currently for a gang designation to be modified or deleted is through the Courts.

[94] For example, the Gang Audit Questionnaire and the Hot Spot Designation Application are listed as "pending."

[95] To view the list of external agencies with access to CLEAR that CPD provided to OIG, see Appendix E.

Department's control over external agency access and its capacity to monitor the use of CPD's gang information by external agencies.

For external agencies with access to CPD's gang-related data, the Department has no agreements clearly delineating criteria for appropriate use of such data. Specific to data in CLEAR, CPD has no agreements beyond the initial application, which only provides broadly that the information be used for "law enforcement purposes." Beyond examining audit trails of information access for excessive use, the Department does not have any mechanisms in place to ensure that all external agencies use gang-related data for a legitimate law enforcement purpose.

CPD's own directive General Order (G.O.) 09-01-01 "Access to Computerized Data, Dissemination and Retention of Computerized Data" mandates that external agencies with access to CPD databases must agree to be in compliance with 28 Code of Federal Regulations (CFR) Part 23—a guideline for law enforcement agencies operating federally funded multi-jurisdictional criminal intelligence systems.[96] 28 CFR Part 23 dictates the ways in which these systems must be operated to protect privacy rights and civil liberties relating to the collection, storage, and dissemination of criminal intelligence information; this includes provisions such as regular review and purging of data. According to G.O. 09-01-01, violations of the regulations imposed by 28 CFR Part 23 are subject to monetary fines of $11,000 per violation. Currently, the application for external agencies to receive CLEAR access does not mandate adherence to 28 CFR Part 23. In addition, the application does not require that external agencies or users receive training "in the proper use of the interface tool(s) and issues involving 28 CFR compliance," as required by G.O. 09-01-01.

Taken together, these insufficient controls inhibit CPD's ability to hold external agencies accountable for their use of gang-related data.

## B.  CPD'S GANG INFORMATION PRACTICES LACK PROCEDURAL FAIRNESS PROTECTIONS

The Department lacks procedural fairness protections, including processes to notify, appeal, review, and purge relating to gang designations, that could reduce the frequency and potential harms of inaccurate designations.

CPD provides no notifications to individuals regarding their gang designations. Even if individuals become aware of the gang designation assigned to them by CPD, the Department has no processes by which an individual may contest or appeal this designation. In interviews with the Department about potential future changes in

---

[96] According to Departmental interviews, CPD receives federal funding to "increase information-sharing via CLEAR."

CPD's gang-related strategies, CPD members stated "it is important for law enforcement purposes that [gang-related] information is accurate, so the Department wants people to challenge their [designation]" and "we want people to challenge their [gang designation]...because if a person has been included incorrectly they should be removed, making the information more accurate and thus stronger."

The Department has no process for regularly examining gang designations for their continued applicability and retention. Further, the Department has no process for purging gang designations, including those that were applied decades ago and may no longer be valid. There have been 57 individuals classified as gang members for 21 years based on Gang Arrest Cards. These individuals were first classified as gang members in 1997, the earliest year of OIG's analysis.

CPD's lack of procedural fairness protections in relation to gang information inhibits the Department's ability to maintain accurate information and potentially undermines public confidence in the Department's efforts to promote public safety.

## C.    CPD'S GANG ARREST CARDS RAISE SIGNIFICANT DATA QUALITY CONCERNS

Throughout OIG's review, Department members described CPD's gang-related data as "squishy" and characterized various sources as "seldom used." Regarding ISRs specifically, Department members described gang-related data captured on these forms as "not legit," containing "too many discrepancies," and "unverified." According to the Department, many gang-related data sources "started and then dropped off," were "collapsed," and include "older data from a previous system added into a new model."

In the course of OIG's analysis of various CPD data sources relating to gangs, OIG discovered a variety of data quality concerns. According to CPD, data in Gang Arrest Cards—which are completed when an individual is arrested by CPD—contain the most reliable information. This is because individuals are fingerprinted during the arrest process and as such their identity is verified and cannot be confused with that of anyone else's. However, there are significant data quality concerns with respect to CPD's Gang Arrest Cards, including:

- 90 records where individuals designated in the Gang Arrest Card had a birth date prior to 1901, making these individuals over 117 years old. Further, OIG found 80 records where the individual's age was listed as zero.
- 10,428 records with invalid Identification Record (IR) numbers, meaning that the IR number field was blank, and/or an individual had multiple IR numbers assigned to them.

- 6,233 individuals designated with multiple race classifications, and 903 individuals designated with multiple gender classifications.[97]
- 21,380 individuals designated with multiple dates of birth, approximately 15.9% of the total number of individuals, and 922 individuals of the 21,380 had dates of birth that could not be determined. This includes two individuals in the Gang Arrest Cards data whose ages were listed as 6 and 7 respectively—however, both individuals had multiple dates of birth listed.[98]
- 15,174 individuals with no specific gang designation, despite being listed as gang members—approximately 11.3% of the total number of individuals.
- 15,648 individuals designated as gang members never had a reason provided by CPD for this designation in any Gang Arrest Card, approximately 11.7% of the total number of individuals. Further, 24,151 Gang Arrest Card records had no reason provided for the designation.

OIG further encountered significant data quality concerns in employment data captured on Arrest Reports with Gang Arrest Cards as well. Arresting officers listed occupations for individuals with Gang Arrest Cards such as "SCUM BAG," "BUM," "CRIMINAL," "BLACK," "DORK," "LOOSER [*sic*]," and "TURD." Approximately 23% of Arrest Reports had blank occupation fields.

## D.　CPD'S PRACTICES AND LACK OF TRANSPARENCY REGARDING ITS GANG DESIGNATIONS STRAIN POLICE-COMMUNITY RELATIONS

According to the Department's Strategic Plan, CPD "cannot succeed in safeguarding Chicago's neighborhoods without the trust and support of the communities we [CPD] serve and protect." In the course of this review, OIG participated in "Community Conversations sessions,"[99] observed community events,[100] and conducted interviews to understand, among other things, the community impact and public perception of the Department's approach to gang designations. Based on the accounts and testimonies provided to OIG in public forums and interviews, it is apparent that the lack of transparency and community experiences around CPD's "gang database"

---

[97] CPD systems only allow Department members to indicate a single race and a single gender for individuals in the Arrest Report. Because of this limitation, classification of individuals with multiple races and/or genders across various arrests in these data may not always present a data quality concern.
[98] For the individual listed as 6 years old, this individual was also listed as 14 years old in other CPD data systems. OIG determined that this individual was actually 14 years old at the time of arrest. For the individual whose age was listed as 7, OIG determined through validation that the individual was 16 at the time of arrest.
[99] OIG participated in four "Community Conversations" in the Garfield Park, Austin, Little Village, and Back of the Yards communities in March and April of 2018. The sessions provided a forum for community members to communicate their concerns and experiences surrounding the "Gang Database."
[100] OIG staff observed two "gang database" community events in June of 2018.

strain police-community relations and inhibit the Department's ability to build public trust.

During this review, community members reported that CPD is not transparent or responsive regarding the "gang database" and described CPD's "gang database" as a "black box." Community members repeatedly expressed uncertainty about the criteria, use, structure, and purpose of the "gang database." Community groups cited challenges in receiving responses from the Department regarding such concerns. This lack of transparency about CPD's gang-related practices fosters misunderstanding, speculation, and mistrust. Indeed, common reference to CPD's "gang database" is itself a misnomer. As demonstrated, the Department's collection of gang information is not limited to a single database.

Community members who participated in the public forums and interviews reported personal accounts in which individuals were misidentified by CPD as gang members, experienced harassment and/or acts of discrimination by CPD as a result of gang designations, and faced obstacles to immigration relief due to CPD's gang designations. Community members described the ways in which these experiences furthered the divide between themselves and the police. An individual who works in violence prevention stated that they were incorrectly included in the database because of their work, and that the inclusion in the "gang database" has had negative consequences for their children who are not affiliated with gangs. An individual who works as a victim advocate stated that the police pulled them over and were initially friendly, but after seeing that the individual was listed as a gang member in CPD's system(s)—even though they are not a gang member—the police pointed their guns at the individual. Another individual stated that CPD incorrectly designated them as a gang member, and the individual was denied immigration relief and faced deportation as a result.

One young person reported that at age 11, the young person and some friends were stopped by the police and asked about their gang affiliation. Although the young person stated that they were not a gang member, the police told them that "because you're around gang members, you will be considered one as well." The young person stated that they felt at this point that if they were going to be labeled anyway, they "might as well actually join a gang." An individual who expressed previous involvement in gang activity, prior to serving over 30 years in prison and leaving the gang, stated, "CPD discriminates based on past labels." Other community members asserted that the "gang database" served as an "excuse for criminalizing people in certain neighborhoods" and a "tool for racial profiling."

It should be noted that many of the participants who attended the public forums were generally suspicious of and/or opposed to CPD's "gang database." OIG cites the

examples above to provide readers with an understanding of some of the narratives that exist in Chicago's communities regarding CPD's gang information practices. These examples do not necessarily represent the views of all community members who reside in the neighborhoods where OIG attended public forums.

# VI.  RECOMMENDATIONS

Based on the insufficient controls, lack of procedural fairness protections, data quality concerns, and impact on police-community relations, CPD should undertake a holistic evaluation of the ongoing utility and impacts of continuing to collect gang designations. If the Department elects to continue collecting this data, CPD and the City of Chicago must implement comprehensive changes to address the issues detailed in this report. OIG offers the following recommendations to the Department and the City to address the utility, risks, and impacts of CPD's gang designation practices.

## ACTION ITEMS FOR THE CHICAGO POLICE DEPARTMENT

## A.  UTILITY AND ALIGNMENT WITH CPD'S VIOLENCE REDUCTION EFFORTS

Over the course of this review, OIG interviewed community members, Department members across Bureaus and ranks, academics, criminal justice agencies, and violence prevention workers. These stakeholders reported that the nature of many "gangs" in Chicago has significantly changed since the late 1990s.[101]  Currently, many "gangs" in Chicago no longer operate under the hierarchical structures they once did.[102] Many of the larger gangs of the past have fractured into factionalized sets or cliques, some of which engage in violence and some of which do not. In this environment, violence may often be driven by personal affronts and individual acts of retribution, rather than on the basis of gang membership.  Additionally, individuals now frequently change "gang" or group identification and the names of individual "gangs" or groups also regularly change. Lastly, previous indicators used to demonstrate gang affiliation (such as wearing specific colors) are seldom employed as group identifiers.

These changes raise questions about whether CPD's collection of gang-related data aligns with violence prevention efforts and the current landscape of "gangs." Some stakeholders indicated to OIG that many of today's cliques and youth associations may not constitute gangs in the strict legal sense; "three or more persons with an established hierarchy that, through its membership or through the agency of any

---

[101] According to interviews, although there are distinctions between the trajectories of Black and Latinx gangs in Chicago, as well as differences between the West and South Sides, describing gangs as large organizations with well-defined hierarchies, defined rules, and strict alliances is no longer accurate. Factions, also known as "cliques," tend to be smaller, more fluid, and motivated by personal relationships rather than attachment to a larger organization.

[102] On the factionalization of Chicago's gangs, see John Hagedorn et al., The Fracturing of Gangs and Violence in Chicago: A Research-Based Reorientation of Violence Prevention and Intervention Policy. (Chicago: Great Cities Institute University of Illinois at Chicago, 2019) https://greatcities.uic.edu/wp-content/uploads/2019/01/The_Fracturing_of_Gangs_and_Violence_in_Chicago.pdf.

member engages in a course or pattern of criminal activity."[103] Further, in interviews with OIG, Department members stated that due to the impermanence in the landscape of "gangs" currently CPD's gang designation information often becomes inaccurate as soon as it is documented. Finally, OIG found that CPD's methods for determining whether shooting incidents were gang-related rely on data sources with demonstrated data quality and procedural concerns (such as Gang Arrest Cards) and may misrepresent and overstate the frequency of shooting incidents that are caused by gang conflicts. This overrepresentation may obscure a more nuanced and accurate understanding of violence in Chicago, while also not providing compendious information for law enforcement purposes with respect to violence. As such, CPD must adapt to the fluidity and impermanence of the current landscape as part of its violence reduction efforts.

To ensure that CPD's gang strategies are appropriately aligned with violence reduction efforts in the city, CPD should:

1. Evaluate, in partnership with stakeholders,[104] whether collecting, maintaining, sharing, and using gang information best serves violence reduction efforts in the city, including with consideration of the collateral consequences of these practices. Avenues for partnership may include, but are not limited to: conducting a formal and publicly reported evaluation, holding public hearings, and participating in City Council hearings.
2. Ensure policing resources are focused on violent actors instead of all individuals designated as gang members.
3. Consider other mechanisms for preserving officer safety based on more reliable data, such as flagging individuals with a documented history of violence or weapons possession.
4. Utilize gang designations to identify at-risk individuals for the purpose of offering appropriate social intervention services.
5. Formally evaluate whether the individuals and groups CPD tracks as gangs meet the legal criteria of criminal gang members and criminal gangs, respectively.
6. Formally evaluate whether the current methods of identifying and tracking gang membership align with the current landscape of gangs in Chicago.

---

[103] 740 ILCS 147
[104] Stakeholders include, but are not limited to, adult and youth community members, students, parents, academics, community agencies, law enforcement, and other expert leaders.

## B.    CONTROLS AND PROCEDURAL FAIRNESS PROTECTIONS

Various jurisdictions have implemented a wide variety of reforms with respect to gang-related data. For example, the California Department of Justice mandated the enactment of procedural fairness protections for the state-wide gang database "CalGang."[105] These protections include: notifications for individuals designated as gang members, regular review and purging of outdated or inaccurate gang-related data, opportunities for individuals to contest their designations, and the creation of an Advisory Committee comprised of expert stakeholders.[106] In Portland, Oregon, the Police Bureau dismantled its gang database after public outcry over the consequences of the database, although gang-related information is still captured on several Bureau forms.[107] In Providence, Rhode Island, the City passed an ordinance entitled "Providence Community-Police Relations Act" mandating due process protections for individuals designated as gang members and public reporting on designations by the Providence Police Department, as well as codifying regulations regarding the criteria the Department can utilize for determining gang membership.[108] In Greater London, England, the Information Commissioner's Office found that the Metropolitan Police's gang database ("the Matrix") breached data protection rules and mandated protective reforms.[109]

---

[105] On January 1, 2018, the California DOJ became responsible for the oversight of CalGang. Penal Code Section 186.36 grants the California DOJ the statutory authority to collect and regulate CalGang data and to report annually on the information included in this data. See State of California, Department of Justice, "Attorney General's Annual Report on CalGang for 2017," 2018, accessed February 4, 2019, https://oag.ca.gov/sites/all/files/agweb/pdfs/calgang/ag-annual-report-calgang-2017.pdf. State of California, Penal Code, Section 186.36. https://oag.ca.gov/sites/all/files/agweb/pdfs/calgang/regs-outline.pdf.

[106] Advisory Committee members include: the Attorney General, or his or her designee; the President of the California District Attorneys Association, or his or her designee; the President of the California Public Defenders Association, or his or her designee; a representative of organizations that specialize in gang violence intervention, appointed by the Senate Committee on Rules; a representative of organizations that provide immigration services, appointed by the Senate Committee on Rules; the President of the California Gang Investigators Association, or his or her designee; a representative of community organizations that specializes in civil or human rights, appointed by the Speaker of the Assembly; a person who has personal experience with a shared gang database as someone who is or was impacted by gang labeling, appointed by the Speaker of the Assembly; the Chairperson of the California Gang Node Advisory Committee, or his or her designee; and the President of the California Police Chiefs Association, or his or her designee; the President of California State Sheriffs' Association, or his or her designee.

[107] Josh Saul, "In a First for the Nation, Portland Police End Gang List to Improve Relations with Black and Latinos," *Newsweek Magazine*, September 15, 2017, accessed February 1, 2019, https://www.newsweek.com/2017/10/06/gang-violence-portland-police-tear-gang-member-list-effort-rebuild-community-665374.html.

[108] City of Providence, "ORD-2017-18 Providence Community-Police Relations Act," June 1, 2017, accessed February 1, 2019, https://providenceri.iqm2.com/Citizens/Detail_LegiFile.aspx?MeetingID=6206&ID=3786.

[109] Some of the reforms put forth by the Information Commissioner included: implement a retention schedule that addresses how and when data subjects should be removed from the Matrix, and that the personal data of those data subjects is not otherwise retained; conduct a full review of all data sharing

CPD's G.O. 09-01-01: "Access to Computerized Data, Dissemination and Retention of Computer Data" indicates that CPD already recognizes the importance of data protections, including reviewing data for accuracy and deleting inaccurate and outdated information. G.O. 09-01-01 specifically applies to members assigned or detailed to the Bureau of Detectives or the Bureau of Organized Crime, when identifying an individual as an active criminal and seeking to enter the information into criminal intelligence databases. It states that the members must ensure the data is current and accurate. Additionally, the Chief of the Bureau of Detectives and the Chief of the Bureau of Organized Crime must ensure submissions into CPD's computerized information systems meet established criteria, conduct periodic audits reviewing the validity of information, and authorize purging of records as appropriate. Further, modifications to a record which "correct errors or negate an individual's classification...must be reported to any agency that received such erroneous information." The principles articulated in G.O. 09-01-01 could serve as a starting point for addressing some of the concerns raised by stakeholders regarding CPD's gang designations if CPD elects to continue collecting gang information.

OIG offers the following recommendations in keeping with the direction of current regulatory reform efforts while remaining specific to the needs and challenges of Chicago. CPD should:

## CONTROLS

7. Formally inventory all gang-related data collection, reporting, and visualization points, and the relationships between them.
8. Formally inventory all extant paper and electronic records containing gang information.
9. Establish formal, clear, public purposes and goals for the collection of gang information, and tailor training, access,[110] policies, and technology to align with these purposes and goals.
10. Ensure all forms featuring gang-related data are listed on the Records Retention Schedule, and that all forms featuring gang-related data have a finalized retention timeframe.

---

relating to the Gangs Matrix across the Metropolitan Police Service (MPS) in order to evaluate what sharing is occurring, the legal basis for the sharing, whether the sharing is necessary and justified, and whether the sharing is properly regulated by formal written agreements approved by the MPS Information Rights Unit; and implement compulsory purpose-specific training for all officers and staff responsible for processing personal data on the Gangs Matrix. Information Commissioner's Office, "ICO finds Metropolitan Police Service's Gangs Matrix breached data protection laws," November 16, 2018, accessed February 1, 2019, https://ico.org.uk/about-the-ico/news-and-events/news-and-blogs/2018/11/ico-finds-metropolitan-police-service-s-gangs-matrix-breached-data-protection-laws/.

[110] See, for example, 28 CFR Part 23: "The project must promulgate rules and regulations based on good cause for implementing its authority to screen, reject for employment, transfer, or remove personnel authorized to have direct access to the system." https://it.ojp.gov/documents/28cfr_part_23.pdf.

11.　　Establish formal written agreements with external agencies regarding data quality, input and output controls, and appropriate use.[111]

　　a.　　Codify that compliance with 28 CFR Part 23 is included as a requirement in agreements with external agencies.

　　b.　　Provide external agencies with training for 28 CFR Part 23 compliance, as well as appropriate usage of CPD data.

　　c.　　Ensure that CPD reports any gang-related records that are appealed, modified, or purged to external agencies accessing these records.

12.　　Regularly conduct formal audits of external agency access and use based on clearly defined metrics.[112]

13.　　Consider implementing additional, formal protections and restrictions for sharing gang-related data with external agencies including, but not limited to, immigration enforcement agencies.

14.　　Provide formal training and policies to all officers regarding gang-related data, as well as regular, formal refresher trainings on gang-related data, including updates with respect to the evolving nature of gangs in Chicago.

　　a.　　Gang-related trainings should incorporate adult and youth community members, academics, representatives from relevant community agencies, law enforcement, and other expert instructors.

15.　　Codify formal processes for supervisory and/or expert-level review of gang designations for accuracy.

16.　　Formally require the inclusion and assessment of specified types of evidence required to support proposed gang designations.[113]

---

[111] See, for example, 28 CFR Part 23: "A project or authorized recipient shall disseminate criminal intelligence information only where there is a need to know and a right to know the information in the performance of a law enforcement activity... a project shall disseminate criminal intelligence information only to law enforcement authorities who shall agree to follow procedures regarding information receipt, maintenance, security, and dissemination which are consistent with these principles." https://it.ojp.gov/documents/28cfr_part_23.pdf.

[112] See, for example, 28 CFR Part 23: "A project maintaining criminal intelligence information shall ensure that administrative, technical, and physical safeguards (including audit trails) are adopted to insure against unauthorized access and against intentional or unintentional damage. A record indicating who has been given information, the reason for release of the information, and the date of each dissemination outside the project shall be kept. Information shall be labeled to indicate levels of sensitivity, levels of confidence, and the identity of submitting agencies and control officials." https://it.ojp.gov/documents/28cfr_part_23.pdf.

[113] See, for example, 28 CFR Part 23: "In an interjurisdictional intelligence system, the project is responsible for establishing the existence of reasonable suspicion of criminal activity either through examination of supporting information submitted by a participating agency or by delegation of this responsibility to a properly trained participating agency which is subject to routine inspection and audit procedures established by the project." https://it.ojp.gov/documents/28cfr_part_23.pdf.

    a.    If the reason for the designation is "self-admission," require the inclusion of supporting evidence such as video footage of the interaction and/or a signed statement from the individual designated.

17.    Formally update and publicly report clearly defined criteria for "gang" and "gang activity."

    a.    Ensure criteria are narrowly tailored to align with the Department's focus on criminal gangs.[114]

    b.    Being in a gang-designated area or around gang-designated individuals should not, in and of itself, be considered suitable criteria to designate an individual as a gang member.

    c.    Adopt a written policy indicating that determinations regarding individual gang designations may not be based solely on an individual's race, gender, religion, ethnicity, culture, socioeconomic status, or other protected classes. [115]

18.    Conduct regular, formal reviews of gang designations to evaluate continued accuracy of the designation.[116]

    a.    Establish clear, formal, and public criteria for continued accuracy.

19.    Develop and implement a formal means to regularly purge applicable gang designations from all originating documents and visualization tools.[117]

    a.    If CPD retains a designation past the regular review period, new evidence must be provided; an additional notification must also be provided to the individual regarding the designation.

---

[114] See, for example, 28 CFR Part 23: "A project shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity." https://it.ojp.gov/documents/28cfr_part_23.pdf.

[115] See, for example, 28 CFR Part 23: "A project shall make assurances that there will be no harassment or interference with any lawful political activities as part of the intelligence operation." https://it.ojp.gov/documents/28cfr_part_23.pdf.

[116] See, for example, 28 CFR Part 23: "All projects shall adopt procedures to assure that all information which is retained by a project has relevancy and importance. Such procedures shall provide for the periodic review of information and the destruction of any information which is misleading, obsolete or otherwise unreliable and shall require that any recipient agencies be advised of such changes which involve errors or corrections. All information retained as a result of this review must reflect the name of the reviewer, date of review and explanation of decision to retain. Information retained in the system must be reviewed and validated for continuing compliance with system submission criteria before the expiration of its retention period, which in no event shall be longer than five (5) years." https://it.ojp.gov/documents/28cfr_part_23.pdf.

[117] See, for example, 28 CFR Part 23: "information retained in the system must be reviewed and validated for continuing compliance with system submission criteria...any information not validated within [the given time] period must be purged from the system." https://it.ojp.gov/documents/28cfr_part_23.pdf.

PROCEDURAL FAIRNESS PROTECTIONS

20. Formally require that every individual who receives a gang designation from CPD is notified.
    a. Notifications should be provided at no cost to the individual.
    b. Notifications should be provided in the individual's preferred language.
21. Establish formal protections for juveniles.
    a. "Self-admission" should not be considered sufficient evidence for designating a juvenile as a gang member unless a lawyer and/or a juvenile advocate is present.
22. Establish formal, written policies mandating that conversations or interviews with law enforcement which may result in the application of a gang designation must be conducted in the individual's preferred language.
23. Establish a formal appeal process.
    a. Develop and publicize formal, clear, achievable criteria for individuals to appeal their gang designations.
    b. Ensure that the appeals process is available at no cost to the individual.
    c. Ensure that every individual has timely access to the report(s) on which they are designated as gang members, as well as the supporting evidence for the designation.
    d. Establish a third-party mechanism to make determinations regarding appeals.
24. Ensure that every individual who has already been designated by CPD is notified and may appeal their designation(s), in keeping with the recommendations listed above.

## C.   POLICE LEGITIMACY AND COMMUNITY INVOLVEMENT

Meaningful community input, transparency from the Department, and durable partnerships will be required to address concerns expressed by community members during OIG's review regarding CPD's gang information practices and to ensure the safety of Chicago communities. CPD should:

COMMUNITY INVOLVEMENT

25. Participate in a committee of stakeholders formed by the City to address ongoing reforms (see recommendation #30).
    a. Through a mechanism determined by this committee, the Department should respond to the recommendations put forth by the committee in a timely and comprehensive manner.

