UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Darren Cole, | |
| Plaintiff, | |
| | Case No. 21-cv-1640 |
| v. | |
| The City of Chicago, | Judge Mary M. Rowland |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darren Cole is the victim of mistaken identity: He has a similar name and driver's license number as a Darren H. Cole, who has an outstanding warrant for his arrest. As a result, Plaintiff has been stopped and unconstitutionally detained by the Chicago Police Department over sixty times since 2006. Plaintiff brings a one-count complaint under 42 U.S.C. § 1983 against Defendant City of Chicago to redress the alleged violations of his Fourth Amendment right to be free from unreasonable seizures. Defendant has moved to dismiss. [15]. For the reasons explained below, this Court grants in part and denies in part Defendant's motion to dismiss.

I. Background

A. The Stops and Detentions

Plaintiff Darren Cole is a fifty-year-old resident of Chicago. *Id.* ¶ 4. Since 2006, Chicago Police Department officers have detained Plaintiff approximately sixty times based upon a warrant for another individual who happens to have a similar name and driver's license number—one Darren H. Cole. *Id.* ¶ 6. On approximately ten of

1

these occasions, police have additionally transported Plaintiff to Chicago police stations, typically on the west side of Chicago and most often the 11th District station. *Id.* ¶ 7.

CPD officers detained Plaintiff for the first time in or about the spring of 2006 while he was driving in the City. *Id.* ¶ 8. The officers pulled him over and told him there was a warrant out for his arrest. *Id.* The officers held Plaintiff for four hours before releasing him. *Id.* The morning after, Plaintiff traveled to the 11th District police station and explained to the two CPD officers sitting behind the front desk that he was detained on a warrant for someone else and wanted to know how to prevent this from occurring again. *Id.* ¶ 9. The officers advised him to travel at all times with his driver's license, car insurance, and social security card to prove his identity. *Id.* The officers, however, also said that there was nothing they could do. *Id.*

In or about September 2006, CPD officers pulled over Plaintiff, handcuffed him, and told him there was a warrant out for his arrest. *Id.* ¶ 10. They questioned him for approximately one hour before releasing him. *Id.*

About two months later, CPD officers again pulled over Plaintiff. *Id.* ¶ 11. A white male officer approached Plaintiff's vehicle with his gun drawn and pointed at Plaintiff. *Id.* The officer ordered Plaintiff out of his vehicle, handcuffed him, guided him to the rear of the vehicle, and forced him to lay his face down on the trunk. *Id.* The officer pointed his gun at Plaintiff, ordering him to walk towards the police vehicle. *Id.* He told Plaintiff that "if you fucking move, I'll shoot you" and demanded that Plaintiff lay on the ground. *Id.* Eventually the officers who detained Plaintiff

2

the previous September arrived and told the others that Plaintiff was not the subject of the warrant. *Id.* The officers then released Plaintiff, but not before he had already been detained for hours. *Id.*

During the next ten years, CPD officers repeatedly stopped and detained Plaintiff based upon the false belief that there was a warrant out for his arrest. During these detentions the officers often handcuffed him and held him for hours before releasing him. *Id.* ¶ 12.

On a summer evening in or about 2016 or 2017, an officer who pulled him over said that he had turned without using his turn signal. *Id.* ¶ 13. When backup officers arrived, they notified Plaintiff there was a warrant out for his arrest. *Id.* When Plaintiff attempted to explain that he was not the subject of the warrant, an officer punched him in the mouth. *Id.* CPD officers released Plaintiff after detaining him for several hours. *Id.*

In or about 2017, CPD officers pulled over Plaintiff while he was transporting a friend, who had been injured in a motorcycle accident, to the hospital. *Id.* ¶ 14. Two officers approached Plaintiff and informed him there was a warrant out for his arrest. *Id.* After Plaintiff explained that he was not the subject of the warrant, one officer suggested they let him go while the other insisted they detain Plaintiff and called for backup. *Id.* When backup officers arrived, one officer threatened to tase Plaintiff. *Id.* Officers then handcuffed Plaintiff and brought him to the 11th District police station and detained him for several hours. *Id.* Plaintiff's injured friend drove Plaintiff's car away from the scene. *Id.*