26. Continue to build partnerships with community-based organizations to foster collaborative solutions to violence.

## TRANSPARENCY

27. Regularly report on CPD's collection, storage, sharing, and use of gang data, including:
    a. a list of all forms and databases where gang designations can be collected, reported and/or viewed;
    b. the number of individuals who are designated as gang members disaggregated by, but not limited to, race, gender, age, location of designation, reason for designation, number of convictions for serious/violent crime(s), and number of years designated as a gang member;
    c. the number of designations that have been reviewed, appealed (including the outcomes of the appeals), purged, and retained;
    d. an aggregation of law enforcement actions taken as a result of gang designations; and
    e. a list of all external agencies with access to CPD's gang information.

# ACTION ITEMS FOR THE OFFICE OF THE MAYOR AND CHICAGO CITY COUNCIL

28. Establish a committee of stakeholders including adult and youth community members, students, parents, academics, community organizations, law enforcement, and other expert leaders to discuss ongoing reforms.
    a. This committee should have a formal role in shaping training, criteria, and procedures relating to gang designations. The committee should also regularly evaluate the utility and impacts of gang designations and make recommendations to the Department.
29. Consider legislation that would create and impose a legal mandate for CPD to appropriately gather, maintain, sharing, and use gang-related data.
30. Consider legislative amendments to the Welcoming City Ordinance that would remove exceptions based on the individual being "identified as a known gang member either in a law enforcement agency's database or by his own admission."

# VII.  DEPARTMENT RESPONSE

In its response to this report, CPD agreed with OIG's findings and largely concurred with many of OIG's recommendations and partially concurred or disagreed with others. CPD acknowledged that its gang information policies, practices, and technology had impeded the Department's ability to maintain updated and relevant information. CPD proposed the development of a new system to collect and store gang information, the Criminal Enterprise Database (CED). As proposed by the Department, the CED will be a single, unified system that ensures the inclusion of updated and vetted information, purging of outdated gang information, and a process for members of the public to ascertain and appeal their designation as a gang member or affiliate. CPD also indicated that the new system will incorporate additional protections when sharing gang information with third parties. However, it should be noted that these proposed controls and reforms do not apply to the gang information currently maintained by the Department and that this unverified, often outdated information will remain available to any officer or department that currently has access to this information.

While the Department has signaled intentions to reform its gang-related technology and information practices, CPD's response and proposed measures diverge from OIG's recommendations in several critical ways. The Department's response indicates that CPD will not engage with community stakeholders in the fashion that OIG recommends. CPD states that it has already conducted an internal evaluation, affirmed the utility of collecting gang information, and drafted policies for a new system.

CPD's response also deviates from OIG's recommendations with the proposal of an appeals process that involves several substantive barriers, including limited hours and days on which appeals can be made, required appearance at police facilities, and no access for designated individuals to the evidence which CPD used to determine their gang status.

OIG also recommended additional protections for juveniles in CPD's gang identification processes. Twenty-five percent of individuals identified as gang members in OIG's analysis were under the age of 18 when first designated as a gang member. In spite of this, CPD's response to this report indicates that the Department has determined that existing protections and processes for juveniles are sufficient.

Finally, the Department's response provides no proposed timeline for implementation of the CED. As part of its stated commitment to community engagement, CPD should consider communicating to the public an estimated timeframe for development and implementation.

# VIII. APPENDIX A: CPD BUREAUS AND DIVISIONS INVOLVED IN GANG DESIGNATION, TRACKING, AND ENFORCEMENT

There are many Bureaus, Divisions, Units, and Sections within CPD involved in designating and tracking individuals and areas as gang-involved, as well as in gang-related enforcement.

## Bureau of Patrol

The Bureau of Patrol (BOP), the largest bureau within CPD, is heavily involved in gang designations and enforcement. Officers in the BOP conduct traffic stops, complete ISRs, and enforce gang-related ordinances and directives.[118] Each district has District Intelligence Officers who are responsible for, among other duties, obtaining and sharing information about "current gang-related conflicts, alliances, gang funerals, gang parties" as well as remaining "cognizant of specific dates that gangs might be either celebrating or memorializing."[119]

## Bureau of Organized Crime

The Bureau of Organized Crime (BOC) houses the Gang Investigation Division, a division involved in gang designations and enforcement. The Gang Investigation Division is "responsible for ensuring the proper investigation of any individual, group, or organization reasonably believed to be engaging in criminal activity; initiating investigations for the purpose of identifying gang organizations involved in criminal offenses; and disseminating information about gangs to appropriate Departmental units."[120] The Gang Investigation Division is made up of several teams and sections; those immediately related to gangs include the Area Gang Investigation Teams, the FBI Joint Task Force on Gangs, and Gang School Safety Teams (GSST). Within the Division, the FBI Joint Task Force on Gangs is a collaborative effort between CPD and the FBI to "identify, disrupt, and dismantle violent, drug-trafficking, street gangs and their criminal enterprises operating within the City."[121] GSSTs collaborate with CPS

---

[118] City of Chicago, Chicago Police Department, "General Order G01-02-03: Organization and Functions of the Bureau of Patrol," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-1291da66-88512-91e6-521a90347177e975.pdf?hl=true.

[119] City of Chicago, Chicago Police Department, "General Order G10-01-02: District Intelligence Officer," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57b38-141c256b-3e214-1c25-b7f2916b04df6d35.pdf?hl=true.

[120] City of Chicago, Chicago Police Department, "General Order G01-02-05: Organization and Functions of the Bureau of Organized Crime," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57b73-14a1c64f-eee14-a1c6-83093e222447a9bb.pdf?hl=true.

[121] City of Chicago, Chicago Police Department, "General Order G01-02-05: Organization and Functions of the Bureau of Organized Crime," accessed April 5, 2019,

officials as well as CPD units and the Cook County Juvenile Probation to conduct "interventions" regarding "school-related gang violence," including through social media monitoring. CPD estimated that GSSTs conduct approximately 20 interventions per month, and that the majority of these interventions occur at school, a hospital, or home.

## Bureau of Technical Services

The Bureau of Technical Services is involved in gang-related tracking. The Information Services Division generates District Intelligence Bulletins, which contain district-specific intelligence pertaining to gangs.[122]  The Instant Update Unit in the Records Division reviews all rap sheets and identifies arrestees who are on parole, are on probation, have pending felony charges, or are out on bond for misdemeanor charges that have not been adjudicated, to "combat gang violence and aid in the prosecution of violent gang members."[123] Public Safety Information Technology (PSIT) builds maps and linking capabilities in CLEAR based on data from the Gang Audit.[124]

## Bureau of Detectives

The Bureau of Detectives oversees investigations of selected felonies and selected misdemeanors. Detectives interview victims, witnesses, and others during the course of an investigation, as well as review data in CPD databases, to determine perpetrator(s) and motive(s). The detectives' work is also informed by the preliminary information gathered in BOP Case Reports, along with any interviews conducted at the scene and any/all other information the patrol officer includes. If Detectives determine that a crime was gang-motivated based on the totality of circumstances found during the investigation, this information can be captured in the CHRIS Supplemental Reports.

## Deployment Operations Center

The DOC is involved in gang-related designations and tracking. The DOC creates "gang profiles" which include gang affiliation, arrests, associates, ISRs, known conflicts,

---

http://directives.chicagopolice.org/directives/data/a7a57b73-14a1c64f-eee14-a1c6-83093e222447a9bb.pdf?hl=true.

[122] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[123] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[124] City of Chicago, Chicago Police Department, "General Order G10-01-01: Gang Audits," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57b38-141c256b-3e214-1c25-b583fdc4cd349e84.pdf?hl=true.

and possible retaliation information in the case of a shooting.[125] On a weekly basis, the DOC Commander recommends areas to be designated as "High Level Gang Conflict Locations."[126] Finally, with respect to the Gang Audit, DOC confirms and manages gang-related data. The Crime Prevention and Information Center (CPIC) is a section in the DOC responsible for "preparing and disseminating Gang Violence Reduction Strategy informational packets on victims of murders or shootings."[127]

---

[125] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[126] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true.

[127] City of Chicago, Chicago Police Department, "Special Order S03-04-04: Crime Prevention and Information Center (CPIC)," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-13ed7140-08513-ed71-4cecd9c378c05dec.pdf?hl=true.

# IX. APPENDIX B: ADDITIONAL INFORMATION REGARDING POTENTIAL COLLATERAL CONSEQUENCES OF CPD'S GANG DESIGNATIONS

## LAW ENFORCEMENT

CPD employs a number of strategies with respect to gangs. These include Focused Deterrence, Gang Missions, Gang Loitering Ordinance Enforcement, Gang Investigations, Targeted Vehicle Enforcement, Area Gang Strategy Meetings, and Parole Compliance Checks. Further, CPD utilizes several programs with respect to gangs, including the Gang Intervention Probation Program and the Targeted Repeat Offender Apprehension and Prosecution Program.

## FOCUSED DETERRENCE

Focused Deterrence, a component of CPD's "Gang Violence Reduction Strategy," involves partnerships between law enforcement officials, social service providers, and community members to deliver messages of "alternatives" and "swift, targeted enforcement" with respect to violence.[128] One element of Focused Deterrence is Custom Notification, a process by which individuals identified as "associated with the continuum of violence" are notified of the "risk and consequences that will result should they engage in criminal conduct or continue in violent activity."[129] During a Custom Notification, Department members visit the identified individual and/or their family at their residence to articulate that law enforcement action—including federal and state sentencing options and asset seizure where applicable—will be "targeted and specific to the individual" if the individual engages in gun violence and to offer resources as an alternative.[130] If an individual engages in criminal activity for which they are arrested after receiving a Custom Notification, the "highest possible charges will be pursued" against that individual.[131] The second component involves Call-In Sessions, wherein CPD convenes partnering social service providers and community members with groups associated with violence to deliver the message to groups identified as associated with violence: "we will help you if you will let us, but we will

---

[128] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[129] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[130] City of Chicago, Chicago Police Department, "Special Order S10-05: Custom Notification in Chicago," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-1456faf9-bfa14-570a-a2deebf33c56ae59.pdf?hl=true.

[131] City of Chicago, Chicago Police Department, "Special Order S10-05: Custom Notification in Chicago," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-1456faf9-bfa14-570a-a2deebf33c56ae59.pdf?hl=true.

stop you if you make us."[132] In these sessions, CPD inform group members that the next violent incident committed will result in "swift, targeted enforcement—using any legal means available."[133]

## GANG MISSIONS

In Gang Missions, CPD conducts "aggressive patrol and violence suppression missions" in areas designated as involving gang conflicts.[134]

## GANG INVESTIGATIONS

In Gang Investigations, officers in the Bureau of Organized Crime—often in conjunction with federal agencies—conduct in-depth investigations of individuals designated as gang-involved for the purpose of developing evidence to prosecute these individuals.[135]

## GANG LOITERING ENFORCEMENT

For areas designated as "Hot Spots," "High Level Gang Conflict Locations," and "Areas Associated with a Heightened Level of Violence," CPD may issue Gang Loitering dispersal orders if two or more persons are loitering in the area and one of the people is a "known gang member."[136] These dispersal orders can require that the individual not return to the specified area for eight to 12 hours;[137] if the individual returns within "sight or hearing" of the area, individuals face imprisonment for not more than six months, a fine between $100 and $500, or both. Subsequent violations of dispersal orders can result in additional penalties.[138]

---

[132] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[133] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[134] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

[135] City of Chicago, Chicago Police Department, "General Order G01-02-05: Organization and Functions of the Bureau of Organized Crime," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57b73-14a1c64f-eee14-a1c6-83093e222447a9bb.pdf?hl=true.

[136] City of Chicago, Chicago Police Department, "Special Order S10-02: Gang and Narcotics-Related Loitering," accessed April 5, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-128884f1-9d212-8894-7cf08ab5b5062cb9.pdf?hl=true.

[137] The amount of time depends on the classification of the area—areas designated as Heightened Level of Violence are 12-hour dispersal areas. In all other circumstances, the dispersal period is eight hours.

[138] A second or subsequent offense is punishable by a mandatory minimum sentence of no less than five days. After a third or subsequent conviction within a one-year period, a court will additionally issue an

## TARGETED VEHICLE ENFORCEMENT

Targeted Vehicle Enforcement aims to "reduce gang violence, shootings, and drive-by shootings" through vehicle-related missions.[139] This can include impounding vehicles for a variety of offenses, as well as "seat belt missions, red light missions, school safety zone missions, license plate reader enforcement, moving violation enforcement, and the issuance of parking citations."[140] These offenses include an assault weapon or narcotics in the vehicle, a revoked or suspended driver's license, playing music too loudly, possession of spray paint by a minor in the vehicle, possession of an altered handicap permit, displaying a false temporary registration permit, soliciting a prostitute, fireworks in the vehicle, fleeing a police vehicle, and other ordinances that allow impounding a vehicle.[141]

## AREA GANG STRATEGY MEETINGS

During Area Gang Strategy Meetings, agencies within and outside of CPD disseminate gang-related intelligence and develop strategies to identify and address gang-related persons of interest believed to be involved in criminal activity.[142] Agencies include BOP, BOD, BOC, DOC, federal agencies, Chicago High Intensity Drug Trafficking Area (HIDTA), CCSAO, United States Attorney's Office, IDOC, the Cook County Adult Probation Department's Gang Intervention Unit, and surrounding suburban police agencies.[143]

---

order requiring the person to refrain from "gang loitering within sight and sound of the location" of the latest dispersal order for 30 days. If an officer sees the individual engaged in gang loitering in violation of the court order, the officer can immediately place the individual under arrest without requiring the officer to provide a dispersal warning.

[139] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

[140] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

[141] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

[142] City of Chicago, Chicago Police Department, "Special Order S10-07: Area Gang Strategy Meeting," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bb9-159744bb-bbd15-9744-eb517377337c557e.pdf?hl=true

[143] City of Chicago, Chicago Police Department, "Special Order S10-07: Area Gang Strategy Meeting," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bb9-159744bb-bbd15-9744-eb517377337c557e.pdf?hl=true

## PAROLE COMPLIANCE CHECKS

In Parole Compliance Checks, CPD officers support IDOC in parolee compliance checks—defined as home visits—and conduct surveillance on "gang-involved parolees and recent parolees that are high-ranking gang members."[144]

## GANG INTERVENTION PROBATION PROGRAM[145]

The Gang Intervention Probation Program (GIPP) is implemented in conjunction with the CCSAO and the Cook County Adult Probation Department's Gang Intervention Unit, with the stated goal of "deterring individuals placed in the program from additional criminal gang activity by enforcing the conditions of their probation."[146]

GIPP imposes obligations and sanctions upon those enrolled including: mandatory curfew, residential conditions, prohibition on association with known gang members, and a ban on engaging in gang activity.[147] If an individual violates any of these conditions, the individual will be sent to Central Bond Court.[148] If the individual violates the conditions with additional charges, they are no longer eligible for bond.[149]

## TARGETED REPEAT OFFENDER APPREHENSION AND PROSECUTION PROGRAM[150]

The Targeted Repeat Offender Apprehension and Prosecution Program (TRAP) is a joint CPD/CCSAO initiative prioritizing "enhanced prosecution to detain, convict, and incarcerate" repeat offenders considered to be involved in violence and/or narcotics distribution, and uses gang affiliation and gang role to determine program inclusion.[151]

---

[144] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

[145] According to Department members and external agencies during interviews, GIPP is not currently active and/or is seldom used. However, this program is still listed in Department directives.

[146] City of Chicago, Chicago Police Department, "Special Order S10-03: Gang Intervention Probation Program," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd06-ae86f58b4f2d081e.pdf?hl=true

[147] City of Chicago, Chicago Police Department, "Special Order S10-03: Gang Intervention Probation Program," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd06-ae86f58b4f2d081e.pdf?hl=true

[148] City of Chicago, Chicago Police Department, "Special Order S10-03: Gang Intervention Probation Program," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd06-ae86f58b4f2d081e.pdf?hl=true

[149] City of Chicago, Chicago Police Department, "Special Order S10-03: Gang Intervention Probation Program," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd06-ae86f58b4f2d081e.pdf?hl=true

[150] According to Department members and external agencies during interviews, TRAP is not currently active and/or is seldom used. However, this program is still listed in Department directives.

[151] City of Chicago, Chicago Police Department, "Special Order S10-06: Targeted Repeat-Offender Apprehension and Prosecution (T.R.A.P.) Program," Accessed April 8, 2019,

TRAP-enrolled individuals are subject to possible enhanced prosecution pending the review of the CCSAO which can include: no deals, no 'nolle prosequi' for small or petty cases, monitoring sources of bail, and prosecuting several small cases together to enhance the penalty.

## CRIMINAL JUSTICE

Gang membership, gang designation in a database, or gang affiliation may have an effect on bail, bond, sentencing, sanctions, probation, prison, and parole in Illinois. The magnitude of any effect will vary based on the discretion of prosecutors in introducing gang related evidence, as well as the weight Courts give to any evidence presented. All gang-related information will need to satisfy the applicable admissibility standards, depending on the phase of the criminal proceeding, before it is accepted into evidence.

## BAIL AND BOND

According to state statute, gang membership alone is not a factor in determining bail.[152] Courts will examine the nature and circumstances of the alleged criminal conduct, including any relation it may have to an organized gang, to determine eligibility for bail and/or the amount of bond due.[153] Evidence of gang membership or affiliation is only admissible at bail/bond hearings if it is relevant and reliable. Relevant gang-related evidence includes evidence that the alleged criminal conduct was related to or done in furtherance of criminal gang activity or was motivated by the defendant's membership in or allegiance to an organized gang.[154] Reliable gang-related evidence includes evidence that shows indicia of reliability or trustworthiness but may not be admissible at a trial based on the rules of evidence. Relevant and reliable gang-related evidence may include designation as a gang member by law enforcement, and this designation can result in higher bond or denial of bail.[155]

According to G.O. 10-01, individuals designated as "verified gang members and charged with jailable offenses" are not eligible for Individual Bonds (I-Bonds) — personal recognizance bonds that do not require cash payment— potentially requiring the individual to remain in custody pending an appearance in bond court.[156] Criteria for establishing that the individual is a "verified gang member" include

---

http://directives.chicagopolice.org/directives/data/a7a57b38-14eabf49-88714-eabf-585e2775112f376d.pdf?hl=true
[152] 725 ILCS 5/110 – 5(a)
[153] 725 ILCS 5/110 – 5(a)
[154] 725 ILCS 5/110 – 5(a)
[155] 725 ILCS 5/110 – 5(a)
[156] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

"identification of the individual as a member of a specific street gang through any database or information contained in the CLEAR system."

## SENTENCING

Gang-related evidence may impact a criminal defendant's sentence through the imposition of a mandatory, minimum sentence or the introduction of aggravating factors.[157] Additionally, Courts may impose certain gang-related conditions to a sentence of probation or conditional discharge.[158] Potential evidence at sentencing could include information from CPD's tracking and designation of individuals or areas as gang related.

Per the Illinois Unified Code of Corrections, Courts are required to impose a mandatory, minimum sentence of imprisonment for certain classes of offenses.[159] Included in the list of eligible offense are forcible felonies, if the offense was related to the activities of an organized gang, and unlawful possession of a firearm by a streetgang member when the firearm was loaded or contained firearm ammunition.[160] Courts may also consider aggravating factors—facts or circumstances that increase the severity or culpability of a crime—when deciding to impose a period of imprisonment or a more severe sentence, according to the Illinois Unified Code of Corrections. .[161] One such aggravating factor Courts can consider is if the individual committed an offense related to the activities of an "organized gang."[162]

## PROBATION

Certain conditions may be imposed upon a defendant who receives a sentence of probation or conditional discharge. If a defendant receives a sentence of probation or conditional discharge for an offense related to or in furtherance of the criminal activities of an organized gang and was motivated by the offender's membership or allegiance to an organized gang, Courts will require the defendant to complete community service hours.[163] The number of hours is discretionarily determined by the

---

[157] 730 ILCS 5/5-5-5-3(c)(2)(J)
　　730 ILCS 5/5-5-3(c)(2)(Y)
　　730 ILCS 5/1-1-1 *et seq.*
[158] 730 ILCS 5/5-6-3(a)(6)
　　730 ILCS 5/5-6-3(b)(15)
[159] 730 ILCS 5/5-5-5-3(c)(2)(J)
　　730 ILCS 5/5-5-3(c)(2)(Y)
[160] 730 ILCS 5/5-5-5-3(c)(2)(J)
　　730 ILCS 5/5-5-3(c)(2)(Y).
[161] 730 ILCS 5/1-1-1 *et seq.*
[162] 730 ILCS 5/1-1-1 *et seq.*
　　74o ILCS 147/10 (3).
[163] 730 ILCS 5/5-6-3(a)(6).

Court and may range between 30 and 120 hours.[164] As an additional condition of probation, Courts may order a defendant to refrain from having any contact, directly or indirectly, with certain specified persons or types of persons, including but not limited to members of street gangs.[165]

## SANCTIONS

The "Streetgang Fine" sanction may be imposed upon individuals in relation to gangs—designation by CPD may be proffered as evidence in establishing gang membership and/or incidents as gang-related.[166] In addition to any other penalty imposed, individuals convicted of a crime who were, at the time of the crime a streetgang member,[167] receive a fine of $100. The funds collected from this fine are given to the "State Police Streetgang-Related Crime Fund" in the Illinois treasury.[168]

## PRISON

IDOC records and tracks gang designations and activity for individuals incarcerated through commitment to release. After reviewing relevant laws and policies, it is unclear if IDOC utilizes CPD's gang data in its recording and tracking, although CPD does share gang-related information with IDOC and vice versa. Individuals incarcerated and designated as gang members are not eligible for certain pre-release programs, such as the Prisoner Entrepreneur Education Program.[169]

## PAROLE

Once an individual is released on parole, certain conditions will apply. Among the many conditions, the parolee will not associate with persons who are members of an organized gang.[170] Additionally, individuals on either probation or parole can be legally mandated to attend Call-In Sessions, under CPD's Focused Deterrence strategy.[171]

## JUVENILES

As with adults, information related to gang membership could impact juveniles within the criminal justice system. Instead of a bond hearing, juveniles charged in juvenile court will appear before the Court for a formal reading of criminal charges

---

[164] 730 ILCS 5/5-6-3(a)(6).

[165] 730 ILCS 5/5-6-3(b)(15)

[166] According to CPD and external agencies during interviews, the Streetgang Fine is rarely applied. However, this fine is still listed in law.

[167] As defined in section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act.

[168] 730 ILCS 5/5-9-1.19

[169] This section is set to be repealed on August 24, 2022.

[170] 730 ILCS 5/3-2-2(b-5).

[171] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," accessed April 9, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true.

and a "shelter-care hearing."[172] During shelter-care hearings, a judge determines whether the juvenile will be held in a facility while awaiting trial or released to their guardians—and if released, whether or not there are restrictions placed upon the release.[173] This determination is based on the Court's assessment of whether it is a matter of immediate and urgent necessity for the protection of the minor, another person, or their property to detain the juvenile.[174] Designation as a known gang member by CPD may be offered as evidence in a shelter-care hearing for the Court to determine whether the juvenile will be detained or released with restrictions.

Sentencing for a juvenile designated as a gang member could include an order that the juvenile undergo medical treatment to remove gang-related tattoos.[175] If a juvenile is sentenced to the Department of Juvenile Justice, once the juvenile is eligible for parole, called "aftercare," certain restrictions will be placed on the juvenile. One of those restrictions requires that the juvenile does not associate with persons who are "members of organized gangs."[176]

---

[172] 705 ILCS 405/5-501.
[173] 705 ILCS 405/5-501.
[174] 705 ILCS 405/5-501.
[175] 705 ILCS 405/5-710(a)(ix).
[176] 705 ILCS 405/5-505(1).

# X.    APPENDIX C: GANG INFORMATION SYSTEMS DIAGRAM PROVIDED BY CPD

In response to OIG's request for a diagram depicting relationships between systems in which gang-related data exist, CPD provided Figure 13 below.[177] According to interviews with CPD, this diagram does not include every source of gang information in CPD's systems and in systems maintained by external agencies that CPD can access. Due to CPD's lack of entity relationship diagrams and data flow diagrams, OIG was unable to validate the depiction of relationships between these systems. Further, due to CPD's lack of a complete list of all the various places gang information could be recorded, reported, and visualized, OIG was unable to validate the accuracy and completeness of the diagram components.

---

[177] In interviews CPD members stated that they used the term "affiliation" synonymously with "membership" in this diagram, and that CPD collects gang membership information rather than affiliation information.

## FIGURE 13: CPD GANG INFORMATION SYSTEMS DIAGRAM



# XI.  APPENDIX D: DATA COLLECTION, REPORTING, AND VISUALIZATION POINTS

The following represent points where gang-related information about individuals and areas can be collected, within the past ten years.

1. Gang Arrest Cards
2. Gang Audit Questionnaire
3. Investigative Stop Reports (ISRs)
4. Contact Cards
5. Information Reports
6. Hot Spot Designations
7. Major Incident Notifications
8. Criminal History Records Information System (CHRIS) Supplemental Reports

The following represent points where gang-related data that has already been collected can be reported, within the past ten years.

9. District Intelligence Bulletins (DIBs)
10. Daily Bulletin
11. Officer Safety Alerts

The following represent points where gang-related information about individuals and areas can be displayed and/or queried, within the past ten years.

12. Caboodle
13. Gang Listing Report
14. Gang Profile Search
15. Gang Members Search
16. Link Analysis
17. Strategic Subject List (SSL) Dashboard[178]
18. Law Enforcement Agencies Data System (LEADS)

---

[178] As of January 9, 2019, the Strategic Subject List (SSL) Dashboard has been replaced by the Subject Assessment and Information Dashboard (SAID).