In the summer of 2018, CPD officers stopped Plaintiff, ordered him out of his vehicle, and handcuffed him. *Id.* ¶ 15. One officer slammed Plaintiff's face on the hood of his vehicle, yelling at him. *Id.* The officers detained Plaintiff on the street for about three hours and thoroughly searched his vehicle before releasing him. *Id.*

On or about April 1, 2019, CPD officers stopped Plaintiff and approached his vehicle with guns drawn. *Id.* ¶ 16. Plaintiff provided the officers with documentation he accumulated over the years—letters from a CPD Sergeant Osborne and Marion County Sheriff DeVore showing that he was not the subject of the warrant on which he had been repeatedly pulled over. *Id.* ¶ 16. Police eventually released him, saying, "hey, you need to do something about your license plates. I'm sorry." *Id.*

After this stop, Plaintiff took remedial steps, as suggested. *Id.* ¶ 17. Around April 3, 2019, he traveled to a DMV and spoke to a supervisor. *Id.* While there, Plaintiff called Chicago police, and the responding officer was one of the same officers who had pulled him over days earlier. *Id.* The officer and Plaintiff spoke with the DMV supervisors and contacted a DMV office in Springfield. *Id.* The officer said "somebody's got to do something about that license plate," and DMV personnel told the group "that's not him" and "y'all shouldn't be locking him up." *Id.* Eventually, the group recommended that Plaintiff travel to the Illinois State Police (ISP) office in Villa Park. *Id.*

Later that same day, Plaintiff traveled to the ISP office in Villa Park. *Id.* ¶ 18. Before going inside, Plaintiff called Villa Park for police assistance to prevent any confusion about his identity that could lead to another detention. *Id.* A Villa Park

4

police officer arrived and, upon request, ran Plaintiff's license plate. *Id.* Plaintiff and the officer then pulled into the ISP parking lot, where an ISP supervisor came and informed Plaintiff that any problem with the mistaken warrant rested with the City of Chicago. *Id.* The officers recommended that Plaintiff retain a lawyer. *Id.*

In approximately November 2019, CPD officers again stopped and wrongfully detained Plaintiff on the west side of Chicago. *Id.* ¶ 19. Plaintiff again provided documentation to show his innocence, but officers detained him, handcuffing him so tightly that his hands went numb and his shoulders felt as if they were being pulled from their sockets. *Id.* ¶ 20. Plaintiff alleges, on information and belief, that the officers called for backup despite Plaintiff's documentation, because three additional squad cars arrived. *Id.* ¶ 21.

On December 7, 2020, Chicago police officer Wrightfeld detained Plaintiff for a malfunctioning brake light. *Id.* ¶ 22. During the stop, Plaintiff called one of his lawyers who spoke with Wrightfeld regarding the warrant, after which Wrightfeld released Plaintiff. *Id.*

### B. Plaintiff's Remedial Steps

Plaintiff has taken various remedial actions over the years to protect himself from being mistaken as Darren H. Cole. *Id.* ¶ 25.

In or about 2008, Plaintiff went to CPD's headquarters and asked to be fingerprinted to prove that he was not Darren H. Cole. *Id.* ¶ 26. The officers there took no action; they merely informed him to carry his identification and social security card at all times. *Id.* The officers also recommended that he speak with

5

representatives from the Cook County Sheriff's department. *Id.* Plaintiff did so, and the Cook County Sheriff's department called the Marion County Sheriff's department. *Id.* The Marion County Sheriff's department indicated that Plaintiff should not be arrested and that CPD had the responsibility to correct this situation. *Id.* But on Plaintiff's next shift at work, Cook County Sheriffs appeared at his job with a warrant for his arrest. *Id.* Plaintiff was then transported from his workplace to the 16th District police station, where he was detained for six hours before being released. *Id.*

In 2014, Plaintiff engaged a law firm to help him obtain a letter from the then-Marion County Sheriff, Jerry DeVore, indicating that Plaintiff was not the Darren H. Cole with the outstanding warrant. *Id.* ¶ 27. Plaintiff carries this letter with him at all times and has produced it to CPD officers on multiple occasions in an attempt to avoid lengthy detentions. *Id.* ¶ 27. For the most part, however, officers have ignored this letter. *Id.*