## DATA COLLECTION

The following represent points where gang-related information about individuals and areas can be captured, within the past ten years.

1.     Gang Arrest Cards

Department members may complete Gang Arrest Cards during arrests, when the arrestee's membership in a criminal street gang is "substantiated or self-admitted."[179]

### FIGURE 14: ELECTRONIC GANG ARREST CARD



2.     Gang Audit Questionnaire[180]

The Gang Audit is conducted periodically in each district.[181] During the Audit, Department members from several units complete a form delineating the following within the district: gang names, gang faction names, territorial borders, faction size, documented criminal activity, rivals and active conflicts, alliances and active alliances, organizational level, violence level, and the most active or influential members of each faction.[182] The results of the Gang Audit can be visualized in Caboodle.[183]

---

[179] City of Chicago, Chicago Police Department, "Special Order S10-02-01: Criminal Street Gang Arrest Information," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-10288308dbafb745.pdf?hl=true

[180] City of Chicago, Chicago Police Department, "Gang Audit Questionnaire," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-12.140.pdf

[181] City of Chicago, Chicago Police Department, "General Order G10-01-01: Gang Audits," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57b38-141c256b-3e214-1c25-b583fdc4cd349e84.pdf?hl=true

[182] City of Chicago, Chicago Police Department, "Gang Audit Questionnaire," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-12.140.pdf

[183] City of Chicago, Chicago Police Department, "General Order G10-01-01: Gang Audits," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57b38-141c256b-3e214-1c25-b583fdc4cd349e84.pdf?hl=true

## FIGURE 15: GANG AUDIT QUESTIONNAIRE[184]



### GANG AUDIT QUESTIONNAIRE
### Deployment Operations Center/Chicago Police Department

The Gang Factions for the District as noted in the Gang Faction module of CLEARMap Caboodle must be reviewed. Use this form to add, delete or change information and circle the appropriate action on the right. If a Gang Faction is being added, include all the applicable information as shown below. Make extra copies of the questionnaire if necessary and indicate page number as appropriate on bottom. Email the completed questionnaires to gangaudit@chicagopolice.org.

| DISTRICT | | | | DATE | | | |
|---|---|---|---|---|---|---|---|
| | | | | Sheet ___ of ___ | | | |
| GANG NAME | Add | Delete | Change | OFFICER COMPLETING | | | |
| FACTION NAME | Add | Delete | Change | SIZE | Add | Delete | Change |
| BOUNDARIES | | | | | Add | Delete | Change |
| ORGANIZATION LEVEL | Add | Delete | Change | VIOLENCE LEVEL | Add | Delete | Change |

**ACTIVITIES**

| Cannabis Sales | Add | Delete | Change | Cocaine Sales | Add | Delete | Change |
|---|---|---|---|---|---|---|---|
| Heroin Sales | Add | Delete | Change | PCP Sales | Add | Delete | Change |
| Ecstasy Sales | Add | Delete | Change | Weapons Distribution | Add | Delete | Change |
| Narcotics Trafficking | Add | Delete | Change | Robbery | Add | Delete | Change |
| Burglary | Add | Delete | Change | Theft | Add | Delete | Change |
| Prostitution | Add | Delete | Change | Shootings | Add | Delete | Change |

**RIVAL FACTIONS** | | | | **ACTIVE CONFLICT?** | | |

| | Add | Delete | Change | | Add | Delete | Change |
|---|---|---|---|---|---|---|---|
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |

**ALLIANCE FACTIONS** | | | | **ACTIVE ALLIANCE?** | | |

| | Add | Delete | Change | | Add | Delete | Change |
|---|---|---|---|---|---|---|---|
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |
| | Add | Delete | Change | | Add | Delete | Change |

DEPLOYMENT OPERATIONS CENTER  - Bell: (312) 745-6191 Pax: 0308 Fax: (312) 745-6710

CPD-12.140 (7/13)                    Page 1



## GANG AUDIT QUESTIONNAIRE
## Deployment Operations Center/Chicago Police Department

| DISTRICT | DATE | | Sheet ____ of ____ |
|---|---|---|---|
| GANG NAME | FACTION NAME | | |

**MEMBERS**

| Name | IR# | Sex | Race | Hgt. | Wgt. | DOB | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |

**ASSOCIATES**

| Name | IR# | Sex | Race | Hgt. | Wgt. | DOB | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |
| | | | | | | | Add | Delete | Change |

**NARCOTICS LINE NAMES (If Known)**

| | | | |
|---|---|---|---|
| | Add | Delete | Change |

**DISTINCT NARCOTICS PACKAGING (If Known)**

| | | | |
|---|---|---|---|
| | Add | Delete | Change |

**LOCATIONS OF INTEREST**

| | | | |
|---|---|---|---|
| | Add | Delete | Change |

**OTHER INFORMATION**

| | | | |
|---|---|---|---|
| | Add | Delete | Change |

| DEPLOYMENT OPERATIONS CENTER - Bell: (312) 745-6191 Pax: 0308 Fax: (312) 745-6710 |
|---|

CPD-12.140 (7/13)　　　　　Page 2

---

3.      Investigatory Stop Reports (ISRs)

Investigatory Stop Reports are completed when a Department member temporarily detains and questions a person in the vicinity where the person was stopped based on "Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a criminal offense."[185] On the ISR, officers can document an individual's gang affiliation, known "hangouts" for the gang, and types of criminal activities attributed to that gang.[186] According to the ISR form, "gang/narcotics-related enforcement" can be a factor that leads to the investigatory stop.[187]

Department members also complete ISRs during Gang Loitering Dispersals, when a Department member observes two or more individuals loitering in an area designated as a Hot Spot or a High-Level Gang Conflict Location and the member determines that a "criminal street gang member is present" and "the persons are engaged in gang loitering."[188]

## FIGURE 16: GANG-RELATED SECTIONS ON THE ISR FORM



---

[185] City of Chicago, Chicago Police Department, "Special Order S04-13-09: Investigatory Stop System," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57b99-151b6927-49f15-1b69-2c32e99868b316b0.pdf?hl=true

[186] City of Chicago, Chicago Police Department, "Investigatory Stop Report," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-11.910.pdf

[187] City of Chicago, Chicago Police Department, "Investigatory Stop Report," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-11.910.pdf

[188] City of Chicago, Chicago Police Department, "Special Order S10-02-03: Gang and Narcotics-Related Enforcement," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-d845218c69a1f912.pdf?hl=true

## FIGURE 17: SEARCH TOOL FOR GANG-RELATED INFORMATION CAPTURED ON ISRs



4.　　Contact Cards

Contact Cards are used to document Investigatory Stops as well as enforcement of the Gang and Narcotics-Related Loitering Ordinances.[189] Contact Cards contain information about the individual stopped and/or dispersed, including, if applicable, gang membership, tattoos, gang hangouts, and gang activities. According to Department directives, Contact Cards are no longer in use—ISRs are now used to document stops and loitering enforcement.

---

[189] Prior to January 7, 2015, Contact Cards were used to document "Routine Citizen Encounters" and Investigatory Stops.

## FIGURE 18: PAPER CONTACT CARD, FRONTSIDE



## FIGURE 19: PAPER CONTACT CARD, BACKSIDE

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

## FIGURE 20: ELECTRONIC CONTACT CARD SEARCH PAGE

5. Information Reports[190]

Information Reports bring information on various police concerns, including gang-related information, to the attention of CPD. Information Reports can contain the following information about individuals: "names, aliases, nicknames, and physical descriptions; addresses of residence, business, and locations frequented; description of criminal or suspicious activities, incidents, etc., in which the person is engaged; detailed data on vehicles, especially licensing information (i.e., state and city license information) and the vehicle identification number; information on associates engaged in the same or other criminal activity; and Records Division (RD) numbers, of any known incidents to which the Information Report may be connected."

## FIGURE 21: INFORMATION REPORT CREATION PAGE WITH CATEGORIES



---

[190] City of Chicago, Chicago Police Department, "Special Order S04-13-08: Information Report System," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a864e6-91c12-a867-a4e051c823647762.pdf?hl=true

## FIGURE 22: INFORMATION REPORT GANG COMPONENTS

| | |
|---|---|
| Clothing Description | |
| Gang | BLACK DISCIPLES ▾ |
| Gang Faction | BLACK GATE ▾ |
| Unlisted Gang Name | |
| Self Admitted | No ▾ |
| Scar/Mark Description | |

6.　　　　Hot Spot Designation

CPD District Commanders complete Hot Spot Designation applications for areas within their district which they believe require special enforcement attention—these reasons can be a result of concerns regarding gang activity.[191] The application can include observations such as "gang graffiti" and "flashing gang signs."[192]

Heightened Level of Violence Areas are designated when there is "reliable information from sources" that a "special-enforcement area" is experiencing or is about to experience increased violence—as an example, CPD's directive cites "increased violence may be due to a gang conflict."[193] Heightened Level of Violence Areas are then designated "12-hour dispersal areas," wherein a person dispersed from the area may not return for 12 hours.[194]

The Commander of CPD's DOC recommends High Level Gang Conflict Locations to the Superintendent on a weekly basis. The Superintendent or their designee then communicates these locations to the Chief of the BOP, the Chief of the Office of Crime Control Strategies, and the Commander of the DOC, for "dissemination and enforcement by sworn members."[195] High Level Gang Conflict Locations are

---

[191] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true
[192] City of Chicago, Chicago Police Department, "'Hot Spot' Designation Application," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-21.372.pdf
[193] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true
[194] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true
[195] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true

automatically designated as enforcement areas for Gang and/or Narcotics-Related Loitering dispersals.[196] These locations are also automatically designated areas associated with a Heightened Level of Violence and therefore a 12-hour-dispersal designation, commencing on Fridays at 5:00pm and continuing through Sundays at 11:30pm.[197]

## FIGURE 23: HOT SPOT DESIGNATION APPLICATION EXCERPT



**"HOT SPOT" DESIGNATION APPLICATION**

DATE:_____

BUREAU OF PATROL
CHICAGO POLICE DEPARTMENT

DISTRICT:_____

PRIORITY # - _____ OF _____

Recommended
Time Period for: _____ to:_____ (Day / Mon / Year)
District "Hot Spot" Locations expire after a 6 month period.

SUBMITTED FOR APPROVAL AS:  ☐ GANG    ☐ NARCOTICS    ☐ BOTH

Is this a renewal for a currently active location?  ☐ YES Include number of dispersals and number of persons dispersed in the binder.
☐ NO

**"Hot Spot" Boundaries:**    North: _____
East: _____
South: _____
West: _____

Affected Beat(s): _____
Note: a map with the above area highlighted must be submitted as page 4 of this application.
GANG(S) IDENTIFIED - 1._____ 2._____

The package submitted identifying the above described area as a "Hot Spot" includes the following documentation:

**A- ANALYSIS OF CRIME**
☐ Incident data    ☐ Arrest data    ☐ Calls For Service    ☐ CLEAR Web Maps    ☐ Charts/Graphs

What distinguishes this area from other areas nearby or elsewhere within the district?    **(Must complete this section)**

**B - SPECIFIC PATTERNS (as related by Police personnel):**

☐ Gang Graffiti               ☐ "Flashing" gang signs
☐ Shots Fired                 ☐ Fights on street
☐ Disturbance call            ☐ Underage drinking
☐ Large groups gathering      ☐ Street Robberies/Thefts
☐ Community Alerts            ☐ Crime Patterns

Neighbors not using:
☐ Parks
☐ School yards
☐ Other
☐
Explain: _____

---

[196] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true

[197] City of Chicago, Chicago Police Department, "Special Order S10-02-02: Selection of Designated Enforcement Areas," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12bcfa66-cf112-bd05-8b11becc05997c4e.pdf?hl=true

7.    Major Incident Notifications

Within CPD's CLEAR system, the Major Incident Notification application contains short descriptions of major incidents, including those considered gang-related.[198]

8.    Criminal History Records Information System (CHRIS) Supplemental Reports

Detectives complete Supplemental Reports throughout the course of an investigation. Supplemental Reports provide updates regarding the investigation, and can include information such as additional interviews completed, additional evidence collected, and case progress in court; Supplemental Reports can also be used to designate a gang-relation of the incident, victim, or perpetrator.

[198] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

## FIGURE 24: CHRIS



## REPORTS INCLUDING GANG-RELATED DATA

The following represent reports generated with gang-related data about individuals and areas, within the past 10 years.

9.     District Intelligence Bulletins (DIBs)

DIBs, generated by the Information Services Division, include information specific to each district regarding gang intelligence.[199]

---

[199] City of Chicago, Chicago Police Department, "Special Order S04-13-08: Information Report System," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a864e6-91c12-a867-a4e051c823647762.pdf?hl=true

## FIGURE 25: DIBs HOMEPAGE



Welcome to the DISTRICT INTELLIGENCE BULLETIN!   Select your district of deployment. 

**Hit Summary**

The Deployment Operations Center is interested in your feedback or any intelligence information you have to share. Click **HERE** to submit your information.      FEEDBACK

| AREA ONE: | GANGS | CONFLICT BOUNDARIES | | | |
|---|---|---|---|---|---|
| GC-CE-002-011 | BD GD | 57TH ST | 61ST ST | DR MARTIN LUTHER KING JR DR | STATE ST |
| GC-CE-003-004 | GD BD | 58TH ST | 66TH ST | ST LAWRENCE AVE | |
| GC-CE-008-004 | INTERNAL GD | 59TH | 73RD ST | BELL | CALIFORNIA |
| GC-CE-008-017 | INTERNAL GD | | | | |
| GC-CE-009-001 | LATIN SAINT LA RAZA | 43RD ST | 49TH ST | RACINE AVE | DAMEN AVE |
| GC-CE-010-001 | LK TWO SIX | CERMAK | 33RD | CALIFORNIA | KOSTNER |
| GC-CE-012-001 | SD AMBROSE | 18TH ST | BLUE ISLAND AVE | WOOD ST | WESTERN AVE |
| GC-CE-012-004 | BD TVL | | | | |
| GC-CE-012-012 | BISHOPS VS. LATIN COUNTS | CULLERTON ST | 16TH ST | BLUE ISLAND AVE | DAMEN AVE |

## FIGURE 26: DIBs AREA INFORMATION



**11TH DISTRICT. HARRISON**

HOME    FEEDBACK

Page 1 of 2                Thursday, July 17, 2014                Select District  D11 ▾

**View Hot Spots/Violence Zones**

**High Threat Gang Conflicts**

| GC-NO-011-005 | TVL 4CH CVL/INT 4CH |
|---|---|
| DIVISION ST | FRANKLIN BLVD |
| KEDZIE | PULASKI |
| GC-NO-011-014 | 4CH VS. GD UVL BS NB TVL BD |
| MADISON ST | ROOSEVELT RD |
| WASHTENAW AVE | KILBOURN AVE |

**Upcoming Beat Meetings**

**Drug Selling Locations Last 7 Days**

| Block | # Calls |
|---|---|
|  | 13 |
|  | 10 |
|  | 9 |
|  | 8 |
|  | 8 |
|  | 7 |
|  | 6 |
|  | 6 |
|  | 6 |

**Shots Fired Locations Last 7 Days**

| Block | # Calls |
|---|---|
|  | 3 |
|  | 2 |
|  | 2 |
|  | 2 |
|  | 4 |

**Gang Disturbance Locations Last 7 Days**

| Block | # Calls |
|---|---|
|  | 2 |
|  | 1 |
|  | 1 |
|  | 1 |
|  | 4 |

## FIGURE 27: DIBs IN DISTRICT, WANTED INDIVIDUALS



10.     Officer Safety Alerts

The DOC issues Officer Safety Alerts to notify law enforcement personnel of potential threats. The Officer Safety Alert provides descriptions of offenders, vehicles, threats and/or weapons wanted, and lists subjects wanted for probable cause arrests and active court warrants. Officer Safety Alerts also identify gang conflicts, gang funerals, and/or persons of interest.

## FIGURE 28: INFORMATION BULLETIN SEARCH



### 11.    Daily Bulletin

The Daily Bulletin is used to disseminate information, from certain sections and divisions of the Department, about wanted or missing persons and stolen property, and is available via CPD's Intranet homepage.[200] Department members submitting information for inclusion in the Daily Bulletin can include information about an individual's gang affiliation, along with name, address, sex, race, tattoos, and pictures, among other data.[201]

## DATA VISUALIZATION POINTS

The following represent points where gang-related information about individuals and areas can be displayed and/or queried, within the past 10 years.

### 12.    Caboodle

Caboodle displays the results of the Gang Audit for each District including gang boundaries and factions, gang members, and gang rivals and alliances, as well as other data.[202]

---

[200] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true
[201] City of Chicago, Chicago Police Department, "Material Submitted for use in the Daily Bulletin," Accessed April 8, 2019, http://directives.chicagopolice.org/forms/CPD-11.463.pdf
[202] City of Chicago, Chicago Police Department, "General Order G10-01-01: Gang Audits," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57b38-141c256b-3e214-1c25-b583fdc4cd349e84.pdf?hl=true

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"            APRIL 11, 2019

## FIGURE 29: CABOODLE, CITY OVERVIEW



REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

FIGURE 30: VISUALIZATION IN CABOODLE



REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"          APRIL 11, 2019

## FIGURE 31: DISTRICT GANG FACTIONS AND GANG ARREST CARD MEMBERS



### 13.    Gang Listing Report

The Gang Listing Report is a query page used to generate a "report of all Gang Arrest Cards citywide entered on a Contact Card or a Gang Arrest Card application."

### 14.    Gang Profile Search

The Gang Profile Search is a query page which describes the characteristics of a gang or gang faction and enables Department members to view a profile summary about a gang.[203] Gang Profiles are generated by DOC using information collected from the Gang Audit.[204]

---

[203] City of Chicago, Chicago Police Department, "Special Order S10-02-01: Criminal Street Gang Arrest Information," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-10288308dbafb745.pdf?hl=true

[204] City of Chicago, Chicago Police Department, "General Order G10-01: Gang Violence Reduction Strategy," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57bf0-136d1d31-16513-6d1d-382b311ddf65fd3a.pdf?hl=true

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

## FIGURE 32: GANG PROFILE SEARCH



15.        Gang Members Search

Gang Members Search is a query page of gang membership including the individual's arrest histories and affiliations with other individuals with whom they have been arrested.[205]

---

[205] City of Chicago, Chicago Police Department, "Special Order S10-02-01: Criminal Street Gang Arrest Information," Accessed April 8, 2019, http://directives.chicagopolice.org/directives/data/a7a57be2-12a5752b-27112-a586-10288308dbafb745.pdf?hl=true

FIGURE 33: GANG MEMBER SEARCH



16.　　Link Analysis

Link Analysis is a visualization tool that allows Department members to search for individuals and their related crimes and associates based on levels of connection. Link Analysis connects the associates of shooting victims, as well as the associates of their associates. These connections, along with ballistic evidence, are linked to other shootings and murders.

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

## FIGURE 34: LINK ANALYSIS



17.    Strategic Subject List (SSL) Dashboard

The SSL Dashboard displays the SSL scores of individuals, as well as aggregated in-depth information about each individual listed, drawn from a number of Departmental data sources. Among other tabs of information, the SSL Dashboard includes a Gang Tab and a Violence Reduction Strategy Profile Tab. The Gang Tab provides detailed information regarding gang membership from records in the Gang Audit and Gang Arrest Card databases, as well as other sources. The Violence Reduction Strategy Profile Tab contains demographic and identification information, gang affiliation, investigative alerts, arrest history, known associates, ISRs, traffic convictions, interventions, Administrative Notice of Ordinance Violation citations, and the DOC Analyst's notes. As of January 9, 2019, the SSL Dashboard has been replaced by the Subject Assessment and Information Dashboard (SAID).

REVIEW OF THE CHICAGO POLICE DEPARTMENT'S "GANG DATABASE"                    APRIL 11, 2019

## FIGURE 35: SSL DASHBOARD



## FIGURE 36: SSL DASHBOARD GANG DETAILS



## FIGURE 37: SUBJECT ASSESSMENT AND INFORMATION DASHBOARD



## FIGURE 38: SUBJECT ASSESSMENT AND INFORMATION DASHBOARD INDIVIDUAL DETAILS



18.    Law Enforcement Agencies Data System (LEADS)

LEADS contains records of individuals identified as gang members by ISP, as well as by law enforcement and criminal justice agencies throughout Illinois.