Plaintiff also visited the 11th District police station in 2018 to rectify the situation. *Id.* ¶ 28. There, Plaintiff obtained a handwritten note from Sergeant Osborne indicating that the outstanding warrant was not for Plaintiff; Sergeant Osborne also provided his personal contact information for CPD officers to use in the event of a stop. *Id.* But like the letter from Sheriff DeVore, CPD officers generally have ignored this note from Sergeant Osborne. *Id.*

### C. The CPD's Alleged Pattern and Practice

According to Plaintiff, CPD officers and supervisors know that Plaintiff has been repeatedly harassed with unconstitutional detentions. *Id.* ¶ 32. Multiple CPD officers and supervisors from stations on the west side of the City have recognized Plaintiff during these incidents and have on several occasions told other officers that "he's not the guy" or "the warrant's not for him." *Id.*

Plaintiff alleges, upon information and belief, that after each detention, CPD officers generated documents including contact cards, arrest reports, and activity reports describing Plaintiff's mistaken identity. *Id.* ¶ 33. Supervisors reviewed these documents but took no action to prevent future detentions. *Id.*

In addition, a high-ranking CPD officer was made aware that Plaintiff was mistakenly detained. *Id.* ¶ 34. This high-ranking officer provided Plaintiff with a handwritten note, and advised Plaintiff to present the note to CPD officers when stopped. *Id.* Plaintiff produced this note for CPD officers during subsequent incidents, but the note has not protected him from being detained. *Id.*

CPD uses an information database called CLEAR that allows officers to complete and search for reports for investigatory stops. *Id.* ¶ 36. Plaintiff claims that CPD has failed to use its data collection and management systems, including CLEAR, in a manner to ensure accurate records. *Id.* ¶ 37. CPD, asserts Plaintiff, has known that its systems have been deficient for some time based upon investigations done by the Department of Justice, the Police Accountability Task Force, and the Office of the Inspector General. *Id.*

As a result of these alleged incidents, Plaintiff brings one claim against the City pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 668, 680 (1978) for maintaining policies, customs, or practices that have violated his Fourth Amendment right to be free from unreasonable seizures. [1] ¶¶ 42–49. He filed suit on March 25, 2021. *See generally* [1]. Defendant, for its part, has moved to dismiss Plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6), arguing that most of the alleged detentions upon which he bases his claim are time-barred and that Plaintiff insufficiently alleges a *Monell* claim. [15].

## II.     Legal Standard

A motion to dismiss tests the sufficiency of a counterclaim, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), the counterclaim "must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts the well-pleaded factual allegations as true and draws all permissible inferences in the pleading party's favor. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl.*

8

*Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586–87 (7th Cir. 2021) (quoting *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016)).

### III. Analysis

#### A. The Statute of Limitations

Defendant argues that many of Plaintiff's alleges seizures occurred outside of the applicable two-year statute of limitations and thus cannot provide a basis for Plaintiff to recover. [15] at 4–5.

As Defendant correctly recognizes, a two-year statute of limitations applies to § 1983 claims, including those based on *Monell* liability, in Illinois. *Herrera v. Cleveland*, 8 F.4th 493, 494 (7th Cir. 2021); *Bowers v. Dart*, 1 F.4th 513, 518 (7th Cir. 2021). A § 1983 claim generally accrues when the plaintiff knows or should have known that his constitutional rights have been violated. *Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31; AFL-CIO*, 942 F.3d 352, 361 (7th Cir. 2019), *cert. denied sub nom. Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 141 S. Ct. 1282 (2021). In the Fourth Amendment context, a claim based upon an unconstitutional detention accrues when the detention ends. *Mitchell v. City of Elgin*,

912 F.3d 1012, 1013 (7th Cir. 2019); *Olrich v. Kenosha County*, 825 F. App'x 397, 399 (7th Cir. 2020).

Here, Plaintiff bases his § 1983 claim upon unconstitutional seizures that occurred both before and after March 25, 2019, two years before he filed suit in this Court. *See* [1] ¶¶ 6, 22. Thus, at first glance his claim appears to be based, at least in part, on time-barred incidents.