# XII. APPENDIX E: LIST OF EXTERNAL AGENCIES WITH ACCESS PROVIDED BY CPD

| ORGANIZATION CODE | ORGANIZATION TYPE |
|---|---|
| AOIL | AGENCIES OUTSIDE OF ILLINOIS |
| CABS | COOK COUNTY LAW ENFORCEMENT |
| ILL | ILLINOIS LAW ENFORCEMENT |
| ASA | STATE'S ATTORNEY'S OFFICE |
| FED | FEDERAL LAW ENFORCEMENT |
| IAOC | ILLINOIS AGENCIES OUTSIDE OF COOK COUNTY |
| ATF | ALCOHOL, TOBACCO AND FIREARMS |
| CHI | CITY OF CHICAGO |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | ADAM COUNTY SHERIFF OFFICE | Y |
| IAOC | ADAMS COUNTY PROBATION DEPARTMENT | Y |
| IAOC | ADDISON POLICE DEPARTMENT | Y |
| ATF | ALCOHOL TOBACCO AND FIREARMS | Y |
| IAOC | ALGONQUIN POLICE DEPT. | Y |
| CABS | ALSIP | Y |
| CHI | AM LEGAL SERVICES | Y |
| AOILL | AMES POLICE DEPARTMENT | Y |
| IAOC | AMTRAK R.R. POLICE DEPT. | Y |
| IAOC | ANTIOCH POLICE DEPARTMENT | Y |
| CABS | ARLINGTON HEIGHTS | Y |
| IAOC | ATF, NW INDIANA | Y |
| IAOC | AURORA POLICE DEPARTMENT | Y |
| IAOC | BANNOCKBURN | Y |
| CABS | BARRINGTON | Y |
| CABS | BARRINGTON HILLS | Y |
| CABS | BARTLETT | Y |
| IAOC | BARTONVILLE POLICE DEPT. | Y |
| IAOC | BATAVIA POLICE DEPARTMENT | Y |
| IAOC | BEARDSTOWN POLICE DEPARTMENT | Y |
| CABS | BEDFORD PARK | Y |
| IAOC | BEECHER POLICE DEPT. | Y |
| CABS | BELLWOOD | Y |
| CABS | BELT RAILWAY | Y |
| IAOC | BENSENVILLE POLICE DEPARTMENT | Y |
| CABS | BERKELEY | Y |
| CABS | BERWYN | Y |
| IAOC | BLOOMINGDALE POLICE DEPARTMENT | Y |
| IAOC | BLOOMINGTON POLICE DEPARTMENT | Y |
| CABS | BLUE ISLAND | Y |
| CABS | BNSF RAILWAY | Y |
| IAOC | BOLINGBROOK POLICE DEPT. | Y |
| IAOC | BOONE COUNTY SHERIFF | Y |
| IAOC | BRADLEY POLICE DEPARTMENT | Y |
| CABS | BRIDGEVIEW | Y |
| CABS | BROADVIEW | Y |
| CABS | BROOKFIELD | Y |
| CABS | BUFFALO GROVE | Y |
| CABS | BURBANK | Y |
| IAOC | BUREAU COUNTY SHERIFF | Y |
| CABS | BURNHAM | Y |
| CABS | BURR RIDGE | Y |
| IAOC | BYRON POLICE DEPT. | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | CAHOKIA POLICE DEPT. | Y |
| CABS | CALUMET CITY | Y |
| CABS | CALUMET MEMORIAL PARK | Y |
| CABS | CALUMET PARK | Y |
| IAOC | CAROL STREAM POLICE DEPARTMENT | Y |
| IAOC | CARPENTERSVILLE POLICE DEPT. | Y |
| IAOC | CARROLL COUNTY SHERIFF | Y |
| IAOC | CARY POLICE DEPT. | Y |
| ILL | CDN PACIFIC RAILWAY POLICE SRV | Y |
| AOILL | CEDAR LAKE POLICE DEPT. | Y |
| AOILL | CEDAR RAPIDS POLICE DEPT. | Y |
| ILL | CENCOM E911 | Y |
| CABS | CENTRAL MGMT SERVICES | Y |
| ASA | CHAMPAIGN COUNTY SA | Y |
| IAOC | CHAMPAIGN COUNTY SHERIFF | Y |
| IAOC | CHAMPAIGN POLICE DEPT. | Y |
| IAOC | CHANNAHON POLICE DEPT. | Y |
| IAOC | CHARLESTON POLICE DEPARTMENT | Y |
| AOILL | CHESTERTON POLICE DEPARTMENT | Y |
| CHI | CHGO DEPT. OF AVIATION COM CNTR | Y |
| CHI | CHICAGO AVIATION POLICE | Y |
| CHI | CHICAGO FIRE DEPT. -OFI | Y |
| CABS | CHICAGO HEIGHTS | Y |
| CABS | CHICAGO HEIGHTS PARK DISTRICT | Y |
| CHI | CHICAGO HOUSING AUTHORITY OFFICE OF INSP GENERAL | Y |
| CHI | CHICAGO OFFICE OF INSPECTOR GENERAL | Y |
| CABS | CHICAGO RIDGE | Y |
| CABS | CHICAGO STATE UNIVERSITY | Y |
| CABS | CICERO | Y |
| IAOC | CLARENDON HILLS POLICE DEPARTMENT | Y |
| IAOC | COAL CITY POLICE DEPARTMENT | Y |
| IAOC | COLES COUNTY SHERIFF OFFICE | Y |
| IAOC | COLLEGE OF DUPAGE POLICE DEPT | Y |
| IAOC | COLLEGE OF LAKE COUNTY POLICE DEPARTMENT | Y |
| CABS | COOK COUNTY ADULT PROB | Y |
| CABS | COOK COUNTY JUVENILE PROBATION | Y |
| CABS | COOK COUNTY SHERIFF | Y |
| CABS | COOK COUNTY SOCIAL SERVICE | Y |
| CABS | COOK COUNTY STATE ATTORNEY | Y |
| CHI | COPA (FORMERLY IPRA) | Y |
| CABS | COUNTRY CLUB HILLS | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| CABS | COUNTRYSIDE | Y |
| CHI | CPD-ADMINISTRATION | Y |
| IAOC | CREST HILL POLICE DEPT. | Y |
| CABS | CRESTWOOD | Y |
| IAOC | CRETE POLICE DEPARTMENT | Y |
| AOILL | CROWN POINT POLICE DEPT | Y |
| IAOC | CRYSTAL LAKE POLICE DEPT. | Y |
| CABS | CSX RAILROAD POLICE | Y |
| ILL | CTA OFFICE OF INSPECTOR GEN. | Y |
| CHI | CTA SAFETY AND SECURITY | Y |
| FED | D.E.A. | Y |
| AOILL | DANE COUNTY DISTRICT ATTORNEY | Y |
| AOILL | DANE COUNTY SHERIFF | Y |
| IAOC | DANVILLE POLICE DEPARTMENT | Y |
| IAOC | DARIEN POLICE DEPARTMENT | Y |
| AOILL | DE MOTTE POLICE DEPT | Y |
| IAOC | DECATUR POLICE DEPT. | Y |
| IAOC | DEERFIELD POLICE DEPARTMENT | Y |
| IAOC | DEKALB COUNTY COURT SERVICES | Y |
| IAOC | DEKALB COUNTY SHERIFF | Y |
| IAOC | DEKALB POLICE DEPARTMENT | Y |
| CHI | DEPARTMENT OF LAW | Y |
| CABS | DES PLAINES | Y |
| CABS | DIXMOOR | Y |
| IAOC | DIXON POLICE DEPT. | Y |
| CABS | DOLTON | Y |
| IAOC | DOWNERS GROVE P.D. | Y |
| IAOC | DU PAGE COUNTY ADULT PROBATION | Y |
| AOILL | DUBUQUE COUNTY SHERIFFS OFFICE | Y |
| IAOC | DU-COMM | Y |
| IAOC | DUPAGE COUNTY SHERIFF OFF. | Y |
| IAOC | DUPAGE COUNTY STATES ATTY. | Y |
| IAOC | DWIGHT POLICE DEPT. | Y |
| AOILL | DYER POLICE DEPT. (INDIANA) | Y |
| AOILL | EAST CHICAGO POLICE DEPT. | Y |
| IAOC | EAST DUNDEE POLICE DEPT. | Y |
| CABS | EAST HAZEL CREST | Y |
| IAOC | EAST MOLINE POLICE DEPT. | Y |
| IAOC | EAST PEORIA POLICE DEPT. | Y |
| IAOC | E-COM DISPATCH | Y |
| IAOC | EDWARDSVILLE POLICE DEPARTMENT | Y |
| IAOC | EFFINGHAM COUNTY SHERIFF OFF. | Y |
| IAOC | ELBURN POLICE DEPARTMENT | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| CABS | ELGIN | Y |
| CABS | ELK GROVE VILLAGE | Y |
| AOILL | ELKHART CO. PROSECUTOR | Y |
| IAOC | ELMHURST POLICE DEPARTMENT | Y |
| CABS | ELMWOOD PARK | Y |
| CABS | EVANSTON | Y |
| AOILL | EVANSVILLE POLICE DEPARTMENT | Y |
| CABS | EVERGREEN PARK | Y |
| FED | F.B.I. | Y |
| AOILL | FBI - MERRILLVILLE RA | Y |
| FED | FBI – ROCKFORD | Y |
| AOILL | FBI CJIS | Y |
| FED | FBI GANG INTELLIGENCE CENTER | Y |
| IAOC | FBI SPRINGFIELD DIV. | Y |
| AOILL | FITCHBURG POLICE DEPARTMENT | Y |
| CABS | FLOSSMOOR | Y |
| IAOC | FORD COUNTY SHERIFF | Y |
| CABS | FOREST PARK | Y |
| CABS | FOREST PRESERVE | Y |
| CABS | FOREST VIEW | Y |
| IAOC | FOX LAKE POLICE DEPARTMENT | Y |
| IAOC | FOX VALLEY PARK DIST. PD | Y |
| IAOC | FRANKFORT POLICE DEPARTMENT | Y |
| CABS | FRANKLIN PARK | Y |
| IAOC | FREEPORT POLICE DEPT. | Y |
| AOILL | FT. WAYNE INDIANA POLICE DEPT. | Y |
| IAOC | FULTON COUNTY SHERIFF'S OFFICE | Y |
| IAOC | GALESBURG POLICE DEPT. | Y |
| AOILL | GARY PAROLE OFFICE - INDIANA | Y |
| AOILL | GARY POLICE DEPARTMENT | Y |
| IAOC | GENESEO POLICE DEPT. | Y |
| IAOC | GENEVA POLICE DEPT. | Y |
| IAOC | GIBSON CITY POLICE DEPT | Y |
| IAOC | GLEN ELLYN POLICE DEPARTMENT | Y |
| CABS | GLENCOE | Y |
| IAOC | GLENDALE HEIGHTS POLICE DEPT | Y |
| CABS | GLENVIEW | Y |
| CABS | GLENWOOD | Y |
| CABS | GOLF | Y |
| IAOC | GOVERNORS STATE UNIV. POLICE | Y |
| IAOC | GRAYSLAKE POLICE DEPARTMENT | Y |
| AOILL | GRIFFITH POLICE DEPT. | Y |
| IAOC | GRUNDY COUNTY SHERIFFS OFFICE | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | GURNEE POLICE DEPARTMENT | Y |
| IAOC | HAMILTON POLICE DEPT. | Y |
| AOILL | HAMMOND PD | Y |
| CABS | HANOVER PARK | Y |
| CABS | HARPER COLLEGE | Y |
| IAOC | HARVARD POLICE DEPARTMENT | Y |
| CABS | HARVEY | Y |
| CABS | HARWOOD HEIGHTS | Y |
| IAOC | HAWTHORN WOODS POLICE DEPT | Y |
| CABS | HAZEL CREST | Y |
| AOILL | HENNEPIN COUNTY SHERIFF'S | Y |
| IAOC | HENRY COUNTY PROB / COURT SERV | Y |
| IAOC | HENRY COUNTY SHERIFF | Y |
| CABS | HICKORY HILLS | Y |
| CABS | HIDTA | Y |
| IAOC | HIGHLAND PARK | Y |
| AOILL | HIGHLAND POLICE DEPT. | Y |
| IAOC | HIGHWOOD POLICE DEPARTMENT | Y |
| CABS | HILLSIDE | Y |
| IAOC | HINSDALE | Y |
| AOILL | HOBART POLICE DEPARTMENT | Y |
| CABS | HODGKINS | Y |
| CABS | HOFFMAN ESTATES | Y |
| IAOC | HOMELAND SECURITY / ICE | Y |
| FED | HOMELAND SECURITY INTELLIGENCE | Y |
| FED | HOMELAND SECURITY INVESTIGATIONS | Y |
| FED | HOMELAND SECURITY OFFICE OF INSPECTOR GENERAL | Y |
| CABS | HOMETOWN | Y |
| CABS | HOMEWOOD | Y |
| IAOC | HOOPESTON POLICE DEPARTMENT | Y |
| IAOC | HUNTLEY POLICE DEPARTMENT | Y |
| IAOC | ICE / NCFIU | Y |
| ILL | IL DEPT OF NATURAL RESOURCES LAW ENFORCEMENT | Y |
| IAOC | IL LAW ENFORC. TRAIN. & STAND. | Y |
| ILL | ILL DEPT. OF CORR. (PAROLE DIV) | Y |
| CABS | ILLINOIS ATTORNEY GENERAL | Y |
| ILL | ILLINOIS COMMERCE COMMISSION POLICE | Y |
| CABS | ILLINOIS CRIMINAL JUSTICE INFO AUTHORITY | Y |
| IAOC | ILLINOIS DCFS / IG | Y |
| IAOC | ILLINOIS DEPARTMENT OF CORRECTIONS | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
| --- | --- | --- |
| IAOC | ILLINOIS DEPT OF HEALTHCARE AND FAMILY – OIG | Y |
| CABS | ILLINOIS DEPT. OF REVENUE | Y |
| ILL | ILLINOIS SECRETARY OF STATE | Y |
| CABS | ILLINOIS STATE POLICE | Y |
| IAOC | ILLINOIS STATE UNIVERSITY PD | Y |
| CABS | INDIAN HEAD PARK | Y |
| AOILL | INDIANA DEPARTMENT OF CHILD SERVICES (DCS) | Y |
| AOILL | INDIANA DEPT. OF CORRECTION | Y |
| AOILL | INDIANA GAMING COMMISSION | Y |
| CABS | INDIANA HARBOR BELT RAILROAD PD | Y |
| AOILL | INDIANA STATE POLICE | Y |
| AOILL | INDIANAPOLIS METRO POLCE DEPT | Y |
| AOILL | INDIANAPOLIS POLICE DEPT | Y |
| ILL | INSPECTOR GEN. & SEC. OF STATE | Y |
| FED | INTERNAL REVENUE SERVICE | Y |
| CABS | INVERNESS | Y |
| IAOC | ISLAND LAKE POLICE DEPT. | Y |
| IAOC | ITASCA POLICE DEPARTMENT | Y |
| AOILL | JASPER COUNTY SHERIFF INDIANA | Y |
| IAOC | JASPER COUNTY SHERIFF OFFICE | Y |
| IAOC | JO DAVIESS COUNTY SHERIFF | Y |
| IAOC | JOHNSBURG POLICE DEPT | Y |
| IAOC | JOLIET JUNIOR COLLEGE PD | Y |
| IAOC | JOLIET POLICE DEPARTMENT | Y |
| CABS | JUSTICE | Y |
| IAOC | KANAKAKEE MEG | Y |
| IAOC | KANE COUNTY COURT SERVICES | Y |
| IAOC | KANE COUNTY SHERIFFS OFFICE | Y |
| IAOC | KANKAKEE COUNTY PROBATION | Y |
| IAOC | KANKAKEE COUNTY SHERIFF OFFICE | Y |
| IAOC | KANKAKEE COUNTY STATE'S ATTORNEY | Y |
| IAOC | KANKAKEE POLICE DEPARTMENT | Y |
| IAOC | KENCOM COUNTY DISPATCH | Y |
| IAOC | KENDALL COUNTY PROBATION / COURT SERVICES | Y |
| IAOC | KENDALL COUNTY SHERIFF | Y |
| CABS | KENILWORTH | Y |
| AOILL | KENOSHA COUNTY SHERIFF DEPT. | Y |
| AOILL | KENOSHA POLICE DEPARTMENT | Y |
| IAOC | KILDEER POLICE DEPARTMENT | Y |
| IAOC | KNOX COUNTY PROBATION | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| AOILL | KOUTS POLICE DEPT. | Y |
| AOILL | LA PORTE POLICE DEPARTMENT | Y |
| AOILL | LAFAYETTE POLICE DEPT. | Y |
| CABS | LAGRANGE | Y |
| CABS | LAGRANGE PARK | Y |
| IAOC | LAKE BLUFF POLICE DEPT. | Y |
| IAOC | LAKE COUNTY CORONER | Y |
| AOILL | LAKE COUNTY HIDTA / ISC | Y |
| AOILL | LAKE COUNTY INDIANA PROBATION | Y |
| AOILL | LAKE COUNTY PROSECUTOR OFFICE | Y |
| AOILL | LAKE COUNTY SHERIFF INDIANA | Y |
| IAOC | LAKE COUNTY SHERIFF OFFICE | Y |
| IAOC | LAKE COUNTY STATE ATTORNEY | Y |
| IAOC | LAKE FOREST POLICE DEPT | Y |
| IAOC | LAKE IN THE HILLS POLICE DEPT. | Y |
| IAOC | LAKE VILLA POLICE DEPARTMENT | Y |
| IAOC | LAKE ZURICH POLICE DEPT | Y |
| IAOC | LAKEMOOR POLICE DEPARTMENT | Y |
| CABS | LANSING | Y |
| IAOC | LASALLE COUNTY SHERIFF'S OFFICE | Y |
| CABS | LEMONT | Y |
| IAOC | LEWIS UNIVERSITY POLICE DEPARTMENT | Y |
| IAOC | LIBERTYVILLE POLICE DEPARTMENT | Y |
| IAOC | LINCOLN POLICE DEPT. | Y |
| IAOC | LINCOLNSHIRE POLICE DEPARTMENT | Y |
| CABS | LINCOLNWOOD | Y |
| IAOC | LINDENHURST POLICE DEPT. | Y |
| IAOC | LISLE POLICE DEPARTMENT | Y |
| IAOC | LIVINGSTON COUNTY SHERIFF | Y |
| IAOC | LOCKPORT POLICE DEPARTMENT | Y |
| IAOC | LOCKPORT TOWNSHIP PARK DISTRICT POLICE | Y |
| IAOC | LOGAN COUNTY SHERIFF | Y |
| IAOC | LOMBARD POLICE DEPARTMENT | Y |
| IAOC | LOYOLA UNIVERSITY PD | Y |
| CABS | LYNWOOD | Y |
| CABS | LYONS | Y |
| IAOC | MACOMB POLICE DEPT. | Y |
| IAOC | MACON COUNTY SHERIFF'S OFFICE | Y |
| AOILL | MADISON POLICE DEPARTMENT | Y |
| IAOC | MANHATTAN POLICE DEPARTMENT | Y |
| AOILL | MAPLE BLUFF POLICE DEPARTMENT | Y |
| IAOC | MARENGO POLICE DEPT. | Y |
| CABS | MARKHAM | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | MARYVILLE POLICE DEPT. | Y |
| CABS | MATTESON | Y |
| IAOC | MATTOON POLICE DEPARTMENT | Y |
| CABS | MAYWOOD | Y |
| IAOC | MC DONOUGH COUNTY SHERIFF | Y |
| IAOC | MC HENRY COUNTY PROBATION | Y |
| IAOC | MC HENRY COUNTY SHERIFF | Y |
| IAOC | MC HENRY COUNTY STATES ATTY | Y |
| IAOC | MC HENRY POLICE DEPARTMENT | Y |
| IAOC | MC LEAN COUNTY SHERIFF OFFICE | Y |
| ASA | MC LEAN COUNTY STATES ATTORNEY | Y |
| CABS | MCCOOK | Y |
| IAOC | MCLEAN COUNTY PROBATION OFFICE | Y |
| CABS | MELROSE PARK | Y |
| AOILL | MERRILLVILLE POLICE DEPT. | Y |
| CABS | MERRIONETTE PARK | Y |
| IAOC | METCAD 911 | Y |
| CABS | METRA POLICE | Y |
| AOILL | MICHIGAN CITY POLICE DEPT. | Y |
| CABS | MIDLOTHIAN | Y |
| IAOC | MILWAUKEE HIDTA | Y |
| IAOC | MINOOKA POLICE DEPARTMENT | Y |
| AOILL | MISHAWAKA POLICE DEPT. | Y |
| IAOC | MOKENA POLICE DEPT. | Y |
| IAOC | MOLINE | Y |
| IAOC | MONEE POLICE DEPARTMENT | Y |
| IAOC | MONTGOMERY POLICE DEPARTMENT | Y |
| ILL | MOODY BIBLE INSTITUTE POLICE DEPARTMENT | Y |
| CABS | MORAINE VALLEY | Y |
| IAOC | MORRIS POLICE DEPT. | Y |
| CABS | MORTON GROVE | Y |
| IAOC | MORTON POLICE DEPT. | Y |
| IAOC | MOULTRIE COUNTY SHERIFF OFFICE | Y |
| CABS | MOUNT PROSPECT | Y |
| IAOC | MT. ZION POLICE DEPT. | Y |
| IAOC | MUNDELEIN POLICE DEPT. | Y |
| AOILL | MUNSTER POLICE DEPT. INDIANA | Y |
| IAOC | NAPERVILLE POLICE DEPARTMENT | Y |
| IAOC | NATIONAL INSURANCE CRIME BUREAU | Y |
| IAOC | NAUVOO POLICE DEPT | Y |
| FED | NAVAL CRIMINAL INVESTIGATIVE SERVICE - GREAT LAKES | Y |
| CHI | NAVY PIER SAFETY AND SECURITY | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | NEW LENOX POLICE DEPARTMENT | Y |
| CABS | NILES | Y |
| CABS | NORFOLK SOUTHERN | Y |
| IAOC | NORMAL POLICE DEPARTMENT | Y |
| CABS | NORRIDGE | Y |
| IAOC | NORTH AURORA POLICE DEPT. | Y |
| CABS | NORTH CENTRAL NARCOTICS TASK FORCE | Y |
| IAOC | NORTH CHICAGO POLICE DEPT. | Y |
| AOILL | NORTH INDIANA TRANSIT POLICE | Y |
| CABS | NORTH RIVERSIDE | Y |
| IAOC | NORTH UTICA POLICE DEPARTMENT | Y |
| CABS | NORTHBROOK | Y |
| CABS | NORTHEASTERN ILLINOIS UNIV. | Y |
| IAOC | NORTHERN ILLINOIS UNIV. PD | Y |
| CABS | NORTHFIELD | Y |
| CABS | NORTHLAKE | Y |
| CABS | NORTHWESTERN UNIVERISITY | Y |
| IAOC | OAK BROOK POLICE DEPARTMENT | Y |
| CABS | OAK FOREST | Y |
| CABS | OAK LAWN | Y |
| CABS | OAK PARK | Y |
| IAOC | OAKBROOK TERRACE | Y |
| CABS | OAKTON COMMUNITY COLLEGE POLICE DEPT | Y |
| CABS | OFFICE OF COOK CNTY-INSP. GEN. | Y |
| CHI | OFFICE OF EMERGENCY COMM. | Y |
| IAOC | OGLE COUNTY SHERIFF'S OFFICE | Y |
| CABS | OLYMPIA FIELDS | Y |
| CABS | ORLAND HILLS | Y |
| CABS | ORLAND PARK | Y |
| IAOC | OSWEGO POLICE DEPT. | Y |
| IAOC | OTTAWA POLICE DEPARTMENT | Y |
| CABS | PALATINE | Y |
| CABS | PALOS HEIGHTS | Y |
| CABS | PALOS HILLS | Y |
| CABS | PALOS PARK | Y |
| CABS | PARK FOREST | Y |
| CABS | PARK RIDGE | Y |
| IAOC | PEKIN POLICE DEPARTMENT | Y |
| IAOC | PEORIA PARK POLICE DEPT. | Y |
| IAOC | PEORIA POLICE DEPARTMENT | Y |
| IAOC | PEOTONE POLICE | Y |
| IAOC | PERU POLICE DEPARTMENT | Y |
| CABS | PHOENIX | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | PINGREE GROVE POLICE DEPT. | Y |
| IAOC | PLAINFIELD POLICE DEPARTMENT | Y |
| IAOC | PONTIAC POLICE DEPT. | Y |
| AOILL | PORTER COUNTY ADULT PROBATION | Y |
| AOILL | PORTER COUNTY SHERIFF DEPT. | Y |
| AOILL | PORTER POLICE DEPARTMENT | Y |
| AOILL | PORTER POLICE INDIANA | Y |
| CABS | POSEN | Y |
| IAOC | PRINCETON POLICE DEPARTMENT | Y |
| CABS | PROSPECT HEIGHTS | Y |
| AOILL | PURDUE UNIV. POLICE DEPT. | Y |
| IAOC | QUAD COM DISPATCH | Y |
| IAOC | QUINCY POLICE DEPT. | Y |
| AOILL | RACINE POLICE DEPT. | Y |
| IAOC | RANTOUL POLICE DEPARTMENT | Y |
| AOILL | RENSSELAER POLICE DEPT | Y |
| AOILL | RICHLAND CENTER POLICE DEPARTMENT | Y |
| CABS | RICHTON PARK | Y |
| CABS | RIVER FOREST | Y |
| CABS | RIVER GROVE | Y |
| CABS | RIVERDALE | Y |
| CABS | RIVERSIDE | Y |
| IAOC | RIVERSTON POLICE DEPT | Y |
| IAOC | RIVERWOODS POLICE DEPT. | Y |
| CABS | ROBBINS | Y |
| IAOC | ROCHELLE POLICE DEPT. | Y |
| IAOC | ROCK FALLS POLICE DEPT. | Y |
| IAOC | ROCK ISLAND COUNTY COURT SERV. | Y |
| IAOC | ROCK ISLAND COUNTY SHERIFF | Y |
| IAOC | ROCK ISLAND POLICE DEPARTMENT | Y |
| IAOC | ROCK VALLEY COLLEGE PD | Y |
| IAOC | ROCKFORD POLICE DEPT. | Y |
| CABS | ROLLING MEADOWS | Y |
| IAOC | ROMEOVILLE POLICE DEPT. | Y |
| IAOC | ROSCOE POLICE DEPARTMENT | Y |
| CABS | ROSELLE | Y |
| CABS | ROSEMONT | Y |
| IAOC | ROUND LAKE BEACH POLICE DEPT | Y |
| IAOC | ROUND LAKE PARK P.D. | Y |
| IAOC | ROUND LAKE POLICE DEPARTMENT | Y |
| CABS | SAINT XAVIER UNIVERSITY | Y |
| IAOC | SANGAMON COUNTY SHERIFF OFFICE | Y |
| CABS | SAUK VILLAGE | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| CABS | SCHAUMBURG | Y |
| AOILL | SCHERERVILLE POLICE DEPT. | Y |
| CABS | SCHILLER PARK | Y |
| IAOC | SENECA POLICE DEPARTMENT | Y |
| CABS | SKOKIE | Y |
| IAOC | SLEEPY HOLLOW POLICE DEPT. | Y |
| CABS | SOUTH BARRINGTON | Y |
| IAOC | SOUTH BELOIT POLICE DEPT. | Y |
| AOILL | SOUTH BEND POLICE DEPT. | Y |
| CABS | SOUTH CHICAGO HEIGHTS | Y |
| IAOC | SOUTH ELGIN POLICE DEPT. | Y |
| CABS | SOUTH HOLLAND | Y |
| CABS | SOUTH SUBURBAN COLLEGE | Y |
| IAOC | SPRING GROVE POLICE DEPT. | Y |
| IAOC | SPRING VALLEY POLICE DEPT. | Y |
| IAOC | SPRINGFIELD POLICE DEPARTMENT | Y |
| FED | SSA OFFICE OF INVESTIGATIONS | Y |
| IAOC | ST. CHARLES POLICE DEPARTMENT | Y |
| AOILL | ST. JOHN POLICE DEPT. | Y |
| AOILL | ST. PAUL POLICE DEPT. | Y |
| IAOC | STARK COUNTY SHERIFF OFFICE | Y |
| AOILL | STARKE COUNTY PROBATION INDIANA | Y |
| ILL | STATE OF ILLINOIS | Y |
| CABS | STEGER | Y |
| IAOC | STERLING POLICE DEPT. | Y |
| CABS | STICKNEY | Y |
| CABS | STONE PARK | Y |
| CABS | STREAMWOOD | Y |
| ILL | STROGER HOSPITAL PD | Y |
| IAOC | SUGAR GROVE POLICE DEPARTMENT | Y |
| IAOC | SULLIVAN POLICE DEPARTMENT | Y |
| CABS | SUMMIT | Y |
| AOILL | SUN PRAIRIE POLICE DEPARTMENT | Y |
| IAOC | SYCAMORE POLICE DEPARTMENT | Y |
| IAOC | TAZEWELL COUNTY STATES ATTY. | Y |
| CABS | THORNTON | Y |
| CABS | TINLEY PARK | Y |
| AOILL | TIPPECANOE COUNTY PROSECUTOR | Y |
| IAOC | TOWER LAKES PD | Y |
| CABS | TRITON COLLEGE | Y |
| IAOC | U.I.S POLICE DEPT. | Y |
| CABS | UNION PACIFIC RR | Y |
| CHI | UNITED ROAD TOWING | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | UNIVERSITY OF CHICAGO PD | Y |
| CABS | UNIVERSITY OF ILLINOIS | Y |
| IAOC | UNIVERSITY OF ILLINOIS - URBANA | Y |
| CABS | UNIVERSITY PARK | Y |
| IAOC | URBANA POLICE DEPARTMENT | Y |
| FED | US ATTORNEY OFFICE | Y |
| AOILL | US ATTY OFFICE, NORTH DIST. IND | Y |
| FED | US CITIZENSHIP & IMMIGRATION | Y |
| FED | US COAST GUARD | Y |
| FED | US CUSTOMS AND BORDER PROTECTION – CHICAGO | Y |
| IAOC | US DEPARTMENT OF LABOR - I.G | Y |
| FED | US DEPT OF AGRICULTURE - OIG | Y |
| FED | US DEPT OF EDUCATION INSPECTOR GEN | Y |
| FED | US DEPT OF HEALTH AND HUMAN SERVICES OIG | Y |
| FED | US DEPT OF VETERAN AFFAIRS - OIG | Y |
| CABS | US DVA HINES HOSPITAL | Y |
| CABS | US DVA MED CENTER | Y |
| FED | US FDA OFFICE OF CRIMINAL INVESTIGATIONS | Y |
| FED | US FEDERAL AIR MARSHALL SERV. | Y |
| IAOC | US FEDERAL PROTECTIVE SERVICES | Y |
| FED | US GENERAL SERVICES ADMIN | Y |
| AOILL | US MARSHALL TASK FORCE HAMMOND | Y |
| FED | US MARSHALS OFFICE CHICAGO | Y |
| IAOC | US NAVY - GREAT LAKES POLICE | Y |
| FED | US OFFICE PERSONNEL MANAGEMENT FIS | Y |
| FED | US POSTAL INSPECTION SERVICE | Y |
| IAOC | US POSTAL SERVICES - IG OFFICE | Y |
| FED | US PRETRIAL SERVICES OFFICE | Y |
| AOILL | US PROBATION (EAST WISCONSIN) | Y |
| FED | US PROBATION (NORTHERN DIST) | Y |
| FED | US PROBATION NORTHERN INDIANA | Y |
| FED | US R.R. BOARD INSP. GEN | Y |
| FED | US SECRET SERVICE CHICAGO | Y |
| FED | US SECRET SERVICE MILWAUKEE | Y |
| FED | US STATE DEPT-FOREIGN DIG. SER | Y |
| AOILL | US TREASURY IG, TAX ADMIN | Y |
| FED | USD HS / ICE – DRO | Y |
| AOILL | VALPARAISO POLICE DEPARTMENT | Y |
| IAOC | VERMILION COUNTY STATES ATTY | Y |
| IAOC | VERNON HILLS POLICE DEPT | Y |
| IAOC | VILLA PARK POLICE DEPARTMENT | Y |
| CABS | WARRENVILLE | Y |