Resisting this result, Plaintiff counters that he has suffered continuing violations of his Fourth Amendment rights, bringing each alleged incident within the statute of limitations. [20] at 3–5. The "continuing violation doctrine" posits that when a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the wrong ceases. *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009). The doctrine does not apply, however, where a complaint alleges "discrete and independently actionable violations." *Kovacs v. United States*, 614 F.3d 666, 675 (7th Cir. 2010). And particularly relevant here, courts have rejected the notion that an arrest could set into motion events creating an ongoing violation that alters the date of accrual for a Fourth Amendment claim. *Marshall v. Buckley*, 644 F. Supp. 2d 1075, 1082 (N.D. Ill. 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 397 (2007)); *see Olrich*, 825 F. App'x at 399 (holding that the continuing violation doctrine could not apply to the plaintiff's claims based upon multiple unlawful arrests because each "constitutional violation . . . constitutes its own singular, discrete event"; and because the plaintiff was present for each of his arrests, nothing "prevented him from appreciating any alleged violations that

10

occurred"); *see also Blocker v. City of Chicago*, No. 17 CV 00055, 2017 WL 3278323, at *3 (N.D. Ill. Aug. 2, 2017) (noting that an arrest constitutes a discrete act); *see also, e.g.*, *Woody v. City of Granite City*, No. 17-CV-534-SMY-RJD, 2019 WL 1326884, at *5 (S.D. Ill. Mar. 25, 2019) (holding that the plaintiffs have failed to invoke the continuing violation doctrine to a series of warrantless searches of their property because they have "alleged isolated instances" and "could have filed suit after each alleged illegal search"), *dismissed sub nom. Woody v. Granite City*, No. 19-1784, 2019 WL 10893358 (7th Cir. Dec. 9, 2019).

Based upon the complaint's allegations and the existing jurisprudence, the continuing violation doctrine cannot apply here. Each detention Plaintiff alleges in his complaint constitutes a separate and discrete incident: Plaintiff knew each time that the officers wrongly detained him, as he was not the subject of the arrest warrant precipitating the detentions. Therefore, each detention was independently actionable and cannot form the basis of a continuing violation. *Marshall v. Buckley*, 644 F. Supp. 2d at 1082. Although Plaintiff insists that the continuing violation doctrine applies to save the earlier detentions because he "continues to suffer harm" from the repeated violations, [20] at 4, the continuing violation doctrine applies only to "a continuing *wrong*, not of continuing *harm*; once the wrong ends, the claim accrues even if that wrong has caused a lingering injury." *Manuel v. City of Joliet*, 903 F.3d 667, 669 (7th Cir. 2018).

In short, the continuing violation doctrine fails to save Plaintiff's claim to the extent based upon injuries suffered from unconstitutional detentions pre-dating

11

March 25, 2019. *See Walden v. City of Chicago*, 755 F. Supp. 2d 942, 968 (N.D. Ill. 2010) ("As discussed above, because a *Monell* claim is predicated on an underlying constitutional injury, only Walden's claims that have not been dismissed can form the basis of his *Monell* claim.") (internal citation omitted); *see also Blocker*, 2017 WL 3278323, at *5 (dismissing a *Monell* claim as time-barred because the claim "is tied to the underlying allegations" that officers violated the plaintiff's constitutional rights more than two years before the plaintiff's filed suit). Practically speaking, this means that only the alleged policies and practices that relate to Plaintiff's timely constitutional injuries can form the basis of Plaintiff's *Monell* claim. *Walden*, 755 F. Supp. 2d at 968.

### B. *Monell* Allegations

Defendant next argues that, for a variety of reasons, Plaintiff has failed plead his *Monell* claim. A *Monell* claim requires Plaintiff to plead: (1) he has suffered the deprivation of a constitutional right; and (2) an official custom or policy of defendant caused that deprivation. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

First, Defendant contends that Plaintiff has failed to allege a cognizable constitutional deprivation because, during each alleged seizure, the officers possessed probable cause which constitutes an absolute bar to Fourth Amendment claims. [15] at 5–8. This argument fails to persuade at the pleadings stage. Resolving probable cause requires a court to examine "whether an objectively reasonable officer in the arresting officer's position would conclude, based on the facts and circumstances