| ORGANIZATION CODE | AGENCY NAME | ACCESS STATUS |
|---|---|---|
| IAOC | WASHINGTON POLICE DEPARTMENT | Y |
| IAOC | WAUCONDA POLICE DEPARTMENT | Y |
| IAOC | WAUKEGAN POLICE DEPARTMENT | Y |
| AOILL | WAUWATOSA POLICE DEPARTMENT | Y |
| IAOC | WAYNE POLICE DEPARTMENT | Y |
| IAOC | WEST CHICAGO POLICE DEPT | Y |
| IAOC | WEST DUNDEE POLICE DEPT. | Y |
| AOILL | WEST LAFAYETTE POLICE DEPT. | Y |
| CABS | WESTCHESTER | Y |
| IAOC | WESTERN ILLINOIS UNIV. POLICE | Y |
| CABS | WESTERN SPRINGS | Y |
| CABS | WESTMONT | Y |
| IAOC | WHEATON POLICE DEPARTMENT | Y |
| CABS | WHEELING | Y |
| IAOC | WHITESIDE COUNTY COURT SERVICE | Y |
| IAOC | WHITESIDE COUNTY SHERIFF | Y |
| IAOC | WHITESIDE COUNTY STATE ATTY | Y |
| IAOC | WILL COUNTY CIRCUIT CLERK | Y |
| IAOC | WILL COUNTY COURT SERVICES | Y |
| IAOC | WILL COUNTY JUVENILE PROBATION | Y |
| IAOC | WILL COUNTY SHERIFF OFFICE | Y |
| IAOC | WILL COUNTY STATE ATTY | Y |
| CABS | WILLOW SPRINGS | Y |
| IAOC | WILLOWBROOK POLICE DEPARTMENT | Y |
| CABS | WILMETTE | Y |
| IAOC | WINFIELD POLICE DEPARTMENT | Y |
| IAOC | WINNEBAGO COUNTY SHERIFF | Y |
| CABS | WINNETKA | Y |
| IAOC | WINTHROP HARBOR POLICE DEPT | Y |
| AOILL | WISCONSIN - DIV. OF CRIM INVEST | Y |
| IAOC | WOOD DALE POLICE DEPARTMENT | Y |
| IAOC | WOODRIDGE POLICE DEPARTMENT | Y |
| CABS | WORTH | Y |
| IAOC | ZION POLICE DEPARTMENT | Y |

# XIII. APPENDIX F: APPLICATION FOR EXTERNAL AGENCY ACCESS TO CLEAR



### Security Requirements for Accessing Information from
### CLEAR - Citizens and Law Enforcement Analysis and Reporting

As the Chief Executive of _____ I affirm that all members of the agency for whom I have assigned authority to enter and access data electronically from the CLEAR system managed by the Chicago Police Department will abide by the security requirements as delineated herewith by the Chicago Police Department in this document and in any written successor security requirement document disseminated by the Chicago Police Department.

I do so for the purpose of gaining access to the data stored in the CLEAR system and that other information which the Chicago Police Department has voluntarily made available to criminal justice agencies over its extra net.

All inquiries must be for criminal justice purposes only. All users of CLEAR in my agency will be informed that each inquiry made of CLEAR is tracked to the logon identification number of the requestor. Audits will be conducted to review usage by agencies and individuals authorized to make such inquiries.

The following security requirements are mandatory for all agencies and persons accessing information from CLEAR:

1. Users must be full time criminal justice agency employees or certified as police officers in the State of their employment of the participating police department / criminal justice agency.

2. Users must have no history of felony convictions; participating local criminal justice agencies in Illinois must submit a State of Illinois Identification (SID) Number for each user as evidence that a criminal history background check was previously conducted for an employee. Outside of Illinois each CLEAR user must be uniquely identified. (Note: Mostly, this unique identifier is that member's FBI CJIS systems logon 10.)

3. All agencies must provide demographic data and pertinent numeric identifiers for personnel identified by their respective agency to the Chicago Police Department before access to CLEAR will be authorized.

4. The Chicago Police Department will assign each user a logon identifier to access CLEAR.

5. All users of the CLEAR programs must create an individualized password when they first logon using the new logon identifier.

6. Passwords should be changed regularly.

© Chicago Police Department, 2016

- 5 -

**Note:** Users can change their passwords without the assistance of the CPD Help Desk by going through the CLEAR Portal.

7. Participating agencies will <u>not</u> maintain a listing of their members' passwords.
8. Passwords are confidential and known only to the user.

9. CLEAR passwords may be re-set by either the local agency CLEAR Administrators or the Chicago Police Department's Help Desk at 312-745-5083.

   **Note:** Members seeking to re-activate their password will be required to positively answer a set of prescribed questions for which the answers have previously been recorded at the Help Desk.

10. Participating agencies may be required to validate their agencies' rosters of employees who have CLEAR logon identification numbers on demand in the manner prescribed by the Chicago Police Department.

11. Participating agencies will immediately de-activate the logon Ids of all members of their respective agency who have been suspended, are retired, on extended leave of absence, or otherwise no longer an active employee in good standing; this will be done by one of the agency's CLEAR Administrators.

12. Any suspected or documented misuse of CLEAR information discovered or reported to a participating agency must be reported by that participating agency chief to the Chicago Police Department's Director of Information Services Division at 312-745-5083 during normal business hours. Members whose passwords are suspected to have been compromised will change their passwords.

13. Any misuse of the information accessed from the CLEAR should be considered a disciplinary infraction by that participating agency and be addressed in such a manner by that agency.

14. Any documented misuse of information obtained from CLEAR or failure to abide by the security rules established by the Chicago Police Department may result in termination of the participating agency's access by the CPD.

15. Each participating agency will identify two members of their agency to function as CLEAR Administrators. At the direction of the chief of the subject agency CLEAR Administrator will be authorized to create, de-activate and modify CLEAR user information for members of that agency.

Accepted by: _____

Title: _____

Agency: _____

Date: _____

© Chicago Police Department, 2016

- 6 -

# XIV. APPENDIX G: GANG ARREST CARD ALLEGATIONS

Arrest charges predominately fall within three large groups: felonies, misdemeanors, and petty offenses/ordinance violations. Felony charges are based on serious or violent crime and are further divided according to the statutory severity of the crime. From least to most severe, felonies are classified as Class 4 (punishable by up to 3-years of imprisonment), Class 3 (punishable by up to 5-years of imprisonment), Class 2 (punishable by up to 7-years of imprisonment), Class 1 (punishable by up to 15-years of imprisonment), Class X (punishable by up to 30-years of imprisonment), or Class M (punishable by up to 60-years of imprisonment).[206]

Crimes such as aggravated unlawful use of a weapon and possession of less than one gram of a controlled substance like cocaine or heroin are examples of Class 4 felonies. Class 3 felonies include different types of aggravated batteries such as those occurring on the public way or based on the status of the victim. Burglary, possession of a stolen motor vehicle, and robbery are examples of Class 2 felonies. Class 1 felonies include crimes such as aggravated discharge of a firearm, residential burglary, and aggravated robbery. Class X felonies are very serious and violent crimes such as armed robbery, aggravated vehicular hijacking, aggravated battery with a firearm, and aggravated criminal sexual assault. Finally, Class M felonies are reserved for murders. The spectrum of felony classifications generally follows the level of severity or violence exhibited in a crime.

Misdemeanors are generally low-level crimes and are not as serious, either in nature or impact, as felonies. Misdemeanors are classified, from least to most severe, as Class C (punishable by not more than 30-days of imprisonment), Class B (punishable by not more than 6-months of imprisonment), and Class A (punishable by less than 1-year of imprisonment). Until recently, possession of small amounts of cannabis were classified as misdemeanors. Possession of less than 2.5 grams was a Class C misdemeanor, more than 2.5 grams but less than 10 grams was a Class B misdemeanor, and 10 to 30 grams was a Class A misdemeanor. On July 26, 2016, changes to the Illinois Cannabis Control Act took effect which turned possession of less than 10 grams of cannabis into a civil law violation punishable by a fine.[207]

Some misdemeanors do not have a named victim but are based on the general welfare of the public. In Arrest Reports, the State of Illinois is usually listed as the victim. These types of misdemeanors under Class A include minor drug-related charges as well as reckless conduct, disorderly conduct, gambling on the street, and streetgang contact by a parolee.

---

[206] The sentencing guidelines are taken from the Illinois Uniform Code of Corrections found at 730 ILCS 5/5-4.5-5, *et. seq.* The possible sentence durations described above are general guidelines and do not encompass enhanced or extended sentencing options.
[207] See 720 ILCS 550, *et. seq.*

Lastly, petty offenses and ordinance violations are the least serious group of charges. Generally, an arrestee will be fined if found in violation of a petty offense or ordinance provision. In Chicago, the local ordinances are found in the Municipal Code of Chicago (MCC). Examples of a local ordinance violation include drinking on the public way (MCC § 8-4-30) and narcotics related loitering (MCC § 8-4-017).

It is important to note that the charges listed on an Arrest Report and used in the data analysis are charges that CPD determined to be the most appropriate. It is ultimately the responsibility of those in the CCSAO to determine the charges to prosecute. This analysis does not examine the charging decisions of the CCSAO or the outcomes of any prosecutions stemming from an arrest.

# XV. APPENDIX H: GANG ARREST COUNTS BY COMMUNITY AREA (JANUARY 1, 1997, THROUGH NOVEMBER 7, 2018)

| Arrest Community Area | Number of Records | % of Total |
|---|---|---|
| 25 – AUSTIN | 46,093 | 8.81% |
| COMMUNITY AREA UNKNOWN[208] | 38,714 | 7.40% |
| 29 - NORTH LAWNDALE | 29,226 | 5.59% |
| 23 - HUMBOLDT PARK | 28,481 | 5.44% |
| 30 - SOUTH LAWNDALE | 21,587 | 4.13% |
| 67 - WEST ENGLEWOOD | 18,522 | 3.54% |
| 61 - NEW CITY | 18,433 | 3.52% |
| 68 – ENGLEWOOD | 16,195 | 3.10% |
| 66 - CHICAGO LAWN | 16,181 | 3.09% |
| 27 - EAST GARFIELD PARK | 15,776 | 3.02% |
| 26 - WEST GARFIELD PARK | 15,574 | 2.98% |
| 71 - AUBURN GRESHAM | 13,375 | 2.56% |
| 43 - SOUTH SHORE | 12,757 | 2.44% |
| 49 – ROSELAND | 12,289 | 2.35% |
| 24 - WEST TOWN | 11,187 | 2.14% |
| 46 - SOUTH CHICAGO | 10,506 | 2.01% |
| 69 - GREATER GRAND CROSSING | 10,488 | 2.01% |
| 28 - NEAR WEST SIDE | 9,619 | 1.84% |
| 31 - LOWER WEST SIDE | 9,527 | 1.82% |
| 19 - BELMONT CRAGIN | 9,007 | 1.72% |
| 42 – WOODLAWN | 8,437 | 1.61% |
| 22 - LOGAN SQUARE | 8,153 | 1.56% |
| 8 - NEAR NORTH SIDE | 7,650 | 1.46% |
| 3 – UPTOWN | 7,524 | 1.44% |
| 1 - ROGERS PARK | 7,482 | 1.43% |
| 53 - WEST PULLMAN | 7,132 | 1.36% |
| 44 – CHATHAM | 7,108 | 1.36% |
| 63 - GAGE PARK | 6,914 | 1.32% |
| 58 - BRIGHTON PARK | 6,330 | 1.21% |
| 38 - GRAND BOULEVARD | 5,302 | 1.01% |
| 40 - WASHINGTON PARK | 5,275 | 1.01% |
| 73 - WASHINGTON HEIGHTS | 4,842 | 0.93% |
| 14 - ALBANY PARK | 4,262 | 0.81% |
| 20 – HERMOSA | 4,197 | 0.80% |
| 35 – DOUGLAS | 3,947 | 0.75% |

[208] There were 38,714 records where the Community Area of arrest could not be determined, approximately 7.4% of the total number of records. These records were excluded from the map in the analysis. For the demographic portion of the analysis these records were classified as "Community Area Unknown."

| 2 - WEST RIDGE | 3,349 | 0.64% |
| 21 – AVONDALE | 3,327 | 0.64% |
| 15 - PORTAGE PARK | 3,097 | 0.59% |
| 51 - SOUTH DEERING | 3,045 | 0.58% |
| 37 - FULLER PARK | 2,977 | 0.57% |
| 77 – EDGEWATER | 2,956 | 0.57% |
| **Arrest Community Area** | **Number of Records** | **% of Total** |
| 16 - IRVING PARK | 2,891 | 0.55% |
| 52 - EAST SIDE | 2,715 | 0.52% |
| 75 - MORGAN PARK | 2,639 | 0.50% |
| 70 – ASHBURN | 2,499 | 0.48% |
| 6 - LAKE VIEW | 2,291 | 0.44% |
| 4 - LINCOLN SQUARE | 2,209 | 0.42% |
| 60 – BRIDGEPORT | 2,184 | 0.42% |
| 56 - GARFIELD RIDGE | 2,108 | 0.40% |
| 32 – LOOP | 2,036 | 0.39% |
| 65 - WEST LAWN | 2,008 | 0.38% |
| 50 – PULLMAN | 1,836 | 0.35% |
| 59 - MCKINLEY PARK | 1,501 | 0.29% |
| 62 - WEST ELSDON | 1,388 | 0.27% |
| 48 - CALUMET HEIGHTS | 1,325 | 0.25% |
| 54 – RIVERDALE | 1,316 | 0.25% |
| 5 - NORTH CENTER | 1,276 | 0.24% |
| 64 – CLEARING | 1,245 | 0.24% |
| 39 – KENWOOD | 1,205 | 0.23% |
| 33 - NEAR SOUTH SIDE | 1,189 | 0.23% |
| 45 - AVALON PARK | 1,113 | 0.21% |
| 7 - LINCOLN PARK | 1,111 | 0.21% |
| 34 - ARMOUR SQUARE | 950 | 0.18% |
| 57 - ARCHER HEIGHTS | 886 | 0.17% |
| 41 - HYDE PARK | 845 | 0.16% |
| 47 – BURNSIDE | 813 | 0.16% |
| 17 – DUNNING | 735 | 0.14% |
| 36 – OAKLAND | 624 | 0.12% |
| 11 - JEFFERSON PARK | 572 | 0.11% |
| 13 - NORTH PARK | 543 | 0.10% |
| 55 – HEGEWISCH | 520 | 0.10% |
| 72 – BEVERLY | 364 | 0.07% |
| 18 – MONTCLARE | 358 | 0.07% |
| 76 – OHARE | 350 | 0.07% |
| 10 - NORWOOD PARK | 267 | 0.05% |
| 74 - MOUNT GREENWOOD | 165 | 0.03% |
| 12 - FOREST GLEN | 128 | 0.02% |
| 9 - EDISON PARK | 27 | 0.01% |
| **Grand Total** | **523,075** | **100.00%** |

# XVI. APPENDIX I: GLOSSARY

APPEAL: A process by which an individual designated as a gang member can contest this designation.

CABOODLE: A map-based data visualization tool that allows users to look up gang boundaries and gang-identified individuals.

CALGANG DATABASE: A relational intelligence database used in California that houses data on members of criminal street gangs, descriptions, tattoos, criminal associates, locations, vehicles, field interviews, criminal histories, and activities.

CITIZEN AND LAW ENFORCEMENT ANALYSIS AND REPORTING (CLEAR): One of CPD's databases for entering, storing, and visualizing information.

CONTACT CARDS: Predecessor of the Investigatory Stop Reports. Contact Cards were used to document Investigatory Stops as well as enforcement of the Gang and Narcotics-Related Loitering Ordinances.

CPD'S GANG DATABASE: Popular terminology for the multitude of databases, forms, visualization tools, and repositories for gang-related data.

FREEDOM OF INFORMATION ACT (FOIA): A law that provides the public with the right to request access to records from government agencies. FOIA also requires agencies to proactively post online certain categories of information, including frequently requested records.

GANG-INVOLVED: Real or perceived relationship to, or holding membership in, a gang.

GANG-RELATED DATA/GANG INFORMATION: Information created, shared, or received by CPD including gang designations.

GANG ARREST CARD: A form that is a module of the Arrest Report completed through the Automated Gang Arrest Card application. The form is completed when an officer believes that an arrestee is in a gang and is used to indicate an arrestee's gang designation.

GANG DESIGNATIONS: An individual's membership in a gang as recorded by law enforcement agencies.

HIGH INTENSITY DRUG TRAFFICKING AREAS (HIDTA): A program that supports multiagency activities ranging from enforcement initiatives involving investigation, interdiction, and prosecution, to drug use prevention and treatment initiatives.

HUMAN RESOURCES BOARD: A three-member board appointed by the Mayor that is charged with the responsibility of conducting hearings and rendering decisions in instances of alleged misconduct by career service employees. The Board also presides over appeal hearings concerning disciplinary action taken against employees by individual City departments and eligibility hearings for police officer candidates.

ILLINOIS CIVIL RIGHTS ACT OF 2003: An act that prohibits governmental policies that have a disparate impact against a racial group, regardless of intent, and allows aggrieved parties to challenge such policies in state or federal court.

ILLINOIS CRIMINAL IDENTIFICATION ACT: An act from Section 5.2 of the Criminal Identification Act (20 ILCS 2630/5.2) that allows qualifying arrests, supervision and probation to be expunged.

ILLINOIS STREETGANG TERRORISM OMNIBUS PREVENTION ACT (740 ILCS 147): An act established in 1993 which creates a civil remedy against streetgangs and their members that focuses upon patterns of criminal gang activity and upon the organized nature of streetgangs.

ILLINOIS UNIFIED CODE OF CORRECTIONS (730 ILCS 5/): A state statute that establishes and grants powers to Illinois' Department of Corrections and the Department of Juvenile Justice, allowing for a range of sanctions to be assigned proportionate to the seriousness of a criminal offense and in recognition of an individual's possibility for rehabilitation.

INVESTIGATORY STOP: The temporary detention and questioning of a person in the vicinity of where the person was stopped based on Reasonable Articulable Suspicion that the person is committing, is about to commit, or has committed a criminal offense.

INVESTIGATORY STOP REPORT (ISR): A document officers complete when they conduct an investigatory stop.

LAW ENFORCEMENT AGENCIES DATA SYSTEM: A statewide, computerized, telecommunications system, maintained by the Illinois State Police, designed to provide the Illinois criminal justice community with access to computerized justice-related information at both the state and national level.

LOCAL RECORDS ACT (50 ILCS 205): An act that regulates the preservation or disposal of the public records of all units of local government in Illinois.

LOCAL RECORDS COMMISSION: An agency that oversees how long local government agencies must retain each type of form they produce, and also gives permission for the destruction of agency records.

NOTIFYING: A process for alerting the individual that they have been designated as a gang member.

PURGING: A regular process for deleting certain gang designations completed within a given timeframe.

REMOVING: A process by which an individual who has successfully appealed their gang designation may have that designation deleted from CPD's information systems.

RETENTION SCHEDULE: A policy that defines how long records must be kept and provides disposal guidelines for how records should be discarded.

REVIEWING: A regular process, completed within a given timeframe, examining gang designations for their continued accuracy and retention.

RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO):  A United States federal law that provides for extended criminal penalties and a civil cause of action for acts performed as part of an ongoing criminal organization.

# XVII. APPENDIX J: CPD'S RESPONSE LETTER



| | | |
|---|---|---|
| **Rahm Emanuel**<br>Mayor | **Department of Police · City of Chicago**<br>3510 S. Michigan Avenue · Chicago, Illinois 60653 | **Eddie T Johnson**<br>Superintendent of Police |

April 5, 2019

**VIA ELECTRONIC MAIL**
Mr. Joseph Lipari
Deputy Inspector General
Public Safety Section
City of Chicago Office of Inspector General
740 N. Sedgwick, Suite 200
Chicago, Illinois 60654
jlipari@igchicago.org

Re:     *CPD's Response to City of Chicago Office of Inspector General's Review of the Chicago Police Department's "Gang Database"*

Dear Deputy Inspector General Lipari:

Please see below the Chicago Police Department's response to the City of Chicago Office of Inspector General's Review of the Chicago Police Department's "Gang Database".

I.   <u>Summary Response:</u>

The Chicago Police Department ("CPD") is currently in the process of historic reform and transformation. At the core of CPD's strategic plan, Department members are focused upon improving public safety with proactive, focused crime-fighting strategies while building community trust and strengthening relationships within the City of Chicago. To this end, CPD's comprehensive plan includes and requires a Department-wide modernization of its technological capabilities and intelligence gathering methods. A critical part of this effort includes an overhaul of the manner in which CPD officers collect and manage gang information and intelligence.

It goes without saying that criminal street gangs in Chicago pose a real, substantial, and ongoing threat of violence to our great City. Chicago continues to experience unrelenting and sometimes unspeakable crimes in furtherance of criminal street gang activity. The ability to understand how these criminal networks operate, organize, and potentially conflict with one another is essential to reduce violent crime, and enhance the safety and awareness of our officers working every day in the street.

Given the unique gang violence issues that have existed and evolved for generations in Chicago, maintaining gang information and intelligence is a vital part of CPD's anti-violence efforts. Put simply, the use of gang information within CPD is as diverse as the various Bureaus, Divisions, and Units that make up the Department.

To demonstrate some of the more traditional examples, district command staff consider a shooting victim's gang membership or affiliation to effectively allocate resources and help prevent further retaliation. Gang boundaries and territories are analyzed to help identify and explain crime patterns in a specific area or by a specific group of perpetrators. Detectives use gang membership and affiliation to analyze social networks and seek out potential suspects, witnesses, or informants who may have material information in criminal investigations. Narcotics enforcement teams utilize gang intelligence to understand criminal hierarchies while investigating drug conspiracies. Law enforcement partners use gang information to build long-term investigations against criminal enterprises under state and federal Racketeer Influenced and Corrupt Organizations (RICO) statutes. At Area Gang Strategy Meetings and District Shooting Reviews, gang membership or affiliation is pertinent for law enforcement to identify the correct preventative action following a specific pattern of gun violence.

CPD also uses gang information to assist with non-enforcement violence reduction initiatives. In the past, District Commanders and accompanying service providers have taken potential gang ties or allegiances into consideration when offering social services, employment, or educational opportunities to gang-involved persons at high risk of being the victim in a violent crime. Officers use gang information to appropriately allocate resources and prevent violence at a funeral or memorial service for a known gang leader.

These examples are not exhaustive, but provide a sample of the many anti-violence efforts within CPD where gang information is incredibly useful, if not essential.

Now more than a year ago - and prior to when the Office of the Inspector General began its formal audit and review - CPD initiated an internal examination into the policies and practices governing the collection and management of gang information. In conjunction with this process, CPD also looked for guidance from other law enforcement agencies, and researched laws and regulations in jurisdictions throughout the country. With this background, the Department began to craft an updated policy that incorporates national best practices while also reflecting the unique gang culture that has been at the forefront of violence in Chicago for decades.

CPD's internal review and research revealed many of the same findings of the OIG's audit, discussed in turn in greater detail below. In sum, for many years, CPD built separate data systems and silos of gang information on top of each other. The varying structure of these systems impeded CPD's ability to keep the most updated and relevant gang information readily available to the police officers that protect and serve Chicago's communities.