12

within the officer's knowledge, that the suspect has committed, is committing, or is about to commit an offense." *Neita v. City of Chicago*, No. 19 C 595, 2019 WL 5682838, at *3 (N.D. Ill. Nov. 1, 2019). This Court lacks a fulsome record from which to make a probable cause determination. And in any case, Plaintiff's allegations, which this Court takes as true, establishes for pleading purposes that the Defendant's officers lacked probable cause to detain him. For instance, the complaint alleges that CPD officers stopped Plaintiff in April 2019 and informed him that his license plate "was flagged as belonging to a person with an outstanding warrant"; the officers, moreover, continued to hold Plaintiff at gunpoint even after he showed them documentation proving he was not the correct person. Dkt. 1 at ¶ 16. These facts plausibly establish that the CPD officers did not reasonably believe that Plaintiff had committed or was committing a crime. *See United States v. Hammond*, 996 F.3d 374, 391 (7th Cir. 2021) (probable cause exists "when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense.") (quoting *United States v. Haldorson*, 941 F.3d 284, 290–91 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 1235 (2020)).

Defendant also suggests that Plaintiff's *Monell* claim should be dismissed because he has failed to allege incidents concerning other individuals. [15] at 10. True, to prevail on a *Monell* claim, Plaintiff "must demonstrate that there is a policy at issue rather than a random event." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). For this reason, while it is "not impossible for a plaintiff to

13

demonstrate a widespread practice or custom with evidence limited to personal experience, it is necessarily more difficult." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (internal quotation marks and citation omitted), *cert. denied*, 141 S. Ct. 1527 (2021). Notwithstanding, at the pleadings stage, Plaintiff is "not required to identify every other or even one other individual" that suffered an injury caused by Defendant's unconstitutional policies or practices. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016); *see also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021) (noting that there "are many" examples where plaintiffs have adequately pleaded *Monell* claims alleging only their individual experiences). Indeed, courts generally allow *Monell* claims based upon "conclusory allegations that a policy or practice existed" to proceed, "so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Dadej v. Cook Cty. Sheriff*, No. 19 C 1972, 2021 WL 3419483, at *2 (N.D. Ill. Aug. 5, 2021) (quoting *Rodriguez v. Mohammad*, 2020 WL 5800816, at *3 (N.D. Ill. Sept. 29, 2020)). Plaintiff has more than adequately put Defendant on notice of its alleged *Monell* violation by alleging that the CPD has maintained widespread practices of: (1) failing to maintain an adequate data management system; (2) failing to take necessary steps to ensure the correct identity of a suspect before subjecting him or her to prolonged detention; and (3) failing to effectively use CLEAR to protect against unconstitutional detention due to mistaken identity. [1] ¶ 45.

Defendant also argues that although Plaintiff's complaint contains numerous references to the allegedly deficient CLEAR system, the real "catalyst" to Plaintiff's

detentions was not the CLEAR system but an "intrastate warrant record keeping system" maintained by the Illinois State Police. [27] at 7–8. This argument is not successful at this procedural posture, however, because this Court must presume that Plaintiff's allegations that Defendant's deficient use of the CLEAR system caused his constitutional injuries. *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). To the extent Defendant wishes to introduce extrinsic evidence proving that a system employed by the Illinois State Police was the actual cause of Plaintiff's alleged injuries, it remains free to do so later during the proceedings.

For the reasons above, this Court declines to dismiss Plaintiff's claim based upon Defendants' arguments regarding pleading sufficiency.

## IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part Defendant's motion to dismiss [15]. Plaintiff has also moved for leave to amend his complaint [31], which this Court held in abeyance pending the resolution of the motion to dismiss, *see* [33]. Plaintiff wishes to make minor stylistic changes and add allegations regarding new OIG reports that he claims serve as "further proof" that CPD maintains an inadequate records management system. [31] at 2. Federal Rule of Civil Procedure 15(a)(2) requires courts to give leave to amend freely. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). The proposed new allegations merely support the existing *Monell* claim; Plaintiff does not seek to add additional claims or parties. Accordingly, this Court sees no prejudice that would result to Defendant if amendment were allowed. Thus,

this Court grants Plaintiff to leave file an amended complaint. Plaintiff is directed to file his amended complaint as a separate docket entry by January 7, 2022. Defendant shall answer the amended complaint by January 28, 2022.

Dated: January 3, 2022

E N T E R:

MARY M. ROWLAND
United States District Judge