Following its internal review, CPD sought to establish a gang management system that would accomplish two primary goals: (1) create a comprehensive, updated, and accurate gang intelligence tool that will improve public safety, officer safety, and investigations into criminal street gangs, and (2) ensure that the interests of the public are respected, with a clear and transparent process for both the inclusion and removal of gang information contained in the system. With these goals in mind, CPD's proposed gang intelligence system – now known as the Criminal Enterprise Database – is governed under the following primary areas:

- A comprehensive, single gang intelligence system with clear standards for officers to use in determining gang membership or affiliation;
- Required and ongoing refresher training for all Department members to access and use the system;
- Review from supervisors and gang intelligence officers to ensure accurate and properly supported information is entered into the system;

- Ongoing audits to ensure updated and accurate intelligence with input from gang investigations experts, including an automatic purge of stagnant gang information;
- A process for members of the general public to discover whether they are determined to be a gang member or affiliate, and the opportunity to appeal that determination;
- Limitations on sharing of gang information with third parties for employment, education, licensing, housing purposes

As discussed in Section II, these proposed policy changes to CPD's gang information collection and management address many of the findings and recommendations laid out in the OIG report. CPD continues to welcome constructive feedback into its updated internal policy. Like past policy initiatives that have garnered substantial public interest, the Department will open up the Criminal Enterprise Database policy for a public comment period prior to issuance, and incorporate input from community members that will help further our shared goal of a safer Chicago.

**Overall, the Department concurs with the OIG that CPD policies, practices, and technology systems must improve to ensure that accurate gang information is provided to officers to support their day-to-day functions and further reduce gang violence.**

## II. <u>OIG Recommendations and Response:</u>

The OIG provides 30 total recommendations broken up into five major categories (1) Utility and Alignment with Violence Reduction Strategies, (2) Controls and Procedural Fairness Protections, (3) Police Legitimacy & Community Involvement, and (4) Transparency. The fifth category makes recommendations outside of CPD directly to the City of Chicago. Of the 27 recommendations that apply to CPD, the Department agrees with the vast majority of the OIG's recommendations, most of which are already laid out in CPD's draft directive. Relevant portions of CPD's Criminal Enterprise Database draft directive are cited in the responses set forth below, and the entire proposed policy is attached to this response. CPD intends to disseminate this draft for public comment before finalizing and instituting the new policy.

### A. <u>Utility and Alignment with Violence Reduction Efforts (Recommendations 1-6)</u>

On the whole, the first six recommendations contained in the OIG's report call for a deeper analysis of how gang information is utilized within the Department. Over the past year, CPD has conducted a series of internal meetings to discuss how gang information is currently used, and how these processes could be streamlined and enhanced. CPD's leadership has uniformly and unequivocally determined that the collection of gang data is essential to further its operations. While many of CPD's targeted efforts against violent actors are undertaken irrespective of a person or group's gang affiliation, the collection of gang information serves as a critical component in many of these operations.

**<u>Recommendation #1: Conduct a formal and publicly reported evaluation of whether collecting gang information services CPD's violence reduction efforts.</u>**

**<u>CPD Response #1:</u> CPD partially concurs with Recommendation #1 as it pertains to an internal evaluation of CPD's utility for collecting gang information. CPD does not concur that a public evaluation is necessary, and further asserts that such an evaluation could put**

3 | P a g e

**certain gang crime strategies or information at risk and negatively impact the public and officer safety.**

Since beginning its own internal review of gang information collection and management, CPD has met regularly and deliberated among command staff leadership and specialized units to discuss the utility of gang intelligence in furtherance of operational strategies. During this process, CPD identified several operations where gang information is essential to its operations, particularly for violent and gun crime suppression efforts. CPD's internal review included leadership from the Bureau of the Patrol, the Bureau of Organized Crime which includes the Gang Investigations and Narcotics Divisions, the Deployment Operations Section, Research and Development Division, and the Information Services Division. As discussed above, CPD leadership unanimously and unequivocally agreed that gang information was necessary to carry out the various functions of the Department represented at these internal meetings.

CPD does not believe that an additional public evaluation would render a different result. Additionally, making such an internal evaluation public could result in dissemination of sensitive gang intelligence and potentially undermine the effectiveness of ongoing anti-violence strategies throughout the Department.

CPD has participated in various policy discussions and internal reforms that are of substantial public interest over the past several years. Consistent with these prior efforts, the Chicago Police Department does plan to submit its draft directive for public comment, and will include community feedback before final issuance of the Criminal Enterprise Database policy. As part of its ongoing efforts to grow community partnerships and public trust, CPD will notify its stakeholder partners throughout the City about the public comment period to encourage meaningful participation and feedback. Additionally, CPD plans to engage City Council members on the details of its draft policy to receive their input before final issuance of the policy.

**Recommendation 2: Ensure policing resources are focused on violent actors instead of all individuals designated as gang members.**

**CPD Response #2: CPD concurs with Recommendation #2. The Department already focuses its policing resources on violent actors irrespective of whether or not they are designated as gang members.**

CPD does have multiple targeted, person-based efforts that focus on violent actors, regardless of gang affiliation or status. Under these initiatives, the person's gang membership may be relevant depending on the type of targeted endeavor. As discussed previously, gang membership or affiliation may be merely supplemental and material to a particular program or effort, but not the sole driving factor into the investigation.

Some common examples include Area Gang Strategy Meetings and District "Shooting Reviews," which are CPD-led and person-focused initiatives that examine recent shooting patterns alongside local and federal law enforcement partners, and generate an action plan that will help apprehend shooters and prevent new shooting victims. *See Special Order S10-07: Area Gang Strategy Meetings.* During Area Gang Strategy Meetings and District Shooting Reviews, specific drivers of violence are identified. Gang information may be taken into account, but is not necessarily required to become a person of interest for the working group.

Additionally, as part of the Strategic Decision Support Centers, command staff run daily briefings that focus attention on violent actors irrespective of whether they are designated as gang members. After analyzing

4 | P a g e

crime trends and potential conflicts, patrol officers are provided information about specific crime patterns and known suspects within the district. *See Special Order S03-19: Strategic Decision Support Centers.* CPD also participates in several multi-jurisdictional task forces that focus on specific violent crime patterns, and those criminal actors behind the violence. Finally, multiple specialized units are participating in long-term investigations into violent criminals every day within CPD's Bureau of Organized Crime.

CPD also has place-based anti-violence initiatives, where based upon historical crime data and analysis of violent crime patterns, CPD will deploy additional resources to high crime "hot spots" or areas where violence is anticipated to occur. Some examples include CPD's use of crime analysis trends to inform the deployment of district patrol officers as part of the Strategic Decision Support Center technology suite, or weekend Strategic Anti-Violence Missions in coordination with District and Area patrol in high crime areas.

**Recommendation 3: Consider other mechanisms for preserving officer safety, such as identifying individuals with a history of weapons or violent crime.**

**CPD Response #3: CPD concurs with Recommendation #3. The Department has such mechanisms in place through current policies and violent offender registries.**

This recommendation is also already addressed in CPD's current policy directives, as well as local and state law. As discussed in Recommendation #2, *Special Order S10-07: Area Gang Strategy Meetings* includes a component that identifies persons of interest who are driving violence in a particular District or Area. Law enforcement stakeholders consider the person's criminal history, including violence, weapons offenses, and narcotics activity within the past five years, as well as other relevant intelligence to determine a person's risk for further violence.

Additionally, pursuant to local and state law, CPD officers also have information about those convicted of certain violent and weapons crimes available to enhance officer safety. Examples include the Gun Offender Registration Ordinance under MCC Chapter 8-26, the Sex Offender Registration Act under 730 ILCS 150/1 et seq., the Murderer and Violent Offender Against Youth Registration Act under 730 ILCS 154/1 et seq., and the Arsonist Registration Act under 730 ILCS 148/1 et seq. The Department assists in the administration of these weapons and violent offender registries.

**Recommendation 4: Utilize gang designations to identify at-risk youth for social intervention services.**

**CPD Response #4: CPD concurs with Recommendation #4. The Department is currently developing intervention and prevention strategies for those at high risk of victimization.**

CPD does participate in identification of both at-risk adults and youth through its Violence Reduction Initiative in select districts. CPD is currently undergoing a system and policy overhaul for implementation of these types of interventions.

The current process for engaging at-risk individuals, known within the Department as a "custom notification," is also currently being re-evaluated for improvement and implementation. General definitions and an overview of the recent strategy is laid out in Section VI(F) of the *General Order G10-01: Gang Violence Reduction Strategy.* The current custom notification is described as,

5 | P a g e

*"a process that identifies potential criminal actors and victims associated with the continuum of violence. Once identified, the individual is notified of the risk and consequences that will result should they engage in criminal conduct or continue in violent activity."*

In accordance with this recommendation, CPD will continue to develop strategies to engage those at greatest risk of victimization with beneficial services, education, and job-training services.

**Recommendation 5: Formally evaluate whether individuals and groups CPD tracks as gangs meet the legal criteria of a criminal gang.**

**CPD Response #5: CPD concurs with Recommendation #5. In its proposed directive, CPD will apply the definitions that currently exist under Illinois state law in order to establish street gangs within the Criminal Enterprise Database.**

CPD's current draft directive *G10-01-03: Criminal Enterprise Database* cross-references the current definitions under the Streetgang Omnibus Terrorism Prevention Act in 740 ILCS 147/ *et seq.* CPD membership will apply these definitions to both criminal street gangs and criminal street gang members in accordance with the policy.

Section IV of the draft directive states in part:

*"Street gang member" or "gang member" means any person who actually and in fact belongs to a gang and any person who knowingly acts in the capacity of an agent for or accessory to, or is legally accountable for, or voluntarily associates himself or herself with a course or pattern of gang-related criminal activity, whether in a preparatory, executory, or cover-up phase of any activity, or who knowingly performs, aids, or abets any such activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147).*

*"Street gang" or "gang" or "organized gang" or "criminal street gang" means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of three or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147)."*

*"Criminal Activity" – The commission, attempted commission, or solicitation, in association with or with intent to promote criminal conduct by criminal enterprise or street gang members, of two or more acts of the following offenses, at least one of which occurred within the last five years: murder; drug induced homicide; kidnapping; forcible detention; aggravated assault—discharging firearm; aggravated battery; heinous battery; aggravated battery with a firearm; aggravated battery of a child; aggravated battery of a senior citizen; intimidation; compelling organization membership of persons; home invasion; aggravated criminal sexual assault; robbery; armed robbery; burglary; residential burglary; criminal fortification of a residence or building; arson; aggravated arson; possession of explosives or incendiary devices; unlawful use of weapons; unlawful use or possession of weapons by felons or persons in the custody of the Department of Corrections; aggravated discharge of a firearm; mob action—violence; bribery;*

6 | P a g e

*armed violence; manufacture or delivery of cannabis; cannabis trafficking; calculated criminal cannabis conspiracy and related offenses; illegal manufacture or delivery of a controlled substance; controlled-substance trafficking; calculated criminal drug conspiracy and related offenses."*

Under these definitions, Sections III(B) and V(A) require that criminal enterprises and street gangs are identified in accordance with state law definitions codified in the policy:

*From Section III(B): "The Information Services Division will establish the Criminal Enterprise Database CLEAR application for use by authorized Department members. The Information Services Division will initially gather all gang-related information in conjunction with the appropriate Department personnel to apply the criteria delineated in Item V of this directive to all existing gang-related information before entry in to the Criminal Enterprise Database."*

*From Section V(A): "Criminal enterprises and street gangs will be identified on the basis of specific, documented, and reliable information, including but not limited to:*

*1. analysis of crime pattern information;*
*2. observations by Department members;*
*3. witness interviews;*
*4. interviews of admitted criminal enterprise or street gang members; and*
*5. information received from informants who have proven to be reliable and whose information can be independently corroborated."*

The Deployment Operations Section is responsible for ensuring that criminal street gangs maintained are updated and accurate in accordance with the definitions set forth.

*From Section IX(C): "The Deployment Operations Section will: (1) finalize and update the Criminal Enterprise Database of all criminal street gangs and criminal enterprises identified during the district gang audit*
*…*
*(3) inform the Director, Information Services when a criminal street gang or criminal enterprise has been eliminated from "active" status"*

**Recommendation 6:** **Formally evaluate whether the current methods of identifying and tracking gang membership align with the current landscape of gangs in Chicago.**

> **CPD Response #6:** CPD concurs with Recommendation #6. Under its proposed directive, CPD will engage in ongoing management of information contained within the Criminal Enterprise Database, with input from gang experts and district intelligence officers.

During the development of its internal draft directive *G10-01-03: Criminal Enterprise Database*, CPD engaged in substantial discussion about how to manage gang information moving forward to best support officers in their efforts. These internal discussions included input from both District and Area command staff, along with gang investigations experts, district intelligence officers, and officers who conduct outreach and community policing at the district level. CPD leadership and officers who engage with gang members in their

daily patrols and investigations were able to provide insights on the applicable criteria and parameters for the Criminal Enterprise Database.

Importantly, one component adopted into the draft policy includes an ongoing review of information by gang investigations and intelligence officers to ensure it is current. In addition to the process that ensures information is reviewed for accuracy going in, these audit reviews will combine the necessary district-level and gang investigations experts to review whether the information in the system matches their intelligence and observations from the field. Furthermore, the ongoing management of CPD's Criminal Enterprise Database will give officers using it in the field added confidence that the information is accurate and updated.

> *From Section IX(A)(2): "District commanders will annually, in coordination with the Gang Investigation Division and other designated Department personnel, perform a gang audit in accordance with G10-01-01 "Gang Audits," updating information for accuracy in the Criminal Enterprise Database."*

> *From Section IX(B) of the proposed draft: "The Gang Investigation Division will:*
>   1. *in addition to entry and review of information in the Criminal Enterprise Database, when possible, assist Department members with the identification of individuals as members and affiliates of criminal enterprises or street gangs.*
>   2. *review requests to appeal the status of gang membership or affiliation in the Criminal Enterprise Database consistent with Item VIII-D of this directive.*
>   3. *coordinate with district intelligence officers to perform an annual gang audit and review and confirm information for accuracy in the Criminal Enterprise Database.*
>   4. *when appropriate, provide information to remove eligible individuals from the Criminal Enterprise Database."*

> *From Section IX(C): "The Deployment Operations Section will: finalize and update the Criminal Enterprise Database: of all criminal street gangs and criminal enterprises identified during the district gang audit; upon successful appeal of gang membership or affiliation in the Criminal Enterprise Database; or upon request of the Commander, Gang Investigation Division, or a district commander."*

> *From Section IX(C)(3) of the propose draft directive: "The Deployment Operations Section will ...inform the Director of Information Services when:*
>     (a) *It is appropriate to remove eligible individuals from the Criminal Enterprise Database, and*
>     (b) *When a criminal street gang or criminal enterprise has been eliminated from active status."*

### B. Controls and Procedural Fairness Protections (Recommendations 7-23)

CPD concurs with the vast majority of the recommendations set forth in the OIG's controls and procedural fairness section, both in its efforts to balance the privacy interests of the public and to ensure that the most relevant and accurate gang information is made available to officers. Many of these recommendations are already addressed in CPD's draft directive. The general parameters of CPD's proposed directive also align with similar policies adopted in outside jurisdictions cited by the Inspector General's Office, such as California and Providence, RI.

8 | P a g e

Given that some of these recommendations relate to CPD's data and record retention, two points of clarification are warranted. First, CPD cannot alter, delete, or destroy historical criminal arrest or investigative records that either have been or could become part of a court or administrative proceeding. Modifying or deleting past source records to remove gang information could severely undermine the integrity of the discovery process, and potentially open up the City and CPD to sanctions and violations. Second, since the inception of the Department of Justice investigation in December of 2015, CPD has discontinued following a record retention schedule, and is instead following a record preservation order. Pursuant to the investigation and ensuing consent decree, CPD has maintained records in all of its data systems unless destruction is required by law. Since that time, which covers a substantial portion of the data reviewed by the OIG during this audit, CPD has only destroyed records following an individualized assessment and disposal certificate filed with the Local Records Commission.

**Recommendation 7: Formally inventory all gang-related data collection, reporting, and visualization points, and the relationships between them.**

**CPD Response #7: CPD concurs with Recommendation #7. The Criminal Enterprise Database directive contains a provision to carry out an initial inventory of gang-related data.**

In its proposed directive, CPD does address this recommendation with the creation of the Criminal Enterprise Database. The Information Services Division at CPD is tasked with initially gathering all relevant gang information within CPD's systems and integrating it into the Criminal Enterprise Database. Through the internal data system review already carried out, the Information Services Division has gained an understanding of CPD's gang information source data systems and how they interrelate.

*From Section III(B): "The Information Services Division will establish the Criminal Enterprise Database CLEAR application for use by authorized Department members. The Information Services Division will initially gather all Department gang-related information in conjunction with the appropriate Department personnel to apply the criteria delineated in Item V of this directive to all existing gang-related information before entry in to the Criminal Enterprise Database."*

**Recommendation 8: Formally inventory all extant paper and electronic records containing gang information.**

**CPD Response #8: CPD partially concurs with Recommendation #8. The Criminal Enterprise Database directive contains a provision to carry out an initial inventory of gang-related information. However, an inventory of all paper criminal and investigative records that may contain gang information is moot as this information is most certainly older than 5 years and thus will not be used to vet gang membership for entry into the new Criminal Enterprise Database.**

CPD incorporates its response to recommendation #7 above.

First, in the draft policy, CPD will only use relevant indicators of gang membership acquired within the past 5 years to enter a person into the Criminal Enterprise Database, and will further remove individuals from

the Database after 5 years if the person does not commit a new qualifying offense or an act in furtherance of gang activity.

> *From Section VII(A): "An individual is eligible for removal when he or she has not committed any act in furtherance of gang activity and has not been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years. If an arrest, charge, petition for delinquency, finding of delinquency, or conviction was part of the determination that led to the person's entry into the Criminal Enterprise Database, this five-year period begins following the date of release or discharge from custody, probation, supervision, incarceration, or parole for that offense, whichever is later."*

> *From Section IX(D)(3): "The Director, Information Services Division, will: upon consultation with the Commander, Deployment Operations Section, remove gang information for individuals who have not committed a new qualifying criminal offense and have not had a documented incident in furtherance of gang activity for at least five years."*

CPD would also point out that although it may have very old criminal investigative files that were created before its electronic file systems, some of which is now stored in microfiche, those outdated materials will not be used to vet the accuracy of gang membership for entry into the Criminal Enterprise Database. It is possible that these records contain some reference to gang membership or affiliation; however, CPD does not plan to search these records for gang information as part of its systems inventory.

> *From Section III(B): "The Information Services Division will establish the Criminal Enterprise Database CLEAR application for use by authorized Department members. The Information Services Division will initially gather all gang-related information in conjunction with the appropriate Department personnel to apply the criteria delineated in Item V of this directive to all existing gang-related information before entry in to the Criminal Enterprise Database."*

Moreover, CPD cannot modify or alter these criminal investigative records if gang information is discovered. Additionally, the proposed directive includes the following disclaimer for recordkeeping purposes and notification to CPD members who may come across stagnant gang information:

> *From Section VIII(E): "Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database only. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws. Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information."*

**Recommendation 9:** Establish formal and clear purposes for collection of gang information, and tailor training, access, policies, and technology to align with these purposes and goals.

> **CPD Response #9:** CPD concurs with Recommendation #9. CPD will add a clearly defined purpose section to its Criminal Enterprise Database directive that aligns with its current anti-gang violence goals.

CPD concurs with this recommendation and will update the policy directive accordingly. CPD does have several initiatives that pertain directly to gang violence suppression laid out in *General Order G10-01: Gang Violence Reduction Strategy*. CPD has also undertaken internal reforms and crafted a new strategic plan, which includes the development, institution and enhancement of the strategies set forth in *G10-01*. In coordination with the Criminal Enterprise Database policy, CPD plans to evaluate the implementation and effectiveness of the strategies set forth in *G10-01*, in order for the General Order to accurately reflect CPD's current programs and efforts related to violent gang members. In relevant part, *G10-01* states under its purpose:

> I.  *"Purpose:*
> ...
> *The Chicago Police Department Gang Violence Reduction Strategy to combat gang-related murders, shootings, and general violence related to gang activity."*

Additionally, CPD has its Area Gang Strategy Meetings, encompassed in *Special Order S10-07,* which states in relevant part:

> I.  *"Purpose:*
> ...
> A.  *Department-wide initiatives to combat the proliferation of increasing gang-related crime, and*
> B.  *Area gang strategy meetings with attendant duties, responsibilities, and accountability for the development and implementation of specific strategies to address current gang-related crime trends."*

As discussed above, there are a multitude of uses for CPD members in their various duties where gang information may be relevant or merely supplemental to achieving a specific purpose or task. CPD plans to revisit those initiatives as well in coordination with the creation of the Criminal Enterprise Database.

**Recommendation 10:** Ensure all forms featuring gang-related data are listed on the Records Retention Schedule

> **CPD Response #10:** CPD concurs with Recommendation #10. CPD will include gang information to the Records Retention Schedule subject to the purge criteria set forth in the Criminal Enterprise Database policy. However, CPD is currently under a records preservation order and is not following the Records Retention Schedule.

Pursuant to its obligations under the consent decree, the Chicago Police Department is currently under a record preservation order. Until the order is rescinded, original records cannot be destroyed. CPD does not anticipate that it will begin following the Records Retention Schedule until full compliance with the terms under the revised consent decree.

11 | P a g e

In conjunction with its new policy directive, CPD will add gang information contained in the Criminal Enterprise Database to the Records Retention Schedule. CPD anticipates it will begin following the Records Retention Schedule once it has met full compliance with the consent decree.

Additionally, the new draft Criminal Enterprise Database directive does reference records retention and policies, stating in relevant part:

> From Section XII: *"Any record maintained in the Criminal Enterprise Database must comply with local, state, and federal law. The Commander, Youth Investigations Division, will ensure juvenile records that are part of the Criminal Enterprise Database are retained and expunged in accordance with the Juvenile Court Act and any applicable local, state, or federal law."*

For information contained in the Criminal Enterprise Database itself, Section VII(A) and Section IX(D)(3) reference the automatic purge of gang information after a five-year period if the person is not arrested for a qualifying offense or engaged in gang activity:

> From Section VII(A): *"An individual is eligible for removal when he or she has not committed any act in furtherance of gang activity and has not been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years. If an arrest, charge, petition for delinquency, finding of delinquency, or conviction was part of the determination that led to the person's entry into the Criminal Enterprise Database, this five-year period begins following the date of release or discharge from custody, probation, supervision, incarceration, or parole for that offense, whichever is later."*

> From Section IX(D)(3): *"The Director, Information Services Division, will: upon consultation with the Commander, Deployment Operations Section, remove gang information for individuals who have not committed a new qualifying criminal offense and have not had a documented incident in furtherance of gang activity within the past five years."*

Once the Criminal Enterprise Database directive is finalized, CPD will ensure that the Records Retention Schedule reflects these new policies, and will begin to follow the schedule once the preservation order is lifted.

**Recommendation 11:** **Establish formal written agreements with external agencies regarding data quality, inputs, and outputs.**

**CPD Response #11:** **CPD concurs with Recommendation #11. The Information Services Division will execute data sharing agreements with law enforcement partners who have access to the Criminal Enterprise Database in accordance with 28 CFR Part 23.**

**Recommendation 12:** Regularly conduct formal audits of external agency access and use based on clearly defined metrics.

**CPD Response #12:** CPD concurs with Recommendation #12. The Information Services Division will strive to ensure external law enforcement agencies with access to the Criminal Enterprise Database maintain compliance with 28 CFR Part 23.

Under the proposed directive, CPD will collaborate among district command staff, intelligence officers, and gang investigations experts to manage the information in the Criminal Enterprise Database on an ongoing basis, including a five year purge of any stagnant gang information in compliance with 28 CFR Part 23.20. To ensure compliance with federal regulations on criminal intelligence systems, CPD will require a criminal predicate in order to obtain gang information from the Criminal Enterprise Database. CPD will conduct routine audits to manage gang information on an ongoing basis, with ongoing information review by district intelligence officers and command staff, Gang Investigation Division, and the Deployment Operations Section. *See* 28 CFR Part 23.20(c). The audits are intended to allow gang intelligence experts to ensure gang information in the system is relevant and accurate, with the ability to update or remove information at their discretion and in accordance with the established criteria. *See* 28 CFR Part 23.20(h). Additionally, CPD intends to enter into data sharing agreements with outside agencies that will set forth requirements of use that will have to be met by the outside agency, including but not limited to compliance with local law. In its new application, CPD will also have the ability to run external agency audits to see which agencies access the Criminal Enterprise Database.

**Recommendation 13:** Consider additional protections for restricting gang information with other law enforcement agencies, such as immigration enforcement agencies.

**CPD Response #13:** CPD partially concurs with Recommendation #13. The Information Services Division will execute data sharing agreements with law enforcement partners who have access to the Criminal Enterprise Database, which will include a requirement that law enforcement agencies using the Database comply with the City of Chicago's Welcoming City Ordinance.

During the time that CPD has been reviewing its internal policies and practices on the collection and management of gang information, the Department has also been working to strengthen relationships with its law enforcement partners, particularly those in the federal government. For the past several years, CPD has also been working to drive down a historic and unacceptable spike in violent crime, particularly against shootings and homicides. The Department recognized that it needed to leverage every resource available to aid in the crime fight, and one primary goal in strengthening relationships with federal partners has been to work collaboratively to target the drivers of violence and reduce shootings and associated crimes. Federal partners in the FBI, DEA, ATF, and United States Attorney's Office have been ready and willing to assist CPD to this end, and the Department is fortunate to work alongside these agencies.

Once the Criminal Enterprise Database is finalized, CPD plans to share it with our federal law enforcement partners in accordance with the policies set forth and federal regulations. As discussed in several initiatives set forth above, gang information is an integral part of several of CPD's multi-jurisdictional crime reduction efforts and task forces. The proposed directive will include a disclaimer that CPD members cannot

13 | P a g e

share gang information with non-law enforcement third parties, and that all CPD members and third party agencies that use the Database are subject to the City of Chicago's Welcoming City Ordinance.

> *From Section XI: "The Criminal Enterprise Database is available for use only by Department members with authorized access acting in furtherance of a legitimate law enforcement purpose. Information will not be disclosed to any third party for employment, education, licensing, or housing purposes.*
> *...*

> *Reminder: It is the policy of the Chicago Police Department that, pursuant to federal law, the enforcement of immigration law generally rests with the federal government and not with the state or local police. Department members will continue to follow the procedures outlined in S06-14-03 "Responding to Incidents Involving Citizenship Status," including compliance with the provisions of the City of Chicago's Welcoming City Ordinance."*

Additionally, external law enforcement agencies that have access to the Criminal Enterprise Database or other CPD records systems will receive a disclaimer that historical records may not be used to determine gang membership, as these records may contain reliable gang information.

> *From Section VIII(E): "Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database only. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws. Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information."*

**Recommendation 14:** **Provide formal training and policies to all officers regarding how to use gang-related data.**

> **CPD Response #14:** **CPD concurs with Recommendation #14. The proposed Criminal Enterprise Database directive outlines the training requirements for CPD members.**

This recommendation is encompassed within Section X of CPD's proposed Criminal Enterprise Database directive.

> *From Section X(B): "The Education and Training Division, in consultation with the Deployment Operations Section, the Gang Investigation Division, and the Bureau of Patrol, will establish an eLearning module on the use of the Criminal Enterprise Database. Members will receive this training on an annual basis. Members must complete the eLearning module before gaining authorization to enter, retrieve, or approve information in the Criminal Enterprise Database."*

**Recommendation 15:** **Provide regular, formal refresher training updates to officers on the evolving nature of gangs in Chicago.**

**CPD Response #15:** CPD concurs with Recommendation #15. Refresher training will be required annually.

This recommendation is encompassed within Section X of CPD's proposed Criminal Enterprise Database directive.

*From Section X(B): "The Education and Training Division, in consultation with the Deployment Operations Section, the Gang Investigation Division, and the Bureau of Patrol, will establish an eLearning module on the use of the Criminal Enterprise Database. Members will receive this training on an annual basis. Members must complete the eLearning module before gaining authorization to enter, retrieve, or approve information in the Criminal Enterprise Database."*

**Recommendation 16:** **Formally mandate the inclusion of supporting evidence with gang designations.**

**CPD Response #16:** CPD concurs with Recommendation #16. The proposed Criminal Enterprise Database policy has specific review processes not only for supervisors, but across patrol and specialized units to ensure gang information going into the system is substantiated and reliable. The proposed Criminal Enterprise Database also mandates that entries into the system are properly documented and accompanied with relevant supporting documentation.

Within the proposed Criminal Enterprise Database directive, Section III(E) and Section IX lay out the responsibilities for review of gang information to ensure accuracy and compliance with the policy. The general process requires an officer to submit an entry based on the criteria set forth in Section V. The officer's supervisor then reviews the entry for accuracy, compliance, and proper supporting documentation, and then forwards the entry for substantive review from a District Intelligence Officer. Once the district review is complete, the entry is forwarded along to Gang Investigation Division personnel, and finally the Deployment Operations Section personnel for accuracy review.

Relevant sections from the draft directive are set forth in part as follows:

*From Section VI: "Following the positive identification of a person with membership in or affiliation with a criminal enterprise or street gang, Department members will:*
1. *ensure information and all supporting documentation is entered into the CLEAR Criminal Enterprise Database accurately;*
2. *locate and make notation of any visible scars, marks, or tattoos, if applicable;*
3. *ensure all evidentiary electronic media, including body-worn camera and in-car video system recordings, is properly attached or saved, if applicable;*
4. *notify a supervisor that the data entry is complete and available for review*
*Upon receiving notification, the reviewing supervisor will:*
1. *ensure that the data entry is in compliance with Item V and Item VI-A of this directive; and*

15 | P a g e

> 2. *approve data entry that is in compliance with Item V and Item VI-A of this directive and forward the data entry to the appropriate district intelligence officer and designated members of the Gang Investigation Division for review*
>
> …
>
> *Note: All information entered into the Criminal Enterprise Database will be reviewed and managed by the Deployment Operations Section."*

*From Section III(E): "Upon supervisory approval, all information entered into the Criminal Enterprise Database will be reviewed by the appropriate district intelligence officer and by the designated members of the Gang Investigation Division. All information entered into the Criminal Enterprise Database will be reviewed and approved by the Deployment Operations Section. The Deployment Operations Section has final authority to review, remove, and manage information within the Criminal Enterprise Database, unless as otherwise delineated in Item VIII-D of this directive."*

The proposed directive also requires supporting documentation for all entries into the Criminal Enterprise Database. As with all investigations, supporting documentation capturing relevant gang identifiers of bodyworn or in-car camera recordings, photographs of tattoos or emblems at arrest intake and booking, or statements from independently corroborated informants will be required with an entry into the Criminal Enterprise Database.

CPD determined that with the recently administered body-worn cameras for all officers and updated in-car video recording systems, and the additional state law requirements for electronically recorded interviews, the proper mechanisms are in place to capture self-admissions on a camera recording at most points during an investigation. CPD settled on the policy that if the person's self-admission is lawfully captured on a video recording or other intercepted communication, that statement alone is sufficient grounds to designate a person as a gang member. The CPD member would have to ensure that the video recording or intercepted communication where the statement is contained is provided as supporting evidence of the person's self-admission.

If the self-admission occurs during some point in the investigation where cameras are not recording, officers can still submit an entry for self-admission so long as the statement was lawfully received and documented, and an additional independent indicator of gang membership or affiliation exists under the criteria.

*From Section V(B): "Membership in or affiliation with a criminal enterprise database or street gang must be substantiated by specific, documented, and reliable information received by the Department within the past five years, and in accordance with the following:*

> *(1) the individual's own admission of membership or affiliation lawfully captured on electronic or video recorded communications, such as bodyworn camera, in-car video system recordings, electronically recorded interview, text message communications, social media communications, or a consensual overhear device; or*
>
> *(2) two or more of the following:*
>     *a. an unrecorded or non-intercepted statement provided voluntarily by the individual, or*

*if a statement is made pursuant to a custodial interrogation, a statement provided by the individual following a knowing, intelligent, and voluntary waiver of his or her constitutional rights.*
*b. the wearing of distinctive emblems, tattoos, or similar markings indicative of a specific criminal enterprise or street gang but only when such signals or symbols would not reasonably be expected to be displayed by any individual expect a member of that specific criminal enterprise or street gang.*

> *Note: Membership may not be established solely because an individual is wearing specific items of clothing which are available for sale to the general public.*

*c. the use of signs or symbols indicative of a specific criminal enterprise or street gang but only when such signals or symbols would not reasonably be expected to be displayed by any individual except a member of that specific criminal enterprise or street gang.*
*d. the identification of the individual as a member or affiliate or a specific criminal enterprise or street gang by an individual who has provided reliable information to the Department in the past and whose information can be independently corroborated.*
*e. the identification of the individual as a member or affiliate of a specific criminal enterprise or street gang by another government agency or a federal, state, or local penal institution.*
*f. a violation, arrest, charge, petition for delinquency, finding of delinquency, or conviction where gang membership or participation is either an element of the offense or documented in the complaint or court record as part of the criminal design."*

**Recommendation 17: Formally update and publicly report clearly defined criteria for "gang" and "gang activity."**

> **CPD Response #17: CPD concurs with Recommendation #17. The proposed Criminal Enterprise Database policy codifies definitions from Illinois law, prohibits designations based on a person's demographic status as a protected class, and the entire policy will be made available to the public.**

The draft Criminal Enterprise Database does establish criteria for determining gang membership or affiliation, using established definitions set forth in the Illinois Compiled Statutes. Once a directive is finalized and issued to CPD members, it is made publicly available under CPD's searchable policy directives as well. The proposed criteria does not include being in a gang-designated area or around gang-designated individuals as a sufficient basis for a determination of gang membership or affiliation. With reference to CPD's current *General Order G02-04: Prohibition Regarding Racial Profiling and Other Bias Based Policing,* the policy also includes a disclaimer that gang affiliation cannot be based upon the person's religious or racial demographic as a member of a protected class. Relevant portions of the proposed directive are cited below.

The proposed directive defines "Gang," "Street Gang Member," and "Criminal Activity" as follows:

*From Section IV(B): "Street Gang" as "Street gang" or "gang" or "organized gang" or "criminal street gang" means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of three or more persons with an established hierarchy that,*

17 | P a g e

*through its membership or through the agency of any member engages in a course or pattern of criminal activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147)."*

*From Section IV(C): "Street gang member" or "gang member" means any person who actually and in fact belongs to a gang and any person who knowingly acts in the capacity of an agent for or accessory to, or is legally accountable for, or voluntarily associates himself or herself with a course or pattern of gang-related criminal activity, whether in a preparatory, executory, or coverup phase of any activity, or who knowingly performs, aids, or abets any such activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147)."*

*From Section IV(C): "Criminal Activity" means the commission, attempted commission, or solicitation, in association with or with intent to promote criminal conduct by criminal enterprise or street gang members, of two or more acts of the following offenses, at least one of which occurred within the last five years: murder; drug induced homicide; kidnapping; forcible detention; aggravated assault—discharging firearm; aggravated battery; heinous battery; aggravated battery with a firearm; aggravated battery of a child; aggravated battery of a senior citizen; intimidation; compelling organization membership of persons; home invasion; aggravated criminal sexual assault; robbery; armed robbery; burglary; residential burglary; criminal fortification of a residence or building; arson; aggravated arson; possession of explosives or incendiary devices; unlawful use of weapons; unlawful use or possession of weapons by felons or persons in the custody of the Department of Corrections; aggravated discharge of a firearm; mob action—violence; bribery; armed violence; manufacture or delivery of cannabis; cannabis trafficking; calculated criminal cannabis conspiracy and related offenses; illegal manufacture or delivery of a controlled substance; controlled-substance trafficking; calculated criminal drug conspiracy and related offenses."*

The proposed directive establishes the criteria for a determination of gang membership or affiliation as follows, none of which include being in a gang-designated area or around gang-designated individuals:

*From Section V(B): "Membership in or affiliation with a criminal enterprise database or street gang must be substantiated by specific, documented, and reliable information received by the Department within the last five years, and in accordance with the following:*

*(1)    the individual's own admission of membership or affiliation lawfully captured on electronic or video recorded communications, such as bodyworn camera, in-car video system recordings, electronically recorded interview, text messages communications, social media communications, or a consensual overhear device; or*

*(2)    two or more of the following:*

*a. an unrecorded or non-intercepted statement provided voluntarily by the individual, or if a statement is made pursuant to a custodial interrogation, a statement provided by the individual following a knowing, intelligent, and voluntary waiver of his or her constitutional rights.*

*b. the wearing of distinctive emblems, tattoos, or similar markings indicative of a specific criminal enterprise or street gang but only when such signals or symbols would not*

18 | P a g e

*reasonably be expected to be displayed by any individual expect a member of that specific criminal enterprise or street gang.*

*Note: Membership may not be established solely because an individual is wearing specific items of clothing which are available for sale to the general public.*

*c. the use of signs or symbols indicative of a specific criminal enterprise or street gang but only when such signals or symbols would not reasonably be expected to be displayed by any individual except a member of that specific criminal enterprise or street gang.*

*d. the identification of the individual as a member or affiliate or a specific criminal enterprise or street gang by an individual who has provided reliable information to the Department in the past and whose information can be independently corroborated.*

*e. the identification of the individual as a member or affiliate of a specific criminal enterprise or street gang by another government agency or a federal, state, or local penal institution.*

*f. a violation, arrest, charge, petition for delinquency, finding of delinquency, or conviction where gang membership or participation is either an element of the offense or documented in the complaint or court record as part of the criminal design."*

In making a determination of a person's gang status, the proposed directive includes the following reminder for CPD members:

*From Section V: "Determinations regarding an individual's membership in or affiliation with a criminal enterprise or street gang will not be based solely on an individual's race, gender, religion, ethnicity, culture, socioeconomic status, or other protected classes consistent with G02-04: Prohibition Regarding Racial Profiling and Other Bias Based Policing."*

**Recommendation 18:** **Conduct regular, formal reviews of gang designations to evaluate continued accuracy of the gang designation.**

**CPD Response #18:** **CPD concurs with Recommendation #18. The proposed Criminal Enterprise Database directive contains a process to update and review gang information for accuracy.**

In its proposed directive, CPD has laid out a specific and collaborative process in order to ensure ongoing accuracy of information in the Criminal Enterprise Database. During this process, CPD will remove outdated and unreliable information from the Criminal Enterprise Database with input from gang investigations experts and intelligence officers. To reiterate, CPD cannot modify or remove information from criminal or investigative source records.

Section IX of the proposed directive lays out this ongoing review process, with relevant sections stating in part:

> *From Section IX(A)(2): "District commanders will: annually, in coordination with the Gang Investigation Division and other designated Department personnel, perform a gang audit in accordance with G10-01-01 "Gang Audits," updating information for accuracy in the Criminal Enterprise Database."*

> *From Section IX(C): "The Deployment Operations Section will: finalize and update the Criminal Enterprise Database: of all criminal street gangs and criminal enterprises identified during the district gang audit; upon successful appeal of gang membership or affiliation in the Criminal Enterprise Database; or upon request of the Commander, Gang Investigation Division, or a district commander."*

> *From Section IX(D)(3): "The Director, Information Services Division, will: upon consultation with the Commander, Deployment Operations Section, remove gang information for individuals who have not committed a new qualifying criminal offense and have not had a documented incident in furtherance of gang activity within the past five years."*

> **Recommendation 19: Develop and implement a formal means to regularly purge applicable gang designations from all originating documents and visualization tools.**

> > **CPD Response #19: CPD partially concurs with Recommendation #19. The proposed Criminal Enterprise Database directive contains a process to purge stagnant gang information after five years. However, CPD cannot modify original source documents that are part of a past or ongoing criminal investigation.**

CPD will purge a person's gang information from the Criminal Enterprise Database after a five year period without further criminal or gang related behavior. Section VII(A) and Section IX(D)(3) reference the automatic purge of gang information after a five-year period if the person is not arrested for a qualifying offense or engaged in gang activity:

> *From Section VII(A): "An individual is eligible for removal when he or she has not committed any act in furtherance of gang activity and has not been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years. If an arrest, charge, petition for delinquency, finding of delinquency, or conviction was part of the determination that led to the person's entry into the Criminal Enterprise Database, this five-year period begins following the date of release or discharge from custody, probation, supervision, incarceration, or parole for that offense, whichever is later."*

> *From Section IX(D)(3): "The Director, Information Services Division, will: upon consultation with the Commander, Deployment Operations Section, remove gang information for individuals who have not committed a new qualifying criminal offense and have not had a documented incident in furtherance of gang activity within the past five years."*

As previously stated, CPD cannot alter, delete, or destroy historical criminal arrest or investigative records that either have been or could become part of a court or administrative proceeding. Modifying or deleting past source records to remove gang information could severely undermine the integrity of the discovery process, and potentially open up CPD to violations.

For criminal investigative source records that are maintained, CPD members will receive a disclaimer that these records are not to be used to determine gang membership or affiliation. Only the Criminal Enterprise Database will contain updated, substantiated, and accurate gang designations.

> *From Section VIII(E): "Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database only. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws. Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information."*

**Recommendation 20:** Formally require that every individual who received a gang designation from CPD is notified.

> **CPD Response #20:** CPD partially concurs with Recommendation #20. CPD will take several steps to inform the general public about how to access their individual gang designations. These notifications will occur in-person, rather than through the mail. Information will also be made available at district stations and online. Finally, CPD will undertake efforts to create a system in which in-person notification is provided to subjects, informing them of the process to appeal a determination of gang membership or affiliation.

After careful deliberation, CPD determined that written notification to all persons designated as gang members is not safe or proper, and may actually create a greater risk of gang violence. Both for those designated as gang members in the past and under the new policy moving forward, CPD would have serious logistical issues accurately identifying a gang member or affiliate's correct address. As such, sending notification letters to individual addresses could serve to cause greater confusion and frustration between the community and the police, and actually initiate more violence if the notification letter is intercepted into the wrong hands.

Instead, as part of its overall police reform efforts, CPD is currently working through a notification process to communicate certain rights or other procedures to individuals who interact with the police. CPD intends to incorporate a notification of gang designations into this process, and inform subjects in person that they may have been identified as a gang member or affiliate during the course of an investigation or interaction. The notification would inform the subject that he or she may have been identified as a gang member or affiliate, subject of course to review and approval under the criteria. Further, it will set forth the process to appeal such a determination and seek removal from the Criminal Enterprise Database.

CPD has also committed to a process that will allow individuals to determine whether they are designated as a gang member or affiliate. If identified in the Criminal Enterprise Database, the person can then challenge that determination. CPD will make information about this process available through its website, at

local district stations, and allow members of the general public to submit email inquiries to obtain more information. A fee is not required in order to access the person's gang status.

> *From Section VIII(C)(1): "Any person may seek to access or appeal the status of his or her own street gang or criminal enterprise membership or affiliation in the Criminal Enterprise Database. A parent or legal guardian of a minor under the age of eighteen may make a request for access or appeal on behalf of his or her child.*

> *To access the status of gang membership or affiliation in the Criminal Enterprise Database, a person must:*
> > *a. make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1530 hours, excluding holidays;*
> > *b. complete the Criminal Enterprise Database Access form (CPD-31.615) provided by the Department; and*
> > *c. submit valid government identification."*

> *From Section IX(A)(5): "District commanders will: (5) make general information about the access and removal process associated with the Criminal Enterprise Database available to the general public at the district station."*

> *From Section IX(D): "The Director, Information Services Division, will: (5) create an online website that provides general information about the Department's Criminal Enterprise Database and the process to access and remove a person's gang membership or affiliation status within the Criminal Enterprise Database, and (6) create and monitor the gangstatusinquiry@chicagopolice.org email address and establish protocol to respond to emails from the general public with general information about how to access and remove a person's gang membership or affiliation status from the Criminal Enterprise Database."*

**Recommendation 21:** **Establish formal protections for juveniles.**

> **CPD Response #21:** **CPD does not concur with Recommendation #21. However, CPD recognizes that its current investigation process inherently has greater protections for minors than adults.**

For purposes of this specific policy, juveniles and adults are treated the same under the proposed Criminal Enterprise Database directive. Pursuant to state law and provisions under the recently filed consent decree, additional legal protections already exist for juveniles throughout the investigation and arrest process, particularly during interviews with police. For example, an officer must take immediate action to notify the minor's parent or person responsible for the minor upon arrest. 705 ILCS 405/2-6; 405/5-405. If the minor is arrested for a felony offense or any sex offense, following a waiver of simplified Miranda rights tailored to juveniles, a custodial interrogation cannot take place unless the interview with the juvenile is video recorded. 705 ILCS 5-401.5(b). For these felony investigations, the consent decree will also require CPD to go beyond state law, and make all reasonable efforts to ensure a parent or guardian is also present for an interview of a juvenile in custody. See "Consent Decree" *Illinois v. Chicago*, 17-cv-6260; ¶35(c).

22 | P a g e

In addition to the bodyworn camera requirements for CPD officers who interact with members of the public during investigations in the field, CPD has determined that established protections and processes for juveniles are sufficient to ensure self-admissions made in the presence of police are voluntary and reliable.

**Recommendation 22:** **Establish formal policies mandating that conversations or interviews with law enforcement which may result in a gang designation be conducted in the individual's preferred language.**

**CPD Response #22:** **CPD concurs with Recommendation #22, and notes that CPD interactions with individuals of limited English proficiency are addressed in a separate policy.**

CPD agrees with this recommendation, and points out that CPD's process for obtaining a translator is codified in a separate policy. *See Special Order S02-01-05: Limited English Proficiency.* In addition, the consent decree also has a multitude of language access provisions related to interactions with limited English proficient individuals. See "Consent Decree" *Illinois v. Chicago*, 17-cv-6260; ¶¶64-65. Under the consent decree, CPD is not only going to update its current language access policies and procedures, but also appoint a language access coordinator to ensure that limited English proficient individuals can effectively communicate with CPD members.

**Recommendation 23:** **Establish a formal appeal process.**

**CPD Response #23:** **CPD partially concurs with Recommendation #23. The proposed Criminal Enterprise Database policy has a formal appeal process outlined; however, CPD does not intend to turn over the supporting documentation or investigative records that serve as the basis for a gang designation.**

Within its proposed Criminal Enterprise Database directive, CPD has laid out a formal appeal process to remove gang designations from the system. The appeal process is free of cost upon establishing the individual's identity with valid identification. CPD does not plan to turn over supporting documentation that may be part of an investigation to the individual submitting an appeal, as this would be inappropriate particularly where a criminal proceeding is or has taken place.

The relevant portions of the appeal process is set forth below:

*From Section VII: "Criteria for Removal from the Criminal Enterprise Database*

*(A) An individual is eligible for removal when he or she has not committed any act in furtherance of gang activity and has not been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years. If an arrest, charge, petition for delinquency, finding of delinquency, or conviction was part of the determination that led to the person's entry into the Criminal Enterprise Database, this five-year period begins following the date of release or discharge from custody, probation, supervision, incarceration, or parole for that offense, whichever is later.*

23 | P a g e

*(B) An individual can also have his or her information removed from the Criminal Enterprise Database if the information is not substantiated by specific, documented, and reliable information to establish membership or affiliation in a criminal enterprise or street gang in accordance with Item V of this directive."*

*From Section VIII(C)(2)*: *"To appeal the status of gang membership or affiliation in the Criminal Enterprise Database, a person must:*
> *a. make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1200 hours, excluding holidays;*
> *b. complete the Criminal Enterprise Database Appeal form (CPD-31.625) provided by the Department;*
>> *NOTE: The requestor may also submit any supporting documentation or references that he or she deems relevant for the Department's consideration.*
> *c. submit valid government identification; and*
>> *NOTE: A minor's parent or legal guardian making a request on behalf of a minor must provide legal documentation to verify that he or she is the parent or legal guardian.*
> *d. cooperate with a background investigation conducted by the Chicago Police Department.*
> *...*

*D. Upon receipt of the completed request from the Records Division, the Deployment Operations Section, the Gang Investigation Division and the District Intelligence Officer of the affected District will consult with the Office of Legal Affairs to determine if the criteria is met and the information will be deleted from the Criminal Enterprise Database.*

*E. If the criteria is met, the Commander, Deployment Operations Section, will inform the Director, Information Services Division, who will ensure the individual's name, other identifiers, and records indicating street gang or criminal enterprise membership or affiliation are removed from the Criminal Enterprise Database.*

> *NOTE: Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database only. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws. Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information.*

*F. Upon request to access or appeal the status in the Criminal Enterprise Database, an individual who is not identified in the Criminal Enterprise Database or who has had his or her information removed following a successful appeal may request and obtain a letter from the Department indicating his or her current status in the Criminal Enterprise Database."*

**Recommendation 24:** Provide notification to already designated gang members, and enable these individuals to appeal their designations.

> **CPD Response #24:** CPD partially concurs with Recommendation #24. CPD will take several steps to inform the general public about how to access their individual gang designations. Information will also be made available at district stations and online. The proposed Criminal Enterprise Database policy also has a formal appeal process outlined; however, CPD does not intend to turn over the supporting documentation or investigative records that serve as the basis for a gang designation.

CPD incorporates its responses to Recommendations #20 and #23 above.

After careful deliberation, CPD determined that written notification to all persons designated as gang members is not safe or proper, and may actually create a greater risk of gang violence. Both for those designated as gang members in the past and under the new policy moving forward, CPD would have serious logistical issues accurately identifying a gang member or affiliate's correct address. As such, sending notification letters to individual addresses could serve to cause greater confusion and frustration between the community and the police, and actually initiate more violence if the notification letter is intercepted into the wrong hands.

Instead, as part of its overall police reform efforts, CPD is currently working through a notification process to communicate certain rights or other procedures to individuals who interact with the police. CPD intends to incorporate a notification of gang designations into this process, and inform subjects in person that they may have been identified as a gang member or affiliate during the course of an investigation or interaction. The notification would inform the subject that he or she may have been identified as a gang member or affiliate, subject of course to review and approval under the criteria. Further, it will set forth the process to appeal such a determination and seek removal from the Criminal Enterprise Database.

CPD has also committed to a process that will allow individuals to determine whether they are designated as a gang member or affiliate. If identified in the Criminal Enterprise Database, the person can then challenge that determination. CPD will make information about this process available through its website, at local district stations, and allow members of the general public to submit email inquiries to obtain more information. A fee is not required in order to access the person's gang status.

*From Section VIII(C)(1): "Any person may seek to access or appeal the status of his or her own street gang or criminal enterprise membership or affiliation in the Criminal Enterprise Database. A parent or legal guardian of a minor under the age of eighteen may make a request for access or appeal on behalf of his or her child.*

*To access the status of gang membership or affiliation in the Criminal Enterprise Database, a person must:*

> *a. make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1530 hours, excluding holidays;*
> *b. complete the Criminal Enterprise Database Access form (CPD-31.615) provided by the Department; and*

25 | P a g e

*c. submit valid government identification."*

*From Section IX(A)(5): "District commanders will: (5) make general information about the access and removal process associated with the Criminal Enterprise Database available to the general public at the district station."*

*From Section IX(D): "The Director, Information Services Division, will: (5) create an online website that provides general information about the Department's Criminal Enterprise Database policy and the process to access and remove a person's gang membership or affiliation status within the Criminal Enterprise Database, and (6) create and monitor the gangstatusinquiry@chicagopolice.org email address and establish a protocol to respond to emails from the general public with general information about how to access and remove a person's gang membership or affiliation status from the Criminal Enterprise Database."*

Additionally, within its proposed Criminal Enterprise Database directive, CPD has laid out a formal appeal process to remove gang determinations from the system. The appeal process is free of cost upon positively establishing the individual's identity with valid identification. CPD does not plan to turn over supporting documentation that may be part of an investigation to the individual submitting an appeal, as this would be inappropriate particularly where a criminal proceeding is or has taken place.

The relevant portion of the appeal process is set forth below:

*From Section VIII(C)(2): "To appeal the status of gang membership or affiliation in the Criminal Enterprise Database, a person must:*
> *a. make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1200 hours, excluding holidays;*
> *b. complete the Criminal Enterprise Database Appeal form (CPD-31.625) provided by the Department;*
>> *NOTE: The requestor may also submit any supporting documentation or references that he or she deems relevant for the Department's consideration.*
> *c. submit valid government identification; and*
>> *NOTE: A minor's parent or legal guardian making a request on behalf of a minor must provide legal documentation to verify that he or she is the parent or legal guardian.*
> *d. cooperate with a background investigation conducted by the Chicago Police Department.*
> *...*
*D. Upon receipt of the completed request from the Records Division, the Deployment Operations Section, the Gang Investigation Division and the District Intelligence Officer of the affected District will consult with the Office of Legal Affairs to determine if the criteria is met and the information will be deleted from the Criminal Enterprise Database.*

*E. If the criteria is met, the Commander, Deployment Operations Section, will inform the Director, Information Services Division, who will ensure the individual's name, other identifiers,*

26 | P a g e

*and records indicating street gang or criminal enterprise membership or affiliation are removed from the Criminal Enterprise Database.*

> *NOTE: Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database only. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws.  Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information.*

*F. Upon request to access or appeal the status in the Criminal Enterprise Database, an individual who is not identified in the Criminal Enterprise Database or who has had his or her information removed following a successful appeal may request and obtain a letter from the Department indicating his or her current status in the Criminal Enterprise Database."*

### C.  Police Legitimacy & Community Involvement (Recommendations 25-26)

CPD does not interpret these recommendations to apply its specific written policy on collecting and managing gang information.  Rather, recommendations 24-26 address outreach efforts and updates on the policy and additional data outputs.  As set forth above, CPD plans to open its proposed Criminal Enterprise Database directive for a public comment period due to substantial public interest in this topic.  CPD will take public comments and proposed edits into consideration before issuing its final policy.

**Recommendation 25: Participate in a committee of stakeholders formed by the City to address ongoing reforms.**

**CPD Response #25: CPD will open its proposed directive up for public comment.**

As discussed previously, CPD has participated in various policy discussions and internal reforms that are of substantial public interest over the past several years.  Consistent with these prior efforts, the Chicago Police Department does plan to submit its draft directive for public comment, and will include community feedback before final issuance of the Criminal Enterprise Database policy.  As part of its ongoing efforts to grow community partnerships and public trust, CPD will notify its stakeholder partners throughout the City about the public comment period to encourage meaningful participation and feedback.  Additionally, CPD plans to engage City Council members on the details of its draft policy to receive their input before final issuance as well.

**Recommendation 26:** Continue to build partnerships with community-based organizations to foster collaborative solutions to gang-related violence.

**CPD Response #26:** CPD concurs with Recommendation #26. Building community partnerships to problem solve and reduce violence is currently a benchmark of CPD's Office of Community Policing.

Again, this is an ongoing focus within CPD's community policing strategy. Over the past few years, and in coordination with a panel of national experts and community leaders, CPD created an Office of Community Policing under the purview of Superintendent Eddie Johnson. The cornerstone of the Office of Community Policing's mission has been to revitalize effective problem solving activities and reduce violent crime while building community trust. CPD wholeheartedly agrees with this recommendation and will continue to build its violence reduction efforts in partnership with community-based organizations.

**Recommendation 27:** Regularly report on CPD's data collection, storage, sharing, and use of gang data.

**CPD Response #27:** CPD partially concurs with Recommendation #27. CPD will publicly report aggregate data within the Criminal Enterprise Database, but has not yet decided what level of specificity is appropriate.

CPD is also currently in the process of enhancing its transparency, and has been regularly reporting relevant data points, enforcement efforts, and crime statistics. CPD is currently discussing internally on how to integrate progress updates and aggregate figures on the Criminal Enterprise Database. CPD will consider the appropriate avenues to make aggregate data available as the new policy is implemented, ongoing audits are conducted, and refined data becomes available in accordance with the new criteria and process. At this time, CPD makes no commitment as to the categories of aggregate data it will produce.

**D.   To the City of Chicago (Recommendations 28-30)**

CPD defers to the City of Chicago on decisions about its legislative agenda and community engagement efforts. In line with the theme of several recommendations in the OIG report, any legislative initiative should provide ample room for CPD to continue to modify, update, and improve its gang collection and management practices moving forward.

Sincerely,

Eddie T. Johnson
Superintendent of Police

28 | P a g e

# XVIII. APPENDIX K: DRAFT GENERAL ORDER G10-01-03

| Chicago Police Department | | General Order   G10-01-03 |
|---|---|---|
| **CRIMINAL ENTERPRISE DATABASE** | | |

| **ISSUE DATE:** | 08 April 2019 | **EFFECTIVE DATE:** | 08 April 2019 |
|---|---|---|---|
| **RESCINDS:** | | | |
| **INDEX CATEGORY:** | Gang and Narcotic Abatement | | |

**I.     PURPOSE**

This directive introduces:

   A.     the Criminal Enterprise Database.

   B.     a revised criminal enterprise and gang affiliation identification criteria.

   C.     procedures for entering persons into the Criminal Enterprise Database.

   D.     responsibilities for reviewing, auditing, and purging listings from the Criminal Enterprise Database.

   E.     the Criminal Enterprise Database Access form (CPD-31.615) and the Criminal Enterprise Database Appeal form (CPD-31.625).

**II.    ILLINOIS COMPLIED STATUTES (ILCS):**

Illinois Compiled Statutes, 740 ILCS 147 — Illinois Street Gang Terrorism Omnibus Prevention Act.

740 ILCS 147/5(b) — The General Assembly finds that urban, suburban, and rural communities, neighborhoods and schools throughout the State are being terrorized and plundered by streetgangs. The General Assembly finds that there are now several hundred streetgangs operating in Illinois, and that while their terrorism is most widespread in urban areas, streetgangs are spreading into suburban and rural areas of Illinois.

**III.   SCOPE**

The purpose of the Criminal Enterprise Database is to collect and manage criminal and gang intelligence information to prevent, detect, and investigate criminal activity.

**IV.    CRIMINAL ENTERPRISE DATABASE**

   A.     The Criminal Enterprise Database is a CLEAR application used for the entry of information based on an individual's membership in or affiliation with a criminal enterprise or street gang.

   B.     The Information Services Division will establish the Criminal Enterprise Database CLEAR application for use by authorized Department members. The Information Services Division will initially gather all existing Department gang-related information in conjunction with the appropriate Department personnel to apply the criteria delineated in Item VI of this directive to all existing Department gang-related information before entry in to the Criminal Enterprise Database.

   C.     Only Department members who have completed the new user and any required continuing education training will have access to the Criminal Enterprise Database.

   D.     Upon supervisory approval, all information entered into the Criminal Enterprise Database will be reviewed by the appropriate district intelligence officer and by the designated members of the Gang Investigation Division and the Deployment Operations Section. The Deployment Operations Section has final authority to review, remove, and manage information within the Criminal Enterprise Database, unless as otherwise delineated in Item IX-D of this directive.

**V.     DEFINITIONS**

G10-01-03   Criminal Enterprise Database
© Chicago Police Department, April 2019

A.　**Criminal Enterprise —** A group of individuals with an identified hierarchy or comparable structure engaged in a course or pattern of criminal activity.

B.　**Street Gang —** "Street gang" or "gang" or "organized gang" or "criminal street gang" means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of three or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147).

C.　**Street Gang Member —** "Street gang member" or "gang member" means any person who actually and in fact belongs to a gang and any person who knowingly acts in the capacity of an agent for or accessory to, or is legally accountable for, or voluntarily associates himself or herself with a course or pattern of gang-related criminal activity, whether in a preparatory, executory, or cover-up phase of any activity, or who knowingly performs, aids, or abets any such activity in accordance with the Illinois Street Gang Terrorism Omnibus Prevention Act (740 ILCS 147).

D.　**Hierarchy —** an organized chain of command or leadership structure, whether formal or informal, with leadership that can be interchangeable.

E.　**Membership —** knowingly belonging to a criminal enterprise or street gang by whatever means or methods such enterprise or street gang uses to indicate membership.

F.　**Affiliate —** knowingly establishing a close connection as an accessory or associate with a criminal enterprise or street gang, knowingly promoting the criminal activity of the criminal enterprise or street gang, or knowingly performing any act or knowingly failing to take action which furthers the criminal, economic, or recruitment objectives of the criminal enterprise or street gang.

G.　**Criminal Activity —** The commission, attempted commission, or solicitation, in association with or with intent to promote criminal conduct by criminal enterprise or street gang members, of two or more acts of the following offenses, at least one of which occurred within the last five years: murder; drug-induced homicide; kidnapping; forcible detention; aggravated assault—discharging firearm; aggravated battery; heinous battery; aggravated battery with a firearm; aggravated battery of a child; aggravated battery of a senior citizen; intimidation; compelling organization membership of persons; home invasion; aggravated criminal sexual assault; robbery; armed robbery; burglary; residential burglary; criminal fortification of a residence or building; arson; aggravated arson; possession of explosives or incendiary devices; unlawful use of weapons; unlawful use or possession of weapons by felons or persons in the custody of the Department of Corrections; aggravated discharge of a firearm; mob action—violence; bribery; armed violence; manufacture or delivery of cannabis; cannabis trafficking; calculated criminal cannabis conspiracy and related offenses; illegal manufacture or delivery of a controlled substance; controlled-substance trafficking; calculated criminal drug conspiracy and related offenses.

H.　**Qualifying Criminal Offense —** any offense that involves force or the threat of force against another individual, the use or possession of a firearm or other deadly weapon, any offense that requires registration as a sex offender, a violation of an order of protection or civil no contact order, stalking, a violation of the Controlled Substances Act or Cannabis Control Act, or any offense that involves gang membership, intimidation, solicitation, association, or recruitment as an element of the offense.

**VI.**　**CRIMINAL ENTERPRISE AND GANG AFFILIATION IDENTIFICATION CRITERIA**

A.　Criminal enterprises and street gangs will be identified on the basis of specific, documented, and reliable information, including but not limited to:

1.　analysis of crime pattern information;

2.　observations by Department members;

3.　witness interviews;

4.　interviews of admitted criminal enterprise or street gang members; and

5.　information received from informants who have proven to be reliable and whose information can be independently corroborated.

B.    Membership in or affiliation with a criminal enterprise or street gang must be substantiated by specific, documented, and reliable information received by the Department within the past five years, and in accordance with the following:

1.    The individual's own admission of membership or affiliation on lawfully captured electronic or video recorded communications, such as body-worn camera, in-car video system recordings, electronically recorded interview, electronic communications, or a consensual overhear device; or

2.    Two or more of the following:

a.    an unrecorded or non-intercepted statement provided voluntarily by the individual, or if a statement is made pursuant to a custodial interrogation, a statement provided by the individual following a knowing, intelligent, and voluntary waiver of his or her constitutional rights.

b.    the wearing of distinctive emblems, tattoos, or similar markings indicative of a specific criminal enterprise or street gang, but only when such emblems, tattoos, or similar markings would not reasonably be expected to be displayed by any individual except a member of that specific criminal enterprise or street gang.

NOTE:    Membership may not be established solely because an individual is wearing specific items of clothing which are available for sale to the general public.

c.    the use of signals or symbols indicative of a specific criminal enterprise or street gang but only when such signals or symbols would not reasonably be expected to be displayed by any individual except a member of that specific criminal enterprise or street gang.

d.    the identification of the individual as a member or affiliate of a specific criminal enterprise or street gang by an individual who has provided reliable information to the Department in the past and whose information can be independently corroborated.

e.    the identification of the individual as a member or affiliate of a specific criminal enterprise or street gang by another government agency or a federal, state, or local penal institution.

f.    a violation, arrest, charge, petition for delinquency, finding of delinquency, or conviction where gang membership or participation is either an element of the offense or documented in the complaint or court record as part of the criminal design.

NOTE:    Determinations regarding an individual's membership in or affiliation with a criminal enterprise or street gang will not be based solely on an individual's race, gender, religion, ethnicity, culture, socioeconomic status, or other protected classes consistent with G02-04 "**Prohibition Regarding Racial Profiling and Other Bias Based Policing**."

VII.    **PROCEDURES FOR ENTERING PERSONS INTO THE CRIMINAL ENTERPRISE DATABASE**

Following the positive identification of a person with membership in or affiliation with a criminal enterprise or street gang:

A.    Department members will:

1.    ensure information and all supporting documentation is entered into the CLEAR Criminal Enterprise Database accurately.

2.    locate and make notation of any visible scars, marks, or tattoos, if applicable.

3. ensure all evidentiary electronic media, including body-worn camera and in-car video system recordings, is properly attached or saved, if applicable.

4. notify a supervisor that the data entry is complete and available for review.

B. Upon receiving notification of data entry, the reviewing supervisor will:

1. ensure that the data entry is in compliance with Item VI and Item VII-A of this directive; and

2. approve data entry that is in compliance with Item VI and Item VII-A of this directive and forward the data entry to the appropriate district intelligence officer and designated members of the Gang Investigation Division for review.

**REMINDER:** All information entered into the Criminal Enterprise Database will be reviewed and managed by the Deployment Operations Section.

## VIII. CRITERIA FOR REMOVAL FROM THE CRIMINAL ENTERPRISE DATABASE

A. An individual is eligible for removal when he or she has not committed any act in furtherance of gang or criminal-enterprise-related activity or has not been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years. If an arrest, charge, petition for delinquency, finding of delinquency, or conviction was part of the determination that led to the person's entry into the Criminal Enterprise Database, this five-year period begins following the date of release or discharge from custody, probation, supervision, incarceration, or parole for that offense, whichever is later.

B. An individual can also have his or her information removed from the Criminal Enterprise Database if the information is not substantiated by specific, documented, and reliable information to establish membership or affiliation in a criminal enterprise or street gang in accordance with Item VI-B of this directive.

## IX. ACCESS AND REMOVAL OF CRIMINAL ENTERPRISE DATABASE INFORMATION

A. Any person may obtain general information about the access and removal process through a link provided on the Department's website or by sending a general inquiry email to gangstatusinquiry@chicagopolice.org.

B. An individual who is identified in the Criminal Enterprise Database may appeal and seek removal of his or her information to the designated units delineated in Item IX-D of this directive on the following grounds:

1. the information is not substantiated by specific, documented, and reliable information to establish membership or affiliation in a criminal enterprise or street gang in accordance with Item VI-B of this directive; or

2. the individual has not committed an act in furtherance of gang or criminal-enterprise-related activity or been arrested, charged, petitioned for delinquency, found delinquent, or convicted of a qualifying criminal offense within the past five years, and the information is eligible for removal consistent with Item VIII of this directive.

C. Any person may seek to access or appeal the status of his or her own street gang or criminal enterprise membership or affiliation in the Criminal Enterprise Database. A parent or legal guardian of a minor under the age of eighteen may make a request for access or appeal on behalf of his or her child.

1. To access the status of gang/criminal enterprise membership or affiliation in the Criminal Enterprise Database, a person must:

a. make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1530 hours, excluding holidays;

     b.    complete the Criminal Enterprise Database Access form (CPD-31.615) provided by the Department; and

     c.    submit valid government identification.

> **NOTE:**    A minor's parent or legal guardian making a request on behalf of a minor must provide legal documentation to verify that he or she is the parent or legal guardian.

2.    To appeal the status of gang/criminal enterprise membership or affiliation in the Criminal Enterprise Database, a person must:

     a.    make a request at the Access and Review Unit, Records Division, located at Public Safety Headquarters, 3510 South Michigan Avenue, 1st floor, Monday through Friday, 0800–1200 hours, excluding holidays;

     b.    complete the Criminal Enterprise Database Appeal form (CPD-31.625) provided by the Department;

> **NOTE:**    The requestor may also submit any supporting documentation or references that he or she deems relevant for the Department's consideration.

     c.    submit valid government identification; and

> **NOTE:**    A minor's parent or legal guardian making a request on behalf of a minor must provide legal documentation to verify that he or she is the parent or legal guardian.

     d.    cooperate with a background investigation conducted by the Chicago Police Department.

D.    Upon receipt of the completed request from the Records Division, the Deployment Operations Section, the Gang Investigation Division, and the district intelligence officer of the affected district will consult with the Office of Legal Affairs to determine if the criteria is met and the information will be deleted from the Criminal Enterprise Database.

> **NOTE:**    The Office of Legal Affairs will have the final authority to determine if the criteria has been met for removal and if the information will be deleted from the Criminal Enterprise Database.

E.    If the criteria is met, the Commander, Deployment Operations Section, will inform the Director, Information Services Division, who will ensure the individual's name, other identifiers, and records indicating street gang or criminal enterprise membership or affiliation are removed from the Criminal Enterprise Database.

> **NOTE:**    Individuals who meet the criteria for removal will have their information removed from the Criminal Enterprise Database **only**. Historical records will be maintained in source data systems, as appropriate, and subject to federal, state, and local laws. Department members and law enforcement personnel will rely solely upon the Criminal Enterprise Database to determine an individual's active gang affiliation, as retained historical records may contain outdated or unsubstantiated gang intelligence information.

F.    Upon request to access or appeal the status in the Criminal Enterprise Database, an individual who is not identified in the Criminal Enterprise Database or who has had his or her information removed following a successful appeal may request and obtain a letter from the Department indicating his or her current status in the Criminal Enterprise Database.

## X.　RESPONSIBILITIES

A.　District commanders will:

1.　ensure the district intelligence officer reviews:

a.　data entered into the Criminal Enterprise Database and that the determination of a person's gang/criminal enterprise membership or affiliation is substantiated by specific, documented, and reliable information consistent with Item VI-B of this directive; and

b.　requests to appeal the status of gang/criminal enterprise membership or affiliation in the Criminal Enterprise Database consistent with Item IX-D of this directive.

2.　annually, in coordination with the Gang Investigation Division and other designated Department personnel, perform a gang audit in accordance with G10-01-01 "**Gang Audits**," updating information for accuracy in the Criminal Enterprise Database.

3.　inform the Commander, Gang Investigation Division, if appropriate, before requesting to remove eligible individuals from the Criminal Enterprise Database.

4.　inform the Commander, Deployment Operations Section, to review requests to remove eligible individuals from the Criminal Enterprise Database.

5.　make general information about the access and removal process associated with the Criminal Enterprise Database available to the general public at the district station.

B.　The Gang Investigation Division will:

1.　in addition to entry and review of information in the Criminal Enterprise Database, when possible, assist Department members with the identification of individuals as members and affiliates of criminal enterprises or street gangs.

2.　review requests to appeal the status of gang/criminal enterprise membership or affiliation in the Criminal Enterprise Database consistent with Item IX-D of this directive.

3.　coordinate with district intelligence officers to perform an annual gang audit and review and confirm information for accuracy in the Criminal Enterprise Database.

4.　when appropriate, provide information to remove eligible individuals from the Criminal Enterprise Database.

C.　The Deployment Operations Section will:

1.　finalize and update the Criminal Enterprise Database:

a.　of all criminal street gangs and criminal enterprises identified during the district gang audit;

b.　upon successful appeal of gang/criminal enterprise membership or affiliation in the Criminal Enterprise Database; or

c.　upon request of the Commander, Gang Investigation Division, or a district commander.

2.　publish in the Daily Bulletin any newly identified street gangs or criminal enterprises or when a criminal street gang or criminal enterprise has been eliminated from "active" status.

3.　inform the Director, Information Services Division, when:

a.　it is appropriate to remove eligible individuals from the Criminal Enterprise Database; and

b.　when a criminal street gang or criminal enterprise has been eliminated from "active" status.

D.　　The Director, Information Services Division, will:

1.　maintain the Criminal Enterprise Database.

2.　perform a review and purge of listings in the Criminal Enterprise Database every five years.

3.　upon consultation with the Commander, Deployment Operations Section, remove information for individuals who have not committed a new qualifying criminal offense or have not had a documented incident in furtherance of gang or criminal-enterprise-related activity within the past five years.

4.　remove eligible information when requested by the Commander, Deployment Operations Section.

5.　create an online website that provides general information to the public about:

a.　the Department's Criminal Enterprise Database policy; and

b.　the process to access and remove a person's gang/criminal enterprise membership or affiliation status within the Criminal Enterprise Database.

6.　create and monitor the gangstatusinquiry@chicagopolice.org email address and establish a protocol to respond to emails from the general public with general information about how to access and remove a person's gang/criminal enterprise membership or affiliation status from the Criminal Enterprise Database.

## XI.　TRAINING

A.　The Information Services Division will create a user's guide outlining the procedures for utilizing the Criminal Enterprise Database.

B.　The Education and Training Division, in consultation with the Deployment Operations Section, the Gang Investigation Division, and the Bureau of Patrol, will establish an eLearning module on the use of the Criminal Enterprise Database.

1.　Members will receive this training on an annual basis.

2.　Members must complete the eLearning module before gaining authorization to enter, retrieve, or approve information in the Criminal Enterprise Database.

## XII.　AUTHORIZED USE

The Criminal Enterprise Database is available for use only by Department members with authorized access acting in furtherance of a legitimate law enforcement purpose. Information will not be disclosed to any third party for employment, education, licensing, or housing purposes.

REMINDER:　It is the policy of the Chicago Police Department that, pursuant to federal law, the enforcement of immigration law generally rests with the federal government and not with the state or local police. Department members will continue to follow the procedures outlined in S06-14-03 "**Responding to Incidents Involving Citizenship Status**," including compliance with the provisions of the City of Chicago's Welcoming City Ordinance.

## XIII.　RECORD RETENTION

Any record maintained in the Criminal Enterprise Database must comply with local, state, and federal law. The Commander, Youth Investigations Division, will ensure juvenile records that are part of the Criminal

Enterprise Database are retained and expunged in accordance with the Juvenile Court Act and any applicable local, state, or federal law.

Eddie T. Johnson
Superintendent of Police

18-013 RCL/DK/RWN



## MISSION

The City of Chicago Office of Inspector General (OIG) is an independent, nonpartisan oversight agency whose mission is to promote economy, efficiency, effectiveness, and integrity in the administration of programs and operations of City government. OIG achieves this mission through,

- administrative and criminal investigations by its Investigations Section;
- performance audits of City programs and operations by its Audit and Program Review Section;
- inspections, evaluations and reviews of City police and police accountability programs, operations, and policies by its Public Safety Section; and
- compliance audit and monitoring of City hiring and employment activities by its Hiring Oversight Unit.

From these activities, OIG issues reports of findings and disciplinary and other recommendations to assure that City officials, employees, and vendors are held accountable for violations of laws and policies; to improve the efficiency, cost-effectiveness government operations and further to prevent, detect, identify, expose and eliminate waste, inefficiency, misconduct, fraud, corruption, and abuse of public authority and resources.

## AUTHORITY

OIG's authority to produce reports of its findings and recommendations is established in the City of Chicago Municipal Code §§ 2-56-030(d), -035(c), -110, -230, and 240.

PUBLIC INQUIRIES:
NATALIE A. KURIATA: (773) 478-0534
NKURIATA@IGCHICAGO.ORG

TO SUGGEST WAYS TO IMPROVE CITY GOVERNMENT,
VISIT OUR WEBSITE:
IGCHICAGO.ORG/CONTACT-US/HELP-IMPROVE-CITY-GOVERNMENT

TO REPORT FRAUD, WASTE, AND ABUSE IN CITY PROGRAMS:
CALL OIG'S TOLL-FREE HOTLINE
(866) 448-4754 / TTY: (773) 478-2066

OR VISIT OUR WEBSITE:
IGCHICAGO.ORG/CONTACT-US/REPORT-FRAUD-WASTE-ABUSE/